## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICA'S HEALTH CHOICE MEDICAL  )
PLANS, INC.                       )
1175 South US Highway 1           )
Vero Beach, FL 32962              )
                                  )
    Plaintiff,              )
                                  )
        v.                )
                                  )
UNITED STATES DEPARTMENT OF HEALTH )    Civil Action No. _____
AND HUMAN SERVICES, CENTERS FOR   )
MEDICARE & MEDICAID SERVICES      )
Office of Attorney Advisor        )
7500 Security Blvd.               )
Mail Stop C3-01-20                )
Baltimore, Maryland 21244-1850    )
                                  )
    Defendant.              )
                                  )

## VERIFIED COMPLAINT

Plaintiff America's Health Choice Medical Plans, Inc. ("AHC" or "Plaintiff"), by

counsel, for its Verified Complaint against Defendant United States Department of Health and

Human Services, Centers for Medicare and Medicaid Services ("CMS" or "Defendant"), alleges

as follows:

## NATURE OF THE CASE

1.    This action seeks review pursuant to the Administrative Procedure Act, 5 U.S.C. §

701 et seq., of the final administrative decision of Defendant to terminate its contract with AHC

under the Medicare Advantage program.  (A copy of the decision is annexed hereto as Exhibit

A.)  Because the effects of this termination decision immediately and irreparably harm AHC and

promise to put it out of business, AHC seeks a temporary restraining order and a preliminary injunction pending this Court's review on the merits of the termination decision.

## PARTIES, JURISDICTION AND VENUE

2.     America's Health Choice Medical Plans, Inc. is a corporation organized under the laws of the State of Florida. AHC has its principal place of business in Vero Beach, Florida.

3.     The Department of Health and Human Services, Centers for Medicare and Medicaid Services is an agency or instrumentality of the United States. Defendant has its headquarters in Washington, D.C. and resides for venue purposes in Washington, D.C.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action seeks review of a final agency decision under the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## FACTS

### AHC Is A Leading Medicare Advantage Plan

6.     AHC is an Hispanic-owned Medicare Advantage ("MA") organization under contract with CMS. AHC's network of 51 primary care physicians covers 13,000 beneficiaries in the counties along the east coast of southern Florida extending from a portion of Brevard County in the north to Broward County in the south.

7.     For the relevant time period, in several counties, AHC was the only approved MA plan and continues to be one of only two approved MA plans in Indian River. For example, AHC provided 92% of all MA services in Martin County, 92.8% in Okeechobee County, and 87% in St. Lucie County. Although other companies have now been approved to provide services in those areas, at least some of those companies lack a network of providers in the areas

they have been approved to cover. In spite of the fact that the newly approved companies have been vigorously marketing to AHC's members, and in spite of the fact that AHC has been prohibited from marketing at all since August 2005, the vast majority of AHC's members have chosen to remain with AHC.

8.     AHC's members attest to the quality of its services. In a recent survey, over half of AHC's beneficiaries responding rated their health care over the prior six months at the highest rating of 5 on a scale of 1-5, and over 95% rated it as a 3 or better. In the same survey, 85% reported being satisfied or very satisfied with AHC as their health care plan.

### Defendant's Flawed Termination Process

9.     On July 6, 2005, CMS issued its Notice of Intent to Impose Intermediate Sanctions and Terminate Medicare Advantage Contract. AHC submitted a timely request for reconsideration. On August 3, 2005, AHC submitted a CAP addressing each of the alleged deficiencies noted by the CMS staff. CMS rejected AHC's corrective action plan out of hand on September 2, 2005, in a terse notice providing no response to any of the elements in AHC's CAP. CMS provided more detailed comments to AHC's CAP on September 13, 2005. But only two weeks later, before AHC could even provide a response, the reconsideration official issued a Reconsideration Decision purporting to modify the original determination by purporting to impose *immediate* termination of AHC's MA contract under § 422.510(a)(5) as a result of supposed "imminent and serious risk to the health of [AHC's] enrollees."

10.     Despite its expressed, supposed rationale for immediate termination, the decision nevertheless characterized the process as one for ordinary, non-immediate termination. After AHC pointed out that CMS had failed to follow its own procedures for immediate termination, CMS reopened its decision by letter dated October 4, 2005, and indicated its intent to terminate

effective immediately, but not until November 1, 2005, still pursuant to § 422.510(a)(5) due to alleged serious concerns of patient health. Two weeks later, apparently recognizing that its stated concerns about "serious concerns of patient health" were ill-founded and obviously inconsistent with a deferral of immediate termination, CMS again amended the reconsideration notice on October 18, this time to impose only ordinary termination without relying on § 422.510(a)(5) or considerations of "serious concerns of patient health."

      11.    AHC requested a hearing pursuant to 42 C.F.R. § 422.662. Based on CMS's articulated intent to terminate AHC's MA contract in its October letters to AHC, and its issuance of the reconsideration decision upholding that termination only three weeks after it provided its comments on AHC's CAP, prior to the November hearing, AHC had no reason to believe it would be granted any relief from CMS through the CAP process. The hearing officer conducted the hearing on November 14-15, 2005. At the hearing, a CMS official, Christine Perenich, testified as a witness for CMS and explained that, although CMS never informed AHC that it was willing to consider further CAP submissions, the CAP process was on a "separate track" from the termination process, and that AHC could still submit a CAP. She further testified that it often takes three, four, or five iterations before CMS will accept a corrective action plan, in spite of the fact that the reconsideration official in this case purported to order immediate termination of AHC's contract after only one iteration of the CAP. Although she commented frequently at the hearing regarding CMS's communications insofar as they were inconsistent with the requirement that AHC be provided a reasonable opportunity to develop an approved CAP, the hearing officer issued her decision on November 22, 2005, upholding the contract termination decision, and curiously overlooking, in effect, the entire issue of the inconsistency of CMS's past communications to AHC that had been a focus of the hearing.

12.    On November 18, 2005, just after the hearing, and after numerous CMS officials and its counsel heard extensive evidence regarding AHC's then-current compliance with the relevant regulations, CMS entered into a new MA contract with AHC for 2006-2007. (A copy of this contract is annexed hereto as Exhibit B.)

13.    The 2006-2007 contract was a new contract, different from the one that was subject to termination by the correspondence that initiated this proceeding. Under the terms of that new 2006-2007 contract (and the relevant regulations, *e.g.,* 42 CFR § 422.506(b)), if CMS intended not to renew that 2006-2007 contract, CMS would have had to notify AHC by June 2006 of its intent not to renew, and allow for an appeal from that determination, and would have had to notify AHC's enrollees by October 2, 2006, ninety days before the end of the relevant contract calendar year.   CMS gave no such notices.  AHC pointed out in early 2006 that, with the new contract then in place, CMS' pursuit of the termination action regarding the previous contract is moot.  No doubt CMS continues to pursue that termination case because it knows that, if it initiates another termination action, which would have to be predicated on current compliance (as this one should be), CMS could not establish that AHC was not in substantial compliance at present.

### Defendant's November 30, 2006 Decision Is Arbitrary And Capricious

14.    On November 30, 2006, Defendant, by its Acting Deputy Administrator, issued its final agency decision to terminate its contract with AHC.  Defendant based its decision on findings that AHC failed to carry out the terms of its contract.  The decision and findings are arbitrary, capricious, an abuse of discretion, unsupported by any evidence in the administrative record, and contradicted by the substantial evidence introduced by AHC.

15.    In particular, CMS's allegations concerning AHC's performance consist of nothing more than vague generalizations, guesswork, miscalculations, skewed data, and outdated facts.    CMS acknowledges in many places that its conclusions are based not upon actual evidence, but merely upon the inspector's claim that there was insufficient information on which to evaluate compliance.    AHC disputes that claim, however, and has presented evidence affirmatively showing that it is in substantial compliance with the applicable regulations.

### A.    Defendant Has Not Initiated Termination of 2006-2007 Contract and Ignores Corrective Action Plan and

16.    AHC acknowledged that as of the May 2005 on-site audit, it had compliance issues.  In response to those findings, however, AHC did what, presumably, the regulations are designed to motivate the regulated community to do:  it completely revamped its compliance function and other corporate processes, and made dramatic strides, which CMS has acknowledged, in every aspect of its performance.    As a result, within literally days of the November 14-15, 2005 hearing on AHC's appeal of CMS's decision to terminate its then-existing contract, apparently in response to the extensive evidence AHC presented at the hearing regarding its greatly enhanced corporate compliance function and other technological improvements directly enhancing the prompt pay and other issues, CMS entered into a new contract for 2006-2007 with AHC on November 18, 2006.

17.    This new contract is not merely a pro-forma or perfunctory renewal of the 2005 contract.  It expressly states in Article I, on page 1, that:

> This contract governs the respective rights and obligations of the parties as of the effective date set forth above [November 18, 2005], and supersedes any prior agreements between the MA Organization and CMS as of such date.  (Ex. B, emphasis added.)

18.    It is a 21-page contract (not including attachments) with a new term, renewable for successive one-year terms.  Renewal is in accordance with 42 CFR §§ 422.505 and 422.506.

By its terms, and consistent with those regulations, the contract requires that CMS notify the Plan by May 1 (or September 1, under limited circumstances) of any intent not to renew for an additional one-year term.    Such non-renewal is of course subject to the other substantive limitations on non-renewal, which must be for cause.    See Contract (Exhibit A) at Article VII. Were CMS to invoke any of these non-renewal provisions, or to terminate the contract (specific termination rights outlined in Article VIII and consistent with 42 CFR §§ 422.508-510), AHC's current compliance status would be at issue, not its prior compliance problems.

19.    But CMS has never even initiated termination of the new contract.    Rather, once it obtained the Hearing Officer's decision upholding the termination of the previous contract (which presumably came as a surprise to CMS), CMS has completely ignored the existence of the new contract, and acted as though the termination of the previous superseded contract also had some effect on the new contract.    No doubt it takes this position knowing that to terminate the new contract it would have to establish AHC's substantial non-compliance with the relevant regulations, which it could not now do based on current compliance.    CMS's insistence on terminating a relationship with a 13,000 member MA Plan, serving a largely minority population, despite its current substantial compliance with regulations, calls into question the motivations of the regulators.    AHC has not asked CMS to waive or bend rules for AHC; it merely asks that it be assessed fairly based on its current compliance, and subject to the same standards to which other plans are subject.    Instead, CMS took the position that its role was merely to determine whether the evidence at the time of the May 2005 inspection supported CMS's decision to terminate a later contract with different terms.

20.    That standard is not consistent with the regulatory requirements.    Since CMS withdrew its purported termination under § 422.510(a)(5), AHC has a regulatory right under §

422.510(c)(1) to be afforded "a reasonable opportunity to develop and receive CMS approval of a corrective action plan to correct the deficiencies that are the basis of the proposed termination."

21.    In similar cases, the DAB has held that the administrative law judge, whose role is comparable to that of a hearing officer (*see* 42 C.F.R. § 422.666 (hearing officer may, but need not be, an administrative law judge)), must "resolve[] these issues *de novo* in the sense that the determination is based on the evidence as it is developed before the [hearing officer] and not on how CMS evaluated the evidence as it stood at whatever point CMS made its assessment." *Emerald Oaks*, DAB 1800 (2001). That is to say, AHC can prevail by showing, on the record as a whole, either that it has not been afforded a reasonable opportunity to correct deficiencies or that it *currently* "is in substantial compliance with the relevant statutory and regulatory provisions." *Hillman Rehabilitation Center*, DAB No. 1611; *see also Cross Creek Health Care Center*, DAB No. 1665 (1998); *Emerald Oaks*, DAB No. 1800 (2001); 42 C.F.R. § 422.510(c).

22.    The hearing officer explicitly refused to follow the precedent from the DAB, and instead applied a highly deferential standard and merely rubber-stamped CMS's determination, refusing even to consider AHC's substantial steps towards compliance. (*See* Hearing Officer Decision at 15 ("[T]he scope of [the] review does not extend to making a new determination as to whether a plan has come into compliance ...") (no citation provided)). Although the hearing officer apparently felt that she did not have the authority to rule upon whether such a reasonable opportunity has been afforded, the regulations state otherwise. "The hearing officer inquires fully into *all* the matters at issue ..." 42 C.F.R. § 422.676(b) (emphasis added).

23.    AHC's current compliance and its opportunity to develop and receive approval of a corrective action plan were clearly matters in issue. The hearing officer should have considered them. Her refusal to follow established departmental precedent and to consider

evidence of AHC's current substantial compliance was arbitrary and capricious, and cannot withstand legal scrutiny.

24.    CMS's most recent on-site inspection of AHC was on May 10, 2005.    The inspection noted certain deficiencies, but, as explained in detail at the hearing, AHC has taken dramatic steps to correct those deficiencies in accordance with its regulatory right, and responsibility, to bring itself back into compliance.    As AHC stated at the hearing, this is an example of the regulatory process having worked well, with a regulated entity having been given notice of deficiencies, hearing that message, and turning the organization around as a result. First, it reorganized its corporate management and quickly appointed a new chief operating officer and compliance officer, Richard Tuten, to take charge of AHC's compliance program and implement a corrective action plan.    Mr. Tuten has a strong background in compliance, having been the senior counsel to Health Law Center in Greenville, South Carolina, and the corporate compliance officer for Rotech Healthcare in Orlando, Florida.    He and his team are largely responsible for AHC's strong compliance record for the past several months.

25.    AHC implemented its compliance program's procedures for discipline, training, monitoring, and auditing.    The compliance plan meets all of the regulatory requirements enumerated in 42 C.F.R. § 422.503(b)(vi).    It demonstrates AHC's commitment to comply with all applicable federal and state standards, designates a compliance officer and committee accountable to senior management, provides for training and education, and establishes effective lines of communication, disciplinary guidelines, internal monitoring and auditing standards, and procedures for prompt response and development of corrective action initiatives.

26.    The CMS staff complained that Mr. Tuten's dual role as chief operating officer and compliance officer would leave insufficient time for him to devote to his compliance

function. Although the facts do not bear out CMS's concern and, more fundamentally, there is no regulatory requirement that a chief operating officer not also act as a chief compliance officer, AHC nevertheless responded by hiring Ms. Teresa Wong in November as its new full-time compliance officer. AHC's compliance staff now consists of five full-time professionals, including Ms. Wong, well in excess of the industry standard for a compliance office of a company of AHC's size.

27.    Even CMS has acknowledged that "AHC has significantly increased their compliance plan and procedures." Nevertheless, in spite of all that Mr. Tuten and his team have done, CMS and the hearing officer failed to recognize AHC's substantial compliance, and instead relied on erroneous and outdated reports to support the contract termination determination. Contrary to CMS's assertions, AHC has demonstrated that it (1) provides a network of appropriate providers sufficient to provide adequate access to covered services; (2) has implemented an electronic claims payment system facilitating full compliance with prompt pay requirements; (3) complies with regulatory requirements relating to grievances and appeals; and (4) has in place an acceptable quality assessment and improvement program. Thus, AHC is substantially carrying out the terms of its contract with CMS in a manner consistent with effective and efficient implementation of the applicable regulations, and proved as much at the hearing. AHC presented the expert testimony of Bruce Ardis, an expert in managed care, who testified that AHC's network meets or exceeds accepted standards in the industry. CMS, on the other hand, presented no expert testimony and nobody who could speak to AHC's current compliance.

28.    Furthermore, a settlement was entered into with CMS on April 28, 2006 that suspended the sanctions and termination against AHC and provided for AHC to enter into a

Stock Purchase Agreement and sale to HealthSpring. In addition, under the settlement, HealthSpring entered into a consulting agreement with AHC to provide full management services over the plan.

### B.   AHC Provides a Sufficient Network of Appropriate Providers

29.     CMS acknowledged that the focus of its concern regarding AHC, and its most significant complaint, was AHC's supposedly inadequate network of providers. The focus of this complaint was the lack of a contracted hospital within rural Okeechobee County. AHC maintains a network of fifty-one primary care physicians and contracts with twenty hospitals within its seven-county coverage area. With 13,000 beneficiaries, AHC boasts a ratio of just over 300 patients per physician, and no primary care provider is assigned more than about 750 patients. AHC's ratios are far superior to the industry standard of 1,800 to 2,000 patients per physician, and AHC's expert witness testified that AHC could even support several hundred more members per primary care provider if it had to. The hearing officer stated in her ruling that AHC has only one contracted hospital on the Treasure Coast, where approximately 10,000 members reside. This statement is false. As can be seen on the maps provided as exhibits, AHC has a contracted hospital covering Indian River County and a small portion of Brevard County and three other hospitals covering the Treasure Coast, including two within about 35 miles of AHC's members in Okeechobee County. CMS faults AHC for not having a contract with the Raulerson Hospital in Okeechobee County, but no authority is cited for the hearing officer's implicit assumption that a MA organization must have a hospital in every county.

30.     According to the Medicare Managed Care Manual, "a general rule of thumb is the 30-30 rule that asserts that services must be available either within 30 miles of an enrollee's residence or within 30 minutes travel time," and exceptions to that rule may be made in rural

areas such as Okeechobee County. Virtually all of AHC's coverage area, even in the rural areas, falls within thirty miles of a contracted hospital, and almost all of AHC's beneficiaries reside within thirty miles of a contracted hospital. A portion of Okeechobee County falls just a few miles outside of the thirty mile radius from the nearest hospital, but even that portion is within just a few miles of an AHC clinic, and well within the latitude ordinarily extended to such rural areas. Raulerson Hospital has refused to contract with AHC at acceptable Medicare Advantage rates, demanding instead that AHC pay three times the Medicare rate for service that AHC currently pays it as a non-participating hospital. In other words, the services provided at Raulerson would be substantially more expensive if AHC had a contract with them.

31.    CMS has argued that AHC does not meet the 30-30 rule in Okeechobee County. If that is true, however, one wonders why CMS approved Okeechobee County as a coverage area in the first place (when AHC had never had a contract with Raulerson Hospital), why AHC was found to have adequate network access during the inspections in 2002 through 2004, when CMS has always known that AHC has no contract with Raulerson Hospital, and why when AHC volunteered to give up Okeechobee County, CMS requested that they not. Furthermore, CMS's position on this point sends mixed signals, as it has just approved Universal Care to cover Okeechobee County where Universal Care has no contract with a hospital or even with any primary care provider. The double standard being applied is troubling, to say the least.

32.    One fundamental misconception infecting all of CMS's testimony during the hearing was its assumption that AHC's beneficiaries were harmed by AHC's lack of a contract with the hospital in Okeechobee County. What it failed to understand was that, even if AHC's beneficiaries had to use Raulerson Hospital in Okeechobee or any other non-contracted hospital, they would receive those services, and would typically not be charged more for that under the

HMO plan. At the hearing, Christine Perenich testified as a witness for CMS that AHC's members would "probably" have to pay more for services at a non-contracted hospital. Her testimony was pure speculation, and it was false. In fact, under AHC's benefits structure members pay exactly the same copay fees for service, $50 for emergency care and $100 for hospital services, whether they receive care at a contracted or non-contracted hospital.

33.     AHC also has a clinic in Okeechobee, just a few minutes away from all of AHC's Okeechobee beneficiaries. The CMS staff has made the highly misleading assertion that AHC's Okeechobee clinic "was not currently staffed with a doctor or nurse." In fact, for about six weeks in February through March of 2005, the Okeechobee clinic was without a *permanently assigned* physician, but was staffed by several physicians in rotation while a full-time replacement was found for the provider who left that position. In addition, the clinic was staffed by a full-time certified physician assistant.

34.     The CMS staff has also raised concerns regarding the number of specialists AHC has available, particularly in Indian River County, but these concerns are not supported by the data, either. According to the industry standards set by a survey by the Graduate Medical Education National Advisory Committee, AHC's entire patient population of 13,000 throughout its covered counties would require only one-half of a full-time urologist, 0.17 of a rheumatologist, two general surgeons, one-half of a full time urologist, and one-half of a full time cardiologist. Every member residing in Indian River County lives within thirty miles of at least one urologist, two general surgeons, one rheumatologist, and five cardiologists within AHC's plan.

35.     CMS has also tried pointing to emergency room utilization of AHC's members as evidence that AHC's network is insufficient. This view is apparently based on an unsupported

supposition that emergency room utilization alone is indicative of an insufficient network. This supposition is false, but even if it were true, AHC's members' use of emergency room services, approximately 1.463% per year, is actually *below* the national average of 3.95% per year.

36. CMS was apparently not satisfied with AHC's explanation of its emergency room utilization data, and has requested "after-hours emergency utilization reports." AHC pointed out it cannot generate such a report because hospitals do not always supply emergency room admission times, and admission time is not a required field on the billing form. CMS responded that "AHC has said that the information supplied by hospitals does not include admission time. However, CMS is requesting the ER utilization for after hours, not admission time." The CMS reviewer failed to recognize that it is not possible to determine what emergency room utilization was "after hours" without knowing the time of day of the admission.

37. Perhaps the strongest evidence of the adequacy of AHC's provider network is the demonstrated satisfaction of AHC's patients. CMS's claims of insufficient access are not credible in the face of 85% satisfaction with AHC as a health care provider and 95% satisfaction with the health care services provided.

38. CMS's evidence at the hearing focused heavily on AHC's past performance assessment scores, comparing AHC against other MA HMOs on the basis of percentile rank. Not surprisingly, AHC performed well in some areas and not as well in others. However, CMS's reliance on the performance assessment scores is misplaced and cannot be a basis for termination – unless CMS plans to terminate every other MA plan that scored lower, of which there would be many. The scores were based on data almost two years old by the time of the hearing, and CMS's own witness testified that the scores would not be responsive to recent changes.

Moreover, the scores speak only to AHC's performance relative to other HMO's. The reconsideration official herself acknowledged that they bear little weight.

39.    In light of the comprehensive network of providers, AHC's demonstrated customer satisfaction, and considering the rural nature of Okeechobee County and other counties within AHC's coverage area, there is no basis to conclude that AHC substantially fails to provide an adequate network of providers. In fact, the evidence regarding the network introduced at the hearing and the unrebutted expert testimony regarding that evidence unequivocally established that AHC's network complies with or exceeds the standards set forth in the Medicare Managed Care Manual and other industry standards. The hearing officer's conclusions to the contrary were arbitrary and capricious.

### C.    Prompt Pay Requirements

40.    CMS has finally acknowledged that AHC makes appropriate interest payments on approved claims, and that AHC's policies and procedures adequately address CMS's concerns about claim determinations and payment timeframes. Nevertheless, CMS refuses to approve AHC's corrective action plan for past deficiencies in its claim payment timeliness.

41.    AHC has now met the goal set by 42 C.F.R. § 422.520 to pay 95% of "clean" claims to non-contracted providers within 30 days of receipt. As explained at the hearing, in response to requests from CMS and its providers, AHC completed the installation of the Availty electronic claims payment system in October, 2005. It is now in the process of encouraging its providers to use the electronic system. In July through September, 2005, AHC encountered difficulty in meeting the goal due to the time required of its claims staff to implement the electronic claims system. It is now fully compliant with the requirement. As shown in AHC's Claims Timeliness Report, AHC paid 99.54% of non-contracted clean claims received from

November 1, 2005, through November 30, 2005 within 30 days of receipt. Currently, AHC is paying 99.54% of all claims received within 14 days of receipt.

### D.    AHC Complies With Regulatory Requirements Concerning Grievances and Appeals

42.    AHC has in place a policy for handling grievances and appeals pursuant to the regulations. Grievances are handled by AHC's Grievance Department, and appeals are handled by the Appeals Department.

43.    Grievances and appeals may be submitted orally or in writing. When AHC receives a call from a member with a complaint, an initial determination is made as to whether the caller's complaint is a grievance or an appeal. If it is an appeal or a formal grievance, the call is then forwarded to either the Grievance Department or the Appeals Department. If the call is transferred to the wrong department, the coordinator receiving the call transfers it to the other department. The assigned coordinator then sends a letter to the caller documenting the receipt of the grievance or appeal and requesting the member to return a signed copy. Simultaneously, the coordinator opens a file in MedDirect (the HMO management software AHC licenses from an outside vendor), and begins processing the grievance or appeal.

44.    AHC tracks grievances and appeals using MedDirect and monitors them using monitoring logs showing, among other data, when each grievance is received and resolved. The monitoring logs for the last quarter of FY 2005 show that 97% of grievances were resolved within 45 days, and that the average time to resolve a grievance was 13.4 days. Members are notified of action on their grievances and appeals by letter. All members are informed of their appellate rights in the computer-generated form letter sent by AHC. Currently, 100% of formal grievances are resolved within 30 days, with the average time being 12 days. Informal grievances are resolved within 2 days.

45.     CMS's data on AHC's grievance and appeals processes is erroneous, out-of-date, and skewed. It cites a review of a sample of 15 grievances, but the Declaration of Jennifer Clark, submitted by CMS, reveals that the sample was not chosen randomly. The fifteen cases were cherry-picked out of hundreds of files based on the processing times and nature of the complaints in those particular files. AHC chooses not to believe that Ms. Clark's methodology was intentionally engineered to reach an unfavorable result, but it was seriously flawed.

46.     CMS also cites, and the hearing officer relied on, certain statistics regarding data from CHDR. The data on which she relies is over a year old. AHC's CHDR report from the last quarter in FY 2005 shows that every claim but one was forwarded to CHDR in a timely manner and that CHDR upheld AHC's determination in 100% of the claims it reviewed. In her declaration submitted in connection with the hearing, Ms. Dickerson states that none of the claims files she reviewed in January, 2004 had been correctly determined. She does not state her methodology for selecting the files or her basis for claiming that the claims were not correctly determined, so it is unclear whether a deficiency ever even existed. At any rate, if there ever had been a problem, it has clearly been corrected, as evidenced by CHDR's review of claims appeals for the last quarter of FY 2005, upholding 100% of AHC's determinations.

### E.     AHC Has Adequate Quality Assessment and Improvement and Utilization Management Programs

47.     AHC also has a quality assessment and improvement plan in place. The CMS staff appears to acknowledge the sufficiency of the quality assessment and improvement plan, but claims that AHC has not provided documentation that it has been implemented. The CMS staff does not cite to any proof that AHC's quality assessment and improvement plan has not been implemented and AHC is willing to provide any documentation requested. For example, AHC's Quality Improvement minutes show that AHC has been monitoring quality in accordance

with its program and that the Quality Improvement committee is closely monitoring all aspects of care and compliance.

48.    In addition, a fully implemented quality improvement program is a requirement for accreditation and state licensure.    The State of Florida Agency for Health Care Administration ("AHCA") performed a detailed review of AHC's programs in July, 2005. During this visit, AHCA determined that AHC's quality improvement program is adequate and appropriately implemented, and approved AHC's accreditation.    AHCA's visit took place after CMS' last site visit and after AHC had time to correct CMS' cited deficiencies.    AHCA's accreditation of AHC provides further non-biased proof that AHC was in compliance.

49.    Likewise, CMS does not appear to dispute the adequacy of AHC's utilization management plan, but claims not to have sufficient information to determine whether the plan has been implemented.    Again, CMS's allegation falls short of proof or even a claim that the utilization management plan has not been implemented, but AHC produced documents and testimony showing that it has been implemented.    For example, AHC's utilization management committee minutes show careful attention to admissions, referrals, and care provided.    Dr. K.G. Srinivas, AHC's former associate medical director, testified at length about AHC's implementation of the utilization management program.

50.    The CMS staff also alleges that AHC lacks an effective referral process, but this claim conflicts with AHC's monitoring data from last quarter showing that 86% of referrals are approved within a single day, and 95% are approved within four days.    The CMS staff misleadingly states that AHC's processing of referrals "[s]ometimes … took as many as 75 days."    Actually, only one referral ever took 75 days to process, and that was only because the physician requested the referral, but did not submit it to AHC for processing until he had

discussed it with the physician to whom he was referring the patient. When the physician discovered his error, he forwarded the referral request to AHC, and AHC approved it promptly. To ensure that such an event would not happen again, AHC expanded the provider panel and instructed the clinic to process referrals as they are written. The incident has not recurred. This single event cited by CMS is a success story for AHC's quality assessment and improvement program, showing that AHC identifies and corrects problems promptly in order to maintain and improve its high level of care for its beneficiaries.

51.     Totally apart from the unsupported and inconsistent messages that CMS has communicated to AHC regarding its future, CMS has no apparent plan to manage the health care of AHC's 13,000 beneficiaries who will find themselves without MA HMO services if AHC's contract were to be terminated. It may be possible for AHC's members to sign onto other MA HMO plans (plans the members themselves chose not to enter into while AHC is an option). However, those members have chosen AHC. AHC provides 92% of all MA services in Martin County, 92.8% in Okeechobee County, and 87% in St. Lucie County. It is unlikely that any single plan could accommodate the influx of all of AHC's members. Termination of AHC's contract would deprive thousands of its members of their choice of MA HMO.

52.     The termination of AHC would be likely to have a disproportionate impact on Florida's poor and minority residents, particularly its African-American and Hispanic populations. Statistics show that minority individuals are more likely to choose MA HMO coverage because of lower co-pays allowed by cost savings in the HMO model.

53.     CMS cannot responsibly abandon AHC's 13,000 members and deprive them of their choice in HMOs based on such inadequate and outdated grounds as it has asserted for

termination of AHC's contract, particularly when AHC has made such a strong showing of compliance and commitment to improvement since the date of CMS's last on-site inspection.

54.    Moreover, termination of AHC's contract would send the wrong message to the industry, and could undermine the MA program as a whole. In this case, the regulations worked by providing AHC with an opportunity to address CMS's concerns through the CAP process. But the regulations will fail if all of AHC's work in meeting CMS's standards goes to naught. The message to other companies would be that the CAP process is not worth the expense if CMS is willing to terminate a MA HMO in spite of its current compliance.

55.    Finally, AHC has offered and was in the process of selling the MA Plan to HealthSpring, another HMO that would be able to continue to provide the care to these patients pursuant to a settlement with CMS. After months of good faith negotiating on the part of AHC and agreeing to terms much more favorable to HealthSpring than were in the original term sheet, HealthSpring determined that it did not want to buy the plan and the Stock Purchase Agreement was mutually terminated. At that point, CMS stated that the settlement was no longer in effect and reinstated the sanctions and termination action. Even before HealthSpring officially notified AHC that it would not purchase the plan, AHC presented alternatives to a HealthSpring purchase of AHC to CMS. These alternatives would have provided for the same protections that CMS was seeking from HealthSpring. CMS, however, refused to discuss any new buyers with AHC. During this time, AHC has been continuing to have HealthSpring manage AHC and search for a new buyer, keeping with the spirit of the settlement agreement. In fact, on November 22, 2006 NationsHealth requested that CMS approve a stock sale of AHC to NationsHealth and agreed to close the deal within three (3) days of approval from CMS and agreement to remove the sanctions. Such a sale would have allowed the beneficiaries to retain their MA plan benefits and

physicians without any interruption in care and CMS should have been satisfied that current owners and management of AHC would have been replaced. Since CMS refused to dialog with AHC regarding the sale of AHC to anyone other than HealthSpring, it is impossible to know why CMS would have taken this action.

### The Decision Will Immediately and Irreparably Harm AHC

56.    Defendant's decision terminates the contract with AHC effective December 31, 2006.

57.    Defendant immediately will send notices to the beneficiaries of AHC's plan of the December 31, 2006 termination and inform them of their need to secure an alternative provider after the termination of AHC's contract.

58.    These notices will cause AHC's beneficiaries to leave the AHC plan before AHC has an opportunity to seek review of the termination decision.

59.    These notices and the resulting departures of AHC's beneficiaries will cause immediate and irreparable harm to AHC for several reasons. AHC will lose its business before it can get a review of the termination decision. Furthermore, the departures will scuttle plans to sell AHC to another company. Because the acquirer will not purchase a business with essentially no assets (beneficiaries), the acquisition plans will not go through if AHC loses all of its beneficiaries. This harm cannot be undone and must unless enjoined to preserve status quo and allow for a meaningful decision on the merits.

60.    Defendant also plans to publish a press release on its website describing the notice of termination. This press release would have a similarly harmful impact of AHC as the notice letters.

## COUNT I
### (Violation of Administrative Procedure Act, 5 U.S.C. § 701 et seq.)

61.    AHC incorporates by reference paragraphs 1 through __ of this Verified Complaint as if fully set forth herein.

62.    By decision dated November 30, 2006, Defendant, by its Administrator, upheld the decision of its Hearing Officer to terminate the contract between Defendant and AHC.

63.    The decision of the Administrator is arbitrary, capricious, and an abuse of discretion.    The findings of the Administrator are unsupported by any evidence in the administrative record and are contradicted by the substantial evidence introduced by AHC. Likewise, Defendant's acts to terminate AHC's current contract, despite not having followed any of the detailed regulatory requirements for contract termination or the contractual requirements for termination in that contract, are arbitrary, capricious, and an abuse of discretion.

64.    The decision of the Administrator constitutes final agency action and accordingly, AHC has exhausted all administrative remedies required.

65.    Pursuant to 5 U.S.C. § 706, the Court should hold these actions unlawful, set them aside, and compel Defendant to reinstate AHC's contract.

## COUNT II
### (Declaratory Judgment, 28 U.S.C. § 2201)

66.    AHC incorporates by reference paragraphs 1 through __ of this Complaint as if fully set forth herein.

67.    There is an actual and substantial dispute between AHC and Defendant regarding whether Defendant's final agency decision to terminate its contract with AHC is arbitrary, capricious, an abuse of discretion, unsupported by any evidence in the administrative record, and contradicted by the substantial evidence introduced by AHC.

68.    AHC's legal rights are directly and substantially affected by this dispute.    The declaratory relief that they seek will settle the controversy between the parties.

## **PRAYER FOR RELIEF**

WHEREFORE, AHC respectfully requests that the Court enter a judgment and grant the following relief:

A.    Entering a temporary restraining order and preliminary injunction pending this Court's review on the merits of the termination decision;

B.    Declaring that Defendant's decision was arbitrary, capricious, an abuse of discretion, unsupported by any evidence in the administrative record, and contradicted by the substantial evidence introduced by AHC;

C.    Mandating that Defendant reinstate AHC's contract;

D.    Awarding AHC its attorneys' fees and costs; and

E.    Awarding AHC such further relief the Court deems just and proper.

David Cynamon (D.C. Bar # 182477)
Deborah B. Baum (D.C. Bar # 393019 )
Matthew A. Anzaldi (D. C. Bar # 455515)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000 (general)
(202) 663-8492 (D. Cynamon)

Dated:  December 2, 2006

Attorneys for Plaintiff
America's Health Choice Medical Plans, Inc.

# EXHIBIT A

12/01/2006  11:00  '  860043                    CMS

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## CENTERS FOR MEDICARE & MEDICAID SERVICES
### OFFICE OF THE ATTORNEY ADVISOR

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Ms. Deborah B. Baum | Jacqueline R. Vaughn |
| Mr. Howard Cohen | Attorney Advisor |
| Mr. Daniel Wolfe | |

| COMPANY: | DATE: |
|---|---|
| Pillsbury Winthrop Shaw Pittman | ~~11/30/2006~~ |
| OGC – Baltimore | 12/1/2006 |
| OGC – Dallas | |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 202-663-8007 | |
| 410-786-5187 | |
| 214-767-3473 | |

| PHONE NUMBER: | SENDER'S PHONE NUMBER: |
|---|---|
| 202-663-8772 | 410-786-3176 |
| 410-786-9537 | |
| 214-767-3665 | |

RE: 2nd attempt

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your system. Thank you.

2

## I. CMS Audits

CMS oversees the compliance of MA organizations with applicable statutory and regulatory requirements by performing routine and focused review audits. A focused review meant that not every monitoring element listed was surveyed.

Routine compliance audits of all MA organizations are conducted by CMS on a biannual basis. Focused audits are conducted as needed when CMS determines there are areas of concern with the MA organization.[2] CMS received complaints and other concerns with respect to AHC's compliance with the statutory and regulatory contracting provisions. AHC was subject to a routine audit in February 2001, and was found to be out of compliance with 13 CMS monitoring elements. Another routine audit conducted in July 2002 identified 17 monitoring deficiencies.[3] In response to the deficiencies identified during the routine audits, CMS conducted a focused audit in January 2004, and again in May 2005. The 2004 focused review identified 12 monitoring element deficiencies and the 2005 focused review identified 22 deficiencies out of a possible 31, eleven of which were repeat findings from the 2004 focused review.[4]

## II. CMS Termination Decision and Intermediate Sanctions

As a result of CMS' May 2005 focused audit, by letter dated July 6, 2005, CMS exercised its right to impose sanctions on AHC under the termination rights of 42 C.F.R. §522.510(a) and intermediate sanctions rights of 42 C.F.R. §422.750(a)(2) and (a) (4). CMS notified AHC that it intended to impose intermediate sanctions and terminate AHC's MA contract.[5] The letter identified the areas found deficient.[6] In

---

[2] CMS pre-hearing brief at 6.

[3] Id. at 7.

[4] Id. at 8.

[5] CMS Exhibit 69.

[6] The list of deficiencies included non-compliance with several regulatory provisions under 42 C.F.R. §422.112(a)(1,3,6(i),7) – access to services; 422.152(a), (b), (f) – quality improvement program; 422.503(b)(4)(i,ii,vi) – general provisions; 422.504(a)(3,5,6,7, 14(c)), (c), (d), (g)(1), (h)(2) – contract provisions; 422.510(1,2,3,5,6,8,9,10)- termination basis; 422.520(a)(1-3) – prompt payment provisions; 422.562(a),(b) – general provisions; 422.564(a), (b), (e) – general grievance procedures; 422.566(a) – organizational determinations; 422.568(a), (d), (e) – standard timeframes and notice requirements for organizational determinations; 422.590(a)(1,2),(c),(e) – timeframes and responsibility for reconsiderations; and 422.618(b), (c) – effectuation of standard reconsideration determinations. See CMS Exhibit 69 at 2.

3

the letter to AHC, CMS stated that "although AHC has formally responded to CMS on several occasions since the May 2005 audit the company's responses have not mollified our concerns."[7]    CMS specified that it had determined to impose intermediate sanctions against AHC, and to terminate AHC's contract effective October 1, 2005.   The proposed intermediate sanctions suspended AHC from enrolling Medicare beneficiaries and conducting any marketing activities, including the submission of marketing materials for review.

In the July 6, 2005 letter, CMS informed AHC of its right to appeal the termination decision in accordance with 42 C.F.R. §§422.646; 422.648-658.   AHC was also informed that it could submit a written response to the proposed intermediate sanctions in accordance with 42 C.F.R. § 422.756.   Finally, CMS explained that "alternatively, or in addition" to the appeal procedures under 42 C.F.R § 422 Subpart N,[8] AHC could submit a corrective action plan ("CAP") in accordance with 42 C.F.R. § 422.510(c) to correct the deficiencies that were the basis for the proposed termination. CMS explained that the purpose of the CAP is to explain to CMS how the sanctionable actions will be corrected and avoided in the future.  CMS further explained that "[i]f CMS approved the CAP, the termination will be rescinded."[9] CMS requested that any CAP be submitted within 30 days in order to allow CMS an adequate opportunity to review the CAP

AHC responded to CMS on July 18, 2005, stating that "AHC disagrees with the CMS termination decision, and wishes to exercise its right for reconsideration 42 C.F.R. Part 422, Subpart N."[10]   AHC acknowledged that it had continually faced compliance problems as noted in the biennial and focused reviews, including claims processing, appeals and quality of care issues.   AHC stated that it was instituting a series of "rigorous management initiatives designed to bring AHC into full compliance," that it was developing a corrective action plan and that it wished to exercise its right to a reconsideration determination.[11]

---

[7] Id. at 1.

[8] 42 C.F.R. §422 Subpart N [Medicare Contract Determinations and Appeals] encompasses §§ 422.641 through 422.698.   42 C.F.R § 422 [Subpart O – Intermediary Sanctions] encompasses §§ 422.750 through 422.760.

[9] CMS Exhibit 69.

[10] CMS Exhibit 73.

[11] Id.

4

### III. AHC's CAP Submission and CMS' Reconsideration and Reopenings

By letter dated August 3, 2005, CMS responded to AHC's July 18, 2005 letter, stating that CMS would reconsider its determination to impose both intermediate sanctions and to terminate the contract. CMS adjusted the termination date to November 1, 2005, and acknowledged AHC's intent to file a CAP with CMS by September 6, 2005. With respect to the intermediate sanctions, CMS clarified that the deficiencies cited in the July 6, 2005 termination letter posed a serious threat to enrollees' health and safety. Accordingly, under 42 C.F.R. §422.756(d)(2), CMS notified AHC that all marketing and enrollment activities for the company's Medicare products would be suspended.[12]

AHC sent CMS a letter on August 3, 2005 outlining its CAP. AHC described its restructuring of the corporation, its review and revision of all policies and procedures, new training manuals, the outsourcing of programming for electronic payment and continued improvements to its network.[13] CMS notified AHC on September 2, 2005 that it had reviewed AHC's proposed CAP but did not accept the CAP because AHC was unable to provide CMS with assurances that the company now complied or would be able to comply with any of the specified findings of non-compliance described in CMS' May 10-12, 2005 Focused Audit report.[14]

Pursuant to AHC's request, CMS issued a reconsideration determination dated September 30, 2005[15] that affirmed the decision to impose intermediate sanctions and to terminate the plan. The reconsideration determination considered AHC's submission or status subsequent to CMS' original July 6, 2005 decision. The CMS reconsideration decision stated that AHC's contract would be immediately terminated since any delay in termination would present a serious and imminent risk to the health of the enrollees due to AHC's inability to provide required services.[16]

CMS reopened the September 30, 2005 reconsideration determination by letter dated October 4, 2005 and stated that it did not intend to invoke its right to immediately terminate AHC's contract in order to allow the smooth transition for the AHC's enrollees. Instead, CMS elected to wait until November 1, 2005 to terminate the AHC contract. CMS reiterated that the reconsideration determination finding that AHC was being terminated pursuant to §§422.510(a)(5) and (b)(2) was still

---

[12] CMS Exhibit 74, p.1.

[13] AHC Exhibit 35.

[14] CMS Exhibit 116.

[15] CMS Exhibit 80.

[16] Id. at 11.

5

applicable. The reopening was only to allow the orderly transition in the best interests of the Medicare enrollees.[17]  By letter dated October 5, 2005, AHC requested a hearing pursuant to 42 C.F.R. Part 422, Subpart N."[18]

By letter dated October 18, 2005, based upon further review of the documentation provided by AHC and otherwise gathered by CMS, CMS reopened and modified the finding in the October 4, 2005 letter (and the earlier September 30, 2005 letter) regarding the issue of whether the delay inherent in the appeal process would place enrollees in serious and imminent risk of harm.  CMS decided not to invoke the immediate termination provisions in 42 C.F.R. §422.510(a)(5), and instead proceeded with the non-immediate termination, as contemplated in CMS' original determination.[19]  The letter and the incorporated findings from the September 30, 2005 letter, constituted the final reconsideration determination, which is final and binding unless the AHC's requests a hearing under 42 CFR 422.662.  The letter explained that: "if AHC does not request a hearing, this decision will take effect December 1, 2005."

On October 20, 2005 AHC invoked its appeal rights and requested a hearing pursuant to 42 C.F.R. Part 422, Subpart N.[20]  A hearing before a CMS Hearing Officer was held on November 14-15, 2005.[21]

## Issue and Hearing Officer's Decision

The issue is whether the CMS' determination to terminate AHC's MA contract was proper.  The Hearing Officer found that the CMS determination that AHC should be terminated from the Medicare Advantage program effective December 1, 2005 was proper.  The Hearing Officer held that the evidence substantiates that AHC failed to carry out the terms of its MA contract with CMS and therefore, AHC's termination was appropriate.[22]

---

[17] CMS Exhibit 81.

[18] CMS Exhibit 82.

[19] CMS Exhibit 84, p.1.

[20] CMS Exhibit 85.

[21]     The Administrator notes that AHC's appeal to the Hearing Officer and subsequently to the Administrator effectively stayed the termination date pending final Administrator decision.  See 42 C.F.R. §422.664.

[22] The Hearing Officer never addressed whether CMS' imposition of intermediate sanctions were proper since its finding that CMS properly terminated the MA contract rendered that issue moot.

6

## I. Service Access Requirements

The Hearing Officer found that CMS properly determined that AHC failed to comply with service access requirements pursuant to 42 C.F.R. §422.510(a)(10). The Hearing Officer based this decision based on its review of the evidence contained in the record that substantiated CMS' finding that AHC did not have a contracted hospital within 30 miles or 30 minutes driving time for members located in Okeechobee County, it did not have a sufficient number of primary care and specialty providers, and it inadequately staffed many of its clinics.

## II. Grievances and Appeals

The Hearing Officer found that CMS properly determined that AHC substantially failed to: 1) establish or maintain grievance procedures as required by CMS and AHC's own policies and procedures; 2) investigate all allegations made by members, or resolve members' issues and notify them of resolutions; and, 3) correctly distinguish between organization determinations, reconsiderations, and grievances, and to process any of these through the appropriate mechanisms.

The Hearing Officer recognized that AHC instituted some procedures relating to grievances and appeals, and made some improvements, but concluded that the weight of the evidence and testimony does not support that AHC has ever been in substantial compliance with 42 C.F.R. §422.510(a).

## III. Quality Assessment and Performance Improvement Program

The Hearing Officer found that CMS properly determined that AHC failed to implement an acceptable quality assessment and performance improvement program pursuant to 42 C.F.R. §422.510(a)(8). Although AHC had developed a quality assessment plan on paper, there was no evidence that it had actually been implemented. The Hearing Officer supported CMS' determination that AHC's program had not been implemented, that the committees did not meet regularly, that AHC had not identified what staff members held which positions, that program assessment tools had yet to be developed, and that the program had not been reviewed or approved by the AHC Board of Directors.

## IV. Prompt Pay Requirements

The Hearing Officer found that CMS properly determined that AHC failed to comply with prompt pay requirements pursuant to 42 C.F.R. §§422.504(c); 422.510(a) (9). The Hearing Officer supported CMS' contention that there were multiple deficiencies with respect to the prompt pay requirements. As found by the

7

CMS auditors, the Hearing Officer stated that clean claims were not paid by AHC within 30 days, that excessive amounts of interest were being paid on those claims, and that claims from non-contracted providers were not being paid within 60 days. Additionally, because AHC did not have an electronic claims processing system in place, auditors properly found that it was not in compliance with its own internal guidelines requiring claims to be logged in within five days of receipt.

## V. Compliance Program / Contracting Organization Requirements

The Hearing Officer found that CMS properly determined that AHC does not have a fully operational compliance plan, and thus does not meet the requirements to be a contracting organization pursuant to 42 C.F.R. §422.510(a)(3) and 42 C.F.R. §422.503(b)(4)(iv). AHC's compliance program did not have internal monitoring and audit standards, that the training materials for employees were insufficient as were the disciplinary guidelines for employees. The compliance officer position lacked sufficient power to instill the proper level of ongoing compliance in the company.

## VI. Medicare Advantage Contract Terms & Requirements

The Hearing Officer found that AHC has failed to meet the requirements to substantially carry out the terms of its contract with CMS and has also failed to carry out the contract in a manner that is consistent with the effective or efficient implementation of such contract requirements. Over a period of four years, AHC's program was reviewed and each year was found to be out of compliance. CMS has repeatedly identified significant ongoing deficiencies which have not been corrected. Moreover, other monitoring agencies including the HHS Office of the Inspector General, the State of Florida Agency for Healthcare Administration, the Maximus Center for Health Dispute Resolution and Florida Medical Quality Assurance, Inc., also reported that AHC had significant problems efficiently and effectively implementing its MA contract.

8

## SUMMARY OF COMMENTS

### I. CMS Comments

CMS submitted comments stating that, in general, the Hearing Officer's decision should be affirmed by the Administrator. CMM stated that the burden rests on AHC to prove its continuing compliance with statutory and regulatory requirements. Based on the results of CMS reviews, AHS has not fulfilled this burden. CMS reiterated the Hearing Officer's finding that AHC has a history of substantial failure to meet the MA requirements through its repeat findings and inability to cure such findings. CMS noted excerpts in the Hearing Testimony further supporting CMS termination of the contract.

CMS' stated that AHC's deficiencies on multiple independent grounds are each sufficient to warrant termination of AHC's MA contract. Essentially, CMS noted AHC's failure to comply with the specific requirements such as: 1) service access requirements, 2) grievances and appeals requirements, 3) quality assessment and performance improvement requirements, 4) prompt pay requirements, 5) compliance and contracting organization requirements, and finally, 6) the requirements of the existing MA contract. These failures all substantiate and support the basis of terminating the existing AHC MA contract in order to prevent further risk of jeopardizing the interests of the existing Medicare beneficiaries that are enrolled in AHC's MA plan.

### II. AHC Comments

AHC essentially contended that the Hearing Officer's decision should be remanded to the Hearing Officer for a determination of whether AHC is currently in substantial compliance with the relevant regulations. Alternatively, AHC requested that the matter be stayed for 60 days in order to allow AHC an opportunity to pursue its contemplated transaction with its prospective purchaser.

AHC stated that it has taken great strides to improve its organization. AHC stated that it installed new management, restructured its compliance function, and improved its current prompt pay performance in excess of regulatory standards. AHC believed that its current compliance with relevant regulations is at a level well beyond regulatory requirements and prevailing industry levels.

AHC also stated that CMS' decision to terminate the existing MA contract is flawed on several legal basis. AHC argued that CMS has not initiated a contract termination of the current MA contract since it is a new 2006 contract that calls for a one-year

renewal.  Even if the termination was legitimate, AHC argued that the Hearing
Officer did not rely on AHC's existing compliance status, but instead relied upon
outdated information to render its decision.  Finally, AHC argued that even if the
Administrator upheld the  Hearing Officer's decision, CMS had not indicated any
reason why the contract should be terminated by December 31, 2006 other than to
allow existing enrollees the opportunity to elect new coverage.  According to AHC,
enrollees would be able to chose a new plan even outside the established enrollment
period.

## DISCUSSION

The entire record, which was furnished by the Hearing Officer has been examined,
including all correspondence, position papers, hearing transcripts and exhibits. The
Administrator has reviewed the  Hearing Officer's decision. All comments received
from the parties are included in the record and have been considered.

**I.      Scope of Administrative Review.**

The regulation at 42 CFR Subpart N sets forth the provisions for Medicare contract
determinations and appeals. The provision of 42 CFR 422.641 specifically provides
that this subpart "establishes the procedures for making and reviewing the ...contract
determination" including at paragraph (b) "a determination to terminate a contract
with an MA organization in accordance with 422.510(a)."

A CMS contract determination is final and binding under 422.646 unless, inter alia,
the determination is reconsidered in accordance with 422.648 through 658;  a timely
request for a hearing is filed under 422.662; or the reconsideration decision is revised
as a result of a reopening under 422.696. Notably, a request for a reconsideration is
the first step in appealing a contract determination.  Under 42 CFR 422.654(a) a
reconsidered determination is a new determination that:

> Is based on a review of the contract determination, the evidence and
> findings upon which was based and any other written evidence
> submitted before the notice of the reconsidered   determination is
> mailed including facts relating to the status of the MA organization
> subsequent to the contract determination.   The reconsidered
> determination affirms, reverses, or modifies the initial determination.
> (Emphasis added.)

10

Consistent with general administrative law principles, the MA organization has the right to a hearing before a CMS hearing officer, but this review is limited as to whether the CMS determination/reconsideration was proper. Unlike the provision set forth by rule at 42 CFR 422.654(a) on the consideration of new evidence during a CMS reconsideration, there is no similar language referenced in the Hearing Officer's procedures that allows for the consideration of the facts relating to the MA organization status after the mailing of the notice of CMS' reconsidered decision.[23]

Similarly, the Administrator procedures for review of the Hearing Officer's decision forth at 42 CFR 422.692 does not contemplate the consideration of the MA organization's status after the mailing of the notice of the reconsidered decision, nor remand for such reconsideration.

Instead, the scope of the Administrator's review is governed by the regulations at 42 C.F.R. §422.692 which states:

(a) *Request for review by Administrator.* An MA organization that has received a hearing decision upholding a contract termination determination may request review by the Administrator within 15 days of receiving the hearing decision as provided under §422.690(b).

(b) *Review by the Administrator.* The Administrator shall review the hearing officer's decision, and determine, based upon this decision, the hearing record, and any written arguments submitted by the MA organization, whether the termination decision should be upheld, reversed, or modified.

(c) *Decision by the Administrator.* The Administrator issues a written decision, and furnishes the decision to the MA organization requesting review.

Accordingly, the scope of the Administrator's review in this case is limited to whether the Hearing Officer  rendered a proper decision based on the evidence contained in the record and any supplemental comments or arguments submitted by

---

[23] This is also consistent with regulatory provision at 42 CFR 422.510 ( c) that CMS is the administrative body to determined whether the MA organization has successfully developed and implemented a corrective plan to correct the deficiencies that were the basis for the determination.  There is no similar provision in the regulation for the Hearing Officer to make an initial determination on a corrective action plan after the issuance of the CMS determination/reconsideration.

11

the parties. This record is limited to the status of the MA organization at the time of the CMS reconsideration decision.[24]  The Administrator's decision thus cannot address the issue of whether AHC has since corrected its deficiencies enough to be considered "in compliance" with the governing regulations since the scope of the Administrator's review is limited.[25]  Remand to the Hearing Officer for such a determination would also be inappropriate.

Under the regulations at 42 C.F.R §422.694, a decision by the Administrator under section 422.692 is final and binding unless it is reopened and revised in accordance with §422.696.

## II.   Medicare Law and Policy – Medicare + Choice Program/Medicare Advantage Program.

Section 1851 of the Social Security Act ("Act")[26] established the requirements for participation in the Medicare + Choice program.  Section 1857(d)(2) of the Act sets for the contracting requirements for contracting organizations.[27]   Pursuant to the Medicare Modernization Act of 2003,[28] Congress established the Medicare Advantage ("MA") program under Part C of Title XVIII of the Act.  The MA program replaced the Medicare + Choice program.  MA organizations must be organized and licensed under state law as risk-bearing entities that are eligible to offer health insurance or benefits coverage in each state in which an MA plan is offered.  An MA organization is an entity that contracts with the CMS to offer an MA plan. [29]

Pursuant to 42 C.F.R. §422.503(b), CMS has established the general provisions for entities seeking to qualify as MA organizations. Pursuant to 42 C.F.R. §422.503(b), CMS has established the general provisions for entities seeking to qualify as MA organizations.  That section of the regulation states:

(b) Any entity seeking to contract as an MA organization must:

---

[25] In addition, under general administrative law the proponent of the rule has the burden of proof.

[26] 42 U.S.C. §1395w-21

[27] 42 U.S.C. §1395w-27(d)(2)

[28] Pub. Law No. 108-173, Title II, Subtitle A, §201, 117 Stat. 2176.

[29] 42 U.S.C. §1395w-21 et seq.

12

(1) Complete an application as described in § 422.501.

(2) Be licensed by the State as a risk bearing entity in each
State in which it seeks to offer an MA plan as defined in
§ 422.2.

(3) Meet the minimum enrollment requirements of § 422.514,
unless waived under § 422.514(b).

Pertinent to this case, under 42 C.F.R. §422.503(b), the MA organization must:

(4)  Have administrative and management arrangements
satisfactory to CMS, as demonstrated by at least the
following:

(i)  A policy making body that exercises oversight and
control over the MA organization's policies and
personnel to ensure that management actions are in
the best interest of the organization
and its enrollees.

(ii) To operate a quality improvement program and
have an agreement for external quality review as
required under this part.

....

(vi) A compliance plan that consists of the following:

(A) Written policies, procedures, and standards
of conduct that articulate the organization's
commitment to comply with all applicable
Federal and State standards.

(B) The designation of a compliance officer and
compliance committee that are accountable
to senior management.

(C) Effective training and education between the
compliance    officer    and    organization
employees.

(D) Effective lines of communication between
the compliance officer and the organization's
employees.

13

(E)  Enforcement of standards through well-publicized disciplinary guidelines.

(F)  Procedures for internal monitoring and auditing.

(G)  Procedures for ensuring prompt response to detected offenses and development of corrective action initiatives relating to the organization's MA contract.

Furthermore, under 42 C.F.R. §422.503(b), the MA organization contract must provide that CMS, or any person or organization designated by CMS has the right to:

(i)  Inspect or otherwise evaluate the quality, appropriateness, and timeliness of services performed under the MA contract;

(ii)  Inspect or otherwise evaluate the facilities of the organization when there is reasonable evidence of some need for such inspection; and

(ii)  Audit and inspect any books, contracts, and records of the MA organization that pertain to—

(A) The ability of the organization or its first tier or downstream providers to bear the risk of potential financial losses; or

(B)  Services performed or determinations of amounts payable under the contract.

The Secretary's authority to terminate a MA organization's contract derives from Section 1857(c)(2) of the Act,[30] which states that:

The Secretary may at any time terminate any such contract if the Secretary determines that the organization has:

(A)  has failed substantially to carry out the contract;

(B)  is carrying out the contract in a manner inconsistent with the efficient and effective administration of this part; or

(C)  no longer substantially meets the applicable conditions of this part.

Pursuant to the statute, the Secretary promulgated regulations at 42 C.F.R. §422.510 that sets forth the grounds by which CMS has authority to terminate a contract with an MA organization.  That section of the regulation states:

---

[30] 42 U.S.C §1395w-27(c)(2)

(a) *Termination by CMS.* CMS may terminate a contract for any of the following reasons:

   (1) The MA organization has failed substantially to carry out the terms of its contract with CMS.

   (2) The MA organization is carrying out its contract with CMS in a manner that is inconsistent with the effective and efficient implementation of this part.

   (3) CMS determines that the MA organization no longer meets the requirements of this part for being a contracting organization.

   . . . .

   (5) The MA organization experiences financial difficulties so severe that its ability to make necessary health services available is impaired to the point of posing an imminent and serious risk to the health of its enrollees, or otherwise fails to make services available to the extent that such a risk to health exists.

   (6) The MA organization substantially fails to comply with the requirements in subpart M of this part relating to grievances and appeals.

   . . . .

   (8) The MA organization fails to implement an acceptable quality assessment and performance improvement program as required under subpart D of this part.

   (9) The MA organization substantially fails to comply with the prompt payment requirements in § 422.520.

   (10) The MA organization substantially fails to comply with the service access requirements in § 422.112 or § 422.114.

   . . . .

The Secretary's broad termination authority is balanced by the procedural safeguards provided in the statute at Section 1857(h) of the Act:

   (1) IN GENERAL – The Secretary may terminate a contract with a MA organization under this section in accordance with formal investigation and compliance procedures established by the Secretary under which –

      (A) the Secretary provides the organization with the reasonable opportunity to develop and implement a

15

> corrective action plan to correct the deficiencies that were
> the basis of the Secretary's determination under
> subsection (c)(2); and
>
> (B) the Secretary provides the organization with reasonable
> notice and opportunity for hearing (including the right to
> appeal an initial decision) before terminating the contract.
>
> (2) EXCEPTION FOR IMMINENT AND SERIOUS RISK TO
> HEALTH – Paragraph (1) shall not apply if the Secretary
> determines that a delay in termination, resulting from compliance
> with the procedures specified in such paragraph prior to
> termination, would pose an imminent and serious risk to the health
> of the individuals enrolled under this part with the organization.

The decision to terminate such a contract is final and binding unless the MA
organization requests reconsideration and / or hearing. Pursuant to the statute, the
Secretary promulgated regulations at 42 C.F.R. §422.648 et seq., for reconsiderations,
and 42 C.F.R. §422.662 for hearings.

### III.   Finding of Facts and Conclusion of Law.

After a review of the applicable statutes, regulations, CMS policies, documentation
contained in the record, testimony provided at the administrative hearing, as well as
post-hearing submissions, the Administrator finds that the Hearing Officer properly
upheld CMS' determination that AHC should be terminated from the Medicare
Advantage program. The evidence in the record substantiates that AHC failed to
carry out the terms of its MA contract with CMS as required under the terms of the
existing contract with CMS and applicable rules and regulations.

### A.   Service Access Requirements

The Administrator finds that AHC failed to comply with service access requirements
as the record shows that the AHC's provider network is not adequately serving the
needs of the organizations members. The record shows that the AHC Network had
only one contracted hospital serving the health needs of Brevard, Indian River,
Martin, Okeechobe and St. Lucie counties and that purported to serve 10,000
members.[31]   The AHC contended that it was not required to have a contracted
hospital in every county and that it was excepted from the 30 miles/30 minutes rule in

---

[31] In addition, CMS' Managed Care Manual, Ch. 4, §120.2, and Managed Care
Monitoring Guide element AA01, provide generally that commonly used services
should be located within 30 minutes driving time.

Okeechobee county because the county was rural. However, AHC's failure to meet the 30/30 policy[32] in this case was reflective of the more serious failures of AHC to demonstrate that it could meet the service access requirements necessary under the contract terms across its network area.[33]

The record includes the CMS May 2005 audit that shows that many members were forced to seek emergency care at non-contracted hospitals because there were no contracted hospitals located in the area or AHC clinics did not offer after hours care. With respect to this later problem of on-going physician staffing problems, the May 2005 audit noted that at many clinics, physicians were not available five days a week, or had no regular or consistent business hours available for beneficiaries. This finding was also supported by the Florida Agency for Health Care Administration independent review that was conducted in July of 2005. The Florida Agency for Health Care Administration review found that AHC did not have adequate network access in Brevard, St. Lucie and Okeechobee counties.[34]

AHC provided a list of each center,[35] the number of members seen by each center and the names of the physicians at each location. The Hearing Officer found, for eight of the 32 AHC locations, there was a single physician assigned.[36] In six of those centers with only one physician assigned, that physician was also assigned to at least one other center. It was reasonable for the Hearing Officer to conclude that it would be unlikely that these four centers could be adequately staffed by a physician during normal business hours if the physician was also assigned to other centers as well. As the Hearing Officer identified, there were frequent instances that a physician assigned to a clinic might also be assigned to other locations thus supporting the valid assumption that the clinics could not be adequately staffed by a physician five days a week.[37] The Hearing Officer finding is also consistent with the May 2005 auditors report that AHC staff indicated that physicians were not available five days per week or had no regular business hours at several clinics. The May 2005 audit review showed 9 out of 25 of AHC clinics had no physician or mid-level

---

[32] AHC further contends that "a portion of Okeechobee County falls only slightly (just a few miles) outside the thirty-mile radius from the nearest hospital..." See AHC's pre-hearing brief at 8. However, the Hearing Officer noted that the actual road mileage between Okeechobee County and the three closest AHC hospitals showed distances in excess of 40 miles and travel in excess of 57 minutes for each hospital.
[33] AHC Exhibit 37.
[34] CMS Exhibit 25.
[35] AHC Exhibit 36.
[36] CMS noted that the Hearing Officer made detailed findings on this issue that required minor correction. CMS comments n. 55.
[37] Id.

17

provider available to render care.[38]  In sum,  the Administrator finds that the Hearing
Officer properly upheld CMS determination that AHC failed to comply with service
access requirements set forth at 42 C.F.R. §422.510(a)(10).

### B.  Grievances and Appeals

The Administrator finds that the Hearing Officer properly upheld CMS' finding that
AHC had substantially failed to: 1) establish or maintain grievance procedures as
required by CMS and AHC's own policies and procedures;[39] 2) investigate all
allegations made by members, or resolve members' issues and notify them of
resolutions;[40] and, 3) correctly distinguish between organization determinations,
reconsiderations, and grievances, and to process any of these through the appropriate
mechanisms.[41]

CMS had specifically found that AHC did not adequately inform members of their
rights, notify members of its determinations, categorize incoming disputes in a timely
manner, track disputes, maintain dispute- related documents, inform members of the
outcome of disputes timely, effectuate the disputes accurately or maintain files in a
manner suitable for CMS to fully evaluate its compliance with Subpart M.  (Sept 30,
2005 letter)

A review of the record indicates, inter alia,  that even the AHC stipulations[42] support
CMS  documentation of grievance and appeals deficiencies that have persisted
systematically through the past audits of February 2001;[43] July 2002;[44] and January
2004[45] and were again reaffirmed in the May 2005 audit.   As the Hearing Officer
noted, even CMS' later review of the 2005 CAP found that AHC had not provided a
means of evaluation of the grievances and appeals process and that the data in the
submitted report was of questionable accuracy.  Thus, as the Hearing Officer found,
the evidence in the record and testimony at the hearing[46] supports the CMS finding

---

[38] CMS Exhibit 115 at 3.

[39] CMS Exhibit 115 at 14.

[40] Id.

[41] Id. at 12.

[42] Stipulations Nos. 1,2,6,7,8,9,10.

[43] CMS Exhibit 59 at 8.

[44] CMS Exhibit 128.

[45] CMS Exhibit 63 at 13.

[46] See also e.g. Testimony of Dr Srinivas,  AHC Chief of Quality, Appeals  along with
several other job titles.  Tr1 p. 261 (regarding the appeals operation being  closed for
part of August and September of 2005 because of reduced staffing)..

18

that AHC was not in substantial compliance with 42 C.F.R. §422.510(a).[47]
Accordingly, the Administrator finds that the Hearing Officer properly upheld CMS'
determination    that AHC does not meet the requirements of 42 C.F.R.
§422.510(a)(6).

## C. Quality Assessment and Performance Improvement Program

The Administrator finds that the Hearing Officer properly upheld CMS' finding that
AHC had not implemented a quality assessment and performance improvement
program as required by regulation. As the Hearing Officer found although AHC had
developed a quality assessment plan on paper, there was no evidence in the record
that it had actually been implemented. The CMS 2005 auditors found that AHC had
failed to provide supporting documentations as evidence that the program was
actually implemented or currently active within the organization.[48]

The Florida Medical Quality Assurance, Inc. (FMQAI) conducted an independent
review of AHC's quality assurance program and investigated complaints concerning
delay in referrals, delay in treatment and subsequent payment. In a letter to CMS
dated September 6, 2005, FMQAI noted that AHC has been working on a specific
Quality Improvement Plan since 2003 and that AHC was to submit quarterly
monitoring reports to FMQAI to address its systematic delays in their referral
process.[49] FMQAI noted that it had been experiencing difficulties in both receiving
and interpreting the AHC reports evidence that further supporting the contention that
AHC had not been able to implement a quality assessment and performance
program.[50]

AHC had also submitted documentation describing it quality improvement program
as part of its 2005 CAP.[51] However, in reviewing the documentation provided, it is
evident that the program had not been implemented and the committee did not meet
regularly. It is also evident that AHC had not identified what staff members held

---

[47] CMS Exhibit 68.

[48] CMS Exhibit 115 at 4.

[49] CMS Exhibit 15.

[50] Id. See also Transcript of Oral Hearing, Testimony of Ms Cheryl Cook R.N. Tr. 2
pp 198-199 Exhibit 12-15 (regarding problems recorded by FMQAI) See also e.g.
Testimony of Dr Srinivas, AHC Chief of Quality along with several other job titles.
Tr. 1 p280 (regarding the fact that Medical Director responsible for reviewing and
approving all denied referrals perform function twice a week ); Tr 1 pp. 268-269
(failing to explain reasons for delayed referrals).

[51] AHC Exhibits 1-9, and 35.

which positions and that the program assessment tools had yet to be developed. Furthermore the program had not been reviewed or approved by the AHC Board of Directors.[52]

As noted by the Hearing Officer and CMS, with respect to referrals, FMQAI reviewed data received from AHC on their second quarter referrals. FMQAI found that of 76 standard referrals, 21 took more than the accepted completion rate of 14 days. Of the 17 expedited referrals, 3 were over the accepted completion rate of 3 days. Thus, 24 of 93 referrals, or 25.8 percent of all second quarter referrals were above the acceptable limit.[53] Given that AHC had been under a quality improvement plan with FMQAI since 2003 concerning its referrals, the data was a further indication that AHC had not become compliant in this area. The Administrator finds that the Hearing Officer properly upheld CMS finding that AHC failed to implement an acceptable quality assessment and performance improvement program pursuant to 42 C.F.R. §422.510(a)(8).

**D. Prompt Pay Requirements**

The Administrator finds that there were multiple deficiencies shown in the record with respect to AHC's compliance with the prompt pay requirements. The regulations require that an MA organization pay 95 percent of clean claims from contract providers within 30 days of receipt. The regulations also require that the MA organization pay interest on clean claims that are not paid within 30 days, and that all other claims from non-contract providers must be paid or denied within 60 calendar days from the date of request.[54]

The record shows that CMS auditors found that clean claims were not paid within 30 days, that excessive amounts of interest were being paid on those claims, and that claims from non-contracted providers were not being paid within 60 days. Additionally, because AHC did not have an electronic claims processing system in place at that time, auditors found that it was not in compliance with its own internal guidelines requiring claims to be logged in within five days of receipt.[55] Both the September and October 2005 updates filed by AHC as part of its CAP showed substantial noncompliance, with only 42.28   percent of claims paid timely in

---

[52] CMS Exhibit 68 at 5.

[53] CMS Exhibit 15 at 3-6.

[54] See 42 C.F.R. §422.520 et seq.

[55] CMS Exhibit 115 at 20.

20

October.[56] As of the date of the CMS reconsideration, CMS had not observed any fully functioning system for the processing of claims.[57]

According to the evidence reviewed in the administrative record, the Administrator finds that the Hearing Officer properly upheld the finding that AHC did not comply with the prompt payment requirements. Accordingly, the Administrator finds that the Hearing Officer properly upheld CMS finding that AHC failed to comply with prompt pay requirements pursuant to 42 C.F.R. §§422.504(c); 422.510(a) (9) and 422.520(a).

### E. Compliance Program / Contracting Organization Requirements

After a review of the evidence in the record, the Administrator finds that AHC lacked an adequate compliance program to ensure accountability and commitment with all Federal and State standards. The AHC program did not have internal monitoring and audit standards, the training materials for employees were insufficient, and the disciplinary guidelines for employees were inadequate. Moreover, the record shows that the compliance officer position lacked sufficient power to instill the proper level of ongoing compliance in the company.[58]

According to CMS' review of AHC's compliance plan as part of the CAP submitted in August 2005, CMS found that the program did not include internal monitoring standards and does not show evidence that the policies and procedures have been implemented. have are still not in full compliance with the requirements since the existing compliance plan does not address how AHC management will empower the compliance department to make all necessary changes to create a fully compliant organization. The Administrator finds that the Hearing Officer properly upheld CMS finding that AHC did not have a fully operational compliance plan, and thus did not meet the requirements to be a contracting organization pursuant to 42 C.F.R. §422.510(a)(3).

---

[56] CMS Exhibit 4 at 2-4.

[57] Exhibit 80, CMS Letter dated September 30, 2006, p 9

[58] Of little reassurance was Mr. Tuten's testimony that the staff formerly responsible for the poor operation of AHC had been delegated to perform the same function on behalf of AHC as employees of Medical Resources. Medical Resources was wholly owned by the Jankes who were also the sole stockowners of AHC. See CMS comments p 12, Tr, Vol. 1, p.156. While Mr Tutens testified that the compliance department had 5 full time employees and that the compliance plan had been implemented, he could not recall the dates of any audits that had been done Tr. 1, pp 147-148.

21

## F. Medicare Advantage Contract Terms and Requirements

In addition to the record supporting CMS termination of the contract as the AHC
failed to substantially failed to meet certain criteria at 42 CFR 422.504, the
Administrator also finds this record supports CMS other findings under 42 CFR
422.510(a)(1) and (a) (2).    That is, the record shows that AHC has failed to
substantially carry out the terms of the contract under 42  CFR 422.510(a)(1) and
failed to carry out the contract in a manner that is consistent with the effective
implementation of the requirements under 42 CFR 422.510(a)(2).

The record shows that for a period of over a period of four years, AHC's program
was reviewed by CMS and each year CMS found that AHC was out of compliance
with the terms of the MA contract. In both reviews conducted by CMS in 2001 and
2002, CMS identified significant deficiencies.  CMS conducted a focused review in
2004 and again in 2005, again in both instances, CMS found additional significant
deficiencies with the program. After the 2001 review, the 2002 review and the 2004
review, AHC was given the opportunity to establish a corrective action plan,
however, although the corrective action plan was established, AHC failed to
effectively implement the plan.

After CMS notified AHC that its MA contract would be terminated as a result of the
2005, CMS offered AHC another opportunity to submit a corrective action plan
which was submitted by AHC.  CMS' review of the new corrective action plan found
that AHC still did not correct all of the identified deficiencies.  The record shows that
CMS allowed AHC a reasonable opportunity to put into place the necessary
corrective actions to cure its program deficiencies.

 AHC's non-compliance with the MA contract terms has also  been the well
documented focus of other monitoring agencies.  The HHS Office of the Inspector
General, the State of Florida Agency for Healthcare Administration, the Maximus
Center for Health Dispute Resolution and Florida Medical Quality Assurance, Inc.,
have all reported and documented AHC's significant problems in efficiently and
effectively implementing its MA contract.

AHC was afforded reasonable opportunities to develop and implement corrective
action plans to cure the deficiencies that were the basis of CMS' determination to
terminate the MA contract.  CMS' review of AHC's corrective action plan concluded
that the proposed plan was unacceptable since AHC was unable to provide CMS with
assurances that AHC would comply with the specific findings of the non-compliance

22

found in the May, 2005 Focused Audit Report.[59]  Furthermore, CMS provided AHC with reasonable notice and opportunity for a hearing, including the right to appeal an initial decision before terminating the contract.[60]

In summary, the Administrator finds that based on the record, the Hearing Officer correctly upheld CMS' determination that AHC failed to meet the requirements to substantially carry out the terms of its contract with CMS and has also failed to carry out the contract in a manner that is consistent with the effective or efficient implementation of such contract requirements.

## G. Summary

In summary, the Administrator upholds CMS' termination of the AHC contract.  In order to allow MA enrollees an orderly transition, the Administrator terminates the AHC contract effective December 31, 2006.

---

[59]  CMS Exhibit 116.
[60]  CMS Exhibit 69.

23

## DECISION

The decision of the Hearing Officer upholding CMS' termination of the AHC's contract is affirmed and hereby incorporated by reference in accordance with the foregoing opinion. The Administrator upholds CMS termination of the AHC contract effective December 31, 2006.

### THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES

Date: **11\30\06**

Herb B. Kuhn
Acting Deputy Administrator
Centers For Medicare & Medicaid Services

# EXHIBIT B

Contract with Eligible Medicare Advantage (MA) Organization Pursuant to
Sections 1851 through 1859 of the Social Security Act for the Operation
of a Medicare Advantage Coordinated Care Plan(s)

CONTRACT # H1034

Between

Centers for Medicare & Medicaid Services (hereinafter referred to as CMS)

and

America's Health Choice Medical Plans, Inc.
(hereinafter referred to as the MA Organization)

CMS and the MA Organization, an entity which has been determined to be an eligible Medicare
Advantage Organization by the Administrator of the Centers for Medicare & Medicaid Services
under 42 CFR 422.503, agree to the following for the purposes of sections 1851 through 1859 of
the Social Security Act (hereinafter referred to as the Act):

(NOTE: Citations indicated in brackets are placed in the text of this contract to note the
regulatory authority for certain contract provisions. All references to Part 422 are to 42 CFR
Part 422.)

---

**You must check off AND initial each required Addendum type to reflect the coverage offered under the H (or R) number associated with this contract**

| Addendum Type | Initials |
|---|---|
| ____ Part D Addendum | |
| ____ Employer-Only MA-PD Addendum (800 Series) | _____ |
| ____ Employer-Only MA Only Addendum (800 Series) | _____ |
| ____ Variances/Waivers (Provided directly to Demonstration Organizations by CMS) | _____ |
| ____ Regional Preferred Provider Organization Addendum (Provided directly to RPPOs by CMS) | _____ |

## Article I

### Term of Contract

The term of this contract shall be from the date of signature by CMS' authorized representative through December 31, 2006, after which this contract may be renewed for successive one-year periods in accordance with 42 CFR 422.505(c) and as discussed in Paragraph A in Article VII below. **[422.505]**

This contract governs the respective rights and obligations of the parties as of the effective date set forth above, and supersedes any prior agreements between the MA Organization and CMS as of such date. MA organizations offering Part D also must execute an Addendum to the Medicare Managed Care Contract Pursuant to Sections 1860D-1 through 1860D-42 of the Social Security Act for the Operation of a Voluntary Medicare Prescription Drug Plan (hereafter the "Part D Addendum"). For MA Organizations offering MA-PD plans, the Part D Addendum governs the rights and obligations of the parties relating to the provision of Part D benefits, in accordance with its terms, as of its effective date.

## Article II

### Coordinated Care Plan

A. The Medicare Advantage Organization agrees to operate one or more coordinated care plans as defined in 42 CFR 422.4(a)(1)(iii)), including at least one MA-PD plan as required under 42 CFR 422.4(c), as described in its final Plan Benefit Package (PBP) bid submission (benefit and price bid) proposal as approved by CMS and as attested to in the Medicare Advantage Attestation of Benefit Plan and Price, and in compliance with the requirements of this contract and applicable Federal statutes, regulations, and policies.

B. Except as provided in paragraph (C) of this Article, this contract is deemed to incorporate any changes that are required by statute to be implemented during the term of the contract and any regulations or policies implementing or interpreting such statutory provisions.

C. CMS will not implement, other than at the beginning of a calendar year, requirements under 42 CFR Part 422 that impose a new significant cost or burden on MA organizations or plans, unless a different effective date is required by statute. **[422.521]**

## Article III

### Functions To Be Performed By Medicare Advantage Organization

A. PROVISION OF BENEFITS

1. The MA Organization agrees to provide enrollees in each of its MA plans the basic benefits as required under §422.101 and, to the extent applicable, supplemental benefits under §422.102 and as established in the MA Organization's final benefit and price bid proposal as approved by CMS and listed in the MA Organization Plan Attestation of Benefit Plan and Price, which is attached to this contract. The MA Organization agrees to provide access to such benefits as

2

required under subpart C in a manner consistent with professionally recognized standards of health care and according to the access standards stated in §422.112.

2. The MA Organization agrees to provide post-hospital extended care services, should an MA enrollee elect such coverage, through a skilled nursing home facility according to the requirements of section 1852(l) of the Act and §422.133. A skilled nursing home facility is a facility in which an MA enrollee resided at the time of admission to the hospital, a facility that provides services through a continuing care retirement community, a facility in which the spouse of the enrollee is residing at the time of the enrollee's discharge from the hospital, or hospital, or wherever the enrollee resides immediately before admission for extended care services. [422. 133; 422.504(a)(3)]

B. ENROLLMENT REQUIREMENTS
1. The MA Organization agrees to accept new enrollments, make enrollments effective, process voluntary disenrollments, and limit involuntary disenrollments, as provided in subpart B of part 422.
2. The MA Organization shall comply with the provisions of §422.110 concerning prohibitions against discrimination in beneficiary enrollment, other than in enrolling eligible beneficiaries in a CMA-approved special needs plan that exclusively enrolls special needs individuals as consistent with §§422.2, 422.4(a)(1)(iv) and 422.52.
[422.504(a)(2)]

C. BENEFICIARY PROTECTIONS
1. The MA Organization agrees to comply with all requirements in subpart M of part 422, governing coverage determinations, grievances, and appeals. [422.504(a)(7)]
2. The MA Organization agrees to comply with the confidentiality and enrollee record accuracy requirements in §422.118.
3. Beneficiary Financial Protections. The MA Organization agrees to comply with the following requirements:
    (a) Each MA Organization must adopt and maintain arrangements satisfactory to CMS to protect its enrollees from incurring liability for payment of any fees that are the legal obligation of the MA Organization. To meet this requirement the MA Organization must--
        (i) Ensure that all contractual or other written arrangements with providers prohibit the Organization's providers from holding any beneficiary enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and
        (ii) Indemnify the beneficiary enrollee for payment of any fees that are the legal obligation of the MA Organization for services furnished by providers that do not contract, or that have not otherwise entered into an agreement with the MA Organization, to provide services to the organization's beneficiary enrollees. [422.504(g)(1)]
    (b) The MA Organization must provide for continuation of enrollee health care benefits-
        (i) For all enrollees, for the duration of the contract period for which CMS payments have been made; and
        (ii) For enrollees who are hospitalized on the date its contract with CMS terminates, or, in the event of the MA Organization's insolvency, through the date of discharge. [422.504(g)(2)]

3

(c) In meeting the requirements of this section (C), other than the provider contract requirements specified in paragraph (C)(3)(a) of this Article, the MA Organization may use--

    (i) Contractual arrangements;

    (ii) Insurance acceptable to CMS;

    (iii) Financial reserves acceptable to CMS; or

    (iv) Any other arrangement acceptable to CMS. **[422.504(g)(3)]**

## D. PROVIDER PROTECTIONS

1. The MA Organization agrees to comply with all applicable provider requirements in 42 CFR Part 422 Subpart E, including provider certification requirements, anti-discrimination requirements, provider participation and consultation requirements, the prohibition on interference with provider advice, limits on provider indemnification, rules governing payments to providers, and limits on physician incentive plans. **[422.504(a)(6)]**

2. Prompt Payment.

    (a) The MA Organization must pay 95 percent of "clean claims" within 30 days of receipt if they are claims for covered services that are not furnished under a written agreement between the organization and the provider.

    (i) The MA Organization must pay interest on clean claims that are not paid within 30 days in accordance with sections 1816(c)(2) and 1842(c)(2) of the Act.

    (ii) All other claims from non-contracted providers must be paid or denied within 60 calendar days from the date of the request. **[422.520(a)]**

    (b) Contracts or other written agreements between the MA Organization and its providers must contain a prompt payment provision, the terms of which are developed and agreed to by both the MA Organization and the relevant provider. **[422.520(b)]**

    (c) If CMS determines, after giving notice and opportunity for hearing, that the MA Organization has failed to make payments in accordance with subparagraph (2)(a) of this section, CMS may provide--

    (i) For direct payment of the sums owed to providers; and

(ii) For appropriate reduction in the amounts that would otherwise be paid to the MA Organization, to reflect the amounts of the direct payments and the cost of making those payments. **[422.520(c)]**

## E. QUALITY IMPROVEMENT PROGRAM

1. The MA Organization agrees to operate, for each plan that it offers, an ongoing quality improvement program as stated in accordance with Section 1852(e) of the Social Security Act and 42 CFR 422.152.

2. Chronic Care Improvement Program

    (a) Each MA organization (other than MA private-fee-for-service plans) must have a chronic care improvement program and must establish criteria for participation in the program. The CCIP must have a method for identifying enrollees with multiple or sufficiently severe chronic conditions who meet the criteria for participation in the program and a mechanism for monitoring enrollees' participation in the program.

    (b) Plans have flexibility to choose the design of their program; however, in addition to meeting the requirements specified above, the CCIP selected must be relevant to the plan's MA

4

population. MA organizations are required to submit annual reports on their CCIP program to CMS.

3. <u>Performance Measurement and Reporting</u>: The MA Organization shall measure performance under its MA plans using standard measures required by CMS, and report (at the organization level) its performance to CMS. The standard measures required by CMS during the term of this contract will be uniform data collection and reporting instruments, to include the Health Plan and Employer Data Information Set (HEDIS), Consumer Assessment of Health Plan Satisfaction (CAHPS) survey, and Health Outcomes Survey (HOS). These measures will address clinical areas, including effectiveness of care, enrollee perception of care and use of services; and non-clinical areas including access to and availability of services, appeals and grievances, and organizational characteristics. **[422.152(b)(1), (e)]**

4. <u>Utilization Review</u>:

(a) An MA Organization for an MA coordinated care plan must use written protocols for utilization review and policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and have in effect mechanisms to detect both underutilization and over utilization of services. **[422.152(b)]**

(b) For MA regional preferred provider organizations (RPPOs) and MA local preferred provider organizations (PPOs) that are offered by an organization that is not licensed or organized under State law as an HMOs, if the MA Organization uses written protocols for utilization review, those policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and include mechanisms to evaluate utilization of services and to inform enrollees and providers of services of the results of the evaluation. **[422.152(e)]** .

5. <u>Information Systems</u>:

(a) The MA Organization must:

(i) Maintain a health information system that collects, analyzes and integrates the data necessary to implement its quality improvement program;

(ii) Ensure that the information entered into the system (particularly that received from providers) is reliable and complete;

(iii) Make all collected information available to CMS. **[422.152(f)(1)]**

6. <u>External Review</u>

The MA Organization will comply with any requests by Quality Improvement Organizations to review the MA Organization's medical records in connection with appeals of discharges from hospitals, skilled nursing facilities, and home health agencies.


F. COMPLIANCE PLAN

The MA Organization agrees to implement a compliance plan in accordance with the requirements of §422.503(b)(4)(vi). **[422.503(b)(4)(vi)]**


G. COMPLIANCE DEEMED ON THE BASIS OF ACCREDITATION

CMS may deem the MA Organization to have met the quality improvement requirements of §1852(e) of the Act and §422.152, the confidentiality and accuracy of enrollee records requirements of §1852(h) of the Act and §422.118, the anti-discrimination requirements of §1852(b) of the Act and §422.110, the access to services requirements of §1852(d) of the Act and §422.112, and the advance directives requirements of §1852(i) of the Act and §422.128, the

5

provider participation requirements of §1852(j) of the Act and 42 CFR Part 422, Subpart F, and the applicable requirements described in §423.165, if the MA Organization is fully accredited (and periodically reaccredited) by a private, national accreditation organization approved by CMS and the accreditation organization used the standards approved by CMS for the purposes of assessing the MA Organization's compliance with Medicare requirements. The provisions of §422.156 shall govern the MA Organization's use of deemed status to meet MA program requirements.

## H. PROGRAM INTEGRITY

1. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS of any integrity items related to payments from governmental entities, both federal and state, for healthcare or prescription drug services. These items include any investigations, legal actions or matters subject to arbitration brought involving the MA Organization (or MA Organization's firm if applicable) and its subcontractors (excluding contracted network providers), including any key management or executive staff, or any major shareholders (5% or more), by a government agency (state or federal) on matters relating to payments from governmental entities, both federal and state, for healthcare and/or prescription drug services. In providing the notice, the sponsor shall keep the government informed of when the integrity item is initiated and when it is closed. Notice should be provided of the details concerning any resolution and monetary payments as well as any settlement agreements or corporate integrity agreements.

2. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS in the event the MA Organization or any of its subcontractors is criminally convicted or has a civil judgment entered against it for fraudulent activities or is sanctioned under any Federal program involving the provision of health care or prescription drug services.

## I. MARKETING

1. The MA Organization may not distribute any marketing materials, as defined in 42 CFR 422.80(b) and in the Marketing Materials Guidelines for Medicare Advantage-Prescription Drug Plans and Prescription Drug Plans (Medicare Marketing Guidelines), unless they have been filed with and not disapproved by CMS in accordance with §422.80. The file and use process set out at §422.80(a)(2) must be used, unless the MA organization notifies CMS that it will not use this process.

2. CMS and the MA Organization shall agree upon language setting forth the benefits, exclusions and other language of the Plan. The MA Organization bears full responsibility for the accuracy of its marketing materials. CMS, in its sole discretion, may order the MA Organization to print and distribute the agreed upon marketing materials, in a format approved by CMS. The MA Organization must disclose the information to each enrollee electing a plan as outlined in 42 CFR 422.111.

3. The MA Organization agrees that any advertising material, including that labeled promotional material, marketing materials, or supplemental literature, shall be truthful and not misleading. All marketing materials must include the Contract number. All membership identification cards must include the Contract number on the front of the card.

4. The MA Organization must comply with the Medicare Marketing Guidelines, as well as all applicable statutes and regulations, including and without limitation Section 1851(h) of the Act

6

and 42 CFR §§422.80, 422.111 and 423.50. Failure to comply may result in sanctions as provided in 42 CFR Part 422 Subpart O.

Article IV

CMS Payment to MA Organization

A. The MA Organization agrees to develop its annual benefit and price bid proposal and submit to CMS all required information on premiums, benefits, and cost sharing, as required under 42 CFR Part 422 Subpart F. [422.504(a)(10)]

B. Methodology. CMS agrees to pay the MA Organization under this contract in accordance with the provisions of section 1853 of the Act and 42 CFR Part 422 Subpart G. [422.504(a)(9)]

C. Attestation of payment data (Attachments A, B, and C).
As a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the forms attached hereto as Attachment A (enrollment attestation) and Attachment B (risk adjustment data) which attest to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on these attachments. The Medicare Advantage Plan Attestation of Benefit Plan and Price must be signed and attached to the executed version of this contract.
1. Attachment A requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization. The MA Organization shall submit completed enrollment attestation forms to CMS, or its contractor, on a monthly basis. (NOTE: The forms included as attachments to this contract are for reference only. CMS will provide instructions for the completion and submission of the forms in separate documents. MA Organizations should not take any action on the forms until appropriate CMS instructions become available.)
2. Attachment B requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must *attest to (based on best knowledge, information and belief, as of the date specified on the attestation form)* that the risk adjustment data it submits to CMS under §422.310 are accurate, complete, and truthful. The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS. If such risk adjustment data are generated by a related entity, contractor, or subcontractor of an MA Organization, such entity, contractor, or subcontractor must similarly *attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data. [422.504(l)]
3. The Medicare Advantage Plan Attestation of Benefit Plan and Price (which is attached hereto requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of

one of these officers, and who reports directly to such officer, must attest *(based on best knowledge, information and belief, as of the date specified on the attestation form)* that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission. This document is being sent separately to the MA Organization and must be signed and attached to the executed version of this contract, and is incorporated herein by reference. [422.502(l)]

Article V

MA Organization Relationship with Related Entities, Contractors, and Subcontractors

A. Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS. [422.504(i)(1)]

B. The MA Organization agrees to require all related entities, contractors, or subcontractors to agree that--
    (1) HHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent contracts, books, documents, papers, and records of the related entity(s), contractor(s), or subcontractor(s) involving transactions related to this contract; and
    (2) HHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular contract period for 10 years from the final date of the contract period or from the date of completion of any audit, whichever is later. [422.504(i)(2)]

C. The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements:
    (1) Enrollee protection provisions that provide--
    (a) Consistent with Article III(C), arrangements that prohibit providers from holding an enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and
    (b) Consistent with Article III(C), provision for the continuation of benefits.
    (2) Accountability provisions that indicate that the MA Organization may only delegate activities or functions to a provider, related entity, contractor, or subcontractor in a manner consistent with requirements set forth at paragraph D of this article.
    (3) A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA Organization will be consistent and comply with the MA Organization's contractual obligations to CMS. [422.504(i)(3)]

8

D. If any of the MA Organization's activities or responsibilities under this contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or provider:

(1) Written arrangements must specify delegated activities and reporting responsibilities.

(2) Written arrangements must either provide for revocation of the delegation activities and reporting requirements or specify other remedies in instances where CMS or the MA Organization determine that such parties have not performed satisfactorily.

(3) Written arrangements must specify that the performance of the parties is monitored by the MA Organization on an ongoing basis.

(4) Written arrangements must specify that either--

(a) The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA Organization; or

(b) The credentialing process will be reviewed and approved by the MA Organization and the MA Organization must audit the credentialing process on an ongoing basis.

(5) All contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions.
**[422.504(i)(4)]**

E. If the MA Organization delegates selection of the providers, contractors, or subcontractors to another organization, the MA Organization's written arrangements with that organization must state that the MA Organization retains the right to approve, suspend, or terminate any such arrangement. **[422.504(i)(5)]**

F. As of the date of this contract and throughout its term, the MA Organization

(1) Agrees that any physician incentive plan it operates meets the requirements of §422.208, and

(2) Has assured that all physicians and physician groups that the MA Organization's physician incentive plan places at substantial financial risk have adequate stop-loss protection in accordance with §422.208(f). **[422.208]**

9

Article VI

Records Requirements

## A. MAINTENANCE OF RECORDS

1. The MA Organization agrees to maintain for 10 years books, records, documents, and other evidence of accounting procedures and practices that--

(a) Are sufficient to do the following:

(i) Accommodate periodic auditing of the financial records (including data related to Medicare utilization, costs, and computation of the benefit and price bid) of the MA Organization.

(ii) Enable CMS to inspect or otherwise evaluate the quality, appropriateness and timeliness of services performed under the contract, and the facilities of the MA Organization.

(iii) Enable CMS to audit and inspect any books and records of the MA Organization that pertain to the ability of the organization to bear the risk of potential financial losses, or to services performed or determinations of amounts payable under the contract.

(iv) Properly reflect all direct and indirect costs claimed to have been incurred and used in the preparation of the benefit and price bid proposal.

(v) Establish component rates of the benefit and price bid for determining additional and supplementary benefits.

(vi) Determine the rates utilized in setting premiums for State insurance agency purposes and for other government and private purchasers; and

(b) Include at least records of the following:

(i) Ownership and operation of the MA Organization's financial, medical, and other record keeping systems.

(ii) Financial statements for the current contract period and six prior periods.

(iii) Federal income tax or informational returns for the current contract period and six prior periods.

(iv) Asset acquisition, lease, sale, or other action.

(v) Agreements, contracts (including, but not limited to, with related or unrelated prescription drug benefit managers) and subcontracts.

(vi) Franchise, marketing, and management agreements.

(vii) Schedules of charges for the MA Organization's fee-for-service patients.

(viii) Matters pertaining to costs of operations.

(ix) Amounts of income received, by source and payment.

(x) Cash flow statements.

(xi) Any financial reports filed with other Federal programs or State authorities.

[422.504(d)]

2. Access to facilities and records. The MA Organization agrees to the following:

(a) The Department of Health and Human Services (HHS), the Comptroller General, or their designee may evaluate, through inspection or other means--

(i) The quality, appropriateness, and timeliness of services furnished to Medicare enrollees under the contract;

(ii) The facilities of the MA Organization; and

10

(iii) The enrollment and disenrollment records for the current contract period and ten prior periods.

(b) HHS, the Comptroller General, or their designees may audit, evaluate, or inspect any books, contracts, medical records, documents, papers, patient care documentation, and other records of the MA Organization, related entity, contractor, subcontractor, or its transferee that pertain to any aspect of services performed, reconciliation of benefit liabilities, and determination of amounts payable under the contract, or as the Secretary may deem necessary to enforce the contract.

(c) The MA Organization agrees to make available, for the purposes specified in section (A) of this article, its premises, physical facilities and equipment, records relating to its Medicare enrollees, and any additional relevant information that CMS may require, in a manner that meets CMS record maintenance requirements.

(d) HHS, the Comptroller General, or their designee's right to inspect, evaluate, and audit extends through 10 years from the final date of the contract period or completion of audit, whichever is later unless-

(i) CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies the MA Organization at least 30 days before the normal disposition date;

(ii) There has been a termination, dispute, or fraud or similar fault by the MA Organization, in which case the retention may be extended to 10 years from the date of any resulting final resolution of the termination, dispute, or fraud or similar fault; or

(iii) HHS, the Comptroller General, or their designee determines that there is a reasonable possibility of fraud, in which case they may inspect, evaluate, and audit the MA Organization at any time. [422.502(e)]

B. REPORTING REQUIREMENTS

1. The MA Organization shall have an effective procedure to develop, compile, evaluate, and report to CMS, to its enrollees, and to the general public, at the times and in the manner that CMS requires, and while safeguarding the confidentiality of the doctor-patient relationship, statistics and other information as described in the remainder of this section (B). [422.516(a)]

2. The MA Organization agrees to submit to CMS certified financial information that must include the following:

(a) Such information as CMS may require demonstrating that the organization has a fiscally sound operation, including:

(i) The cost of its operations;

(ii) A description, submitted to CMS annually and within 120 days of the end of the fiscal year, of significant business transactions (as defined in §422.500) between the MA Organization and a party in interest showing that the costs of the transactions listed in paragraph (2)(a)(v) of this section do not exceed the costs that would be incurred if these transactions were with someone who is not a party in interest; or

(iii) If they do exceed, a justification that the higher costs are consistent with prudent management and fiscal soundness requirements.

(iv) A combined financial statement for the MA Organization and a party in interest if either of the following conditions is met:

11

(aa) Thirty-five percent or more of the costs of operation of the MA Organization go to a party in interest.

(bb) Thirty-five percent or more of the revenue of a party in interest is from the MA Organization. [422.516(b)]

(v)Requirements for combined financial statements.

(aa) The combined financial statements required by paragraph (2)(a)(iv) must display in separate columns the financial information for the MA Organization and each of the parties in interest.

(bb) Inter-entity transactions must be eliminated in the consolidated column.

(cc) The statements must have been examined by an independent auditor in accordance with generally accepted accounting principles and must include appropriate opinions and notes.

(dd) Upon written request from the MA Organization showing good cause, CMS may waive the requirement that the organization's combined financial statement include the financial information required in paragraph (2)(a)(v) with respect to a particular entity. [422.516(c)]

(vi) A description of any loans or other special financial arrangements the MA Organization makes with contractors, subcontractors, and related entities.

(b) Such information as CMS may require pertaining to the disclosure of ownership and control of the MA Organization. [422.502(f)(1)(ii)]

(c) Patterns of utilization of the MA Organization's services.

3. The MA Organization agrees to participate in surveys required by CMS and to submit to CMS all information that is necessary for CMS to administer and evaluate the program and to simultaneously establish and facilitate a process for current and prospective beneficiaries to exercise choice in obtaining Medicare services. This information includes, but is not limited to:

(a) The benefits covered under the MA plan;

(b) The MA monthly basic beneficiary premium and MA monthly supplemental beneficiary premium, if any, for the plan.

(c) The service area and continuation area, if any, of each plan and the enrollment capacity of each plan;

(d) Plan quality and performance indicators for the benefits under the plan including --

(i) Disenrollment rates for Medicare enrollees electing to receive benefits through the plan for the previous 2 years;

(ii) Information on Medicare enrollee satisfaction;

(iii) The patterns of utilization of plan services;

(iv) The availability, accessibility, and acceptability of the plan's services;

(v) Information on health outcomes and other performance measures required by CMS;

(vi) The recent record regarding compliance of the plan with requirements of this part, as determined by CMS; and

(vii) Other information determined by CMS to be necessary to assist beneficiaries in making an informed choice among MA plans and traditional Medicare;

(e) Information about beneficiary appeals and their disposition;

(f) Information regarding all formal actions, reviews, findings, or other similar actions by States, other regulatory bodies, or any other certifying or accrediting organization;

(g) Any other information deemed necessary by CMS for the administration or evaluation of the Medicare program. [422.502(f)(2)]

12

4. The MA Organization agrees to provide to its enrollees and upon request, to any individual eligible to elect an MA plan, all informational requirements under §422.64 and, upon an enrollee's, request, the financial disclosure information required under §422.516. **[422.502(f)(3)]**

5. Reporting and disclosure under ERISA.

(a) For any employees' health benefits plan that includes an MA Organization in its offerings, the MA Organization must furnish, upon request, the information the plan needs to fulfill its reporting and disclosure obligations (with respect to the MA Organization) under the Employee Retirement Income Security Act of 1974 (ERISA).

(b) The MA Organization must furnish the information to the employer or the employer's designee, or to the plan administrator, as the term "administrator" is defined in ERISA. **[422.516(d)]**

6. Electronic communication. The MA Organization must have the capacity to communicate with CMS electronically. **[422.504(b)]**

7. Risk Adjustment data. The MA Organization agrees to comply with the requirements in §422.310 for submitting risk adjustment data to CMS. **[422.504(a)(8)]**

Article VII

Renewal of the MA Contract

A. Renewal of contract: In accordance with §422.505, following the initial contract period, this contract is renewable annually only if-

(1) The MA Organization has not provided CMS with a notice of intention not to renew; **[422.506(a)]**

(2) CMS and the MA Organization reach agreement on the bid under 42 CFR Part 422, Subpart F; and **[422.505(d)]**

(3) CMS informs the MA Organization that it authorizes a renewal.

B. Nonrenewal of contract

(1) Nonrenewal by the Organization.

(a) In accordance with §422.506, the MA Organization may elect not to renew its contract with CMS as of the end of the term of the contract for any reason, provided it meets the time frames for doing so set forth in subparagraphs (b) and (c) of this paragraph.

(b) If the MA Organization does not intend to renew its contract, it must notify--

(i) CMS, in writing, by the first Monday in June of the year in which the contract would end, pursuant to §422.506

(ii) Each Medicare enrollee, at least 90 days before the date on which the nonrenewal is effective. This notice must include a written description of all alternatives available for obtaining Medicare services within the service area including alternative MA plans, Medigap options, and original Medicare and prescription drug plans and must receive CMS approval prior to issuance.

(iii) The general public, at least 90 days before the end of the current calendar year, by publishing a CMS-approved notice in one or more newspapers of general circulation in each community located in the MA Organization's service area.

13

(c) CMS may accept a nonrenewal notice submitted after the applicable annual non-renewal notice deadline if --

(i) The MA Organization notifies its Medicare enrollees and the public in accordance with subparagraph (1)(b)(ii) and (1)(b)(iii) of this section; and

(ii) Acceptance is not inconsistent with the effective and efficient administration of the Medicare program.

(d) If the MA Organization does not renew a contract under subparagraph (1), CMS will not enter into a contract with the Organization for 2 years from the date of contract separation unless there are special circumstances that warrant special consideration, as determined by CMS. [422.506(a)]

(2) CMS decision not to renew.

(a) CMS may elect not to authorize renewal of a contract for any of the following reasons:

(i) The MA Organization's level of enrollment, growth in enrollment, or insufficient number of contracted providers is determined by CMS to threaten the viability of the organization under the MA program and or be an indicator of beneficiary dissatisfaction with the MA plan(s) offered by the organization.

(ii) For any of the reasons listed in §422.510(a) [Article VIII, section (B)(1)(a) of this contract], which would also permit CMS to terminate the contract.

(iii) The MA Organization has committed any of the acts in §422.752(a) that would support the imposition of intermediate sanctions or civil money penalties under 42 CFR Part 422 Subpart O.

(iv) The MA Organization did not submit a benefit and price bid or the benefit and price bid was not acceptable [422.505(d)]

(b) Notice. CMS shall provide notice of its decision whether to authorize renewal of the contract as follows:

(i) To the MA Organization by May 1 of the contract year, except in the event of (2)(a)(iv) above, for which notice will be sent by September 1.

(ii) To the MA Organization's Medicare enrollees by mail at least 90 days before the end of the current calendar year.

(iii) To the general public at least 90 days before the end of the current calendar year, by publishing a notice in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(c) Notice of appeal rights. CMS shall give the MA Organization written notice of its right to reconsideration of the decision not to renew in accordance with § 422.644. [422.506(b)]

14

Article VIII

Modification or Termination of the Contract

A. Modification or Termination of Contract by Mutual Consent

1. This contract may be modified or terminated at any time by written mutual consent.

(a) If the contract is modified by written mutual consent, the MA Organization must notify its Medicare enrollees of any changes that CMS determines are appropriate for notification within time frames specified by CMS. [422.508(a)(2)]

(b) If the contract is terminated by written mutual consent, except as provided in section (A)(2) of this Article, the MA Organization must provide notice to its Medicare enrollees and the general public as provided in section B(2)(b)(ii) and B(2)(b)(iii) of this Article. [422.508(a)(1)]

2. If this contract is terminated by written mutual consent and replaced the day following such termination by a new MA contract, the MA Organization is not required to provide the notice specified in section B of this article. [422.508(b)]

B. Termination of the Contract by CMS or the MA Organization

1. Termination by CMS.

(a) CMS may terminate a contract for any of the following reasons:

(i) The MA Organization has failed substantially to carry out the terms of its contract with CMS.

(ii) The MA Organization is carrying out its contract with CMS in a manner that is inconsistent with the effective and efficient implementation of 42 CFR Part 422.

(iii) CMS determines that the MA Organization no longer meets the requirements of 42 CFR Part 422 for being a contracting organization.

(iv) There is credible evidence that the MA Organization committed or participated in false, fraudulent or abusive activities affecting the Medicare program, including submission of false or fraudulent data.

(v) The MA Organization experiences financial difficulties so severe that its ability to make necessary health services available is impaired to the point of posing an imminent and serious risk to the health of its enrollees, or otherwise fails to make services available to the extent that such a risk to health exists.

(vi) The MA Organization substantially fails to comply with the requirements in 42 CFR Part 422 Subpart M relating to grievances and appeals.

(vii) The MA Organization fails to provide CMS with valid risk adjustment data as required under §422.310 and 423.329(b)(3).

(viii) The MA Organization fails to implement an acceptable quality improvement program as required under 42 CFR Part 422 Subpart D.

(ix) The MA Organization substantially fails to comply with the prompt payment requirements in §422.520.

(x) The MA Organization substantially fails to comply with the service access requirements in §422.112.

(xi) The MA Organization fails to comply with the requirements of §422.208 regarding physician incentive plans.

15

(xii) The MA Organization substantially fails to comply with the marketing requirements in 422.80.

(b) <u>Notice</u>. If CMS decides to terminate a contract for reasons other than the grounds specified in section (B)(1)(a) above, it will give notice of the termination as follows:

(i) CMS will notify the MA Organization in writing 90 days before the intended date of the termination.

(ii) The MA Organization will notify its Medicare enrollees of the termination by mail at least 30 days before the effective date of the termination.

(iii) The MA Organization will notify the general public of the termination at least 30 days before the effective date of the termination by publishing a notice in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(c) <u>Immediate termination of contract by CMS</u>.

(i) For terminations based on violations prescribed in paragraph (B)(1)(a)(v) of this article, CMS will notify the MA Organization in writing that its contract has been terminated effective the date of the termination decision by CMS. If termination is effective in the middle of a month, CMS has the right to recover the prorated share of the capitation payments made to the MA Organization covering the period of the month following the contract termination.

(ii) CMS will notify the MA Organization's Medicare enrollees in writing of CMS' decision to terminate the MA Organization's contract. This notice will occur no later than 30 days after CMS notifies the plan of its decision to terminate this contract. CMS will simultaneously inform the Medicare enrollees of alternative options for obtaining Medicare services, including alternative MA Organizations in a similar geographic area and original Medicare.

(iii) CMS will notify the general public of the termination no later than 30 days after notifying the MA Organization of CMS' decision to terminate this contract. This notice will be published in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(d) <u>Corrective action plan</u>

(i) <u>General</u>. Before terminating a contract for reasons other than the grounds specified in section (B)(1)(a)(v) of this article, CMS will provide the MA Organization with reasonable opportunity, not to exceed time frames specified at 42 CFR Part 422 Subpart N, to develop and receive CMS approval of a corrective action plan to correct the deficiencies that are the basis of the proposed termination.

(ii) <u>Exception</u>. If a contract is terminated under section (B)(1)(a)(v) of this article, the MA Organization will not have the opportunity to submit a corrective action plan.

(e) <u>Appeal rights</u>. If CMS decides to terminate this contract, it will send written notice to the MA Organization informing it of its termination appeal rights in accordance with 42 CFR Part 422 Subpart N. **[422.510]**

2. Termination by the MA Organization

(a) <u>Cause for termination</u>. The MA Organization may terminate this contract if CMS fails to substantially carry out the terms of the contract.

(b) <u>Notice</u>. The MA Organization must give advance notice as follows:

(i) To CMS, at least 90 days before the intended date of termination. This notice must specify the reasons why the MA Organization is requesting contract termination.

16

(ii) To its Medicare enrollees, at least 60 days before the termination effective date. This notice must include a written description of alternatives available for obtaining Medicare services within the service area, including alternative MA and MA-PD plans, PDP plans, Medigap options, and original Medicare and must receive CMS approval.

(iii) To the general public at least 60 days before the termination effective date by publishing a CMS-approved notice in one or more newspapers of general circulation in each community or county located in the MA Organization's geographic area.

(c) Effective date of termination. The effective date of the termination will be determined by CMS and will be at least 90 days after the date CMS receives the MA Organization's notice of intent to terminate.

(d) CMS' liability. CMS' liability for payment to the MA Organization ends as of the first day of the month after the last month for which the contract is in effect, but CMS shall make payments for amounts owed prior to termination but not yet paid.

(e) Effect of termination by the organization. CMS will not enter into an agreement with the MA Organization for a period of two years from the date the Organization has terminated this contract, unless there are circumstances that warrant special consideration, as determined by CMS. [422.512]

Article IX

Requirements of Other Laws and Regulations

A. The MA Organization agrees to comply with--

(1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 USC 3729 et seq.) , and the anti-kickback statute (section 1128B(b) of the Act): and

(2) HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164. [422.504(h)]

B. The MA Organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS, notwithstanding any relationship(s) that the MA organization may have with related entities, contractors, or subcontractors. [422.504(i)]

C. In the event that any provision of this contract conflicts with the provisions of any statute or regulation applicable to an MA Organization, the provisions of the statute or regulation shall have full force and effect.

17

Article X

Severability

The MA Organization agrees that, upon CMS' request, this contract will be amended to exclude any MA plan or State-licensed entity specified by CMS, and a separate contract for any such excluded plan or entity will be deemed to be in place when such a request is made. [422.504(k)]

Article XI

Miscellaneous

A. Definitions. Terms not otherwise defined in this contract shall have the meaning given to such terms in 42 CFR Part 422.

B. Alteration to Original Contract Terms. The MA Organization agrees that it has not altered in any way the terms of this contract presented for signature by CMS. The MA Organization agrees that any alterations to the original text the MA Organization may make to this contract shall not be binding on the parties.

C. Approval to Begin Marketing and Enrollment. The MA Organization agrees that it must complete CMS operational requirements prior to receiving CMS approval to begin Part C marketing and enrollment activities. Such activities include, but are not limited to, establishing and successfully testing connectivity with CMS systems to process enrollment applications (or contracting with an entity qualified to perform such functions on the MA Organization's Sponsor's behalf) and successfully demonstrating capability to submit accurate and timely price comparison data. To establish and successfully test connectivity, the MA Organization must, 1) establish and test physical connectivity to the CMS data center, 2) acquire user identifications and passwords, 3) receive, store, and maintain data necessary to perform enrollments and send and receive transactions to and from CMS, and 4) check and receive transaction status information.

D. Incorporation of Applicable Addenda. All addenda checked off and initialed on the cover sheet of this contract by the MA Organization are hereby incorporated by reference.

18

In witness whereof, the parties hereby execute this contract.

FOR THE MA ORGANIZATION

___Walter H. Janke, MD _____          __Chief Executive Officer ____
Printed Name                            Title

_____                 __October 27, 2005_____
Signature                               Date

America's Health Choice Medical Plans, Inc.
                                        __1175 South U.S. Highway 1,
                                           Vero Beach, FL  32962
Organization                            Address


FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES

_____             __11/18/05_____
Patricia P. Smith                       Date
Director
Medicare Advantage Group
Center for Beneficiary Choices

19

**ATTACHMENT A**

**ATTESTATION OF ENROLLMENT INFORMATION
RELATING TO CMS PAYMENT
TO A MEDICARE ADVANTAGE ORGANIZATION**

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (America's Health Choice Medical Plans, Inc.), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (H1034), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution. This attestation shall not be considered a waiver of the MA Organization's right to seek payment adjustments from CMS based on information or data which does not become available until after the date the MA Organization submits this attestation.

1. The MA Organization has reported to CMS for the month of (September 2005 ) all new enrollments, disenrollments, and changes in enrollees' institutional status with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

2. The MA Organization has reviewed the CMS monthly membership report and reply listing for the month of (September 2005) for the above-stated MA plans and has reported to CMS any discrepancies between the report and the MA Organization's records. For those portions of the monthly membership report and the reply listing to which the MA Organization raises no objection, the MA Organization, through the certifying CEO/CFO, will be deemed to have attested, based on best knowledge, information, and belief as of the date indicated below, to their accuracy, completeness, and truthfulness.

_____
(INDICATE TITLE [CEO, CFO, or delegate])

on behalf of

America's Health Choice Medical Plans, Inc.
(INDICATE MA ORGANIZATION)

10|27|05
DATE

20

**ATTACHMENT B**

## ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (America's Health Choice Medical Plans, Inc.), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (H1034 ), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS during the period of (September 2005) all (*PHYSICIAN*) risk adjustment data available to the MA Organization with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

_____
(INDICATE TITLE [CEO, CFO, or delegate])

on behalf of

America's Health Choice Medical Plans, Inc.
(INDICATE MA ORGANIZATION)

10/27/05
_____
DATE

21

## ADDENDUM TO MEDICARE MANAGED CARE CONTRACT PURSUANT TO SECTIONS 1860D-1 THROUGH 1860D-42 OF THE SOCIAL SECURITY ACT FOR THE OPERATION OF A VOLUNTARY MEDICARE PRESCRIPTION DRUG PLAN

The Centers for Medicare & Medicaid Services (hereinafter referred to as "CMS") and _____ America's Health Choice Medical Plans, Inc._____ , a Medicare managed care organization (hereinafter referred to as the MA-PD Sponsor) agree to amend the contract *H1034* governing the MA-PD Sponsor's operation of a Part C plan described in Section 1851(a)(2)(A) of the Social Security Act (hereinafter referred to as "the Act") or a Medicare cost plan to include this addendum under which the MA-PD Sponsor shall operate a Voluntary Medicare Prescription Drug Plan pursuant to sections 1860D-1 through 1860D-42 (with the exception of section 1860D-22 and 1860D-31) of the Act.

This addendum is made pursuant to Subpart L of 42 CFR Part 417 (in the case of cost plan sponsors offering a Part D benefit) and Subpart K of 42 CFR Part 422 (in the case of an MA-PD Sponsor offering a Part C plan).

NOTE: For purposes of this addendum, unless otherwise noted, reference to an "MA-PD Sponsor" or "MA-PD Plan" is deemed to include a cost plan sponsor or a MA private fee-for-service contractor offering a Part D benefit.

**Article I**
**Medicare Voluntary Prescription Drug Benefit**

A. The MA-PD Sponsor agrees to operate one or more Medicare Voluntary Prescription Drug Plans as described in its application and related materials, including but not limited to all the attestations contained therein and all supplemental guidance, for Medicare approval and in compliance with the provisions of this addendum, which incorporates in its entirety the Solicitation For Applications from Prescription Drug Plans released on January 21, 2005 (as revised on March 9, 2005) [applicable to Medicare Part C contractors] or the Solicitation for Applications from Cost Plan Sponsors released on January 21, 2005 (as revised on March 9, 2005) [applicable to Medicare cost plan contractors] (hereinafter collectively referred to as "the addendum"). The MA-PD Sponsor also agrees to operate in accordance with the regulations at 42 CFR §423.1 through 42 CFR §423.910 (with the exception of Subparts Q, R, and S), sections 1860D-1 through 1860D-42 (with the exception of sections 1860D-22(a) and 1860D-31) of the Social Security Act, and the applicable solicitation identified above, as well as all other applicable Federal statutes, regulations, and policies. This addendum is deemed to incorporate any changes that are required by statute to be implemented during the term of this addendum and any regulations or policies implementing or interpreting such statutory provisions.

B. CMS agrees to perform its obligations to the MA-PD Sponsor consistent with the regulations at 42 CFR §423.1 through 42 CFR §423.910 (with the exception of Subparts Q, R, and S), sections 1860D-1 through 1860D-42 (with the exception of sections 1860D-22(a) and 1860D-31) of the Social Security Act, and the applicable solicitation, as well as all other applicable Federal statutes, regulations, and policies.

C. CMS agrees that it will not implement, other than at the beginning of a calendar year, regulations under 42 CFR Part 423 that impose new, significant regulatory requirements on the MA-PD Sponsor. This provision does not apply to new requirements mandated by statute.

D. This addendum is in no way intended to supersede or modify 42 CFR, Parts 417, 422 or 423. Failure to reference a regulatory requirement in this addendum does not affect the applicability of such requirements to the MA-PD Sponsor and CMS.

**Article II**
**Functions to be Performed by the MA-PD Sponsor**

A. ENROLLMENT

   1. MA-PD Sponsor agrees to enroll in its MA-PD plan only Part D-eligible beneficiaries as they are defined in 42 CFR §423.30(a) and who have elected to enroll in MA-PD Sponsor's Part C or Section 1876 benefit.

    2. If the MA-PD Sponsor is a cost plan sponsor, the MA-PD Sponsor acknowledges that its Section 1876 plan enrollees are not required to elect enrollment in its Part D plan.

## B. PRESCRIPTION DRUG BENEFIT

1. MA-PD Sponsor agrees to provide the required prescription drug coverage as defined under 42 CFR §423.100 and, to the extent applicable, supplemental benefits as defined in 42 CFR §423.100 and in accordance with Subpart C of 42 CFR Part 423. MA-PD Sponsor also agrees to provide Part D benefits as described in the MA-PD Sponsor's Part D bid(s) approved each year by CMS (and in the Attestation of Benefit Plan and Price, attached hereto).
2. MA-PD Sponsor agrees to calculate and collect beneficiary Part D premiums in accordance with 42 CFR §§423.286 and 423.293.
3. If the MA-PD Sponsors is a cost plans sponsor, it acknowledge that its Part D benefit is offered as an optional supplemental service in accordance with 42 CFR §417.440(b)(2)(ii).

## C. DISSEMINATION OF PLAN INFORMATION

1. MA-PD Sponsor agrees to provide the information required in 42 CFR §423.48.

2. MA-PD Sponsor agrees to disclose information related to Part D benefits to beneficiaries in the manner and the form specified by CMS under 42 CFR §§423.128 and 423.50 and in the "Marketing Materials Guidelines for Medicare Advantage-Prescription Drug Plans (MA-PDs) and Prescription Drug Plans (PDPs)."

3. MA-PD Sponsor certifies that all materials it submits to CMS under the File and Use Certification authority described in the Marketing Materials Guidelines are accurate, truthful, not misleading, and consistent with CMS marketing guidelines.

## D. QUALITY ASSURANCE/UTILIZATION MANAGEMENT

MA-PD Sponsor agrees to operate quality assurance, cost, and utilization management, medication therapy management programs, and support electronic prescribing in accordance with Subpart D of 42 CFR Part 423.

## E. APPEALS AND GRIEVANCES

MA-PD Sponsor agrees to comply with all requirements in Subpart M of 42 CFR Part 423 governing coverage determinations, grievances and appeals, and formulary exceptions. MA-PD Sponsor acknowledges that these requirements are separate and distinct from the appeals and grievances requirements applicable to the MA-PD Sponsor through the operation of its Part C or cost plan benefits.

F. PAYMENT TO MA-PD SPONSOR

1. MA-PD Sponsor and CMS agree that payment paid for Part D services under the addendum will be governed by the rules in Subpart G of 42 CFR Part 423.

2. If the MA-PD Sponsor is participating in the Part D Reinsurance Payment Demonstration, described in 70 FR 9360 (Feb. 25, 2005), it affirms that it will not seek payment under the demonstration for services provided to employer group enrollees.

G. BID SUBMISSION AND REVIEW

If the MA-PD Sponsor intends to participate in the Part D program for the future year, MA-PD Sponsor agrees to submit a future year's Part D bid, including all required information on premiums, benefits, and cost-sharing, by the applicable due date, as provided in Subpart F of 42 CFR Part 423 so that CMS and the MA-PD Sponsor may conduct negotiations regarding the terms and conditions of the proposed bid and benefit plan renewal. MA-PD Sponsor acknowledges that failure to submit a timely bid under this section may affect the sponsor's ability to offer a Part C plan, pursuant to the provisions of 42 CFR §422.4(c).

H. COORDINATION WITH OTHER PRESCRIPTION DRUG COVERAGE

1. MA-PD Sponsor agrees to comply with the coordination requirements with State Pharmacy Assistance Programs (SPAPs) and plans that provide other prescription drug coverage as described in Subpart J of 42 CFR Part 423.

2. MA-PD Sponsor agrees to comply with Medicare Secondary Payer procedures as stated in 42 CFR §423.462.

I. SERVICE AREA AND PHARMACY ACCESS

1. The MA-PD Sponsor agrees to provide Part D benefits in the service area for which it has been approved by CMS to offer Part C or cost plan benefits utilizing a pharmacy network and formulary approved by CMS that meet the requirements of 42 CFR §423.120.

2. The MA-PD Sponsor agrees to ensure adequate access to Part D-covered drugs at out-of-network pharmacies according to 42 CFR §423.124.

3. MA-PD Sponsor agrees to provide benefits by means of point-of-service systems to adjudicate prescription drug claims in a timely and efficient manner in compliance with CMS standards, except when necessary to provide access in underserved areas, I/T/U pharmacies (as defined in 42 CFR §423.100), and long-term care pharmacies (as defined in 42 CFR §423.100).

4

4. MA-PD Sponsor agrees to contract with any pharmacy that meets the MA-PD Sponsor's reasonable and relevant standard terms and conditions. If MA-PD Sponsor has demonstrated that it historically fills 98% or more of its enrollees' prescriptions at pharmacies owned and operated by the MA-PD Sponsor (or presents compelling circumstances that prevent the sponsor from meeting the 98% standard or demonstrates that its Part D plan design will enable the sponsor to meet the 98% standard during the contract year), this provision does not apply to MA-PD Sponsor's plan.

5. The provisions of 42 CFR §423.120(a) concerning the TRICARE retail pharmacy access standard do not apply to MA-PD Sponsor if the Sponsor has demonstrated to CMS that it historically fills more than 50% of its enrollees' prescriptions at pharmacies owned and operated by the MA-PD Sponsor. MA-PD Sponsors excused from meeting the TRICARE standard are required to demonstrate retail pharmacy access that meets the requirements of 42 CFR §422.112 for a Part C contractor and 42 CFR §417.416(e) for a cost plan contractor.

## J. COMPLIANCE PLAN/PROGRAM INTEGRITY

MA-PD Sponsor agrees that it will develop and implement a compliance plan that applies to its Part D-related operations, consistent with 42 CFR §423.504(b)(4)(vi).

## K. LOW-INCOME SUBSIDY

MA-PD Sponsor agrees that it will participate in the administration of subsidies for low-income individuals according to Subpart P of 42 CFR Part 423.

## L. BENEFICIARY FINANCIAL PROTECTIONS

The MA-PD Sponsor agrees to afford its enrollees protection from liability for payment of fees that are the obligation of the MA-PD Sponsor in accordance with 42 CFR §423.505(g).

## M. RELATIONSHIP WITH RELATED ENTITIES, CONTRACTORS, AND SUBCONTRACTORS

1. The MA-PD Sponsor agrees that it maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of this addendum.

2. The MA-PD Sponsor shall ensure that any contracts or agreements with subcontractors or agents performing functions on the MA-PD Sponsor's behalf related to the operation of the Part D benefit are in compliance with 42 CFR §423.505(i).

## N. CERTIFICATION OF DATA THAT DETERMINE PAYMENT

MA-PD Sponsor must provide certifications in accordance with 42 CFR §423.505(k).

### Article III
### Record Retention and Reporting Requirements

A. MAINTENANCE OF RECORDS

MA-PD Sponsor agrees to maintain records and provide access in accordance with 42 CFR §§423.504(d) and 505(d) and (e).

B. GENERAL REPORTING REQUIREMENTS

The MA-PD Sponsor agrees to submit to information to CMS according to 42 CFR §§423.505(f), 423.514, and the "Final Medicare Part D Reporting Requirements," a document issued by CMS and subject to modification each program year.

C. CMS License For Use of Plan Formulary

PDP Sponsor agrees to submit to CMS each plan's formulary information, including any changes to its formularies, and hereby grants to the Government[, and any person or entity who might receive the formulary from the Government,] a non-exclusive license to use all or any portion of the formulary for any purpose related to the administration of the Part D program, including without limitation publicly distributing, displaying, publishing or reconfiguration of the information in any medium, including www.medicare.gov, and by any electronic, print or other means of distribution.

### Article IV
### HIPAA Transactions/Privacy/Security

A. MA-PD Sponsor agrees to comply with the confidentiality and enrollee record accuracy requirements specified in 42 CFR §423.136.

B. MA-PD Sponsor agrees to enter into a business associate agreement with the entity with which CMS has contracted to track Medicare beneficiaries' true out-of-pocket costs.

### Article V
### Addendum Term and Renewal

A. TERM OF ADDENDUM

This addendum is effective from the date of CMS' authorized representative's signature through December 31, 2006. This addendum shall be renewable for successive one-year periods thereafter according to 42 CFR §423.506. MA-PD Sponsor shall not conduct Part D-related marketing activities prior to October 1, 2005 and shall not process enrollment applications prior to November 15, 2005. MA-PD Sponsor shall begin delivering Part D benefit services on January 1, 2006.

B. QUALIFICATION TO RENEW ADDENDUM

    1. In accordance with 42 CFR §423.507, the MA-PD Sponsor will be determined qualified to renew this addendum annually only if—
       (a) CMS informs the MA-PD Sponsor that it is qualified to renew its addendum; and
       (b) The MA-PD Sponsor has not provided CMS with a notice of intention not to renew in accordance with Article VII of this addendum.

    2. Although MA-PD Sponsor may be determined qualified to renew its addendum under this Article, if the MA-PD Sponsor and CMS cannot reach agreement on the Part D bid under Subpart F of 42 CFR Part 423, no renewal takes place, and the failure to reach agreement is not subject to the appeals provisions in Subpart N of 42 CFR Parts 422 or 423. (Refer to Article XI for consequences of non-renewal on the Part C contract and the ability to enter into a Part C contract.)

### Article VI
### Nonrenewal of Addendum

A. NONRENEWAL BY THE MA-PD SPONSOR

    1. MA-PD Sponsor may non-renew this addendum in accordance with 42 CFR 423.507(a).
    2. If the MA-PD Sponsor non-renews this addendum under this Article, CMS cannot enter into a Part D addendum with the organization for 2 years unless there are special circumstances that warrant special consideration, as determined by CMS.

B. NONRENEWAL BY CMS

CMS may non-renew this addendum under the rules of 42 CFR 423.507(b). (Refer to Article X for consequences of non-renewal on the Part C contract and the ability to enter into a Part C contract.)

### Article VII
### Modification or Termination of Addendum by Mutual Consent

This addendum may be modified or terminated at any time by written mutual consent in

accordance with 42 CFR 423.508. (Refer to Article X for consequences of non-renewal on the Part C contract and the ability to enter into a Part C contract.)

### Article VIII
### Termination of Addendum by CMS

CMS may terminate this addendum in accordance with 42 CFR 423.509. (Refer to Article X for consequences of non-renewal on the Part C contract and the ability to enter into a Part C contract.)

### Article IX
### Termination of Addendum by the MA-PD Sponsor

A. The MA-PD Sponsor may terminate this addendum only in accordance with 42 CFR 423.510.

B. CMS will not enter into a Part D addendum with an organization that has terminated its addendum within the preceding 2 years unless there are circumstances that warrant special consideration, as determined by CMS.

C. If the addendum is terminated under section A of this Article, the MA-PD Sponsor must ensure the timely transfer of any data or files. (Refer to Article X for consequences of non-renewal on the Part C contract and the ability to enter into a Part C contract.)

### Article X
### Relationship Between Addendum and Part C Contract or 1876 Cost Contract

A. MA-PD Sponsor acknowledges that, if it is a Medicare Part C contractor, the termination or nonrenewal of this addendum by either party may require CMS to terminate or non-renew the Sponsor's Part C contract in the event that such non-renewal or termination prevents the MA-PD Sponsor from meeting the requirements of 42 CFR §422.4(c), in which case the Sponsor must provide the notices specified in this contract, as well as the notices specified under Subpart K of 42 CFR Part 422. MA-PD Sponsor also acknowledges that Article X.B. of this addendum may prevent the sponsor from entering into a Part C contract for two years following an addendum termination or non-renewal where such non-renewal or termination prevents the MA-PD Sponsor from meeting the requirements of 42 CFR §422.4(c).

B. The termination of this addendum by either party shall not, by itself, relieve the parties from their obligations under the Part C or cost plan contracts to which this document is an addendum.

8

C. In the event that the MA-PD Sponsor's Part C or cost plan contract (as applicable) is terminated or nonrenewed by either party, the provisions of this addendum shall also terminate. In such an event, the MA-PD Sponsor and CMS shall provide notice to enrollees and the public as described in this contract as well as 42 CFR Part 422, Subpart K or 42 CFR Part 417, Subpart K, as applicable.

### Article XI
### Intermediate Sanctions

The MA-PD Sponsor shall be subject to sanctions and civil monetary penalties, consistent with Subpart O of 42 CFR Part 423.

### Article XII
### Severability

Severability of the addendum shall be in accordance with 42 CFR §423.504(e).

### Article XIII
### Miscellaneous

A. DEFINITIONS: Terms not otherwise defined in this addendum shall have the meaning given such terms at 42 CFR Part 423 or, as applicable, 42 CFR Part 422 or Part 417.

B. ALTERATION TO ORIGINAL ADDENDUM TERMS: The MA-PD Sponsor agrees that it has not altered in any way the terms of the MA-PD addendum presented for signature by CMS. MA-PD Sponsor agrees that any alterations to the original text the MA-PD Sponsor may make to this addendum shall not be binding on the parties.

C. ADDITIONAL CONTRACT TERMS: The MA-PD Sponsor agree to include in this addendum other terms and conditions in accordance with 42 CFR §423.505(j).

D. CMS APPROVAL TO BEGIN MARKETING AND ENROLLMENT ACTIVITIES: The MA-PD Sponsor agrees that it must complete CMS operational requirements related to its Part D benefit prior to receiving CMS approval to begin MA-PD plan marketing activities relating to its Part D benefit. Such activities include, but are not limited to, establishing and successfully testing connectivity with CMS systems to process enrollment applications (or contracting with an entity qualified to perform such functions on MA-PD Sponsor's behalf) and successfully demonstrating the capability to submit accurate and timely price comparison data. To establish and successfully test connectivity, the PDP Sponsor must, 1) establish and test physical connectivity to the CMS data center, 2) acquire user identifications and passwords, 3) receive, store, and maintain data necessary to perform enrollments and send and

9

receive transactions to and from CMS, and 4) check and receive transaction status information.

Medicare Advantage Attestation of Benefit Plan and Price

AMERICA'S HEALTH CHOICE MEDICAL PLAN

H1034

Date: 09/08/2005

I attest that the following plan numbers as established in the final Plan Benefit Package (PBP) will be operated by the above-stated organization and made available to eligible Medicare beneficiaries in the approved service area during program year 2006.

| Plan ID | Segment ID | Version | Plan Name | Plan Type | Transaction Type | MA Premium | Part D Premium | CMS Approval Date | Effective Date |
|---------|------------|---------|-----------|-----------|------------------|------------|----------------|-------------------|----------------|
| 001 | 0 | 6 | Americas Health Choice Treasure Coast Prem | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |
| 003 | 0 | 6 | Americas Health Choice Palm Beach Premier | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |
| 004 | 0 | 6 | Americas Health Choice Broward Premier Pla | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |
| 005 | 0 | 6 | Americas Healthy Rewards Treasure Coast Pl | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |
| 006 | 0 | 6 | Americas Healthy Rewards Palm Beach Plan | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |
| 007 | 0 | 6 | Americas Healthy Rewards Broward Plan | HMO | Renewal | 0.00 | 0.00 | 09/08/2005 | 01/01/2006 |

CEO: _____        Date: ___9/8/2005___

Walter Janke
Chief Executive Officer
1175 South U.S. Highway 1

Vero Beach, FL 32962
772-794-0030 (1025)

_____    _____
**CFO:**                          **Date:** 9/8/2005
Muse Alford
Chief Financial Officer
1175 South U.S. Highway 1
Vero Beach, FL 32962
772-794-0030 (1022)

## VERIFICATION

I, Richard Tuten, being duly sworn, depose and say:

1.    I have read the foregoing Verified Complaint; and

2.    To the best of my present knowledge, information, and belief, I believe the allegations in the Verified Complaint to be true, accurate, and complete.

_____
Richard Tuten

Sworn to before me this
_1st_ day of December, 2006

_____
Notary Public

JANET G. KENNEDY
Comm# DD0611544
Expires 3/22/2010
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

JS-44
(Rev. 1/05 DC)

# CIVIL COVER SHEET

RECEIVED
U.S. DISTRICT COURT
DISTRICT

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| America's Health Choice Medical Plans, Inc. ~~2004 DE~~ 88880 | United States Department of Health and Human Services, Centers for Medicare & Medicaid Services |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) MAYER | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

~~1175 South US Highway 1~~ - *DAVID CYNAMON*
~~Vero Beach, FL 02062~~
*2300 N. STREET, N.W.*
*W.D.C. 20037. 202/663 8493*

ATTORNEYS (IF KNOWN)

CASE NUMBER   1:06CV02064

JUDGE: Richard W. Roberts

DECK TYPE: TRO/Preliminary Injunctio

DATE STAMP: 12/04/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◎ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZ
FOR PLAIN

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)   ⑦

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ◎ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☑ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

- ◌ -

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

O 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. § 1331 and §§ 2201-2202 and 5 U.S.C. §§ 702-704. Plaintiffs seek injunctive relief to stop CMS from sending out termination notices.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☑

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☑ If yes, please complete related case form.

DATE December 1, 2006  SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.