RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

FILED
DEC - 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEC -2 PM

NANCY M.
MAYER-WHITTINGTON
CLERK

|  |  |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | |
| Defendant. | ) |

CASE NUMBER  1:06CV02064

JUDGE: Richard W. Roberts

DECK TYPE: TRO/Preliminary Injunctio

DATE STAMP: 12/04/2006

## PLAINTIFF'S APPLICATION FOR
## TEMPORARY RESTRAINING ORDER

Plaintiff America's Health Choice Medical Plans, Inc. ("AHC" or "Plaintiff") hereby respectfully applies to this Court, pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65.1(a), for an order temporarily restraining Defendant United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS" or "Defendant") from terminating AHC's contract, sending the notice of the December 31, 2006 termination to AHC's beneficiaries, or publishing any notice of AHC's termination on its website.

Plaintiff requests a hearing on this application at 9:00 a.m. on Monday, December 4, 2006, so that it may be decided before Defendant sends the notice of termination letters. Defendant agreed only that the letters would not be sent before 10:00 a.m. on Monday, December 4, 2006.

The grounds for this application, as more fully set forth in the accompanying memorandum of points and authorities, are that in the absence of a temporary restraining order and preliminary injunction, AHC will suffer immediate and irreparable harm. If CMS is not

3

enjoined from terminating AHC's contract, sending the notice of the December 31, 2006 termination to AHC's beneficiaries, or publishing any notice of AHC's termination on its website, then AHC will be put out of business. Thus, absent a stay, plaintiff will be deprived of any meaningful review of the CMS decision challenged in this action. CMS, by contrast, will suffer no harm from this injunction.

Plaintiff is likely to prevail on the merits, and at a minimum, it has raised serious and substantial questions that are a fair ground for litigation regarding CMS' decision to terminate the AHC contract. Finally, the public interest favors entry of a temporary restraining order.

This application is based upon the Verified Complaint filed in this action, the accompanying memorandum of points and authorities, and all of the pleadings and papers on file in this case.

WHEREFORE, plaintiff respectfully requests that the Court grant this application and enter a temporary restraining order in the form submitted herewith.

DATED: December 2, 2006

Respectfully submitted,

Deborah B. Baum (D.C. Bar # 393019)
David Cynamon (D. C. Bar # 182477)
Matthew A. Anzaldi (D. C. Bar # 455515)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000 (general)
(202) 663-8492 (D. Cynamon)

Attorneys for Plaintiff
America's Health Choice Medical Plans, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2006 DEC -2  PM 5: 53

NANCY M.
MAYER-WHITTINGTON
CLERK

|  |  |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) ) |
| Defendant. | ) ) ) |

**FILED**

DEC - 4 2006

Civil Action No. _____ **NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

**06 2064**

**PLAINTIFF'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER**
**AND MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff America's Health Choice Medical Plans, Inc. ("AHC" or "Plaintiff") is a Hispanic-owned Medicare Advantage HMO Plan. AHC seeks a temporary restraining order, followed by a preliminary injunction, to preserve the status quo in order to permit the Court to address the merits of its challenge to the arbitrary and capricious final decision of Defendant United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS" or "Defendant") to terminate its current contract with AHC, despite not having followed any of the detailed regulatory requirements for contract termination or the contractual requirements for termination as set forth in that contract. A copy of the November 30, 2006 CMS Final Decision and the current contract are attached to the Verified Complaint at Exhibits A and B respectively.

In short, CMS initiated proceedings to terminate a previous contract with AHC, but, days after AHC demonstrated an extensive reorganization and dramatic improvement in its

compliance function during an administrative hearing in mid-November 2005, CMS promptly entered into a new contract with AHC (Exhibit A) which, by its terms, superseded the previous contract. The new contract outlined detailed termination and non-renewal procedures, which CMS has not triggered. CMS has not even begun, much less concluded, the regulatorily and contractually mandated processes for termination of that contract, which process would, by definition, require a careful assessment of AHC's current compliance with relevant regulations. AHC has repeatedly requested during the administrative review that CMS simply consider its current compliance, and CMS has, for unknown reasons that appear increasingly suspect, refused to do so.

The relevant facts are set forth in the Verified Complaint. They demonstrate that Plaintiff satisfies all of the criteria for a preliminary injunction. First, the balance of hardships weighs heavily in AHC's favor. Absent a stay, CMS will issue (and may already have issued) a press release on its website regarding its termination of AHC's contract, and will send notices to the thousands of participants in AHC's HMO plan informing them that, due to CMS's alleged December 31, 2006 termination of AHC's contract, the participants will need to promptly secure an alternative provider.[1] Such an action will absolutely put AHC out of business before AHC can get a review of the termination decision. Specifically, once CMS sends out the notices of termination, all of these beneficiaries will, understandably, abandon the company to ensure their continued access to necessary health care services.

Additionally, at CMS's urging, AHC has been seeking a purchaser, acceptable to CMS, which would acquire AHC and assume management and complete control of the HMO.

---

[1]    Immediately upon learning of CMS's decision, on Friday, December 1, 2006, AHC's counsel advised CMS's counsel that it intended immediately to seek a TRO, but, despite CMS's repeated acknowledgement that this challenged termination was *not* being undertaken to protect patients from imminent and serious threats to health or safety, CMS would not commit to refrain from issuing a press release regarding the challenged contract termination until AHC sought this Court's review. CMS agreed only that it would not send letters to beneficiaries advising them to seek a new provider before 10:00 a.m. on Monday, December 4.

Pursuant to this suggestion, during 2006, AHC has been substantially reorganized and operated by a respected public health care company with deep experience in managed care operations and compliance. When the final consummation of the sale to that publicly owned buyer fell through at the last moment, AHC sought to secure the commitment of a new buyer, out of the many who had expressed intense interest, but CMS declined to either consider AHC's current contract, its current compliance or to facilitate discussions with the new buyer. The departure of AHC's beneficiaries will obviously scuttle the negotiated sale of AHC to another company because the acquirer will not want to purchase a business entity with essentially no assets. This hardship cannot be undone unless enjoined to preserve the status quo and allow for a meaningful decision on the merits. Thus, without a stay, plaintiff not only will suffer immediate, irreparable harm but will be deprived of any meaningful judicial review of the CMS decision. Moreover, AHC's beneficiaries who, despite CMS's allegations regarding past compliance deficiencies, have not in the intervening period demonstrated any propensity to opt for a different plan, will be denied their first choice of health plans. CMS and the public, by contrast, will suffer no harm at all if CMS waits to send out the termination notices or other public statements discussing the termination until the Court can decide the merits of the case.

Second, plaintiff is likely to prevail on the merits. CMS openly ignores AHC's current substantial compliance with its regulatory and contractual obligations when it purports to terminate AHC's current contract based on regulatory actions taken regarding its previous contract. Furthermore, the stated reasons for termination are unsupported by any evidence in the administrative record and are contradicted by the substantial evidence introduced by AHC. In addition, Defendant engaged in multiple procedural irregularities to prejudice AHC, evidencing an inexplicable but pronounced bias against AHC. Third, an injunction is in the public interest, including the interest of AHC's beneficiaries.

Accordingly, the Court should issue a temporary restraining order prohibiting CMS from notifying AHC participants, or the public, of CMS's purported December 31, 2006 termination of AHC's contract until the Court can rule on plaintiffs' preliminary injunction motion, and then

should issue a preliminary injunction prohibiting CMS from sending such notices pending a judgment on the merits of plaintiffs' challenge to the CMS decision.

## STATEMENT OF FACTS

AHC incorporates by reference the facts its alleges in the Verified Complaint, filed contemporaneously herewith.

## ARGUMENT

To obtain a preliminary injunction, plaintiffs

> must demonstrate that (1) they are likely to prevail on the merits; (2) they will suffer irreparable harm absent the injunction; (3) an injunction would not substantially impair the rights of ... other interested parties; and (4) an injunction would be in the public interest, or at least would not be adverse to the public interest.

Tenacre Found. v. INS, 892 F. Supp. 289, 292 (D.D.C. 1995), aff'd 78 F.3d 693 (D.C. Cir. 1996), following Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 842-44 (D.C. Cir. 1977). The prerequisites for a temporary restraining order are essentially the same. The Nation Magazine v. Dept. of State, 805 F. Supp. 68, 72 (D.D.C. 1992) following Holiday Tours, 559 F.2d at 842-44.

Both forms of interim relief serve the same "preventative, or protective," purpose: to "maintain the status quo pending a final determination of the merits of the suit." Holiday Tours, 559 F.2d at 844. Accordingly, where "the balance of hardships tips decidedly toward [the] plaintiff" *and* the plaintiff has "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation," such interim relief is justified even if the plaintiff is "less likely than not to prevail on the merits." Id. at 844-45 (internal quotation marks and citations omitted). Accord The Nation Magazine, 805 F. Supp. at 72.

4

AHC clearly meets the requirements for a temporary restraining order and a preliminary injunction. The balance of hardships tips decidedly in its favor, because the injury it faces is undeniably irreparable – indeed, it is fatal because it will put AHC out of business. Undoubtedly, there is no harm whatsoever to CMS by delaying its transmission of the termination notices and press releases during the pendency of this case. AHC is likely to prevail on the merits of its claims and the public interest favors interim relief in the circumstances presented here.

## I.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY TOWARD PLAINTIFF

### A.    AHC Will Suffer Immediate and Irreparable Harm Without a Restraining Order and Preliminary Injunction

AHC will suffer immediate and irreparable harm if the Court does not enjoin Defendant from terminating the contract on December 31, 2006, sending the termination notices to AHC's beneficiaries, and issuing a press release regarding the termination on Defendant's website and through other means during the pendency of this case.

Without an injunction, Defendant's proposed action will put AHC out of business. Once Defendant sends AHC's beneficiaries the termination notices, then the AHC beneficiaries will abandon AHC. Furthermore, the termination notices and resulting loss of beneficiaries will end AHC's negotiations to be purchased by another company. The prospective purchaser will certainly terminate these negotiations if AHC loses all of its beneficiaries. Therefore, without an injunction, CMS's decision to send the termination notices to AHC beneficiaries will cause certain destruction of the company. It is well settled that the "destruction of the business is itself an irreparable injury." Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision, et al., 732 F. Supp. 1183,1200-01 (D. D.C. 1990) (granting the plaintiff-thrift's motion requesting a temporary restraining order and a preliminary injunction enjoining the

government agency from taking action that would destroy the company and concluding that the destruction of the business is itself an irreparable injury); See also, John B. Hull, Inc. v. Waterbury Petroleum Products, Inc., 588 F.2d 24, 28 (2nd Cir. 1978) (affirming the lower court's granting of Plaintiff's request for a preliminary injunction because monetary loss constitutes irreparable harm where the movant's very existence is threatened, such as where an act threatens an ongoing business with destruction).

Furthermore, the irreparable injury is such that absent a stay, an ultimate ruling on the merits in AHC's favor will do them no good. If CMS sends termination notices, then the beneficiaries will abandon AHC, the prospective purchaser will end its negotiations to purchase the company, and AHC will be forced to go out of business. In sum, absent a stay, this action will be rendered moot as a practical matter, and CMS will be insulated from judicial review of the merits of its arbitrary and unlawful action.

The termination also causes irreparable harm to AHC's beneficiaries. Defendant has no apparent plan to manage the health care of AHC's 13,000 beneficiaries who will find themselves without Medicare Advantage ("MA") HMO services if AHC's contract were to be terminated. It may be possible for AHC's members to sign onto other MA HMO plans (plans the members themselves chose not to join while AHC is an option). Instead, those members have chosen AHC. AHC provides 92% of all MA services in Martin County, Florida, 92.8% in Okeechobee County, and 87% in St. Lucie County. It is unlikely that any single plan could accommodate the influx of all of AHC's members. Termination of AHC's contract would deprive thousands of its members of their choice of MA HMO, and therefore any insured health care at all.

The termination of AHC would be likely to have a disproportionate impact on Florida's poor and minority residents, particularly its African-American and Hispanic populations.

Statistics show that minority individuals are more likely to choose MA HMO coverage because of lower co-pays allowed by cost savings in the HMO model.

CMS cannot responsibly abandon AHC's 13,000 members and deprive them of their choice in HMOs based on such inadequate and outdated grounds as it has asserted for termination of AHC's contract, particularly when AHC has made such a strong showing, over eighteen months since its last on-site audit on which the previous contract termination action was based, of compliance and commitment to improvement.

Moreover, termination of AHC's contract would send the wrong message to the industry, and could undermine the MA program as a whole. In this case, the regulations worked by providing AHC with an opportunity to address CMS's concerns through the Corrective Action Plan ("CAP") process. But the regulations will fail if all of AHC's work in meeting CMS's standards goes to naught. The message to other companies would be that the CAP process is not worth the expense if CMS is willing to terminate a MA HMO in spite of its current substantial compliance.

Finally, AHC has offered and was in the process of selling the MA Plan to HealthSpring, another HMO that would be able to continue to provide the care to these patients pursuant to a settlement with CMS. After months of good faith negotiating on the part of AHC and agreeing to terms much more favorable to HealthSpring than were in the original term sheet, HealthSpring determined that it did not want to buy the plan and the Stock Purchase Agreement was mutually terminated. At that point, CMS stated that the settlement was no longer in effect and reinstated the sanctions and termination action. Even before HealthSpring officially notified AHC that it would not purchase the plan, AHC presented alternatives to a HealthSpring purchase of AHC to CMS. These alternatives would have provided for the same protections that CMS was seeking

7

from HealthSpring. CMS, however, refused to discuss any new buyers with AHC. During this time, AHC has been continuing to have HealthSpring manage AHC and search for a new buyer keeping with the spirit of the settlement agreement. In fact, on November 22, 2006 NationsHealth requested that CMS approve a stock sale of AHC to NationsHealth and agreed to close the deal within three (3) days of approval from CMS and agreement to remove the sanctions. Such a sale would allow the beneficiaries to retain their MA plan benefits and physicians without any interruption in care, and CMS should have been satisfied that current owners and management of AHC would have been replaced, which seems to be a particular focus of CMS. Since CMS refused to speak with AHC regarding the sale of AHC to anyone other than HealthSpring, it is impossible to know why CMS would have taken this action.

**B.    A Stay Will Have No Adverse Impact on CMS**

A stay pending disposition of this case on the merits will not damage any legitimate interest of CMS. AHC has been providing its beneficiaries with excellent service throughout the CMS administrative appeals process. There is no less reason to protect the AHC beneficiaries during the pendency of this action than there was during the pendency of the administrative appeals. This is all the more true because, as described below, AHC is likely to prevail on the merits. <u>Mova Pharm. Corp. v. Shalala</u>, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (any harm to party "likely to lose on the merits" necessarily "small").

**II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

AHC is likely to succeed on the merits for three principal reasons. First, contrary to the specific regulations governing termination of MA contracts and explicit contract provisions, CMS has tried to terminate a new contract based on actions it took relative to an earlier contract. In the decision affirming the Hearing Officer's decision, the Administrator did not even address this significant legal deficiency, other than acknowledging that AHC had argued the point.

Second, the stated reasons for termination of the current contract are unsupported by any evidence in the administrative record and are contradicted by the substantial evidence introduced by AHC.  Third, Defendant engaged in multiple procedural irregularities to prejudice AHC, evidencing Defendant's bias against AHC.

### A.    CMS Has Not Even Initiated Termination of the 2006 Contract

CMS (and, indeed, the HHS administrative reviewers) have thus far successfully avoided addressing substantively AHC's repeated observation and complaint that the termination proceeding that culminated in the Administrator's November 30, 2006 Decision affirming termination, and on which CMS purports to base its stated intention to inform beneficiaries and issue a press release, was relative to a prior superseded contract.

AHC acknowledged that as of the May 2005 on-site audit, it had compliance issues.  In response to those findings, however, AHC did what, presumably, the regulations are designed to motivate the regulated community to do:  it completely revamped its compliance function and other corporate processes, and made dramatic strides, which CMS has acknowledged, in every aspect of its performance. As a result, within literally days of the November 14-15, 2005 hearing on AHC's appeal of CMS's decision to terminate its then-existing contract, apparently in response to the extensive evidence AHC presented at the hearing regarding its greatly enhanced corporate compliance function and other technological improvements directly enhancing the prompt pay and other issues, CMS entered into a new contract with AHC on November 18, 2006.

This new contract is not merely a pro-forma or perfunctory renewal of the 2005 contract. It expressly states in Article I, on page 1, that:

9

> This contract governs the respective rights and obligations of the parties
> as of the effective date set forth above [November 18, 2005], and
> supersedes any prior agreements between the MA Organization and
> CMS as of such date. (Emphasis added.)

It is a 21-page contract (not including attachments) with a new term, renewable for successive

one-year terms. Renewal is in accordance with 42 CFR §§ 422.505 and 422.506. By its terms,

and consistent with those regulations, the contract requires that CMS notify the Plan by May 1

(or September 1, under limited circumstances) of any intent not to renew for an additional one-

year term. Such non-renewal is of course subject to the other substantive limitations on non-

renewal, which must be for cause. See Contract (Verified Complaint, Exhibit B) at Article VII.

Were CMS to invoke any of these non-renewal provisions, or to terminate the contract (specific

termination rights outlined in Article VIII and consistent with 42 CFR §§ 422.508-510), AHC's

current compliance status would be at issue, not its prior compliance problems.

But CMS has never even initiated termination of the new contract. Rather, once it

obtained the Hearing Officer's decision upholding the termination of the previous contract

(which presumably came as a surprise to CMS), CMS has completely ignored the existence of

the new contract, and acted as though the termination of the previous superseded contract also

had some effect on the new contract. No doubt it takes this position knowing that to terminate

the new contract it would have to establish AHC's substantial non-compliance with the relevant

regulations, which it could not now do based on current compliance. CMS's insistence on

terminating a relationship with a 13,000 member MA Plan, serving a largely minority

population, despite its current substantial compliance with regulations, calls into question the

motivations of the regulators. AHC has not asked CMS to waive or bend rules for AHC; it

merely asks that it be assessed fairly based on its current compliance, and subject to the same

standards to which other plans are subject. Instead, CMS took the position that its role was

merely to determine whether the evidence at the time of the May 2005 inspection supported

CMS's decision to terminate a later contract with different terms.

That standard is not consistent with the regulatory requirements. Moreover, even if CMS

had not entered into a new contract with AHC, CMS did not terminate under § 422.510(a)(5)

(which would have implicated serious questions of patient safety), meaning that AHC has a

regulatory right under § 422.510(c)(1) to be afforded "a reasonable opportunity to develop and

receive CMS approval of a corrective action plan to correct the deficiencies that are the basis of

the proposed termination."

In similar cases, the DAB has held that the administrative law judge, whose role is

comparable to that of a hearing officer (*see* 42 C.F.R. § 422.666 (hearing officer may, but need

not be, an administrative law judge)), must "resolve[] these issues *de novo* in the sense that the

determination is based on the evidence as it is developed before the [decision maker] and not on

how CMS evaluated the evidence as it stood at whatever point CMS made its assessment."

*Emerald Oaks*, DAB 1800 (2001). That is to say, AHC can prevail by showing, on the record as

a whole, either that it has not been afforded a reasonable opportunity to correct deficiencies or

that it *currently* "is in substantial compliance with the relevant statutory and regulatory

provisions." *Hillman Rehabilitation Center*, DAB No. 1611; *see also Cross Creek Health Care

Center*, DAB No. 1665 (1998); *Emerald Oaks*, DAB No. 1800 (2001); 42 C.F.R. § 422.510(c).

CMS refused to follow the precedent from the DAB, and instead applied a highly

deferential standard and merely rubber-stamped CMS's determination, refusing even to consider

AHC's substantial steps towards compliance. (*See* Hearing Officer Decision at 15 ("[T]he scope

of [the] review does not extend to making a new determination as to whether a plan has come

into compliance ...") (no citation provided)). Although the hearing officer apparently felt that

she did not have the authority to rule upon whether such a reasonable opportunity has been afforded, the regulations state otherwise. "The hearing officer inquires fully into *all* the matters at issue ..." 42 C.F.R. § 422.676(b) (emphasis added). The Acting Deputy Administrator in his review affirmed that rationale as well. The opinion of the Acting Deputy Administrator did not even address the validity of the case law.

AHC's current compliance and its opportunity to develop and receive approval of a corrective action plan were clearly matters in issue. CMS should have considered them, even without the existence of the new contract. Its refusal to follow established departmental precedent and to consider evidence of AHC's current substantial compliance was arbitrary and capricious, and cannot withstand legal scrutiny.

CMS's most recent on-site inspection of AHC was on May 10, 2005. The inspection noted certain deficiencies, but, as explained in detail at the hearing, AHC has taken dramatic steps to correct those deficiencies in accordance with its regulatory right, and responsibility, to bring itself back into compliance. As AHC stated at the hearing, this is an example of the regulatory process having worked well, with a regulated entity having been given notice of deficiencies, hearing that message, and turning the organization around as a result.

AHC implemented its compliance program's procedures for discipline, training, monitoring, and auditing. The compliance plan meets all of the regulatory requirements enumerated in 42 C.F.R. § 422.503(b)(vi). It demonstrates AHC's commitment to comply with all applicable federal and state standards, designates a compliance officer and committee accountable to senior management, provides for training and education, and establishes effective lines of communication, disciplinary guidelines, internal monitoring and auditing standards, and procedures for prompt response and development of corrective action initiatives.

Even CMS has acknowledged that "AHC has significantly increased their compliance plan and procedures." Nevertheless, in spite of all that AHC's team has done, Defendant failed to recognize AHC's substantial compliance, and instead relied on erroneous and outdated reports to support the contract termination determination. Contrary to Defendant's assertions, AHC has demonstrated that it (1) provides a network of appropriate providers sufficient to provide adequate access to covered services; (2) has implemented an electronic claims payment system facilitating full compliance with prompt pay requirements; (3) complies with regulatory requirements relating to grievances and appeals; and (4) has in place an acceptable quality assessment and improvement program. Thus, AHC is substantially complying with the regulations that are incorporated into its prior and its existing contract with CMS in a manner consistent with effective and efficient implementation of the applicable regulations, and proved as much at the hearing. AHC presented the expert testimony of Bruce Ardis, an expert in managed care, who testified that AHC's network meets or significantly exceeds accepted standards in the industry. CMS, on the other hand, presented no expert testimony and nobody who could speak to AHC's current compliance at the time of the hearing.

More significantly for present purposes, CMS has not ever even attempted to establish that AHC is currently not in compliance with the requirements of its current contract, which it would of course have to do to terminate the current contract. It is curious why CMS has not taken this opportunity to send a message to the regulated community regarding how well a company can turn itself around in response to regulatory pressure, regarding how effective the CAP and regulatory process can be, instead of seeming intent on demonstrating to all who will listen that it can shut an organization down if it dares challenge CMS.

**B.    The Stated Reasons For Termination Of Even the Previous Contract Are Unsupported By Any Evidence In the Record and Are Contradicted By The Substantial Evidence Introduced by AHC.**

**1.    AHC Provides a Sufficient Network of Appropriate Providers.**

Defendant acknowledged that the focus of its concern regarding AHC, and its most significant complaint, was AHC's supposedly inadequate network of providers. The focus of this complaint was the lack of a contracted hospital within rural Okeechobee County. AHC maintains a network of fifty-one primary care physicians and contracts with twenty hospitals within its seven-county coverage area. With 13,000 beneficiaries, AHC boasts a ratio of just over 300 patients per physician, and no primary care provider is assigned more than about 750 patients. AHC's ratios are far superior to the industry standard of 1,800 to 2,000 patients per physician, and AHC's expert witness testified that AHC could even support several hundred more members per primary care provider if it had to. The hearing officer stated in her ruling, upheld by Defendant, that AHC has only one contracted hospital on the Treasure Coast, where approximately 10,000 members reside. This statement is false. As the maps in the Administrative Record demonstrate, AHC has a contracted hospital covering Indian River County and a small portion of Brevard County and three other hospitals covering the Treasure Coast, including two within about 35 miles of AHC's members in Okeechobee County. CMS faults AHC for not having a contract with the Raulerson Hospital in Okeechobee County, but no authority is cited for the hearing officer's implicit assumption that a MA organization must have a hospital in every county.

According to the Medicare Managed Care Manual, "a general rule of thumb is the 30-30 rule that asserts that services must be available either within 30 miles of an enrollee's residence or within 30 minutes travel time," and exceptions to that rule may be made in rural areas such as

Okeechobee County. Virtually all of AHC's coverage area, even in the rural areas, falls within thirty miles of a contracted hospital, and almost all of AHC's beneficiaries reside within thirty miles of a contracted hospital. A portion of Okeechobee County falls just a few miles outside of the thirty-mile radius from the nearest hospital, but even that portion is within just a few miles of an AHC clinic, and well within the latitude ordinarily extended to such rural areas. Raulerson Hospital has refused to contract with AHC at acceptable Medicare Advantage rates, demanding instead that AHC pay three times the Medicare rate for service that AHC currently pays it as a non-participating hospital. In other words, the services provided at Raulerson would be substantially more expensive if AHC had a contract with them.

Defendant has argued that AHC does not meet the "30-30 rule" in Okeechobee County. If that is true, however, one wonders why CMS approved Okeechobee County as a coverage area in the first place (when AHC had never had a contract with Raulerson Hospital), why AHC was found to have adequate network access during the inspections in 2002 through 2004, when CMS has always known that AHC has no contract with Raulerson Hospital, and why when AHC volunteered to give up Okeechobee County, CMS requested that they not. Furthermore, CMS's position on this point sends mixed signals, as it has recently approved Universal Care to cover Okeechobee County where Universal Care has no contract with a hospital or even with any primary care provider. The double standard being applied is troubling, to say the least.

One fundamental misconception infecting all of CMS's testimony during the hearing before the hearing officer was its assumption that AHC's beneficiaries were harmed by AHC's lack of a contract with the hospital in Okeechobee County. What it failed to understand was that, even if AHC's beneficiaries had to use Raulerson Hospital in Okeechobee or any other non-contracted hospital, they would receive those services, and would typically not be charged more

15

for that under the HMO plan. At the hearing, Christine Perenich testified as a witness for CMS that AHC's members would "probably" have to pay more for services at a non-contracted hospital. Her testimony was pure speculation, and it was false. In fact, under AHC's benefit structure members pay exactly the same copay fees for service, $50 for emergency care and $100 for hospital services, whether they receive care at a contracted or non-contracted hospital.

AHC also has a clinic in Okeechobee, just a few minutes away from all of AHC's Okeechobee beneficiaries. The CMS staff has made the highly misleading assertion that AHC's Okeechobee clinic "was not currently staffed with a doctor or nurse." In fact, for about six weeks in February through March of 2005, the Okeechobee clinic was without a *permanently assigned* physician, but was staffed by several physicians in rotation while a full-time replacement was found for the provider who left that position. In addition, the clinic was staffed by a full-time certified physician assistant.

The CMS staff has also raised concerns regarding the number of specialists AHC has available, particularly in Indian River County, but these concerns are not supported by the data, either. According to the industry standards set by a survey by the Graduate Medical Education National Advisory Committee, AHC's entire patient population of 13,000 throughout its covered counties would require only one-half of a full-time urologist, 0.17 of a rheumatologist, two general surgeons, and one-half of a full time cardiologist. Every member residing in Indian River County lives within thirty miles of at least one urologist, two general surgeons, one rheumatologist, and five cardiologists within AHC's plan.

CMS has also tried pointing to emergency room utilization of AHC's members as evidence that AHC's network was insufficient. This view was apparently based on an unsupported supposition that emergency room utilization alone is indicative of an insufficient

network. This supposition is false, but even if it were true, AHC's members' use of emergency room services, approximately 1.463% per year, is actually *below* the national average of 3.95% per year.

CMS was apparently not satisfied with AHC's explanation of its emergency room utilization data, and has requested "after-hours emergency utilization reports." AHC pointed out it cannot generate such a report because hospitals do not always supply emergency room admission times, and admission time is not a required field on the billing form. CMS responded that "AHC has said that the information supplied by hospitals does not include admission time. However, CMS is requesting the ER utilization for after hours, not admission time." The CMS reviewer failed to recognize that it is not possible to determine what emergency room utilization was "after hours" without knowing the time of day of the admission.

Perhaps the strongest evidence of the adequacy of AHC's provider network is the demonstrated satisfaction of AHC's patients. CMS's claims of insufficient access are not credible in the face of 85% satisfaction with AHC as a health care provider and 95% satisfaction with the health care services provided.

CMS's evidence at the hearing focused heavily on AHC's past performance assessment scores, comparing AHC against other MA HMOs on the basis of percentile rank in years past. Not surprisingly, AHC performed well in some areas and not as well in others. However, CMS's reliance on the performance assessment scores is misplaced and cannot be a basis for termination of even the prior contract – unless CMS plans to terminate every other MA plan that scored lower, of which there would be many. The scores were based on data almost two years old by the time of the hearing, and CMS's own witness testified that the scores would not be responsive

to recent changes. Moreover, the scores speak only to AHC's performance relative to other HMO's. The reconsideration official herself acknowledged that they bear little weight.

In light of the comprehensive network of providers, AHC's demonstrated customer satisfaction, and the rural nature of Okeechobee County and other counties within AHC's coverage area, there is no basis to conclude that AHC substantially fails to provide an adequate network of providers.  In fact, the evidence regarding the network introduced at the hearing and the unrebutted expert testimony regarding that evidence unequivocally established that AHC's network complies with or exceeds the standards set forth in the Medicare Managed Care Manual and other industry standards.  Defendant's conclusions to the contrary were arbitrary and capricious, unsupported by the evidence, and contrary to the substantial evidence submitted by AHC.

### 2.    Prompt Pay Requirements

CMS acknowledged that AHC made appropriate interest payments on approved claims, and that AHC's policies and procedures adequately address CMS's concerns about claim determinations and payment timeframes.  Nevertheless, CMS continues to refuse to approve AHC's corrective action plan for past deficiencies in its claim payment timeliness.

AHC has now met the goal set by 42 C.F.R. § 422.520 to pay 95% of "clean" claims to non-contracted providers within 30 days of receipt.  As explained at the hearing before the hearing officer, in response to requests from CMS and its providers, AHC completed the installation of the Availty electronic claims payment system in October, 2005.  It is now fully compliant with the requirement, and no doubt vastly exceeds the performance of other plans. Indeed, AHC paid 99.54% of non-contracted clean claims received from November 1, 2005,

through November 30, 2005 within 30 days of receipt. Currently, AHC is paying 99.54% of all claims received within 14 days of receipt.

### 3. AHC Complies With Regulatory Requirements Concerning Grievances and Appeals

Despite CMS's findings otherwise, the record shows that AHC has in place a policy for handling grievances and appeals pursuant to the relevant regulations. Grievances are handled by AHC's Grievance Department, and appeals are handled by the Appeals Department.

Grievances and appeals may be submitted orally or in writing. AHC tracks grievances and appeals using MedDirect and monitors them using monitoring logs showing, among other data, when each grievance is received and resolved. The monitoring logs for the last quarter of FY 2005 show that 97% of grievances were resolved within 45 days, and that the average time to resolve a grievance was 13.4 days. Currently 100% of formal grievances are resolved within 30 days, with the average time being 12 days. Informal grievances are resolved within 2 days.

Defendant's data on AHC's grievance and appeals processes is erroneous, out-of-date, and skewed. It cites a review of a sample of 15 grievances, but CMS's own evidence, reveals that the sample was not chosen randomly. The fifteen cases were cherry-picked out of hundreds of files based on the processing times and nature of the complaints in those particular files. AHC chooses not to believe that CMS's methodology was intentionally engineered to reach an unfavorable result, but it was seriously flawed.

CMS also cites, and the hearing officer relied on, certain statistics regarding data from CHDR. The data on which she relies is over a year old. AHC's CHDR report from the last quarter in FY 2005 shows that every claim but one was forwarded to CHDR in a timely manner and that CHDR upheld AHC's determination in 100% of the claims it reviewed.

19

**4.    AHC Has Adequate Quality Assessment and Improvement and Utilization Management Programs**

AHC also has a quality assessment and improvement plan in place. Defendant appears to acknowledge the sufficiency of the quality assessment and improvement plan, but claims that AHC has not provided documentation that it has been implemented. Defendant does not cite to any proof that AHC's quality assessment and improvement plan has not been implemented, and AHC is willing to provide any documentation requested. For example, AHC's Quality Improvement minutes show that AHC has been monitoring quality in accordance with its program and that the Quality Improvement committee is closely monitoring all aspects of care and compliance.

In addition, a fully implemented quality improvement program is a requirement for accreditation and state licensure. The State of Florida Agency for Health Care Administration ("FAHCA") performed a detailed review of AHC's programs in July, 2005. During this visit, FAHCA determined that AHC's quality improvement program is adequate and appropriately implemented, and approved AHC's accreditation. FAHCA's visit took place after CMS' last site visit and after AHC had time to correct CMS' cited deficiencies. FAHCA's accreditation of AHC provides further non-biased proof that AHC was in compliance.

Likewise, Defendant does not appear to dispute the adequacy of AHC's utilization management plan, but claims not to have sufficient information to determine whether the plan has been implemented. Again, Defendant's allegation falls short of proof or even a claim that the utilization management plan has not been implemented, but AHC produced documents and testimony showing that it has been implemented. For example, AHC's utilization management committee minutes show careful attention to admissions, referrals, and care provided. Dr. K.G.

Srinivas, AHC's former associate medical director, testified at length about AHC's implementation of the utilization management program.

Defendant also alleges that AHC lacks an effective referral process, but this claim conflicts with AHC's monitoring data from last quarter showing that 86% of referrals are approved within a single day, and 95% are approved within four days. Defendant has misleadingly stated that AHC's processing of referrals "[s]ometimes ... took as many as 75 days." Actually, only one referral ever took 75 days to process, and that was only because the physician requested the referral, but did not submit it to AHC for processing until he had discussed it with the physician to whom he was referring the patient. When the physician discovered his error, he forwarded the referral request to AHC, and AHC approved it promptly. To ensure that such an event would not happen again, AHC expanded the provider panel and instructed the clinic to process referrals as they are written. The incident has not recurred. This single event cited by CMS is a success story for AHC's quality assessment and improvement program, showing that AHC identifies and corrects problems promptly in order to maintain and improve its high level of care for its beneficiaries.

C.    **Defendant Engaged in Multiple Procedural Irregularities to Prejudice AHC, Evidencing a Bias Against AHC.**

The history of Defendant's communications with AHC regarding the future of its plan has been anything but a clear and fair regulatory action. On July 6, 2005, CMS issued its Notice of Intent to Impose Intermediate Sanctions and Terminate Medicare Advantage Contract. AHC submitted a timely request for reconsideration. On August 3, 2005, AHC submitted a Corrective Action Plan ("CAP") addressing each of the alleged deficiencies noted by the CMS staff. CMS rejected AHC's CAP out of hand on September 2, 2005, in a terse notice providing no response to any of the elements in AHC's CAP. CMS provided more detailed comments to AHC's CAP

on September 13, 2005. But only two weeks later, before AHC could even provide a response, the reconsideration official issued a Reconsideration Decision purporting to modify the original determination by purporting to impose *immediate* termination of AHC's MA contract under § 422.510(a)(5) as a result of supposed "imminent and serious risk to the health of [AHC's] enrollees."

Despite its expressed, supposed rationale for immediate termination, the decision nevertheless characterized the process as one for ordinary, non-immediate termination. After AHC pointed out that CMS had failed to follow its own procedures for immediate termination, CMS reopened its decision by letter dated October 4, 2005, and indicated its intent to terminate effective immediately, but not until November 1, 2005, still pursuant to § 422.510(a)(5) due to alleged serious concerns of patient health. Two weeks later, apparently recognizing that its stated concerns about "serious concerns of patient health" were ill-founded and obviously inconsistent with a deferral of immediate termination, CMS again amended the reconsideration notice on October 18, this time to impose only ordinary termination without relying on § 422.510(a)(5) or considerations of "serious concerns of patient health."

AHC requested a hearing pursuant to 42 C.F.R. § 422.662. Based on CMS's articulated intent to terminate AHC's MA contract in its October letters to AHC, and its issuance of the reconsideration decision upholding that termination only three weeks after it provided its comments on AHC's CAP, prior to the November hearing, AHC had no reason to believe it would be granted any relief from CMS through the CAP process. The hearing officer conducted the hearing on November 14-15, 2005. At the hearing, a CMS official, Christine Perenich, testified as a witness for CMS and explained that, although CMS never informed AHC that it was willing to consider further CAP submissions, the CAP process was on a "separate track"

22

from the termination process, and that AHC could still submit a CAP. She further testified that it often takes three, four, or five iterations before CMS will accept a corrective action plan, in spite of the fact that the reconsideration official in this case purported to order immediate termination of AHC's contract after only one iteration of the CAP. Although she commented frequently at the hearing regarding CMS's communications insofar as they were inconsistent with the requirement that AHC be provided a reasonable opportunity to develop an approved CAP, the hearing officer issued her decision on November 22, 2005, upholding the contract termination decision, and curiously overlooking, in effect, the entire issue of the inconsistency of CMS's past communications to AHC that had been a focus of the hearing.

On November 18, 2005, just after the hearing, and after numerous CMS officials and its counsel heard extensive evidence regarding AHC's then-current compliance with the relevant regulations, CMS entered into the new MA contract, effective immediately. This was a new contract, different from the one that was subject to termination by the correspondence that initiated this proceeding. As noted above, under the terms of that new 2006-2007 contract (and the relevant regulations, *e.g.,* 42 CFR § 422.506(b)), if CMS intended not to renew that 2006-2007 contract, CMS would have had to notify AHC by May 2006 of its intent not to renew, and allow for an appeal from that determination, and would have had to notify AHC's enrollees by October 2, 2006, ninety days before the end of the relevant contract calendar year. CMS gave no such notices. AHC pointed out in early 2006 that, with the new contract then in place, CMS' pursuit of the termination action regarding the previous contract is moot. No doubt CMS continues to pursue that termination case because it knows that, if it initiates another termination action, which would have to be predicated on current compliance (as this one should be), CMS could not establish that AHC was not in substantial compliance at present.

23

## III.    THE PUBLIC INTEREST WILL BE SERVED BY A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Finally, a temporary restraining order and preliminary injunction will serve the public interest in this case.  The public interest favors judicial review on the merits to ensure that the laws are properly enforced.  See Mova Pharm., 140 F.3d at 1066 (public's interest in "faithful application of the laws"); Holiday Tours, 559 F.2d at 843 (general public's interest in having legal questions decided on the merits).  Moreover, AHC was the only approved MA provider in a number of rural Florida counties.  For example, AHC provided 92% of all MA services in Martin County, 92.8% in Okeechobee County, and 87% in St. Lucie County.  Although other companies have now been approved to provide services in those areas, AHC is the MA plan for the vast majority of the individuals who reside in these rural counties.  If CMS sends out the termination notices, then these beneficiaries will have few, if any, MA options, and many will be become uninsured.  Moreover, the AHC beneficiaries will also benefit if AHC is sold to the prospective purchaser because they will be able to continue to receive their health care through AHC.  Therefore, they will not be forced to change to another MA plan with different benefits and potentially change their medical providers.

## **CONCLUSION**

For all of the reasons stated above, AHC respectfully request that this Court issue a temporary restraining order and a preliminary injunction against Defendant, prohibiting Defendant from sending the termination notices to AHC's beneficiaries.

DATED: December 2, 2006

Respectfully submitted,

David Cynamon (D.C. Bar # 182477)
Deborah B. Baum (D.C. Bar # 393019 )
Matthew A. Anzaldi (D. C. Bar # 455515)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8492 (D. Cynamon)

Dated:  December 2, 2006

Attorneys for Plaintiff
America's Health Choice Medical Plans, Inc.

# EXHIBIT A

**Anzaldi, Matthew A.**

| | |
|---|---|
| **From:** | Baum, Deborah B. |
| **Sent:** | Friday, December 01, 2006 7:26 PM |
| **To:** | Wolfe, Daniel (HHS/OGC) |
| **Cc:** | Kass, Julie; Richard Tuten; Anzaldi, Matthew A.; Cynamon, David J. |
| **Subject:** | AHC |

Dan:  per our telephone conversation, we understand that CMS will not be sending any letters to beneficiaries prior to Monday, December 4, at 10:00 am.  Accordingly, we are going to ask the court for a TRO hearing on or before Monday morning at 9:00 am.  We are going to update our papers to reflect this information and will file them tomorrow.  We will, of course, provide copies to you as requested.


**Deborah Baum |** Partner
**Pillsbury Winthrop Shaw Pittman LLP**

Tel:  202.663.8772 | Fax:  202.663.8773 | Cell:  703.969.6487
2300 N Street, NW | Washington, DC 20037-1122

Email:  deborah.baum@pillsburylaw.com
Bio:  www.pillsburylaw.com/deborah.baum
**www.pillsburylaw.com**

1

**Anzaldi, Matthew A.**

| | |
|---|---|
| **From:** | Wolfe, Daniel (HHS/OGC) [Daniel.Wolfe@HHS.GOV] |
| **Sent:** | Friday, December 01, 2006 6:26 PM |
| **To:** | Anzaldi, Matthew A.; Cohen, Howard (HHS/OGC) |
| **Cc:** | Bennett, Carol (HHS/OGC) |
| **Subject:** | RE: AHC TRO application |

Matt,

Thank you for your e-mail. Please send any pleadings to Carol Bennett and Howard Cohen, as well.

Daniel R. Wolfe Jr.
Assistant Regional Counsel
HHS-Office of the General Counsel
1301 Young St., Suite 1138
Dallas, TX 75202
214.767.3665
214.767.4663 (fax)
daniel.wolfe@hhs.gov

Notice: The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege

-----Original Message-----
From: Anzaldi, Matthew A. [mailto:matthew.anzaldi@pillsburylaw.com]
Sent: Friday, December 01, 2006 3:58 PM
To: Wolfe, Daniel (HHS/OGC); Cohen, Howard (HHS/OGC)
Subject: FW: AHC TRO application

I just left you a voicemail message following up on the message below and informing you that we expect to file a TRO at the US District Court in Washington DC sometime over the next 1-2 hours.

We will send you copies of our filings by email before we leave for the court.

I can be reached at the number below.

Matthew A. Anzaldi
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8941 (tel.)
(202) 663-8007 (fax)

1

-----Original Message-----
From: Anzaldi, Matthew A.
Sent: Friday, December 01, 2006 11:01 AM
To: 'daniel.wolfe@hhs.gov'
Cc: 'Kass, Julie'; Baum, Deborah B.; Cynamon, David J.
Subject: AHC TRO application

I work with Debby Baum at Pillsbury Winthrop Shaw Pittman LLP.  I am
sending this message on her behalf.

This message follows up on a phone conversation that Julie Kass and
Debby Baum had with Howard Cohen earlier today.  The call was originally
prompted by Ms. Kass's receipt of troubling information from
NationsHealth, which, as you know, is prepared to essentially step into
the shoes of HealthSpring and acquire AHC.  NationsHealth apparently was
advised by CMS representatives that CMS was unwilling to consider
lifting the marketing and enrollment sanctions and backing off its
termination action with respect to AHC's MA and PDP contracts to allow
the (non-contingent) purchase of AHC to go through.  It was also advised
by Cindy Moreno that CMS would not discuss the viability of the sale to
NationsHealth as CMS expects a decision on AHC's appeal today.  Julie
and Debby were advised during the phone call with Mr. Cohen that the
decision had been rendered yesterday.  We have yet to receive a copy of
the decision from the Administrator.  Mr. Cohen was kind enough,
however, to forward a copy this morning.

Please be advised that, AHC intends to immediately seek a temporary
restraining order enjoining CMS from advising its beneficiaries of the
termination, until such time as the court can consider the propriety of
the termination.  We will of course be willing to coordinate for the
hearing of the TRO at a time that will allow CMS the opportunity to
oppose motion.

I would appreciate your prompt response on these matters.  Please copy
your response to Julie Kass and Debby Baum who will continue to work on
these proceedings.


Matthew A. Anzaldi
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8941 (tel.)
(202) 663-8007 (fax)


==========================================================
The contents of this message, together with any attachments, are
intended only for the use of  the individual or entity to which they are
addressed and may contain information that is legally privileged,

confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this  message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at  Tel: 800-477-0770 x4860 immediately by telephone or by return E-mail and delete this message,  along with any attachments, from your computer. Thank you.
============================================================

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

206 DEC -2  PM 5: 54

NANCY M.
MAYER-WHITTINGTON
CLERK

|  |  |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) ) |
| Defendant. | ) ) ) |

**FILED**

DEC – 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Civil Action No. **06 2064**

## LOCAL RULE 65.1(a) CERTIFICATION

Pursuant to LCvR 65.1(a), I, the undersigned counsel of record for America's Health Choice Medical Plans, Inc., certify the following:

1.      By emails and telephone conversation on Friday, December 1, 2006, we informed counsel for Defendant, Daniel Wolfe, that Plaintiff would apply for a TRO on Saturday, December 2, 2006, and would request a hearing for 9:00 am on Monday, December 4, 2006. A copy of the emails are attached hereto as Exhibit A.

2.      Copies of all pleadings and papers filed in this action to date or to be presented to the Court at the hearing, were furnished to the adverse party on Saturday, December 2, 2006. Copies were served by email, at the request of Defendant, on the following individual representatives of Defendant:

Howard Cohen, Esq.
howard.cohen@hhs.gov
Centers for Medicare & Medicaid Services
Office of Attorney Advisor
7500 Security Blvd.
Mail Stop C3-01-20
Baltimore, MD 21244-1850
(410) 786-0043 (fax)
(410) 786-3176 (phone)

Daniel Wolfe, Esq.
daniel.wolfe@hhs.gov
Office of the General Counsel
Centers for Medicare & Medicaid Services
1301 Young Street, Suite 1138
Dallas, Texas 75202
(214) 767-4663 (fax)
(214) 767-3665 (phone)

DATED: December 2, 2006

Respectfully submitted,

Deborah B. Baum (D.C. Bar # 393019)
David Cynamon (D.C. Bar # 182477)
Matthew A. Anzaldi (D. C. Bar # 455515)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000 (general)
(202) 663-8492 (D. Cynamon)

Attorneys for Plaintiff
America's Health Choice Medical Plans, Inc.

2