## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.:  06-2064 (RWR) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Having failed repeatedly over a period of several years to achieve compliance with numerous Medicare statutory and regulatory requirements that are incorporated into its contract with defendant, plaintiff, America's Health Choice Medical Plans, Inc. ("AHC"), a Medicare Advantage Organization ("MAO"), now asks this Court to give it yet another chance.  Plaintiff was scheduled for termination from the Medicare Advantage ("MA") program based on a May 2005 audit (the fourth audit that AHC had failed), which found AHC to be in non-compliance in key areas such as beneficiary access to health care services, maintenance of a functioning beneficiary grievance and appeals process, failure to provide adequate physician staffing, failure to maintain a functioning quality assurance program, among others.  AHC requested reconsideration of the initial termination decision, and on reconsideration that decision was upheld.  AHC appealed the reconsideration decision, and a Hearing Officer for the Department of Health and Human Services ("HHS") upheld that termination decision on November 22, 2005, after a two-day hearing and full consideration of the evidence and briefs submitted by the parties.

Plaintiff appealed that Hearing Officer's decision to the Administrator of the Centers for

Medicare and Medicaid Services ("CMS"), the agency within HHS that is responsible for the

administration of the Medicare program, and the termination decision was affirmed in a final

agency decision issued on November 30, 2006.[1]  Administrative Record ("A.R.") at 2-24.[2]

Plaintiff now claims that the Administrator lacks authority to terminate the AHC-CMS

MA contract and that CMS is required to give AHC yet another opportunity to demonstrate

compliance; that the Administrator must disregard the 2005 decision of the Hearing Officer and

the audit findings and extensive decision record on which that decision was based; and that the

Secretary must, instead, affirmatively demonstrate that AHC is at this moment not in compliance

with the statutory and regulatory requirements which are incorporated by reference into its

contract with defendant and with which it has repeatedly failed to comply virtually since its

acceptance into the MA program.  Plaintiff is wrong on all counts.

To accept AHC's position and enjoin the impending MA contract termination, as well as

CMS's current plan to notify beneficiaries on December 15, 2006 of that upcoming termination,

---

[1]  As AHC must concede, the Administrator's decision would have been issued much earlier but AHC had requested and CMS had agreed to an administrative stay based on AHC representations that it had found a willing and qualified corporate purchaser, HealthSpring, that would purchase its stock and assume operation of its MA plan.  Because HealthSpring is an MAO that has several ongoing MA contracts with CMS, and because AHC represented that this stock purchase was imminent, CMS agreed to enter into a settlement agreement with AHC whereby CMS agreed to a stay of termination proceedings while the AHC-HealthSpring deal was being finalized, with AHC also agreeing to enter a management contract with AHC pending completion of the sale.  When HHS was notified in November that the deal between AHC and HealthSpring had fallen apart, it requested that the administrative stay be lifted and that the Administrator render a decision.  Christopher J. Eisenberg Declaration ("Decl.") ¶¶ 8010, attached hereto as Exhibit 1.

[2]  The Certified Administrative Record was filed with the Court on December 11, 2006.

2

so that AHC's current Medicare enrollees can make timely alternative and more satisfactory

health care arrangements, would undermine CMS's compliance program and effectively

eviscerate the Secretary's authority to terminate non-complying MA organizations, to the

detriment of the elderly and disabled Medicare beneficiaries and the public.  Because of the

multiple layers of administrative review and opportunities for corrective action which, by statute

and regulation, must be completed before an MA contract may be terminated, the termination

process cannot be completed in a short time frame as plaintiff suggests.  Under plaintiff's theory,

if the proceedings are not completed and the Administrator's decision issued before the end of a

contract year, CMS must conduct a new audit and start termination proceedings and the entire

appeals process anew.  Under this theory, CMS would be endlessly required to conduct new

audits and produce a new record.  This would leave the Secretary with no mechanism to ever

terminate any but the most immediately dangerous MAOs, and would allow non-compliant

organizations such as AHC to continue their misdeeds, with each successive failure going

unaddressed.  CMS has followed all statutory, regulatory and contractual requirements regarding

AHC's termination.  It gave AHC multiple opportunities to correct its deficiencies and, finally,

time to consummate what AHC claimed would result in the imminent sale of its stock to another,

specified MAO.[3]  AHC repeatedly failed to fulfill its promises, correct its deficiencies, and

finally, consummate the promised stock sale.  AHC's claims of current compliance should go

unheeded by this Court because the Secretary is not required to give an organization with AHC's

track record yet another chance, and AHC is not allowed to offer new evidence of its current

---

[3]  That organization, HealthSpring, had a proven record of serving as an MAO, operating
several large-scale managed care plans in a variety of locations under contracts with CMS.

3

status after the record supporting the termination has closed (as it did in 2005).

AHC now seeks a preliminary injunction prohibiting CMS from implementing the November 30, 2006 agency decision terminating AHC's MA contract effective December 31, 2006, sending a notice of the December 31, 2006 termination to AHC's beneficiaries, and publishing any notice of termination on CMS's website.  Plaintiff's Memorandum in Support of Motion for a Preliminary Injunction ("Pl. PI Mem.") at 1.  Because plaintiff shows no likelihood of success or even serious questions on the merits of its claims and because the balance of equities favors allowing CMS's determination to be effectuated, AHC's termination should be allowed to proceed and plaintiff's motion for a preliminary injunction should be denied.

<u>**BACKGROUND**</u>

**I.**     <u>**The Medicare Program and Medicare Advantage Contracts Under Medicare Part C.**</u>

Medicare, the federal medical insurance program for the aged and disabled, is contained in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg (the "Medicare Act"). The HHS Secretary has delegated the authority to administer the Medicare program to CMS. The Medicare Act is divided into several parts.  Part A of the Medicare program provides medical insurance coverage for institutional services such as hospital, skilled nursing facility, and home health care.  <u>See</u> 42 U.S.C. §§ 1395c, 1395d.  Part B of the Medicare program provides voluntary supplemental medical insurance covering certain outpatient services such as physician services, medical supplies, x-rays and laboratory tests.  42 U.S.C. §§ 1395k, 1395l, 1395x(s).  Payment for service rendered to Medicare beneficiaries is made under Parts A and B on a fee-for-service basis; in other words, Medicare pays directly, generally on a per-service basis, for Medicare-covered services provided to Medicare Part A and B beneficiaries.  <u>See</u> 42

4

U.S.C. §§ 1395d(a); 1395k(a).[4]

In the Balanced Budget Act of 1997, Pub. L. No.105-33, 111Stat. 251, 426-32 (Aug. 5, 1997) ("BBA"), Congress added a new Part C to the Medicare statute.  This Part, referred to in the BBA as the "Medicare+Choice Program,"42 U.S.C. §§ 1395w-21-1395w-28, increased beneficiary choice by authorizing Medicare beneficiaries to obtain covered Medicare services through health maintenance organizations, preferred provider plans, and other "managed care" arrangements offered by private health insurers.  See 42 U.S.C. §1395w-21(a)(1).  Under Part C, Medicare does not make direct, per-service payments to health care providers as it does in the Part A and Part B "fee-for-service" context.  Rather, Medicare (through CMS) contracts with private health insurers who agree to provide all necessary Medicare covered services to Part C beneficiaries enrolled in their managed-care plans through their own network of health care providers.  Medicare makes periodic payments to these organizations (based on a fixed, per-enrolled beneficiary price).  In turn, these private insurers are responsible for paying providers in their organization, network or plan, for all Medicare covered services they provide.

On December 8, 2003, the President signed into law the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003).  Title I of the MMA amended the Medicare Act by inserting a new Part D, the "Voluntary Prescription Drug Benefit Program," effective January 1, 2006, which for the first time provided comprehensive Medicare coverage of outpatient prescription drugs.  See 42 U.S.C. §§ 1395w-4 et seq.  Title II of the MMA changed the name of the

---

[4] Parts A and B of Medicare are often referred to as "traditional" or "fee-for-service" Medicare.

Medicare+Choice program contained in Medicare Part C to "Medicare Advantage" ("MA"), and required MA plans to provide prescription drug coverage and made certain other revisions in that program. See MMA §201(a), 117 Stat 2176.

## II.     Monitoring of MAO Compliance

CMS is responsible for monitoring MAO compliance with applicable statutory and regulatory requirements. 42 U.S.C. § 1395w-27(d)(2); 42 C.F.R. § 422.502(d). Its oversight includes conducting audits (or reviews) of MAOs to ensure their continuing compliance with requirements. 42 C.F.R. § 422.502(d). Teams of specially trained CMS staff conduct audits of MAO compliance, using a standardized review guide that is published on CMS's website. See http://www.cms.hhs.gov/healthplans/monitoring/2005guide.asp. CMS conducts two types of MA monitoring audits: "routine" and "focused." Routine audits, where CMS assesses every monitoring review guide element, are undertaken on approximately a biennial basis. Focused monitoring audits are conducted as needed, when CMS becomes aware of areas of concern.

## III.    MA Contract Termination

As discussed above, Medicare Part C anticipates that CMS will enter into MA contracts with private health insurers such as AHC for the provision of medical services. Concomitant with the ability to enter into service contracts, Medicare Part C also grants the Secretary broad authority to terminate such contracts:

> (2) Termination authority
> In accordance with procedures established under subsection (h) of this section, the Secretary *may at any time terminate any such contract* if the Secretary determines that the organization--
>
> (A) has failed substantially to carry out the contract;
> (B) is carrying out the contract in a manner inconsistent with the efficient and effective administration of this part; or

(C) no longer substantially meets the applicable conditions of this part.

42 U.S.C. § 1395w-27(c)(2) (emphasis added).  Subsection (h) further delineates the process

whereby the Secretary's MA contract-termination authority is exercised:

> (1) In general
> The Secretary may terminate a contract with a Medicare+Choice [MA]
> organization under this section in accordance with formal investigation and
> compliance procedures established by the Secretary under which--
>
> (A) the Secretary provides the organization with the reasonable opportunity
> to develop and implement a corrective action plan [CAP] to correct the
> deficiencies that were the basis of the Secretary's determination under
> subsection (c)(2);  and
>
> (B) the Secretary provides the organization with reasonable notice
> and opportunity for hearing (including the right to appeal an initial
> decision) before terminating the contract.

42 U.S.C. § 1395w-27(h).

## **STATEMENT OF FACTS**

### I.    **AHC's MA Contract with CMS and CMS's Decision to Terminate AHC**.

AHC provides health care services in an area called the Treasure Coast of Florida, and its

network encompasses approximately 13,000 beneficiaries in the Florida counties of Broward,

Indian River, Martin, Palm Beach, Okeechobee, St. Lucie, as well as a portion of Brevard

county.  Pl. PI Mem. at 2.  AHC was approved as an MAO in 2000, and for administrative

purposes was assigned contract number H1034.  A.R. 158-59, 3351, 4009 (2002 audit

referencing contract no. H1034).  From almost the inception of AHC's MA contract, CMS audits

revealed that AHC was unable to satisfy Medicare requirements.  AHC was subject to a routine

audit in February 2001, and was found to be out of compliance with 13 (out of 31) CMS

monitoring elements.  A.R. 3.  Another routine audit in July 2002 identified 17 monitoring

deficiencies, four of which were duplicate findings from CMS's 2001 review.  A.R. 3; <u>see</u> <u>also</u>

A.R. 2158-64 (2001 audit report), 2169-85 (2002 audit report).  Because of the deficiencies

identified during these routine audits, CMS conducted focused audits in January 2004 and May

2005.  A.R. 3.  The 2004 focused review identified 12 monitoring element deficiencies, and the

2005 focused review identified 22 deficiencies out of a possible 31, eleven of which were repeat

findings from the 2004 focused review.  A.R. 3; <u>see</u> <u>also</u> AHC Deficiency Chart, attached hereto

as Exhibit 2 (detailing areas of deficiency found in the 2001, 2002, 2004, and 2005 audits); A.R.

2189-2210 (2004 audit report), 2286-317 (2005 audit report).  AHC's systemic problems

remained constant throughout, indicating, among other things, that AHC had failed to provide its

members with sufficient access to services, lacked a quality improvement program, had

problems making prompt payments, and did not properly handle grievances.  Exhibit 2.

    After each audit, AHC was permitted to propose a corrective action plan ("CAP").  42

U.S.C. § 1395w-27(h); 42 C.F.R. § 422.510(c).  Consequently, AHC proposed CAPs in 2001,

2002, 2004, and 2005.  AHC's CAPs were a failure.  On each subsequent audit, CMS continued

to find and document AHC's lack of compliance with Medicare requirements.  Exhibit 2; A.R.

2158-64, 2169-85, 2189-2210, 2286-317.

    As a result of the findings of CMS's May 2005 focused audit, by letter dated July 6,

2005, CMS exercised its right under 42 C.F.R. § 422.510(a) and proposed termination of AHC's

MA contract.  A.R. 3, 2280-85 (July 6, 2005 letter).  AHC's documented and pervasive

deficiencies included failures in such key areas as beneficiaries' access to services, maintenance

of a quality improvement program, prompt payment to providers, beneficiary grievance and

appeal procedures, standard time frames and notice requirements for organizational

determinations, and effectuation of standard reconsideration determinations.  A.R. 3 n.6, 2280-81.  CMS's July 6, 2005 letter also stated that it was proposing intermediate sanctions against AHC pursuant to 42 C.F.R. § 422.750(a)(2), and that AHC's contract would be terminated effective October 1, 2005.[5]  A.R. 3-4; 2280-85.  The proposed intermediate sanctions suspended AHC from enrolling Medicare beneficiaries and conducting any marketing activities, including the submission of marketing materials for review.  A.R. 4; A.R. 2280-85.

## II.    The Administrative Review Process

As noted above, the Secretary's broad authority to terminate MA contracts "at any time," 42 U.S.C. § 1395w-27(c)(2), is balanced by termination review procedures also established under the statute and regulations.  42 U.S.C. § 1395w-27(h); 42 C.F.R. § 422.641 et seq.  Under this review process, after an MAO is notified that CMS has proposed termination of its MA contract, the MAO may request reconsideration of the decision.  42 C.F.R. § 422.644; see also 42 C.F.R. § 422.648 and 422.650.  The MAO may also, at the same time, propose a CAP to CMS.  42 C.F.R. § 422.510(c).  Thus, the MAO's CAP and the request for reconsideration are pursued at the same time.  If CMS issues a reconsideration decision upholding the termination of the organization's MA contract, the MAO may request a hearing.  42 C.F.R. § 422.656-660.  Following an adverse determination by a Hearing Officer, the MAO may appeal to the agency Administrator.  42 C.F.R. § 422.692.  The agency Administrator's decision then becomes the final agency determination.  42 C.F.R. § 422.694.

In AHC's case, the applicable review process was followed to the letter.  On July 18,

_____

[5]  The October 1, 2005 contract termination date was subsequently delayed pursuant to the regulations, pending resolution of AHC's appeals.  See 42 C.F.R. § 422.664.

2005, AHC requested reconsideration of CMS's July 6, 2005 termination decision. A.R. 4, 2331-36. AHC acknowledged that it had continually faced compliance problems as noted in the biennial and focused reviews, including claims processing, appeals and quality of care issues. A.R. 4; 2331-36. AHC stated that it was instituting a series of "rigorous management initiatives designed to bring AHC into full compliance," that it was developing a corrective action plan and that it wished to also exercise its right to a reconsideration determination. A.R. 4; 2335.

On October 18, 2005, CMS issued its reconsideration determination affirming the decision to impose intermediate sanctions and to terminate AHC's MA contract pursuant to 42 C.F.R. § 422.510(a).[6] A.R. 6; 2382-393, 2427-29. The reconsideration decision evaluated AHC's submissions and information provided after CMS's original July 6, 2005 decision, and found that AHC was "no longer a qualified [MA] entity and [was] not in substantial compliance with its Medicare Advantage contract and numerous provisions of the [regulations]." A.R. 5, 2382. AHC appealed the October 18, 2005 reconsideration decision and requested a hearing. A.R. 6, 2431.

An evidentiary hearing was held before a CMS Hearing Officer on November 14-15, 2005, A.R. 6, 222-384 (transcript of proceedings before the Hearing Officer), and on November 22, 2005, the Hearing Officer issued her decision upholding CMS's decision to terminate AHC's MA contract. A.R. 6, 191-213 (Hearing Officer decision). The Hearing Officer determined that the evidence before her substantiated CMS's contention that AHC failed to carry out the terms of

---

[6] During the reconsideration process, CMS considered, but ultimately rejected, *immediate* termination of AHC's MA contract as provided for by 42 C.F.R. § 422.510(a)(5). Termination of AHC's contract, originally slated for October 1, 2005, was therefore postponed pending AHC's appeals. See 42 C.F.R. § 422.664.

its MA contract, and had failed to establish compliance with applicable statutory and regulatory requirements and that AHC's termination from the MA program was proper.[7]  A.R. 6, 191-213.

    As provided for in the regulations, AHC appealed the Hearing Officer's November 22, 2005 decision to the CMS Administrator.  See 42 C.F.R. § 422.692 et seq.; A.R. 190.  Comments – in effect, appeal briefs – respecting the November 22, 2005 Hearing Officer's decision were received from both AHC and CMS in January of 2006.  A.R. 2, 80-155 (AHC Comments), 156-87 (CMS comments).  While that appeal was pending, HHS and AHC entered into a settlement agreement dated April 28, 2006, which resulted in staying the appeal before the Administrator pending the proposed purchase of AHC by HealthSpring, a Delaware corporation with which CMS had several ongoing MA contracts, and which was considered to be a responsible organization.  A.R. 43-53 (settlement agreement).

    The settlement agreement specifically noted that if the stock purchase by HealthSpring failed to occur, CMS was entitled to request that the stay be lifted.  A.R. 47 at ¶ 10.  The agreement also provided that HealthSpring would assume management of AHC while the sale was being consummated.  A.R. 44-45.  This settlement agreement was the sole basis for CMS's agreement to postpone the final determination by the Administrator and to stay AHC's termination.  On November 1, 2006, after being informed that HealthSpring had terminated the purchase agreement, CMS requested that the administrative stay be lifted.  A.R. 64 (CMS letter to the Administrator); see also Cynthia Moreno Decl. ¶¶ 3, 5, attached hereto as Exhibit 3.  After

---

    [7]  Specifically, AHC had failed to comply with requirements related to medical service access and grievances and appeals, had failed to implement an acceptable quality assessment and performance improvement program, did not comply with prompt pay requirements, and in general failed to substantially carry out the terms of its MA contract, and therefore no longer met the requirements to be contracting organization.  A.R. 192-213.

reviewing the administrative record furnished by the Hearing Officer, the parties' comments, and

the Hearing Officer's November 22, 2005 decision, on November 30, 2006, the Administrator

issued the final agency decision upholding CMS's termination of AHC's contract, effective

December 31, 2006.  A.R. 2-24.

## ARGUMENT

## I.    STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy, and the power to issue such an

injunction "should be sparingly exercised." Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir.

1969) (quotation marks omitted).  For plaintiff to prevail on its motion for a preliminary

injunction, it must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it

would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not

substantially injure other interested (non-moving) parties; and (4) that the public interest would

be furthered by the injunction.  CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738,

746 (D.C. Cir. 1995); see also, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,

559 F.2d 841, 842–43 (D.C. Cir. 1977); Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,

259 F.2d 921, 925 (D.C. Cir. 1958).  Plaintiff must satisfy all four factors, and the court must

also find that the four factors together justify the drastic intervention of a preliminary injunction.

See CityFed, 58 F.3d at 747; Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 304

(D.C. Cir. 2006).  Moreover, if a plaintiff has little likelihood of succeeding on the merits of its

claim, the court need not address the other preliminary injunction factors.  Apotex, Inc. v. Food

& Drug Admin., 449 F.3d 1249, 1253 -1254 (D.C. Cir. 2006);  CityFed Fin. Corp., 58 F.3d at

746 (requiring the moving party to "demonstrate . . . a substantial likelihood of success on the

merits"); <u>City of Las Vegas v. Lujan</u>, 891 F.2d 927, 935 (D.C. Cir. 1989) (affirming district

court's denial of preliminary injunction without addressing irreparable injury because appellant

had insufficient likelihood of success on the merits).

      In this regard, AHC's application for a preliminary injunction fails at the first step. The

November 30, 2006 final agency decision is supported by substantial evidence in the record, and

AHC therefore cannot establish any likelihood of success on the merits. Nor has AHC made a

sufficient showing on the remaining three elements. As the record amply demonstrates, AHC

was given many opportunities to comply with MA program requirements, but consistently failed

to do so. Indeed, the only reason CMS agreed to stay termination proceedings was because AHC

agreed that it would be purchased by HealthSpring, a known MA with a proven track record

which would also assume the management of AHC while the contemplated stock purchase was

being finalized. That deal has now evaporated, and HealthSpring's management contract has

also been terminated. It is detrimental to the interests of AHC's Medicare beneficiaries and to

CMS to further postpone the termination of AHC's MA contract while AHC looks for yet

another purchaser and pleads for yet another chance to prove that it is in compliance with the

statute and regulations. The Court should therefore deny AHC's motion for a preliminary

injunction.

## II.    AHC HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    <u>Standard of Review</u>

      With respect to judicial review of the November 30, 2006 final agency decision, 42

U.S.C. § 405(g) provides, in pertinent part, as follows:

      Any individual, after any final decision of [the Secretary of HHS] made after a

13

hearing to which he was a party . . . may obtain a review of such decision by a civil action [brought in the United States District Court for the District of Columbia]. As part of the [Secretary's] answer the [Secretary] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing. *The findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive* [].

42 U.S.C. § 405(g) (emphasis added). Similarly, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the court shall "hold unlawful and set aside [final] agency action, findings and conclusions found to be . . . arbitrary [and] capricious . . . ." This "standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). The Secretary's decision should be upheld if it is supported by substantial evidence. 5 U.S.C. § 706(2)(E).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). The test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." Fla. Mun. Power Agency v. FERC, 315 F.3d 362, 365-66 (D.C. Cir. 2003). Although the Court is to carefully scrutinize the record, it is not to substitute its judgment for that of the agency, but instead assess only whether the Administrator's November 30, 2006 decision to terminate AHC's MA contract "is based on substantial evidence and a correct application of the law." Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004).

Importantly, both 42 U.S.C. § 405(g) and the APA provides for record review only. 42

14

U.S.C. § 405(g) ("The court shall have power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing.") (emphasis added); Florida Power & Light v. Lorion, 470 U.S. 729, 744 (1985) ("The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking.").  Instead, a reviewing court's task is to apply the appropriate standard of review to the agency decision "based on the record the agency presents to the reviewing court." Id. at 743-44 (emphasis added), citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402  (1971); Camp v. Pitts, 411 U.S. 138, 142 (1973) ("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); see also Mathews v. Weber, 423 U.S. 261, 271 (1976) (finding that under 42 U.S.C. § 405(g) "neither party may put any additional evidence before the district court").  Therefore, to the extent that plaintiff attempts to introduce additional evidence in court, that evidence may not be considered by the Court in reviewing the agency's final decision.  Delrosa v. Sullivan, 922 F.2d 480, 483 (8th Cir. 1991); see also Nelson v. Apfel, 131 F.3d 1228, 1236 (7th Cir. 1993) (noting approvingly the proposition that district court may not consider evidence outside of the certified record when reviewing Medicare decision by the Secretary); Beynum v. Barnhart, 435 F. Supp. 2d 142, 144 n.2 (D.D.C. 2006) ("no new evidence may be admitted before the court in this proceeding.").

In sum, although plaintiff offers the court extra-record, unsubstantiated claims of current compliance, this Court may not consider these claims.  Id.  To allow plaintiff to present these claims would render an MAO's obligation to comply with statutory and regulatory requirements a moving target, and the Secretary's authority to terminate MA contracts a nullity, as non-

15

compliant MAOs would always be able to get one more chance to try to demonstrate that they have reformed, and the agency would never be able to terminate an MA contract, absent serious and immediate jeopardy to the beneficiaries, or an MAO's consent to termination.

    **B.**    <u>The November 30, 2006 Decision is Supported by Substantial Evidence in the Record and Should be Affirmed.</u>

In his November 30, 2006 decision, the Administrator first responded to plaintiff's assertion that "The Hearing Officer's decision should be remanded . . . for a determination of whether AHC is currently in substantial compliance with relevant regulations." A.R. 9. With respect to AHC's alleged current compliance status, the Administrator declined to consider any such evidence, noting that the scope of his review was expressly set forth at 42 C.F.R. § 422.692, which "does not contemplate the consideration of the MA organization's status after the mailing of the notice of the reconsidered decision, nor remand for such reconsideration." A.R. 11. Instead, "[t]he Administrator shall review the hearing officer's decision, and determine, *based upon this decision, the hearing record, and any written arguments submitted by the MA organization*, whether the termination decision should be upheld, reversed, or modified." <u>Id.</u> (emphasis added); 42 C.F.R. § 422.692(b).

The Administrator then issued his findings of fact and conclusions of law with respect to the November 22, 2005 Hearing Officer decision. A.R. 16. The Administrator found that the Hearing Officer properly upheld CMS's determination that AHC should be terminated from the MA program based on deficiencies in six different areas. A.R. 16-23. Specifically, the Administrator found that AHC failed to comply with service access requirements, failed to establish proper grievance and appeals procedures, did not implement a quality assessment and performance improvement program as required by regulation, was not in compliance with

prompt pay requirements, lacked an adequate compliance program to ensure accountability with and commitment to applicable Federal and State standards, and failed to substantially carry out the terms of its MA contract with CMS.  Id.  Importantly, any one of these grounds was sufficient to warrant termination of AHC's MA contract.  See 42 U.S.C. § 1395w-27(c)(2) (noting alternate grounds for termination); 42 C.F.R. § 422.510 (same).

As shown below, substantial evidence in the record supports the Administrator's November 30, 2006 decision, and plaintiff has not demonstrated a likelihood of success on the merits.

### 1.    The Administrator and Hearing Officer Properly Declined to Consider AHC's Evidence of Alleged Current Compliance.

Plaintiff alleges that it has "repeatedly requested during the administrative review that CMS simply consider its current compliance, and CMS has, for unknown reasons that appear increasingly suspect, refused to do so."  Pl. PI Mem. at 2.  Plaintiff also claims that it is likely to prevail on the merits because "CMS openly ignores AHC's current substantial compliance with its regulatory and contractual obligations," and the agency's refusal "to consider evidence of AHC's current substantial compliance was arbitrary and capricious and cannot withstand legal scrutiny."  Id. at 3, 12.  Plaintiff's arguments are simply wrong.  The Administrator properly found that pursuant to 42 C.F.R. § 422.692(b), he was to "review the hearing officer's decision, and determine, based upon this decision, the hearing record, and any written arguments submitted by the MA organization, whether the termination decision should be upheld, reversed, or modified."  A.R. 10.  Given the express language of the regulation, the Administrator correctly determined that any evidence of AHC's alleged current compliance was not relevant to his review of the Hearing Officer's November 22, 2005 decision.  Nelson, 131 F.3d at 1236

(holding that it was improper for Administrative Law Judge to consider extra-record evidence in determining extent of petitioner's disability).

The Administrator's determination that the Hearing Officer likewise properly declined to consider evidence of AHC's alleged change in compliance status subsequent to the time of the CMS reconsideration decision should also be upheld. A.R. 12. Pursuant to 42 C.F.R. § 422.646, CMS's July 5, 2005 letter informing AHC of its proposed termination would have been final and binding absent a request for reconsideration in accordance with 42 C.F.R. §§ 422.638-658, or a request for a hearing pursuant to 42 C.F.R. § 422.662. A.R. 10; 2280-317. AHC requested reconsideration, and CMS's final reconsideration decision was issued on October 18, 2005. A.R. 6, 2427. As noted by the Administrator, the pertinent regulation respecting reconsideration provides that a reconsidered determination is a new determination that:

> is based on a review of the contract determination, the evidence and findings upon which that was based, and any other written evidence submitted *before* notice of the reconsidered determination is mailed, *including facts related to the status of the MA organization subsequent to the contract determination* . . . .

42 C.F.R. § 422.654(a) (emphasis added). As such, the regulation expressly contemplates that the reconsideration decision shall take into account new evidence respecting the compliance status of the MAO up to the point of the reconsideration decision. In contrast, however, once the reconsideration decision has been issued, and the MAO exercises its right to a hearing before a CMS Hearing Officer, the Hearing Officer's review is limited as to whether the underlying CMS determination/reconsideration was proper. A.R. 11. Unlike the provision set forth at 42 C.F.R. § 422.654(a) allowing consideration of new evidence during a CMS reconsideration, there is no similar language referenced in the Hearing Officer's

18

procedures that allows for the consideration of the facts relating to the MAO's status <u>after</u> the mailing of the CMS's reconsidered decision. A.R. 11; 42 C.F.R. § 422.676; <u>see also</u> A.R. 206 (decision of the Hearing Officer noting that "the scope of [the Hearing Officer's review] does not extend to making a new determination as to whether a plan has come into compliance with the regulations by the date of the hearing. If such review were contemplated, it would have been specifically set forth in the regulations.") (citing 42 C.F.R. § 403.820[(f)(9)(i)]). In this case, AHC submitted additional evidence on August 19, 2005, but failed to further update the record prior to the issuance of the reconsideration decision. A.R. 2364.

The agency's interpretation of its own regulations and the statute it is charged with administering is to be accorded deference by the Court. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.</u>, 467 U.S. 837, 843-44 (1984); <u>Pharmaceutical Research and Mfrs. America v. Thompson</u>, 362 F.3d 817 (D.C. Cir. 2004) (finding that statutory interpretations made by HHS Secretary in approving state's Medicaid plan were entitled to <u>Chevron</u> deference). Given the express language of the governing regulations, the Administrator properly determined that the scope of both his review and the Hearing Officer's review was limited to the MAO's status <u>at the time of the CMS reconsideration decision</u>, and this determination should be upheld.**[8]**

---

[8] Because of the detailed regulatory scheme found at 42 C.F.R. § 422.641 <u>et seq.</u>, that governs the MA contract termination appeals process, plaintiff's citation to a line of Departmental Appeals Board cases, Pl. PI. Mem. at 11, and the manner in which Administrative Law Judges in those cases received evidence, is not pertinent here. <u>See</u> 42 C.F.R. § 422.641 (noting that this subpart "establishes the procedures for making and reviewing the . . . contract determination" including "a determination to terminate a contract with an MA organization"); A.R. 206 n.68 (Hearing Officer decision noting that "review by a CMS hearing officer of an MA

2.      **The Record Evidence Demonstrates that AHC Failed to
Comply with Beneficiary Access to Healthcare Requirements.**

Pursuant to 42 C.F.R. § 422.510(a)(10), an MAO may be terminated for

substantially failing to comply with the service access requirements found in 42 C.F.R. §

422.112 and § 422.114.  Substantial evidence in the record supports the Administrator's

determination that "AHC failed to comply with service access requirements as the record

shows that AHC's provider network is not adequately serving the needs of the

organization's members."  A.R. 16.

First, the record demonstrated that the AHC network had an insufficient number

of contracted hospitals in certain areas, resulting in compromised member access to

appropriate medical care, and forcing AHC's members to use the emergency departments

of non-contracted hospitals to access needed medical care.  A.R. 3294.  In addition, the

contracted hospital in Indian River County was not within a 30-mile radius, or 30-minute

drive of at least some of AHC's resident members, such as the residents of Okeechobee

county.  CMS's managed Care Manual, Ch. 4, § 120.2, and Managed Care Monitoring

Guide element AA01, provide generally that commonly used services should be located

within 30 minutes driving time.  A.R. 16 n. 31.  Also in this regard, AHC's expert

witness at the November 14-15, 2005 hearing before the CMS Hearing Officer, Mr.

Bruce Ardis, conceded that the nearest AHC-contracted hospital might exceed even a 35

mile drive, and even then only based upon the assumption that the roads proceed in a

---

contract termination is not controlled by DAB precedent").

straight line.[9]  A.R. 241 (hearing transcript at 78-79).

Faced with complaints reported to it through both letters and phone calls to its call centers, the State of Florida's Agency for Health Care Administration ("AHCA") became concerned about the adequacy of AHC's provider networks and quality of care.  A.R. 1688 (AHCA June 10, 2005 letter to AHC).  Shortly after CMS issued its proposed termination letter on July 5, 2005, the Florida AHCA conducted an on-site compliance review of AHC from July 12-15, 2005.  A.R. 1691-94.  AHCA's review found AHC deficient in satisfying Florida Administrative Code § 59A-12.006(3)(d), which requires enrollee access from within the managed care service area to the nearest contracted general hospital in no longer than 30 minutes under normal circumstances.  A.R. 1692 (AHCA deficiency report).  Specifically, AHCA found AHC to have failed to provide access to a complete provider network in Brevard, Okeechobee, and St. Lucie Counties.  A.R. 1692.

In addition, the record evidence supports the Administrator's conclusion that "AHC's failure to meet the [hospital access within] 30 [minute]/30 [miles] policy in this case was reflective of the more serious failures of AHC to demonstrate that it could meet the service access requirements necessary under the contract terms across its network

---

[9]  Plaintiff finds fault with CMS's approval of Okeechobee County as a coverage area in the first place.  Pl. PI Mem. at 15.  An agency's arguably prior lax enforcement policies cannot hamstring its future enforcement efforts.  Beverly Health & Rehabilitation Services, Inc. et al. v. Thompson, 223 F. Supp. 2d 739 (D.D.C. 2002), quoting Rural Day Care Ass'n, DAB No. 1489 at 94-115 (1994) ("To conclude otherwise would require the federal government to throw good money after bad and to continue indefinitely to fund ineffective, incompetent or non-complying programs because it had once begun to do so . . . . If the termination of a grantee is justified by its failings, it is hardly a defense that someone else should be terminated first.").

area." A.R. 17.  Specifically, the record is replete with evidence that AHC had on-going

physician staffing problems.  Indeed, AHC's own physician staffing rosters belied its

contention that "all AHC contracted medical offices are required to be open and staffed

by a physician during normal business hours," and, in fact, supported CMS's May 2005

audit finding that physicians were not available five days per week or had no regular

business hours at several clinics.  A.R. 3296.  Those rosters indicated that four AHC

health centers showed just one physician assigned to each, with each of those physicians

also showing assignments at other AHC health centers.  A.R. 863-70.  In one case, the

sole physician assigned to one center was listed on the staffs of several other centers as

well.  A.R. 863-70.  Similarly, another center was listed as being staffed by two

physicians, but with one of those physicians showing other assignments, and the other

physician having not only another assignment but also serving as AHC's Medical

Director.  A.R. 863-70.  The staffing rosters constitute substantial evidence supporting

the Administrator's finding that "it would be unlikely that these [] centers could be

adequately staffed by a physician during normal business hours if the physician was also

assigned to other centers as well."  A.R. 17.

Additionally, during the audit verification process, CMS was told by the staff of

several clinics that physicians were not always available five days a week nor during

regular business hours, while staff at AHC's Okeechobee County facility acknowledged

that their facility was not then staffed with a doctor or nurse.  A.R. 3296.  Despite AHC's

own policies requiring that clinic facilities be staffed with one or more physicians or

nurses at all times, in its May 2005 audit, CMS found that 9 out of 25 of AHC's clinics

revealed <u>no</u> physician or mid-level provider available to render care.  A.R. 3296.

Hearing testimony further revealed that these same physicians, stretched so thin as to be

unable to even adequately staff AHC's health centers on a routine basis, were, moreover,

also responsible for providing inpatient coverage, after hours and weekend call, and

weekend clinic coverage.  A.R. 339 (testimony of Richard Tuten at transcript pp. 105-

06).

### 3.  AHC Failed to Establish and Maintain Required Grievance Procedures.

The record evidence likewise supports the Administrator's finding that "AHC had

failed to: 1) establish or maintain grievance procedures as required by CMS and AHC's

own policies and procedures; 2) investigate all allegations made by members, or resolve

members' issues and notify them of resolutions; and 3) correctly distinguish between

organization determinations, reconsiderations, and grievances, and to process any of

these through the appropriate mechanisms," thereby providing grounds for CMS's

termination of AHC's MA contract under 42 C.F.R. § 422.510(a)(6).  A.R. 18.

CMS documented grievance and appeals deficiencies that had persisted

systematically through audits conducted in February 2001, July 2002, and January 2004,

and which were again reaffirmed in the May 2005 audit.  A.R. 18; Exhibit 2; 2158-64,

2169-85, 2189-2210, 2286-317.  Indeed, audit evidence revealed AHC's continued and

persistent non-compliance over a this four-year period.  CMS found that AHC did not

adequately inform members of their rights, notify members of its determinations,

categorize incoming disputes in a timely manner, track disputes, maintain dispute-related

documents, inform members of the outcome of disputes timely, effectuate the disputes

accurately or maintain files in a manner suitable for CMS to fully evaluate AHC's compliance with the statute.  A.R. 18; Exhibit 2; see also A.R. 2158-64, 2169-85, 2189-2210, 2286-317.

AHC even admitted to these deficiencies.  Several stipulations into which AHC entered prior to the November 14-15, 2005 hearing acknowledged AHC's deficiencies in the areas of grievances and appeals as of CMS's May 10, 2005 audit.  A.R. 263, 4086-88 (stipulations).  These stipulations included the following:

- Case file documentation was lacking.  A hurricane in 2004 had destroyed a warehouse where certain grievance files were maintained . . . .  Other files were not maintained in a manner satisfactory to the CMS reviewer.

- AHC did not always issue adverse standard pre-service organization determinations within 14 calendar days after receiving the request (or in 28 days where extensions were justified).

- AHC did not always notify members timely of pre-service denials.

- AHC did not always forward cases to CMS's independent review entity within 60 days and did not always notify the member concurrently.

- CMS was unable to determine if the effectuation process [where an MAO's claims denial is reversed in whole or part by CMS['s] independent review entity] was followed according to CMS guidelines.

A.R. 263, 4086-88.  AHC likewise admitted persistent deficiencies with respect to, among other things, appeals, in a letter dated July 18, 2005.  A.R. 2335.  Indeed, CMS established that AHC had never, since the beginning of its MA contract in 2000, maintained compliant grievances and appeals systems.  Exhibit 2; see also A.R. 2158-64, 2169-85, 2189-2210, 2286-317.  In survey after survey, four in all, CMS cited AHC for deficiencies relating to grievances and appeals.  Exhibit 2; see also A.R. 2158-64, 2169-

24

85, 2189-2210, 2286-317.  Even CMS's later review of the 2005 CAP submitted by AHC

"found that AHC had not provided a means of evaluation of the grievances and appeals

process and that the data in the submitted report was of questionable accuracy."  A.R. 18;

3297-302.

Given the ample record evidence reflecting AHC's systemic failure to comply

with MA statutory and regulatory requirements with respect to grievances and appeals,

the Administrator properly upheld the Hearing Officer's November 22, 2005 decision.[10]

**4.    AHC Failed to Implement an Acceptable Quality Assessment
and Performance Improvement Program.**

An MAO may also be terminated from the MA program if it "fails to implement

an acceptable quality assessment and performance improvement program."  42 C.F.R. §

422.510(a)(8).  In this regard, substantial evidence supports the Administrator's finding

that AHC had not fulfilled this regulatory requirement.  A.R. 19.

First the Administrator noted that "although AHC had developed a quality

assessment plan on paper, there was no evidence in the record that it had actually been

implemented."  A.R. 19, 278, 280 (testimony by Christine Perenich).  CMS's 2005 audit

also revealed that AHC's quality improvement committee did not meet regularly, that

AHC had not identified which staff members held which positions, that program

_____

[10]  AHC argues that "[c]urrently 100% of formal grievances are resolved within 30 days .
. . [and] Defendant's data on AHC's grievance and appeals processes is [] out-of-date . . . ."  Pl.
PI Mem. at 19.  Plaintiff misses the point.  AHC's alleged current compliance is not before the
Court.  Instead, the Court must assess whether the Administrator's November 30, 2006 decision
is supported by substantial evidence in the record.  As noted above, the record evidence cannot
and does not include evidence of an MAO's compliance or lack thereof after the reconsideration
decision.

assessment tools had yet to be developed, and that AHC's quality assessment program had not been reviewed or approved by the AHC Board of Directors.  A.R. 280, 2190-96 (2004 CAP review), 3297-302.

In addition, the record evidence demonstrates that the State of Florida's Quality Improvement Organization, Florida Medical Quality Assurance, Inc. ("FMQAI"), had independently reviewed AHC's quality assurance program and investigated complaints concerning delay in referrals, treatment, and subsequent payment, and that FMQAI had found serious problems.  A.R. 1579-1610 (letters from FMQAI respecting AHC problems).  Indeed, FMQAI had been working on its own quality improvement plan with AHC since 2003.  A.R. 1579-1610.  "FMQAI noted that it had been experiencing difficulties in both receiving and interpreting the AHC reports [,] evidence [] further supporting the contention that AHC had not been able to implement a quality assessment and performance program."  A.R. 19; A.R. 270-71 (testimony by FMQAI employee Cheryl Cook).  In addition, with respect to AHC's 2nd quarter 2005 referral record, FMQAI found that 24 of 93 (25.8%) referrals were above the acceptable time limit, with AHC demonstrating little improvement over time.  A.R. 1604-10.  The Administrator properly found that [g]iven that AHC had been under a quality improvement plan with FMQAI since 2003 concerning its referrals, the data was a further indication that AHC had not become compliant in this area."[11]  A.R. 20.

### 5.    AHC Failed to Comply with Prompt Pay Requirements.

---

[11]  Again, AHC attempts to rebut the Administrator's finding with evidence of alleged *current* compliance.  Pl. PI Mem. at 20-21.  As discussed above, any such evidence is irrelevant to whether substantial evidence supports the agency's November 30, 2006 final decision.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

AMERICA'S HEALTH CHOICE MEDICAL
PLANS, INC.

      Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
CENTERS FOR MEDICARE & MEDICAID
SERVICES

      Defendant.

Civil Action No. 1:06CV2064 (RWR)

## DECLARATION OF CHRISTOPHER J. EISENBERG

I, Christopher J. Eisenberg, declare as follows:

1. I am the Director, Division of Health Plan Accountability (DHPA), Plan Oversight & Accountability Group, Center for Beneficiary Choices, Centers for Medicare & Medicaid Services (CMS or the Agency). I have held this position since January 2003. I have worked for CMS, in various positions, for over 14 years. Prior to assuming the DHPA Director's position at CMS, I was Senior Technical Advisor/Managed Care Specialist for compliance and enforcement for the Medicare+Choice program (the predecessor program to the Medicare Advantage program) for approximately two years. As Senior Technical Advisor, I led many of the Agency's enforcement actions against Medicare+Choice and cost organizations – actions that included imposition of intermediate sanctions, levying civil money penalties, and contract termination actions. Prior to these positions, I was a Medicare Managed Care Specialist (a position CMS

calls "Plan Manager") and a health insurance specialist, specializing in Medicare and Medicaid managed care issues.

2. As part of my position as Director, Division of Health Plan Accountability, my primary responsibilities are directing the division which is responsible for overseeing compliance requirements of Medicare Advantage Organizations (MAOs), Prescription Drug Plans (PDPs), 1876 Cost Plans, and 1833 Health Care Prepayment Plans, and certain Medicare managed care demonstration programs. This involves the development of audit tools that meet statutory and regulatory requirements, working with state regulators, effectuating intermediate sanctions and terminations, and the development and implementation of Medicare Managed Care performance measures and metrics. I direct a division of professionals tasked with managing the Agency's compliance and enforcement actions against non-compliant Medicare managed care contractors. Compliance and enforcement actions include implementing and overseeing corrective action plans, imposing intermediate sanctions, and levying civil money penalties. The DHPA serves as the Agency's liaison with federal law enforcement for suspected fraud, waste, and abuse cases involving Medicare managed care contractors. The Division is comprised of approximately 10 professionals from varying backgrounds relevant to government health care programs including law, finance and accounting, pharmacy, information technology, statistics and research methodology, law enforcement, pharmacy benefit management (PBM), and health care administration. In addition to the individuals who staff the Division, we maintain broad access to a wide array of clinical expertise from across the Agency's central office components and regional offices, and call upon this clinical expertise on an as-needed basis to carry out the responsibilities of the Division. The information contained in this declaration is based on knowledge obtained in the course of my official duties.

3. The renewal of the AHC contract, H1034, for either the 2006 or 2007 calendar years did not mean that CMS made any kind of positive determination that AHC was or is currently qualified to hold a Medicare Advantage contract. The renewals only signal that CMS did not exercise its option in 2005 and 2006 to non-renew the contract at the specific points in time required by regulation.

4. It is important to CMS, Medicare beneficiaries, and the American public that MA plans comply with the Medicare Advantage rules and regulations. Many of these rules and regulations directly affect MA beneficiaries' ability to quickly access Medicare-covered healthcare services and the quality of Medicare-covered healthcare the MA beneficiary receives. For example, if an MA organization does not have enough providers in its network or if its beneficiaries have to travel too far for healthcare, beneficiaries may not receive the healthcare they need in the time in which they need it. Also, if an MA organization does not pay providers in a timely fashion, they may either drop out of the MA plan's network or, if a non-contracted provider, may refuse to treat beneficiaries from that MA organization. Beneficiaries may suffer harm from such situations. Furthermore, if an MA organization does not adhere to CMS regulations related to appeals and grievances, Medicare beneficiaries will not receive appropriate appeal rights which can result in Medicare beneficiaries not receiving essential health care services. These are just a few examples of program requirements where AHC is out of compliance—and these examples show how the MA rules and regulations need to be adhered to in order for Medicare beneficiaries to receive the quality healthcare to which they are entitled.

5. For organizations that CMS finds are not in compliance, CMS works with the organization with the goal of bringing the plan into compliance as quickly as possible. Under CMS' existing processes, once CMS determines the organization is not in compliance, the MA

organization is given the opportunity to send CMS a corrective action plan (CAP) which details how the MA plan will fix the problems and the timeframe around which the identified areas of non-compliance will be resolved. If CMS determines that the CAP lays out a plausible plan for correcting the agreed-upon area of non-compliance, and, if the MA plan subsequently successfully implements the CAP to CMS' satisfaction, the MA organization may at CMS discretion, be released from the CAP and return to routine CMS monitoring activities. In cases where CMS issues a notice to terminate an MA organization, the MA organization has another opportunity to submit a Corrective Action Plan (CAP). If CMS finds the CAP is sufficient and, after a subsequent review, also finds the CAP to be fully implemented, CMS will not seek to terminate the plan. See 42 CFR § 422.510. If the CAP is not sufficient and if CMS proceeds with a contract termination process, the MA plan is able to seek reconsideration of that termination decision, then a hearing, and, if the termination decision is affirmed by the hearing officer, the MA plan may seek, review by the CMS Administrator. 42 CFR §§ 422.650, 422.662, 422.692.

6. As noted in the Administrator's decision in this case, an MA organization that is not in compliance has until the reconsideration level of appeal to convince CMS that it is currently in compliance. See Administrator's Decision at 10-11. CMS is not required, and certainly does not have the resources, to continually check on the current compliance posture of a non-compliant organization. To require such successive compliance reviews would significantly diminish already limited compliance/program oversight resources and would inappropriately convey to MA organizations that attaining compliance is a "moving target." It is not. The purpose of the compliance process is to require non-compliant organizations to quickly regain compliance as determined by CMS, or to force non-compliant organizations from the program quickly so that

MA beneficiaries do not suffer harm. The process of removing non-compliant organizations from the program further allows affected beneficiaries to enroll in a new Medicare coverage option— e.g., another Medicare managed care plan or original Medicare -- that operates in compliance with Medicare program requirements and insulates other potential beneficiaries from the harm that could result from enrolling in a non-compliant Medicare managed care plan. For a non-compliant plan that enrolls approximately 13,000 beneficiaries to continuously play the "cat and mouse" compliance game (i.e., "we weren't compliant yesterday but we are compliant today, though we may be out of compliance again tomorrow") endangers beneficiary health and wastes the limited government resources that would be better deployed in overseeing the compliance of the other Medicare managed care organizations that today provide and manage the healthcare for millions of Medicare beneficiaries.

7. America's Health Choice (AHC) has indicated in its recent filing with the district court for the District of Columbia that it is currently in compliance with all Medicare Advantage (MA) requirements. CMS does not believe that this is true. Specifically, CMS staff from the CMS Atlanta regional office and DHPA indicate that they have received recent information that reinforces the Agency's continuing concerns about this MA organization:

> AHC's internal audits submitted to CMS in November 2006, utilizing CMS audit testing tools, show that AHC remains out of compliance with Medicare Advantage program requirements in the following areas: favorable claims reconsiderations, unfavorable claims reconsiderations, unfavorable standard pre-service reconsiderations, and denied claims.

- Seven effectuation notices provided to CMS from AHC officials in August 2006 were falsified by AHC. The effectuation notices were falsified by the AHC Appeals manager who was later demoted.

CMS learned that within the last two months AHC has marketed its MA plan in violation of the Agency's intermediate sanction freezing AHC's marketing and enrollment activities. A State of Florida Health Insurance Counseling Program (SHINE program) representative reported to a CMS employee in the CMS Atlanta regional office about hearing an AHC sales representative at a health fair offer to come to a Medicare beneficiary's home to describe AHC's Medicare products. The results of AHC's internal review of payment appeals show that its original coverage determinations are frequently incorrect.

- In October 2006, AHC provided personally identifiable information (beneficiary social security numbers) to HealthSpring and then to CMS in a manner that was not secure (by unsecure email). AHC is required to adhere to the Health Insurance Portability and Accountability Act (HIPAA) rules and, in addition, CMS regulations and the MA contract require that MA organizations adhere to the HIPAA rules. Failure to properly secure information puts at risk the beneficiary's private information, making identity theft more likely.

- There continue to be issues with provider access in AHC's MA plans. CMS understands that AHC's attempts to contract with an HCA hospital (including the hospital in Okeechobee County) have broken off.

- In the spring of 2006, while AHC was not under a marketing moratorium, the company issued marketing materials that had not been approved by CMS prior to

publication and distribution, in violation of Medicare managed care marketing requirements.  42 CFR § 422.50.

AHC delays in healthcare referrals are still an issue.  AHC's weekly reports to CMS show up to 50% of AHC's grievances pertain to delays in referrals.  In late August 2006, the Florida Medical Quality Assurance, Inc. (FMQAI) reported to CMS that an AHC member experienced a referral delay of 18 months.

8.  CMS and AHC entered into a settlement agreement in late April 2006 based on the intent of HealthSpring to purchase AHC.  HealthSpring has been a long- standing Medicare Advantage organization currently operating contracts in Texas, Illinois, Alabama, Mississippi, and Tennessee.  A term and condition for CMS agreeing to this settlement agreement was that AHC would enter a management agreement with HealthSpring officials whereby HealthSpring employees would run the day-to-day operations of AHC.

9.  Following the failure of AHC and HealthSpring to consummate the purchase of AHC by HealthSpring within timeframes assured to CMS by both AHC and HealthSpring, CMS provided both parties additional time to close the deal.  CMS granted extensions and worked in good faith with both parties in the hopes that this deal would be finalized and AHC's Medicare beneficiaries quickly transitioned to a HealthSpring-managed Medicare managed care plan.

10.  On November 1, 2006 HealthSpring and AHC informed CMS that the HealthSpring board did not approve the purchase of AHC and that AHC and HealthSpring had mutually terminated the stock purchase agreement. During the week of December 4th 2006, AHC informed CMS that it was terminating its management agreement with HealthSpring effective the end of December 2006.

I declare under penalty of perjury that to my best knowledge, information and belief-- the foregoing is true and correct. Executed this 11th day of December, 2006 in Baltimore, Maryland.

Christopher J. Eisenberg

**EXHIBIT 2**: AHC DEFICIENCY CHART

| Element | May 2005 Deficiencies - Element Identification | Repeat Finding | | | |
|---------|-----------------------------------------------|------|------|------|------|
| | | 2001 | 2002 | 2004 | 2005 |
| AA01 | Adequate and Appropriate Provider Network | ✓ | | | ✓ |
| AA02 | Adequate and Appropriate Access to Care | | | | ✓ |
| QY01 | Quality Assessment Performance Program Evaluated Annually | | | ✓ | ✓ |
| QY02 | Adequate Health Information System | | | ✓ | ✓ |
| QY03 | Appropriate Utilization Management Program | | | ✓ | ✓ |
| QY05 | Significant Problems Corrected | | | ✓ | ✓ |
| CN09 | Adequate Compliance Plan | | | | ✓ |
| GV01 | Organization Determinations and Recon's Not Categorized as Grievances | ✓ | | ✓ | ✓ |
| GV02 | Grievance Adjudication | ✓ | ✓ | ✓ | ✓ |
| OC01 | Correct Claim Determinations | | | ✓ | ✓ |
| OC02 | Reasonable Reimbursement for Covered Services | | | ✓ | ✓ |
| OC03 | Timely Payment of Non-Contracting Provider Clean Claims | ✓ | ✓ | | ✓ |
| OC04 | Interest on Clean Claims Paid Late | ✓ | ✓ | | ✓ |
| OC05 | Timely Adjudication of Non-Clean Claims | ✓ | ✓ | | ✓ |
| OC06 | Claim Denials (Notice Content) | ✓ | | | ✓ |
| OP01 | Standard Pre-Service Denials (Timeliness) | | ✓ | | ✓ |
| OP02 | Standard Pre-Service Denials (Notice Content) | | | | ✓ |
| RC01 | Favorable Claims Reconsiderations (Timeliness) | | | | ✓ |
| RC02 | Adverse Claims Reconsiderations (Timeliness) | | | | ✓ |
| RC03 | Effectuation of Third Party Claims Reconsideration Reversals | | | | ✓ |
| RP01 | Favorable Standard Pre-Service Reconsiderations (Timeliness) | | | ✓ | ✓ |
| RP02 | Adverse Standard Pre-Service Reconsiderations (Timeliness) | | | | ✓ |

Source:  A.R. 2158-64, 2169-85, 2189-2210, 2286-317.[1]

---

[1]  The 2004 review was a *focused review*, meaning not every element listed was surveyed.  As such, the fact that deficiencies were not noted for each monitoring element does not signify that AHC necessarily otherwise complied with each element.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) ) ) |
| Defendant. | ) Civil Action No.  1:06CV2064 (RWR) |

## DECLARATION OF CYNTHIA MORENO

I, Cynthia Moreno, declare as follows:

1. I am the Director, Plan Oversight and Accountability Group (POAG), Centers for Beneficiary Choices, Centers for Medicare & Medicaid Services.  Prior to becoming the Director of POAG, I was in the same position as an Acting Director in the predecessor organization.  I have held these positions for the past three (3) years.  My previous position was that of the Director of the Division of Health Plan Accountability for four (4) years.

2. In my current position as Director, my primary responsibilities are overseeing five divisions, including the Division of Health Plan Accountability which is responsible for all Medicare Advantage Organization enforcement actions.  The information

contained in this declaration is based on knowledge obtained in the course of my official duties.

3. On August 28, 2006, at the request of AHC and HealthSpring, AHC and HealthSpring met with CMS officials to discuss questions HealthSpring had, as a result of HealthSpring's due diligence activities at AHC. HealthSpring indicated that its concerns were such that the overall status of the acquisition was being called into question. Both AHC and HealthSpring officials indicated that they would hire an independent auditor to further investigate AHC's risk adjustment data submissions.

4. Risk adjustment data is supplied by the MA plan to CMS and used by CMS to calculate risk adjustment scores. A risk adjustment score measures the health status of a Medicare beneficiary by applying risk co-efficients for certain CMS identified diagnoses. The higher the risk adjustment score, based on the co-efficients and diagnoses, the more that beneficiary's health care will cost in the future. Higher risk scores result in higher payments to MA organizations while lower risk scores result in lower payments for MA organizations.

5. On September 26, 2006, HealthSpring officials met with myself and other CMS officials to further discuss AHC's risk adjustment scores. This was a follow-up meeting, requested by CMS, to the August 28, 2006 meeting which CMS, HealthSpring, and AHC had attended. At the September 26, 2006 meeting HealthSpring indicated that it was concerned about AHC's risk adjustment data and that HealthSpring believed that the revenue stream that HealthSpring had projected for AHC was potentially inaccurate. HealthSpring officials expressed concerns that pursuant to their due diligence activities, they felt that the possibility existed that inaccurate risk adjustment data had been reported

to CMS by AHC. HealthSpring officials expressed to CMS concern that if they acquired AHC and it was later determined that AHC had submitted inaccurate risk adjustment scores to CMS, the successor liability would be HealthSpring's to absorb. HealthSpring officials also indicated that the risk scores for AHC's enrolled beneficiaries were not what they expected and that this new information was causing them to revise their projected revenue estimates and the overall terms and conditions for closing the AHC deal.

I declare under penalty of perjury that to my best knowledge, information and belief the foregoing is true and correct. Executed this 11th day of December, 2006 in Baltimore, Maryland.


_____
Cynthia Moreno

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA

| | |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) ) ) Civil Action No. 1:06CV2064 |
| Defendant. | ) (RWR) ) |

## DECLARATION OF TERESA L. DECARO

I, Teresa L. DeCaro, declare as follows:

1. I am the Acting Deputy Director of the Medicare Advantage Group, Center for Beneficiary Choices, Centers for Medicare & Medicaid Services (CMS or the Agency). I have held this position since May, 2006. I have worked for CMS, in various positions, for fifteen years. I am a registered nurse with twelve years of active clinical practice and management in critical care in major hospitals and medical centers around the Baltimore and Washington, DC metropolitan areas. After receiving my master's degree in public and health policy, I worked for a congressional commission for two years to develop the Medicare physician fee schedule. In 1991, I was employed by the Agency to conduct research and demonstrations to improve financial incentives under the Medicare fee-for-service program to provide efficient and well coordinated health services by provider groups (e.g., hospital-physician organizations and large multi-specialty physician group

practices). For several years I was special assistant to the director of the Agency's center responsible for the policy and operations of the Medicare managed care program (previously the Centers for Health Plans and Providers, and later the Center the Beneficiary Choices). In 2000, I was a co-lead on the development of the Administration's Medicare reform proposal introduced to Congress.. From 2002 to August 2004, I was the co-lead on the policy development and implementation of the Medicare prescription drug discount card, which required developing requirements for private sector firms to apply and contract to offer the drug card program on behalf of Medicare, as well as requirements for oversight and contract termination. From August 2004 until May 2006, I was the Director of the Division of Drug Benefit Purchasing, in the Center for Beneficiary Choices. In this role I was responsible for developing and implementing requirements for private sector firms to apply to provide prescription drug benefits to Medicare beneficiaries under Medicare Advantage and stand alone prescription drug plan contracts, in accordance with the Medicare Modernization Act, as well as requirements for contracting, oversight and contract termination.

2. In my current position I am responsible for the policy and operational development and refinement of the Medicare Advantage (MA) program and other managed care contract types under the Medicare program. I am responsible for contract management for 534 contracts representing thousands of plan benefit packages offered across the United States. As such, I am responsible for the policies and procedures that guide the MA application, non-prescription drug (Part C) benefit reviews, contracting and day to day oversight. I am also responsible for assuring beneficiary choice of competitive benefit offerings provided by health plans that meet the Medicare

requirements. The information contained in this declaration is based on knowledge obtained in the course of my official duties.

3. In order to be eligible to be an Medicare Advantage Organization (MAO), an entity must meet certain threshold criteria; for example (to list just a few of the requirements), being authorized under state law in the requested service area as a risk bearing entity that may offer health benefits (42 CFR § 422.503(b)(2)), having an executive manager whose appointment and removal are under the control of the entity's policy making body (42 CFR § 422.503(b)(4)(iii)), having in place insurance policies or other arrangements to cover losses from various risks (42 CFR § 422.503(b)(4)(v)) and demonstrating a commitment to compliance, integrity and ethical values as confirmed by the development and implementation of a compliance plan that meets Federal standards. 42 CFR § 422.503(b)(vi).

4. Entities seeking to become MAOs must agree to operate coordinated care plans (as defined in 42 CFR 422.4(a)(1)) in compliance with the requirements of their contract and applicable federal statutes, regulations, and policies. The entity must complete a certified application which must be submitted to CMS by a date specified in the Agency's annual call letter. For example, for contracts offered in calendar year 2007, applications were due to CMS by March 20, 2006. 42 CFR § 422.501(b). This certified application must, among other things, thoroughly describe how the entity and its MA plans will meet its obligations under the Medicare Advantage statute, regulations, and program requirements. 42 CFR Part 422; 42 CFR § 422.501. Applicants certify that they will abide by the requirements contained in the Medicare Advantage Contract Application and provide the services outlined in the application, as provided by reference in CMS

regulations and other sub-regulatory guidance such as the Medicare Advantage Contract Application.

5. CMS determines whether the entity qualifies as an MAO and that the proposed MAO meets the requirements for obtaining and maintaining a contract under 42 CFR Part 422. 42 CFR § 422.502; 42 CFR 422 Subpart N; 42 CFR 422 Subpart K.

6. Current MA contractors and new Medicare Advantage applicants must submit to CMS , by the first Monday in June, an aggregate monthly bid for each MA plan the MAO intends to offer in the upcoming year in the MAO's CMS-approved service area. 42 CFR § 422.254(a). The requirements for these bids are set forth at 42 CFR § 422.254(b).

7. CMS then reviews the benefits and aggregate bid amount and negotiates with the MAO regarding the bid amount and the proportions of the aggregate bid amount attributable to basic benefits, supplemental benefits, and prescription drug benefits. 42 CFR § 422.256. The regulations limit the bid proportions that CMS may accept. 42 CFR § 422.256(b).

8. New applicants whose application and benefits and bids are approved may enter into an MA contract. However, before CMS will enter into the contract, the organization must first demonstrate to CMS that items attested to earlier in the application process (e.g., the organization will at a later time, meet CMS' Part D access requirements) are in fact met at the time the contract is entered into between the two parties. 42 CFR § 422.503.

9. Outside of the annual bid process, CMS does not negotiate separate terms and conditions for each contract with each MAO contract applicant – the contracts with all of

the MAOs are the same and merely specify the substance of what is set forth in the Medicare Advantage program statute and regulations.

10. As contemplated in federal regulations at 42 CFR 422.506, CMS annually issues MA organizations contract "intent to renew" notices by May 1st to those organizations that CMS has determined, based on information available at that time, continue to be qualified to hold a contract during the following calendar year. MA organizations are not required to apply for a new contract. Once an MAO is in the MA program and is offering an MA plan, its contract is automatically renewed unless the MAO tells CMS in writing by the first Monday in June that it does not wish to renew its contract with CMS for the following calendar year or termination is being effectuated. 42 CFR 422.506.

11. In August 2005, CMS sent all new and renewing MA plans, including AHC, contracts for 2006. This was unusual in that the contracts are "evergreen" – that is, they automatically renew annually following CMS' issuance of intent to renew letters. CMS does not generally require renewing plans to annually sign new contracts. CMS issued the redrafted MA contract for all MA organizations based upon the numerous statutory and regulatory changes required to implement the Medicare Advantage program (as mandated by the Medicare Modernization Act).

12. All MA organization contracts are continuing contracts (so-called "evergreen" contracts), meaning that the contract is entered into once by CMS and the MAO and then is annually renewed unless either party or both parties non-renew the contract; or CMS or the MA organization terminates the MA organization's contract. As long as an MA plan is in operation, it must be operating under an MA contract. Accordingly, in May 2006, for the 2007 contract year, AHC and all other Medicare Advantage contracts that were

not being terminated at that specific point in time, were sent an 'intent to renew' letter. At this point in time, AHC was operating under an interim arrangement that involved the management and anticipated purchase by another Medicare Advantage organization, HealthSpring, thereby placing on hold the termination proceedings. On October 12, 2006, the circumstances were similar -- the termination was still on hold pending the purchase of AHC by HealthSpring, when automated renewal letters were sent, including to AHC

13. The renewal of the AHC contract, H1034, for either the 2006 or 2007 calendar years did not mean that CMS made any kind of positive determination that AHC was or is currently qualified to hold a Medicare Advantage contract. The renewals only signal that CMS did not exercise its option in 2005 and 2006 to non-renew the contract at those specific points in time as required by regulation.

14. The termination of AHC's MA plan does not mean that the AHC Medicare beneficiaries will be without Medicare coverage. Indeed, these beneficiaries will continue to be covered by Medicare and there will be no time when these beneficiaries will not be covered by Medicare. CMS is currently working on a plan to transition these beneficiaries automatically (in the event the beneficiaries do not exercise an alternative choice) into other comparable MA plans in the beneficiaries' areas. Based on CMS' analysis, CMS believes that there are other MA plans similar in cost and benefits to the AHC plan that are located in the same Florida counties as the AHC plan and that would be willing to cover AHC beneficiaries once the AHC MA plan is terminated. CMS would like to contact these other MA plans to find out definitely if they are able and willing to take AHC beneficiaries but has not yet done so because of this court action by

AHC. Nonetheless, CMS' previous experience in this method suggests that these plans will want to accept these enrollees.

15. Even if another MA plan is not available for particular AHC beneficiaries, these beneficiaries will still continue to be covered by the Medicare program. If another MA plan is not available, once the AHC plan is terminated, the beneficiary will be covered by traditional Medicare. In addition, because the AHC MA plan also included a prescription drug benefit, these particular beneficiaries would be automatically enrolled (in the event they do not exercise an alternative choice) by CMS into a comparable Medicare prescription drug plan for that beneficiary's area (again, only if a comparable MA plan was not available). There are several Medicare prescription drug plans covering the AHC service area in Florida that would likely be comparable to the drug benefit offered by AHC for any beneficiaries not in an area with a comparable non-AHC MA plan.

I declare under penalty of perjury that to my best knowledge, information and belief the foregoing is true and correct. Executed this 11th day of December, 2006 in Baltimore, Maryland.

Teresa L. Decaro