**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES )<br><br>Defendant. ) | No. 06-CV-2064 (RWR) |

**DEFENDANT'S NOTICE OF ERRATA**

PLEASE TAKE NOTICE THAT Defendant United States Department of Health and Human Services, Centers for Medicare & Medicaid Services, files herewith the full version of defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction. Due to computer error, only part of the brief was filed on December 12, 2006, at 1:00 a.m. The attached brief replaces that brief, filed at docket entry no [9]. The previously filed exhibits remain the same.

Dated: December 12, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

_____/s/_____
HEATHER PHILLIPS

1

JAMES C. LUH
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel: (202) 514-4938
Fax: (202) 616-8460

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICA'S HEALTH CHOICE MEDICAL ) 
PLANS, INC., ) 
       Plaintiff, ) 
        ) 
       v. )     Civil Action No.:  06-2064 (RWR) 
        ) 
UNITED STATES DEPARTMENT OF HEALTH ) 
AND HUMAN SERVICES, CENTERS FOR ) 
MEDICARE & MEDICAID SERVICES ) 
       Defendant. ) 
_____ ) 

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Having failed repeatedly over a period of several years to achieve compliance with numerous Medicare statutory and regulatory requirements that are incorporated into its contract with defendant, plaintiff, America's Health Choice Medical Plans, Inc. ("AHC"), a Medicare Advantage Organization ("MAO"), now asks this Court to give it yet another chance. Plaintiff was scheduled for termination from the Medicare Advantage ("MA") program based on a May 2005 audit (the fourth audit that AHC had failed), which found AHC to be in non-compliance in key areas such as beneficiary access to health care services, maintenance of a functioning beneficiary grievance and appeals process, failure to provide adequate physician staffing, failure to maintain a functioning quality assurance program, among others. AHC requested reconsideration of the initial termination decision, and on reconsideration that decision was upheld. AHC appealed the reconsideration decision, and a Hearing Officer for the Department of Health and Human Services ("HHS") upheld that termination decision on November 22, 2005, after a two-day hearing and full consideration of the evidence and briefs submitted by the parties.

Plaintiff appealed that Hearing Officer's decision to the Administrator of the Centers for Medicare and Medicaid Services ("CMS"), the agency within HHS that is responsible for the administration of the Medicare program, and the termination decision was affirmed in a final agency decision issued on November 30, 2006.[1]  Administrative Record ("A.R.") at 2-24.[2]

Plaintiff now claims that the Administrator lacks authority to terminate the AHC-CMS MA contract and that CMS is required to give AHC yet another opportunity to demonstrate compliance; that the Administrator must disregard the 2005 decision of the Hearing Officer and the audit findings and extensive decision record on which that decision was based; and that the Secretary must, instead, affirmatively demonstrate that AHC is at this moment not in compliance with the statutory and regulatory requirements which are incorporated by reference into its contract with defendant and with which it has repeatedly failed to comply virtually since its acceptance into the MA program.  Plaintiff is wrong on all counts.

To accept AHC's position and enjoin the impending MA contract termination, as well as CMS's current plan to notify beneficiaries on December 15, 2006 of that upcoming termination,

_____

[1]  As AHC must concede, the Administrator's decision would have been issued much earlier but AHC had requested and CMS had agreed to an administrative stay based on AHC representations that it had found a willing and qualified corporate purchaser, HealthSpring, that would purchase its stock and assume operation of its MA plan.  Because HealthSpring is an MAO that has several ongoing MA contracts with CMS, and because AHC represented that this stock purchase was imminent, CMS agreed to enter into a settlement agreement with AHC whereby CMS agreed to a stay of termination proceedings while the AHC-HealthSpring deal was being finalized, with AHC also agreeing to enter a management contract with AHC pending completion of the sale.  When HHS was notified in November that the deal between AHC and HealthSpring had fallen apart, it requested that the administrative stay be lifted and that the Administrator render a decision.  Christopher J. Eisenberg Declaration ("Decl.") ¶¶ 8010, attached hereto as Exhibit 1.

[2]  The Certified Administrative Record was filed with the Court on December 11, 2006.

2

so that AHC's current Medicare enrollees can make timely alternative and more satisfactory

health care arrangements, would undermine CMS's compliance program and effectively

eviscerate the Secretary's authority to terminate non-complying MA organizations, to the

detriment of the elderly and disabled Medicare beneficiaries and the public.  Because of the

multiple layers of administrative review and opportunities for corrective action which, by statute

and regulation, must be completed before an MA contract may be terminated, the termination

process cannot be completed in a short time frame as plaintiff suggests.  Under plaintiff's theory,

if the proceedings are not completed and the Administrator's decision issued before the end of a

contract year, CMS must conduct a new audit and start termination proceedings and the entire

appeals process anew.  Under this theory, CMS would be endlessly required to conduct new

audits and produce a new record.  This would leave the Secretary with no mechanism to ever

terminate any but the most immediately dangerous MAOs, and would allow non-compliant

organizations such as AHC to continue their misdeeds, with each successive failure going

unaddressed.  CMS has followed all statutory, regulatory and contractual requirements regarding

AHC's termination.  It gave AHC multiple opportunities to correct its deficiencies and, finally,

time to consummate what AHC claimed would result in the imminent sale of its stock to another,

specified MAO.[3]  AHC repeatedly failed to fulfill its promises, correct its deficiencies, and

finally, consummate the promised stock sale.  AHC's claims of current compliance should go

unheeded by this Court because the Secretary is not required to give an organization with AHC's

track record yet another chance, and AHC is not allowed to offer new evidence of its current

---

[3]  That organization, HealthSpring, had a proven record of serving as an MAO, operating several large-scale managed care plans in a variety of locations under contracts with CMS.

status after the record supporting the termination has closed (as it did in 2005).

AHC now seeks a preliminary injunction prohibiting CMS from implementing the November 30, 2006 agency decision terminating AHC's MA contract effective December 31, 2006, sending a notice of the December 31, 2006 termination to AHC's beneficiaries, and publishing any notice of termination on CMS's website. Plaintiff's Memorandum in Support of Motion for a Preliminary Injunction ("Pl. PI Mem.") at 1. Because plaintiff shows no likelihood of success or even serious questions on the merits of its claims and because the balance of equities favors allowing CMS's determination to be effectuated, AHC's termination should be allowed to proceed and plaintiff's motion for a preliminary injunction should be denied.

## BACKGROUND

### I.     The Medicare Program and Medicare Advantage Contracts Under Medicare Part C.

Medicare, the federal medical insurance program for the aged and disabled, is contained in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg (the "Medicare Act"). The HHS Secretary has delegated the authority to administer the Medicare program to CMS. The Medicare Act is divided into several parts. Part A of the Medicare program provides medical insurance coverage for institutional services such as hospital, skilled nursing facility, and home health care. See 42 U.S.C. §§ 1395c, 1395d. Part B of the Medicare program provides voluntary supplemental medical insurance covering certain outpatient services such as physician services, medical supplies, x-rays and laboratory tests. 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Payment for service rendered to Medicare beneficiaries is made under Parts A and B on a fee-for-service basis; in other words, Medicare pays directly, generally on a per-service basis, for Medicare-covered services provided to Medicare Part A and B beneficiaries. See 42

4

U.S.C. §§ 1395d(a); 1395k(a).[4]

In the Balanced Budget Act of 1997, Pub. L. No.105-33, 111Stat. 251, 426-32 (Aug. 5, 1997) ("BBA"), Congress added a new Part C to the Medicare statute. This Part, referred to in the BBA as the "Medicare+Choice Program,"42 U.S.C. §§ 1395w-21-1395w-28, increased beneficiary choice by authorizing Medicare beneficiaries to obtain covered Medicare services through health maintenance organizations, preferred provider plans, and other "managed care" arrangements offered by private health insurers. See 42 U.S.C. §1395w-21(a)(1). Under Part C, Medicare does not make direct, per-service payments to health care providers as it does in the Part A and Part B "fee-for-service" context. Rather, Medicare (through CMS) contracts with private health insurers who agree to provide all necessary Medicare covered services to Part C beneficiaries enrolled in their managed-care plans through their own network of health care providers. Medicare makes periodic payments to these organizations (based on a fixed, per-enrolled beneficiary price). In turn, these private insurers are responsible for paying providers in their organization, network or plan, for all Medicare covered services they provide.

On December 8, 2003, the President signed into law the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003). Title I of the MMA amended the Medicare Act by inserting a new Part D, the "Voluntary Prescription Drug Benefit Program," effective January 1, 2006, which for the first time provided comprehensive Medicare coverage of outpatient prescription drugs. See 42 U.S.C. §§ 1395w-4 et seq. Title II of the MMA changed the name of the

---

[4] Parts A and B of Medicare are often referred to as "traditional" or "fee-for-service" Medicare.

5

Medicare+Choice program contained in Medicare Part C to "Medicare Advantage" ("MA"), and required MA plans to provide prescription drug coverage and made certain other revisions in that program.  See MMA §201(a), 117 Stat 2176.

## II.      Monitoring of MAO Compliance

CMS is responsible for monitoring MAO compliance with applicable statutory and regulatory requirements.  42 U.S.C. § 1395w-27(d)(2); 42 C.F.R. § 422.502(d).  Its oversight includes conducting audits (or reviews) of MAOs to ensure their continuing compliance with requirements.  42 C.F.R.  § 422.502(d).  Teams of specially trained CMS staff conduct audits of MAO compliance, using a standardized review guide that is published on CMS's website.   See http://www.cms.hhs.gov/healthplans/monitoring/2005guide.asp.  CMS conducts two types of MA monitoring audits: "routine" and "focused."  Routine audits, where CMS assesses every monitoring review guide element, are undertaken on approximately a biennial basis.  Focused monitoring audits are conducted as needed, when CMS becomes aware of areas of concern.

## III.     MA Contract Termination

As discussed above, Medicare Part C anticipates that CMS will enter into MA contracts with private health insurers such as AHC for the provision of medical services.  Concomitant with the ability to enter into service contracts, Medicare Part C also grants the Secretary broad authority to terminate such contracts:

> (2) Termination authority
> In accordance with procedures established under subsection (h) of this section, the Secretary *may at any time terminate any such contract* if the Secretary determines that the organization--
>
> (A) has failed substantially to carry out the contract;
> (B) is carrying out the contract in a manner inconsistent with the efficient and effective administration of this part; or

(C) no longer substantially meets the applicable conditions of this part.

42 U.S.C. § 1395w-27(c)(2) (emphasis added).  Subsection (h) further delineates the process

whereby the Secretary's MA contract-termination authority is exercised:

> (1) In general
> The Secretary may terminate a contract with a Medicare+Choice [MA]
> organization under this section in accordance with formal investigation and
> compliance procedures established by the Secretary under which--
>
> (A) the Secretary provides the organization with the reasonable opportunity
> to develop and implement a corrective action plan [CAP] to correct the
> deficiencies that were the basis of the Secretary's determination under
> subsection (c)(2);  and
>
> (B) the Secretary provides the organization with reasonable notice
> and opportunity for hearing (including the right to appeal an initial
> decision) before terminating the contract.

42 U.S.C. § 1395w-27(h).

## STATEMENT OF FACTS

**I.    AHC's MA Contract with CMS and CMS's Decision to Terminate AHC**.

AHC provides health care services in an area called the Treasure Coast of Florida, and its

network encompasses approximately 13,000 beneficiaries in the Florida counties of Broward,

Indian River, Martin, Palm Beach, Okeechobee, St. Lucie, as well as a portion of Brevard

county.  Pl. PI Mem. at 2.  AHC was approved as an MAO in 2000, and for administrative

purposes was assigned contract number H1034.  A.R. 158-59, 3351, 4009 (2002 audit

referencing contract no. H1034).  From almost the inception of AHC's MA contract, CMS audits

revealed that AHC was unable to satisfy Medicare requirements.  AHC was subject to a routine

audit in February 2001, and was found to be out of compliance with 13 (out of 31) CMS

monitoring elements.  A.R. 3.  Another routine audit in July 2002 identified 17 monitoring

deficiencies, four of which were duplicate findings from CMS's 2001 review.  A.R. 3; see also A.R. 2158-64 (2001 audit report), 2169-85 (2002 audit report).  Because of the deficiencies identified during these routine audits, CMS conducted focused audits in January 2004 and May 2005.  A.R. 3.  The 2004 focused review identified 12 monitoring element deficiencies, and the 2005 focused review identified 22 deficiencies out of a possible 31, eleven of which were repeat findings from the 2004 focused review.  A.R. 3; see also AHC Deficiency Chart, attached hereto as Exhibit 2 (detailing areas of deficiency found in the 2001, 2002, 2004, and 2005 audits); A.R. 2189-2210 (2004 audit report), 2286-317 (2005 audit report).  AHC's systemic problems remained constant throughout, indicating, among other things, that AHC had failed to provide its members with sufficient access to services, lacked a quality improvement program, had problems making prompt payments, and did not properly handle grievances.  Exhibit 2.

After each audit, AHC was permitted to propose a corrective action plan ("CAP").  42 U.S.C. § 1395w-27(h); 42 C.F.R. § 422.510(c).  Consequently, AHC proposed CAPs in 2001, 2002, 2004, and 2005.  AHC's CAPs were a failure.  On each subsequent audit, CMS continued to find and document AHC's lack of compliance with Medicare requirements.  Exhibit 2; A.R. 2158-64, 2169-85, 2189-2210, 2286-317.

As a result of the findings of CMS's May 2005 focused audit, by letter dated July 6, 2005, CMS exercised its right under 42 C.F.R. § 422.510(a) and proposed termination of AHC's MA contract.  A.R. 3, 2280-85 (July 6, 2005 letter).  AHC's documented and pervasive deficiencies included failures in such key areas as beneficiaries' access to services, maintenance of a quality improvement program, prompt payment to providers, beneficiary grievance and appeal procedures, standard time frames and notice requirements for organizational

determinations, and effectuation of standard reconsideration determinations. A.R. 3 n.6, 2280-81. CMS's July 6, 2005 letter also stated that it was proposing intermediate sanctions against AHC pursuant to 42 C.F.R. § 422.750(a)(2), and that AHC's contract would be terminated effective October 1, 2005.[5] A.R. 3-4; 2280-85. The proposed intermediate sanctions suspended AHC from enrolling Medicare beneficiaries and conducting any marketing activities, including the submission of marketing materials for review. A.R. 4; A.R. 2280-85.

## II.    **The Administrative Review Process**

As noted above, the Secretary's broad authority to terminate MA contracts "at any time," 42 U.S.C. § 1395w-27(c)(2), is balanced by termination review procedures also established under the statute and regulations. 42 U.S.C. § 1395w-27(h); 42 C.F.R. § 422.641 et seq. Under this review process, after an MAO is notified that CMS has proposed termination of its MA contract, the MAO may request reconsideration of the decision. 42 C.F.R. § 422.644; see also 42 C.F.R. § 422.648 and 422.650. The MAO may also, at the same time, propose a CAP to CMS. 42 C.F.R. § 422.510(c). Thus, the MAO's CAP and the request for reconsideration are pursued at the same time. If CMS issues a reconsideration decision upholding the termination of the organization's MA contract, the MAO may request a hearing. 42 C.F.R. § 422.656-660. Following an adverse determination by a Hearing Officer, the MAO may appeal to the agency Administrator. 42 C.F.R. § 422.692. The agency Administrator's decision then becomes the final agency determination. 42 C.F.R. § 422.694.

In AHC's case, the applicable review process was followed to the letter. On July 18,

---

[5]  The October 1, 2005 contract termination date was subsequently delayed pursuant to the regulations, pending resolution of AHC's appeals. See 42 C.F.R. § 422.664.

2005, AHC requested reconsideration of CMS's July 6, 2005 termination decision.  A.R. 4, 2331-36.  AHC acknowledged that it had continually faced compliance problems as noted in the biennial and focused reviews, including claims processing, appeals and quality of care issues. A.R. 4; 2331-36.  AHC stated that it was instituting a series of "rigorous management initiatives designed to bring AHC into full compliance," that it was developing a corrective action plan and that it wished to also exercise its right to a reconsideration determination.  A.R. 4; 2335.

On October 18, 2005, CMS issued its reconsideration determination affirming the decision to impose intermediate sanctions and to terminate AHC's MA contract pursuant to 42 C.F.R. § 422.510(a).[6]  A.R. 6; 2382-393, 2427-29.  The reconsideration decision evaluated AHC's submissions and information provided after CMS's original July 6, 2005 decision, and found that AHC was "no longer a qualified [MA] entity and [was] not in substantial compliance with its Medicare Advantage contract and numerous provisions of the [regulations]."  A.R. 5, 2382.  AHC appealed the October 18, 2005 reconsideration decision and requested a hearing. A.R. 6, 2431.

An evidentiary hearing was held before a CMS Hearing Officer on November 14-15, 2005, A.R. 6, 222-384 (transcript of proceedings before the Hearing Officer), and on November 22, 2005, the Hearing Officer issued her decision upholding CMS's decision to terminate AHC's MA contract.  A.R. 6, 191-213 (Hearing Officer decision).  The Hearing Officer determined that the evidence before her substantiated CMS's contention that AHC failed to carry out the terms of

---

[6]  During the reconsideration process, CMS considered, but ultimately rejected, *immediate* termination of AHC's MA contract as provided for by 42 C.F.R. § 422.510(a)(5). Termination of AHC's contract, originally slated for October 1, 2005, was therefore postponed pending AHC's appeals.  See 42 C.F.R. § 422.664.

its MA contract, and had failed to establish compliance with applicable statutory and regulatory requirements and that AHC's termination from the MA program was proper.[7]  A.R. 6, 191-213.

As provided for in the regulations, AHC appealed the Hearing Officer's November 22, 2005 decision to the CMS Administrator.  See 42 C.F.R. § 422.692 et seq.; A.R. 190.  Comments – in effect, appeal briefs – respecting the November 22, 2005 Hearing Officer's decision were received from both AHC and CMS in January of 2006.  A.R. 2, 80-155 (AHC Comments), 156-87 (CMS comments).  While that appeal was pending, HHS and AHC entered into a settlement agreement dated April 28, 2006, which resulted in staying the appeal before the Administrator pending the proposed purchase of AHC by HealthSpring, a Delaware corporation with which CMS had several ongoing MA contracts, and which was considered to be a responsible organization.  A.R. 43-53 (settlement agreement).

The settlement agreement specifically noted that if the stock purchase by HealthSpring failed to occur, CMS was entitled to request that the stay be lifted.  A.R. 47 at ¶ 10.  The agreement also provided that HealthSpring would assume management of AHC while the sale was being consummated.  A.R. 44-45.  This settlement agreement was the sole basis for CMS's agreement to postpone the final determination by the Administrator and to stay AHC's termination.  On November 1, 2006, after being informed that HealthSpring had terminated the purchase agreement, CMS requested that the administrative stay be lifted.  A.R. 64 (CMS letter to the Administrator); see also Cynthia Moreno Decl. ¶¶ 3, 5, attached hereto as Exhibit 3.  After

---

[7]  Specifically, AHC had failed to comply with requirements related to medical service access and grievances and appeals, had failed to implement an acceptable quality assessment and performance improvement program, did not comply with prompt pay requirements, and in general failed to substantially carry out the terms of its MA contract, and therefore no longer met the requirements to be contracting organization.  A.R. 192-213.

reviewing the administrative record furnished by the Hearing Officer, the parties' comments, and

the Hearing Officer's November 22, 2005 decision, on November 30, 2006, the Administrator

issued the final agency decision upholding CMS's termination of AHC's contract, effective

December 31, 2006.  A.R. 2-24.

**ARGUMENT**

## I.    STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy, and the power to issue such an

injunction "should be sparingly exercised." Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir.

1969) (quotation marks omitted).  For plaintiff to prevail on its motion for a preliminary

injunction, it must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it

would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not

substantially injure other interested (non-moving) parties; and (4) that the public interest would

be furthered by the injunction.  CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738,

746 (D.C. Cir. 1995); see also, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,

559 F.2d 841, 842–43 (D.C. Cir. 1977); Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,

259 F.2d 921, 925 (D.C. Cir. 1958).  Plaintiff must satisfy all four factors, and the court must

also find that the four factors together justify the drastic intervention of a preliminary injunction.

See CityFed, 58 F.3d at 747; Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 304

(D.C. Cir. 2006).  Moreover, if a plaintiff has little likelihood of succeeding on the merits of its

claim, the court need not address the other preliminary injunction factors.  Apotex, Inc. v. Food

& Drug Admin., 449 F.3d 1249, 1253 -1254 (D.C. Cir. 2006);  CityFed Fin. Corp., 58 F.3d at

746 (requiring the moving party to "demonstrate . . . a substantial likelihood of success on the

12

merits"); <u>City of Las Vegas v. Lujan</u>, 891 F.2d 927, 935 (D.C. Cir. 1989) (affirming district court's denial of preliminary injunction without addressing irreparable injury because appellant had insufficient likelihood of success on the merits).

In this regard, AHC's application for a preliminary injunction fails at the first step. The November 30, 2006 final agency decision is supported by substantial evidence in the record, and AHC therefore cannot establish any likelihood of success on the merits. Nor has AHC made a sufficient showing on the remaining three elements. As the record amply demonstrates, AHC was given many opportunities to comply with MA program requirements, but consistently failed to do so. Indeed, the only reason CMS agreed to stay termination proceedings was because AHC agreed that it would be purchased by HealthSpring, a known MA with a proven track record which would also assume the management of AHC while the contemplated stock purchase was being finalized. That deal has now evaporated, and HealthSpring's management contract has also been terminated. It is detrimental to the interests of AHC's Medicare beneficiaries and to CMS to further postpone the termination of AHC's MA contract while AHC looks for yet another purchaser and pleads for yet another chance to prove that it is in compliance with the statute and regulations. The Court should therefore deny AHC's motion for a preliminary injunction.

## II.    AHC HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    <u>Standard of Review</u>

With respect to judicial review of the November 30, 2006 final agency decision, 42 U.S.C. § 405(g) provides, in pertinent part, as follows:

Any individual, after any final decision of [the Secretary of HHS] made after a

hearing to which he was a party . . . may obtain a review of such decision by a civil action [brought in the United States District Court for the District of Columbia]. As part of the [Secretary's] answer the [Secretary] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing. *The findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive* [].

42 U.S.C. § 405(g) (emphasis added). Similarly, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the court shall "hold unlawful and set aside [final] agency action, findings and conclusions found to be . . . arbitrary [and] capricious . . . ." This "standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). The Secretary's decision should be upheld if it is supported by substantial evidence. 5 U.S.C. § 706(2)(E).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). The test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." Fla. Mun. Power Agency v. FERC, 315 F.3d 362, 365-66 (D.C. Cir. 2003). Although the Court is to carefully scrutinize the record, it is not to substitute its judgment for that of the agency, but instead assess only whether the Administrator's November 30, 2006 decision to terminate AHC's MA contract "is based on substantial evidence and a correct application of the law." Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004).

Importantly, both 42 U.S.C. § 405(g) and the APA provides for record review only. 42

U.S.C. § 405(g) ("The court shall have power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing.") (emphasis added); Florida Power & Light v. Lorion, 470 U.S. 729, 744 (1985) ("The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking.").  Instead, a reviewing court's task is to apply the appropriate standard of review to the agency decision "based on the record the agency presents to the reviewing court." Id. at 743-44 (emphasis added), citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402  (1971); Camp v. Pitts, 411 U.S. 138, 142 (1973) ("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); see also Mathews v. Weber, 423 U.S. 261, 271 (1976) (finding that under 42 U.S.C. § 405(g) "neither party may put any additional evidence before the district court").  Therefore, to the extent that plaintiff attempts to introduce additional evidence in court, that evidence may not be considered by the Court in reviewing the agency's final decision.  Delrosa v. Sullivan, 922 F.2d 480, 483 (8th Cir. 1991); see also Nelson v. Apfel, 131 F.3d 1228, 1236 (7th Cir. 1993) (noting approvingly the proposition that district court may not consider evidence outside of the certified record when reviewing Medicare decision by the Secretary); Beynum v. Barnhart, 435 F. Supp. 2d 142, 144 n.2 (D.D.C. 2006) ("no new evidence may be admitted before the court in this proceeding.").

In sum, although plaintiff offers the court extra-record, unsubstantiated claims of current compliance, this Court may not consider these claims.  Id.  To allow plaintiff to present these claims would render an MAO's obligation to comply with statutory and regulatory requirements a moving target, and the Secretary's authority to terminate MA contracts a nullity, as non-

compliant MAOs would always be able to get one more chance to try to demonstrate that they

have reformed, and the agency would never be able to terminate an MA contract, absent serious

and immediate jeopardy to the beneficiaries, or an MAO's consent to termination.

**B.**    **The November 30, 2006 Decision is Supported by Substantial Evidence in the**
         **Record and Should be Affirmed.**

In his November 30, 2006 decision, the Administrator first responded to plaintiff's

assertion that "The Hearing Officer's decision should be remanded . . . for a determination of

whether AHC is currently in substantial compliance with relevant regulations."  A.R. 9.  With

respect to AHC's alleged current compliance status, the Administrator declined to consider any

such evidence, noting that the scope of his review was expressly set forth at 42 C.F.R. § 422.692,

which "does not contemplate the consideration of the MA organization's status after the mailing

of the notice of the reconsidered decision, nor remand for such reconsideration."  A.R. 11.

Instead, "[t]he Administrator shall review the hearing officer's decision, and determine, *based*

*upon this decision, the hearing record, and any written arguments submitted by the MA*

*organization*, whether the termination decision should be upheld, reversed, or modified."  Id.

(emphasis added); 42 C.F.R. § 422.692(b).

The Administrator then issued his findings of fact and conclusions of law with respect to

the November 22, 2005 Hearing Officer decision.  A.R. 16.  The Administrator found that the

Hearing Officer properly upheld CMS's determination that AHC should be terminated from the

MA program based on deficiencies in six different areas.  A.R. 16-23.  Specifically, the

Administrator found that AHC failed to comply with service access requirements, failed to

establish proper grievance and appeals procedures, did not implement a quality assessment and

performance improvement program as required by regulation, was not in compliance with

prompt pay requirements, lacked an adequate compliance program to ensure accountability with and commitment to applicable Federal and State standards, and failed to substantially carry out the terms of its MA contract with CMS.  Id.  Importantly, any one of these grounds was sufficient to warrant termination of AHC's MA contract.  See 42 U.S.C. § 1395w-27(c)(2) (noting alternate grounds for termination); 42 C.F.R. § 422.510 (same).

As shown below, substantial evidence in the record supports the Administrator's November 30, 2006 decision, and plaintiff has not demonstrated a likelihood of success on the merits.

### 1.     The Administrator and Hearing Officer Properly Declined to Consider AHC's Evidence of Alleged Current Compliance.

Plaintiff alleges that it has "repeatedly requested during the administrative review that CMS simply consider its current compliance, and CMS has, for unknown reasons that appear increasingly suspect, refused to do so."  Pl. PI Mem. at 2.  Plaintiff also claims that it is likely to prevail on the merits because "CMS openly ignores AHC's current substantial compliance with its regulatory and contractual obligations," and the agency's refusal "to consider evidence of AHC's current substantial compliance was arbitrary and capricious and cannot withstand legal scrutiny."  Id. at 3, 12.  Plaintiff's arguments are simply wrong.  The Administrator properly found that pursuant to 42 C.F.R. § 422.692(b), he was to "review the hearing officer's decision, and determine, based upon this decision, the hearing record, and any written arguments submitted by the MA organization, whether the termination decision should be upheld, reversed, or modified."  A.R. 10.  Given the express language of the regulation, the Administrator correctly determined that any evidence of AHC's alleged current compliance was not relevant to his review of the Hearing Officer's November 22, 2005 decision.  Nelson, 131 F.3d at 1236

(holding that it was improper for Administrative Law Judge to consider extra-record evidence in determining extent of petitioner's disability).

The Administrator's determination that the Hearing Officer likewise properly declined to consider evidence of AHC's alleged change in compliance status subsequent to the time of the CMS reconsideration decision should also be upheld.  A.R. 12.  Pursuant to 42 C.F.R. § 422.646, CMS's July 5, 2005 letter informing AHC of its proposed termination would have been final and binding absent a request for reconsideration in accordance with 42 C.F.R. §§ 422.638-658, or a request for a hearing pursuant to 42 C.F.R. § 422.662.  A.R. 10; 2280-317.  AHC requested reconsideration, and CMS's final reconsideration decision was issued on October 18, 2005.  A.R. 6, 2427.  As noted by the Administrator, the pertinent regulation respecting reconsideration provides that a reconsidered determination is a new determination that:

> is based on a review of the contract determination, the evidence and findings upon which that was based, and any other written evidence submitted *before* notice of the reconsidered determination is mailed, *including facts related to the status of the MA organization subsequent to the contract determination* . . . .

42 C.F.R. § 422.654(a) (emphasis added).  As such, the regulation expressly contemplates that the reconsideration decision shall take into account new evidence respecting the compliance status of the MAO up to the point of the reconsideration decision.  In contrast, however, once the reconsideration decision has been issued, and the MAO exercises its right to a hearing before a CMS Hearing Officer, the Hearing Officer's review is limited as to whether the underlying CMS determination/reconsideration was proper.  A.R. 11.  Unlike the provision set forth at 42 C.F.R. § 422.654(a) allowing consideration of new evidence during a CMS reconsideration, there is no similar language referenced in the Hearing Officer's

18

procedures that allows for the consideration of the facts relating to the MAO's status <u>after</u> the mailing of the CMS's reconsidered decision. A.R. 11; 42 C.F.R. § 422.676; <u>see</u> <u>also</u> A.R. 206 (decision of the Hearing Officer noting that "the scope of [the Hearing Officer's review] does not extend to making a new determination as to whether a plan has come into compliance with the regulations by the date of the hearing. If such review were contemplated, it would have been specifically set forth in the regulations.") (citing 42 C.F.R. § 403.820[(f)(9)(i)]). In this case, AHC submitted additional evidence on August 19, 2005, but failed to further update the record prior to the issuance of the reconsideration decision. A.R. 2364.

The agency's interpretation of its own regulations and the statute it is charged with administering is to be accorded deference by the Court. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.</u>, 467 U.S. 837, 843-44 (1984); <u>Pharmaceutical Research and Mfrs. America v. Thompson</u>, 362 F.3d 817 (D.C. Cir. 2004) (finding that statutory interpretations made by HHS Secretary in approving state's Medicaid plan were entitled to <u>Chevron</u> deference). Given the express language of the governing regulations, the Administrator properly determined that the scope of both his review and the Hearing Officer's review was limited to the MAO's status <u>at the time of the CMS reconsideration decision</u>, and this determination should be upheld.[8]

_____

[8] Because of the detailed regulatory scheme found at 42 C.F.R. § 422.641 <u>et seq.</u>, that governs the MA contract termination appeals process, plaintiff's citation to a line of Departmental Appeals Board cases, Pl. PI. Mem. at 11, and the manner in which Administrative Law Judges in those cases received evidence, is not pertinent here. <u>See</u> 42 C.F.R. § 422.641 (noting that this subpart "establishes the procedures for making and reviewing the . . . contract determination" including "a determination to terminate a contract with an MA organization"); A.R. 206 n.68 (Hearing Officer decision noting that "review by a CMS hearing officer of an MA

## 2.    The Record Evidence Demonstrates that AHC Failed to Comply with Beneficiary Access to Healthcare Requirements.

Pursuant to 42 C.F.R. § 422.510(a)(10), an MAO may be terminated for substantially failing to comply with the service access requirements found in 42 C.F.R. § 422.112 and § 422.114.  Substantial evidence in the record supports the Administrator's determination that "AHC failed to comply with service access requirements as the record shows that AHC's provider network is not adequately serving the needs of the organization's members."  A.R. 16.

First, the record demonstrated that the AHC network had an insufficient number of contracted hospitals in certain areas, resulting in compromised member access to appropriate medical care, and forcing AHC's members to use the emergency departments of non-contracted hospitals to access needed medical care.  A.R. 3294.  In addition, the contracted hospital in Indian River County was not within a 30-mile radius, or 30-minute drive of at least some of AHC's resident members, such as the residents of Okeechobee county.  CMS's managed Care Manual, Ch. 4, § 120.2, and Managed Care Monitoring Guide element AA01, provide generally that commonly used services should be located within 30 minutes driving time.  A.R. 16 n. 31.  Also in this regard, AHC's expert witness at the November 14-15, 2005 hearing before the CMS Hearing Officer, Mr. Bruce Ardis, conceded that the nearest AHC-contracted hospital might exceed even a 35 mile drive, and even then only based upon the assumption that the roads proceed in a

---

contract termination is not controlled by DAB precedent").

straight line.[9]  A.R. 241 (hearing transcript at 78-79).

Faced with complaints reported to it through both letters and phone calls to its call centers, the State of Florida's Agency for Health Care Administration ("AHCA") became concerned about the adequacy of AHC's provider networks and quality of care.  A.R. 1688 (AHCA June 10, 2005 letter to AHC).  Shortly after CMS issued its proposed termination letter on July 5, 2005, the Florida AHCA conducted an on-site compliance review of AHC from July 12-15, 2005.  A.R. 1691-94.  AHCA's review found AHC deficient in satisfying Florida Administrative Code § 59A-12.006(3)(d), which requires enrollee access from within the managed care service area to the nearest contracted general hospital in no longer than 30 minutes under normal circumstances.  A.R. 1692 (AHCA deficiency report).  Specifically, AHCA found AHC to have failed to provide access to a complete provider network in Brevard, Okeechobee, and St. Lucie Counties.  A.R. 1692.

In addition, the record evidence supports the Administrator's conclusion that "AHC's failure to meet the [hospital access within] 30 [minute]/30 [miles] policy in this case was reflective of the more serious failures of AHC to demonstrate that it could meet the service access requirements necessary under the contract terms across its network

---

[9]  Plaintiff finds fault with CMS's approval of Okeechobee County as a coverage area in the first place.  Pl. PI Mem. at 15.  An agency's arguably prior lax enforcement policies cannot hamstring its future enforcement efforts.  Beverly Health & Rehabilitation Services, Inc. et al. v. Thompson, 223 F. Supp. 2d 739 (D.D.C. 2002), quoting Rural Day Care Ass'n, DAB No. 1489 at 94-115 (1994) ("To conclude otherwise would require the federal government to throw good money after bad and to continue indefinitely to fund ineffective, incompetent or non-complying programs because it had once begun to do so . . . . If the termination of a grantee is justified by its failings, it is hardly a defense that someone else should be terminated first.").

area." A.R. 17.  Specifically, the record is replete with evidence that AHC had on-going physician staffing problems.  Indeed, AHC's own physician staffing rosters belied its contention that "all AHC contracted medical offices are required to be open and staffed by a physician during normal business hours," and, in fact, supported CMS's May 2005 audit finding that physicians were not available five days per week or had no regular business hours at several clinics.  A.R. 3296.  Those rosters indicated that four AHC health centers showed just one physician assigned to each, with each of those physicians also showing assignments at other AHC health centers.  A.R. 863-70.  In one case, the sole physician assigned to one center was listed on the staffs of several other centers as well.  A.R. 863-70.  Similarly, another center was listed as being staffed by two physicians, but with one of those physicians showing other assignments, and the other physician having not only another assignment but also serving as AHC's Medical Director.  A.R. 863-70.  The staffing rosters constitute substantial evidence supporting the Administrator's finding that "it would be unlikely that these [] centers could be adequately staffed by a physician during normal business hours if the physician was also assigned to other centers as well."  A.R. 17.

Additionally, during the audit verification process, CMS was told by the staff of several clinics that physicians were not always available five days a week nor during regular business hours, while staff at AHC's Okeechobee County facility acknowledged that their facility was not then staffed with a doctor or nurse.  A.R. 3296.  Despite AHC's own policies requiring that clinic facilities be staffed with one or more physicians or nurses at all times, in its May 2005 audit, CMS found that 9 out of 25 of AHC's clinics

revealed <u>no</u> physician or mid-level provider available to render care.  A.R. 3296.

Hearing testimony further revealed that these same physicians, stretched so thin as to be

unable to even adequately staff AHC's health centers on a routine basis, were, moreover,

also responsible for providing inpatient coverage, after hours and weekend call, and

weekend clinic coverage.  A.R. 339 (testimony of Richard Tuten at transcript pp. 105-

06).

### 3.    AHC Failed to Establish and Maintain Required Grievance Procedures.

The record evidence likewise supports the Administrator's finding that "AHC had

failed to: 1) establish or maintain grievance procedures as required by CMS and AHC's

own policies and procedures; 2) investigate all allegations made by members, or resolve

members' issues and notify them of resolutions; and 3) correctly distinguish between

organization determinations, reconsiderations, and grievances, and to process any of

these through the appropriate mechanisms," thereby providing grounds for CMS's

termination of AHC's MA contract under 42 C.F.R. § 422.510(a)(6).  A.R. 18.

CMS documented grievance and appeals deficiencies that had persisted

systematically through audits conducted in February 2001, July 2002, and January 2004,

and which were again reaffirmed in the May 2005 audit.  A.R. 18; Exhibit 2; 2158-64,

2169-85, 2189-2210, 2286-317.  Indeed, audit evidence revealed AHC's continued and

persistent non-compliance over a this four-year period.  CMS found that AHC did not

adequately inform members of their rights, notify members of its determinations,

categorize incoming disputes in a timely manner, track disputes, maintain dispute-related

documents, inform members of the outcome of disputes timely, effectuate the disputes

accurately or maintain files in a manner suitable for CMS to fully evaluate AHC's

compliance with the statute.  A.R. 18; Exhibit 2; see also A.R. 2158-64, 2169-85, 2189-

2210, 2286-317.

      AHC even admitted to these deficiencies.  Several stipulations into which AHC

entered prior to the November 14-15, 2005 hearing acknowledged AHC's deficiencies in

the areas of grievances and appeals as of CMS's May 10, 2005 audit.  A.R. 263, 4086-88

(stipulations).  These stipulations included the following:

- Case file documentation was lacking.  A hurricane in 2004 had destroyed a warehouse where certain grievance files were maintained . . . .  Other files were not maintained in a manner satisfactory to the CMS reviewer.

- AHC did not always issue adverse standard pre-service organization determinations within 14 calendar days after receiving the request (or in 28 days where extensions were justified).

- AHC did not always notify members timely of pre-service denials.

- AHC did not always forward cases to CMS's independent review entity within 60 days and did not always notify the member concurrently.

- CMS was unable to determine if the effectuation process [where an MAO's claims denial is reversed in whole or part by CMS['s] independent review entity] was followed according to CMS guidelines.

A.R. 263, 4086-88.  AHC likewise admitted persistent deficiencies with respect to,

among other things, appeals, in a letter dated July 18, 2005.  A.R. 2335.  Indeed, CMS

established that AHC had never, since the beginning of its MA contract in 2000,

maintained compliant grievances and appeals systems.  Exhibit 2; see also A.R. 2158-64,

2169-85, 2189-2210, 2286-317.  In survey after survey, four in all, CMS cited AHC for

deficiencies relating to grievances and appeals.  Exhibit 2; see also A.R. 2158-64, 2169-

85, 2189-2210, 2286-317. Even CMS's later review of the 2005 CAP submitted by AHC "found that AHC had not provided a means of evaluation of the grievances and appeals process and that the data in the submitted report was of questionable accuracy." A.R. 18; 3297-302.

Given the ample record evidence reflecting AHC's systemic failure to comply with MA statutory and regulatory requirements with respect to grievances and appeals, the Administrator properly upheld the Hearing Officer's November 22, 2005 decision.[10]

**4.    AHC Failed to Implement an Acceptable Quality Assessment and Performance Improvement Program.**

An MAO may also be terminated from the MA program if it "fails to implement an acceptable quality assessment and performance improvement program." 42 C.F.R. § 422.510(a)(8). In this regard, substantial evidence supports the Administrator's finding that AHC had not fulfilled this regulatory requirement. A.R. 19.

First the Administrator noted that "although AHC had developed a quality assessment plan on paper, there was no evidence in the record that it had actually been implemented." A.R. 19, 278, 280 (testimony by Christine Perenich). CMS's 2005 audit also revealed that AHC's quality improvement committee did not meet regularly, that AHC had not identified which staff members held which positions, that program

---

[10] AHC argues that "[c]urrently 100% of formal grievances are resolved within 30 days . . . [and] Defendant's data on AHC's grievance and appeals processes is [] out-of-date . . . ." Pl. PI Mem. at 19. Plaintiff misses the point. AHC's alleged current compliance is not before the Court. Instead, the Court must assess whether the Administrator's November 30, 2006 decision is supported by substantial evidence in the record. As noted above, the record evidence cannot and does not include evidence of an MAO's compliance or lack thereof after the reconsideration decision.

assessment tools had yet to be developed, and that AHC's quality assessment program had not been reviewed or approved by the AHC Board of Directors. A.R. 280, 2190-96 (2004 CAP review), 3297-302.

In addition, the record evidence demonstrates that the State of Florida's Quality Improvement Organization, Florida Medical Quality Assurance, Inc. ("FMQAI"), had independently reviewed AHC's quality assurance program and investigated complaints concerning delay in referrals, treatment, and subsequent payment, and that FMQAI had found serious problems. A.R. 1579-1610 (letters from FMQAI respecting AHC problems). Indeed, FMQAI had been working on its own quality improvement plan with AHC since 2003. A.R. 1579-1610. "FMQAI noted that it had been experiencing difficulties in both receiving and interpreting the AHC reports [,] evidence [] further supporting the contention that AHC had not been able to implement a quality assessment and performance program." A.R. 19; A.R. 270-71 (testimony by FMQAI employee Cheryl Cook). In addition, with respect to AHC's 2nd quarter 2005 referral record, FMQAI found that 24 of 93 (25.8%) referrals were above the acceptable time limit, with AHC demonstrating little improvement over time. A.R. 1604-10. The Administrator properly found that [g]iven that AHC had been under a quality improvement plan with FMQAI since 2003 concerning its referrals, the data was a further indication that AHC had not become compliant in this area."[11] A.R. 20.

### 5. AHC Failed to Comply with Prompt Pay Requirements.

---

[11] Again, AHC attempts to rebut the Administrator's finding with evidence of alleged *current* compliance. Pl. PI Mem. at 20-21. As discussed above, any such evidence is irrelevant to whether substantial evidence supports the agency's November 30, 2006 final decision.

Pursuant to 42 C.F.R. § 422.510(a)(9), an MAO may be terminated for failing to comply with prompt payment requirements. Specifically, the regulations require that an MAO pay 95 percent of clean claims from contract providers within 30 days of receipt. 42 C.F.R. § 422.520 et seq. An MAO must also pay interest on clean claims that are not paid within 30 days, and all other claims from non-contract providers must be paid or denied within 60 calendar days from the date of request. Id. The Administrator found that "there were multiple deficiencies shown in the record with respect to AHC's compliance with the prompt pay requirements." A.R. 20. Substantial evidence supports this determination.

First, AHC was cited with prompt-pay-related deficiencies by CMS in surveys in 2001, 2002, and 2005. Exhibit 2. The HHS Office of Inspector General independently corroborated the same findings in a December 2004 report. 1554-69 (OIG Report). Both the September and October 2005 updates filed by AHC as part of its CAP showed substantial noncompliance, with only 42.28 percent of claims paid timely in September. A.R. 1516-1519. As of the date of the CMS reconsideration, CMS had not observed any fully functioning system for the processing of claims. A.R. 2390.

In addition, AHC had previously acknowledged that it failed to comply with statutory and regulatory prompt pay requirements. A.R.1355, 1516-1529, 1561, 3311-13. Stipulations filed before the November 14-15, 2005 hearing indicated that:

- AHC paid less than 95% of non-contracted clean claims within 30 days of receipt of the claim.
- Some non-clean claims in the sample reviewed by the CMS did not show a denial date. . . . Some cases failed to meet the 60-day compliance standard.

27

A.R. 4086-87.  AHC also admitted that as of the date of the hearing it still was not in compliance, and that in any event, the data it supplied to CMS was subject to varying interpretations.  A.R. 184 and n.69.  Finally, hearing testimony established that as of October 31, 2005, AHC still had not met prompt pay requirement for clean, non-contracted claims.  A.R. 344.

### 6.    AHC Did Not Meet Regulatory Requirements to be a Contracting MAO.

Pursuant to the governing statute and regulations, an MAO is required to have an adequate compliance program to ensure accountability and commitment with all Federal and State standards.  Absent such a plan, the MAO fails to meet the requirements to be a contracting organization pursuant to 42 C.F.R. § 422.510(a)(3), and may be terminated on that basis.

The record evidence demonstrated that the AHC program did not have internal monitoring and audit standards, the training materials for employees were insufficient, and the disciplinary guidelines for employees were inadequate.  A.R. 21; Exhibit 2; see also A.R. 2158-64, 2169-85, 2189-2210, 2286-317.   For example, at the hearing, Mr. Richard Tutens, AHC's Chief Operating Officer and Chief Compliance Officer, testified that the compliance department had 5 full time employees, and yet he could not recall the dates of any audits that had been done.  A.R. 349 (transcript testimony at pp. 147-148).

CMS reviewed AHC's compliance plan as part of the CAP submitted in August of 2005.  A.R. 21; 3294-325.  CMS found that the program did not include internal monitoring standards and did not contain evidence that the policies and procedures had been implemented.  A.R. 21; 3294-325.  AHC's compliance officer lacked authority to

bring about needed changes and the compliance plan proposed by AHC did not explain

how AHC would cure this problem.  A.R. 21; 3294-325.

Given the record evidence, the Administrator properly determined that "AHC did

not have a fully operational compliance plan, and thus did not meet the requirements to

be a contracting organization pursuant to 42 C.F.R. § 422.510(a)(3).

**7.**      **AHC Failed to Substantially Carry out the Terms of its**
**Contract With CMS and in a Manner Consistent With MAO**
**Requirements.**

In addition to the record supporting termination of AHC's MA contract for

substantially failing to meet certain criteria found in 42 C.F.R. § 422.504 (as discussed

above in parts 1-5), the Administrator also found that "AHC had failed to substantially

carry out the terms of the contract under § 422.510(a)(1) and failed to carry out the

contract in a manner that is consistent with the effective implementation of the

requirements under § 422.510(a)(2)."  A.R. 22.

Over a period of four years, AHC's program was reviewed by CMS and each year

CMS found that AHC was out of compliance with the terms of its MA contract.  A.R. 22;

Exhibit 2; see also A.R. 2158-64, 2169-85, 2189-2210, 2286-317.  Significant

deficiencies were identified by CMS in the 2001 and 2002 reviews.  Exhibit 2; see also

A.R. 2158-64, 2169-85, 2189-2210, 2286-317.  CMS conducted focused reviews in 2004

and 2005 and again found additional significant deficiencies with AHC.  Exhibit 2.  After

each of the 2001, 2002, and 2004 reviews, AHC was given the opportunity to develop

and implement a CAP; however, although AHC devised CAPs in each instance AHC

failed to effectively implement them.  A.R. 22; see also A.R. 2158-64, 2169-85, 2189-

2210, 2286-317.  After AHC was notified in July of 2005 that its MA contract would be terminated, CMS offered AHC another opportunity to establish a CAP.  A.R. 22, 2285, 2339.  CMS's review of the new CAP found that the CAP still would not correct all of the identified deficiencies.  Id.  Given this record of repeated failures, substantial evidence supports the Administrator's conclusion that CMS allowed AHC a reasonable opportunity to put into place the necessary corrective actions to cure its program deficiencies.  A.R. 22.  AHC was simply unable to uphold its end of the bargain.

The Administrator also noted that AHC's non-compliance with the MA contract terms had been well-documented by other monitoring agencies.  A.R. 22.  The HHS Office of the Inspector General, the State of Florida Agency for Healthcare Administration, the Maximus Center for Health Dispute Resolution, and Florida Medical Quality Assurance, Inc., had all documented and reported AHC's significant problems in efficiently and effectively implementing its MA contract.  A.R. 22.

Given the substantial record evidence, the Administrator properly determined that "AHC failed to meet the requirements to substantially carry out the terms of its contract with CMS and [] also failed to carry out the contract in a manner that is consistent with the effective or efficient implementation of such contract requirements," and that AHC was therefore subject to termination from the MA plan pursuant to 42 C.F.R. § 422.510(a)(1) and (a)(2).  A.R. 23.

C.    **The November 18, 2005 AHC MA Contract Renewal Does Not Moot CMS's Termination Action.**

30

Although AHC failed to raise this issue before the CMS Hearing Officer,[12] AHC now argues that CMS's renewal of AHC's MA contract no. H1034 for the 2006 benefit year superseded and effectively mooted CMS's ongoing contract termination action. However, the 2006 renewal of contract no. H1034 is just that – a renewal of an existing contract (albeit with modified terms) that incorporates new statutory requirements dictated by the MMA (discussed supra, p.3) – and not a separate, entirely new contract. There is only one contract at issue in this case – no. H1034 – and that is the contract that CMS has terminated.[13]  There is no legal support for AHC's contention that the terms of the MA contract renewal, or the carry-over of an appeal into a subsequent contract term, somehow invalidate the Secretary's termination authority under the statute.  In addition, the renewal of the AHC MA contract did not mean that CMS had made any kind of positive determination that AHC had somehow become qualified to provide MA services in 2006.  The only thing the renewal signaled was that CMS had not exercised its option not to renew the contract by the May 1, 2005 regulatory deadline.  See 42 C.F.R. § 422.506(b); Teresa L. DeCaro Decl. ¶ 13, attached hereto as Exhibit 4; Christopher J. Eisenberg Decl. ¶ 3.  This nonrenewal option is separate and distinct from the termination procedure outlined in the statute and regulations.

1.    **Procedures for Participating in the Medicare Advantage Program.**

---

[12]  AHC signed the H1034 contract renewal on October 27, 2005.  A.R. 123.  AHC failed to raise any issue regarding that renewal either during the hearing on November 14-15, 2005, or before the Hearing Officer's decision was rendered on November 22, 2005.

[13]  AHC's contract no. H1034 has had the same number, through each successive renewal, since it was entered into by CMS and AHC in 2000.

A step-by step review of the procedures under which private health plans participate in the MA program confirms that there is only one contract is at issue in this case, the same contract that is the subject of the termination proceeding. Importantly, MA contracts are better viewed as documents reflecting obligations imposed by the governing statute and regulations than as typical contracts, since the substantive terms contained therein are established by CMS through notice and comment rulemaking, and not through negotiations by the parties to the contract. See 42 C.F.R. § 422.1(b) (Part 422 of the C.F.R. "establishes standards and sets forth the requirements, limitations, and procedures for Medicare services furnished, or paid for, by Medicare Advantage organizations through Medicare Advantage plans."). The process for an entity that for the first time wishes to become an MAO is as follows:

- In order to be eligible to be an MAO, the entity must meet certain threshold criteria; for example (to list just a few of the requirements), be authorized under state law in the requested service area as a risk-bearing entity that may offer health benefits (42 C.F.R. § 422.503(b)(2)), have an executive manager whose appointment and removal are under the control of the entity's policy making body (42 C.F.R. § 422.503(b)(4)(iii)), and have in place insurance policies or other arrangements to cover losses from various risks (42 C.F.R. § 422.503(b)(4)(v)) and demonstrate a commitment to compliance, integrity and ethical values as confirmed by the development and implementation of a compliance plan that meets federal standards (42 C.F.R. § 422.503(b)(vi)).
- The entity must, before a date specified by CMS, submit an application thoroughly describe how the entity and its MA plan will meet its obligations under the MA statute, regulations, and program requirements. 42 C.F.R. Part 422; 42 C.F.R. § 422.501.
- CMS then determines whether the entity would qualify as an MAO and that the proposed MA plan meets the requirements for obtaining a contract under 42 C.F.R. Part 422. 42 C.F.R. § 422.502.
- If the MAO application is approved by CMS then, by the first Monday in June, the entity must submit to CMS an aggregate monthly bid amount for any MA plan the MAO intends to offer in the upcoming year in a service area. 42 C.F.R. § 422.254(a). The requirements for this bid are set forth

32

at 42 C.F.R. § 422.254(b).

- CMS then reviews the benefits and the stated bid amounts and negotiates with the MAO regarding the bid amount and the proportions of the aggregate bid amount attributable to basic benefits, supplemental benefits, and prescription drug benefits.  42 C.F.R. § 422.256.

- Once CMS approves the MAO's benefits and bid amount, CMS and the MAO may enter into an MA contract.  However, before CMS will enter into the contract, the MAO must demonstrate to CMS that items attested to earlier in the application process are in fact met at the time the contract is entered into between the two parties.  42 C.F.R. § 422.503.

See also DeCaro Decl. ¶¶ 3-8.

As noted above, the terms of each MA contract are dictated entirely by the MA statute and regulations – in essence the MA contract merely repeats the substance of what is set forth in the governing legal authorities.[14]  CMS does not negotiate terms with each MAO – the contracts with all of the MAOs are exactly the same, except for price. DeCaro Decl. ¶ 9.

In contrast to the rather involved process described above, once an MAO is in the MA program and is offering an MA plan, its contract is automatically renewed absent one of the following events: the MAO tells CMS in writing by the first Monday of June in the current contract year that it does not wish to renew its contract,[15] 42 C.F.R. § 422.506(a); CMS and the MAO fail to reach agreement on the bid submitted by the MAO, 42 C.F.R. § 422.254; or CMS informs the MAO by May 1st of the current contract

---

[14]  Indeed, the MA contract constantly cites to the regulations so that the contract terms can be traced back to the regulatory requirements.  See generally A.R. 104-36 (2006 contract renewal).

[15]  The MAO must also inform each of its Medicare enrollees and the general public that the plan is not being renewed.  42 C.F.R. § 422.506(a)(2).

year that it will not renew the MA plan for the following year, 42 C.F.R. § 422.506(b).[16]

See Medicare Managed Care Manual, Chap. 11, part 60.  The MA statute, 42 U.S.C.

§ 1395w-27, and CMS regulations provide that the existing contract is "renewed" year

after year.[17]  42 C.F.R. § 422.505; DeCaro Decl. ¶ 10.

### 2. CMS's Renewal for 2006 of AHC's Contract Did Not Affect CMS's Pending Termination Action.

On July 6, 2005, CMS notified AHC that it intended to terminate AHC's MA

contract.  A.R. 2280-85.  CMS did not elect not to renew AHC's MA contract because

any CMS nonrenewal notice would be required to have been issued by May 1st of the

current contract year in order to be effective for the following year, 42 C.F.R.

§ 422.506(b)(2), and as of May 1, 2005, CMS had not performed a recent audit of AHC.

CMS performed an onsite audit of AHC from May 10-12, 2005, and the results of that

audit triggered CMS's decision to terminate AHC's MA contract no. H1034.

In October 2005, CMS sent all MA plans, including AHC, revised versions of

their contracts for 2006 specifying the new statutory and regulatory changes implemented

by the MMA that were incorporated into the MA contracts.[18]  This was done to

---

[16]  CMS may decide not to renew an MA contract if the MAO has not fully implemented quality improvement projects, the MAO did not submit a benefit and price bid or the bid was unacceptable, or for any reason that CMS would terminate a contract.  42 C.F.R. § 422.506(b) and 422.254.

[17]  New contracts are "entered into" by CMS and the MAO.  Existing contracts are automatically renewed by CMS, unless CMS affirmatively notifies the MA plan by May 1st of the current contract year that it will nonrenew the plan.  42 C.F.R. § 422.506(b).

[18]  An existing MA contract is ordinarily renewed for the next calendar year by operation of HHS regulations.  42 C.F.R. § 422.506.  Nonetheless, in years when there have been substantial statutory or regulatory changes in an MAO's obligations under its contract, a revised document reflecting these changes is sometimes substituted for the existing version.  See DeCaro

incorporate the substantial changes to the MA program occasioned by the passage of the MMA and HHS's regulations implementing the MMA. Since an MA contract essentially parrots the regulatory requirements, CMS reissued a redrafted MA contract to all MAOs for their convenience and to reference in one document all of the statutory and regulatory changes covering the MA program, including the requirement that the MAO provide a prescription drug benefit, supra p. 3; Decaro Decl. ¶ 11.

The fact that in October of 2005 CMS forwarded these MA renewal contracts to all MA plans being renewed for 2006 meant only that CMS had not issued notices by May 1st of that contract year that these contracts would not be renewed, and that CMS wanted the numerous changes in the statute and regulations occasioned by the MMA to be easily found in one place by the MA plans so as to emphasize that MAOs would be accountable for compliance with the new statutory and regulatory requirements. DeCaro Decl. ¶ 11. In contrast, for the 2007 contract year, existing MA contracts were automatically renewed and no new paperwork was sent out by CMS, other than the intent to renew letter. DeCaro Decl. ¶ 12.

### 3. CMS's MA Contract Termination Process Was Unaffected by the Automatic Renewal of AHC's Contract for Calendar Year 2006.

As discussed in detail above, AHC's MA contract is one continuing contract renewable year to year and is, indeed, more like a document setting forth statutory and

---

Decl. ¶ 11. This is not required as a legal matter, because a term in an MAO's standard existing contract provides that the contract is "deemed" to incorporate any changes in MAO obligations made by statute or regulation. Nonetheless, for purposes of clarification, a revised contract document was issued in late 2005.

regulatory obligations than a traditional contract.  While Congress used the term contract in the statute, 42 U.S.C. § 1395w-27(a), it also expressly stated that, "the authority vested in the Secretary by this part may be performed without regard to such provisions of law or regulations relating to the making, performance, amendment, or modification of contracts of the United States as the Secretary may determine to be inconsistent with the furtherance of the purpose of this title."  42 U.S.C. § 1395w-27(c)(5).  Accordingly, as is evident from this statutory language, MA contracts are not federal contracts in the normal sense, but rather are "dictated by the statute and regulations."[19]  65 Fed. Reg. 40170, 40289 (June 29, 2000).

The MA contract is continuing and does not represent a series of separate and distinct year-long contracts as argued by AHC.  DeCaro Decl. ¶ 12.  The statute is replete with references to "a contract" and "such contract."  42 U.S.C. § 1395w-27.  The statute speaks to a contract entered into once by the Secretary of HHS and the MAO and renewed thereafter automatically.  42 U.S.C. § 1395w-27(c)(1) ("[e]ach contract under this section shall be for a term of at least 1 year, as determined by the Secretary, and may be made automatically renewable from term to term in the absence of notice by either party of intention to terminate at the end of the current term.").  If the Secretary had made each contract only one year in length, AHC would have had to submit a new application for the 2006 plan year and indeed for every year thereafter.  However new applications

---

[19]  Moreover, Art. IX, ¶ C of the AHC's MA contract makes this clear, stating that "[i]n the event that any provision of this contract conflicts with the provisions of any statute or regulation applicable to an MA Organization, the provisions of the statute or regulation shall have full force and effect."  A.R. 120.

are not required of current contract holders precisely because the term of the contract lasts longer than one year through the automatic renewal process.  42 C.F.R. § 422.505(c).

Importantly, the Secretary is permitted to "terminate any such contract *at any time*" and this authority is not arbitrarily confined to a particular contract period.  42 U.S.C. § 1395w-27(c)(2) (emphasis added).  If, in fact, a termination process had to begin anew each January 1 (as AHC appears to argue), it would be exceedingly difficult, if not impossible, for CMS to ever exercise its termination authority, due to the time frames and appeal rights built into the termination process.  See 42 U.S.C. § 1395w-27(h).  AHC's position would effectively nullify the Secretary's statutory termination authority in all cases except those involving serious and immediate jeopardy to patient's lives, or those where the MAO agreed not to contest a proposed termination.

The following example illustrates the problem with AHC's position.  CMS audits an MA plan in May and finds serious problems including problems that have been noted before and not yet corrected by the MAO.  CMS provides the MAO with an intent to terminate letter in July.  CMS, as required by the statute, gives the MAO a reasonable opportunity to develop and implement a CAP to correct the deficiencies.  The MA plan submits a CAP to CMS in August.  CMS reviews the CAP but finds it insufficient.  CMS informs the MAO that the CAP is not sufficient in September.  Meanwhile, even as it is attempting to develop a CAP that CMS would approve, the MAO requests reconsideration, as provided in 42 C.F.R. § 422.650, of CMS's July notice of its intent to terminate the MA contract.  The reconsideration official upholds the termination in

October.  Also in October, the MAO requests a hearing.  The hearing and the Hearing

Officer's decision upholding the MA contract termination occur in November.

Marketing and enrollment for all MA plans for the upcoming year begins in mid-

November.  The MA plan appeals the Hearing Officer's decision to the CMS

Administrator in December, but the Administrator does not make a determination until

after the current contract year.  Since the MAO's administrative appeals process has not

been completed by the end of the current contract year, the MAO is permitted to continue

its contract until the administrative appeals process has been concluded.  This allows an

MAO, which has received a termination decision, but has not yet actually been

terminated because it is pursuing appeals, to operate under an existing MA contract.

Indeed, the regulations provide for contract renewal in exactly this situation.  <u>See</u> 42

C.F.R. § 422.664.

      As is apparent from this litany of steps (which is very similar to the chronology of

the present matter) any attempt at termination by CMS would fail in virtually every case

it courts were to accept AHC's theory that each year begins a new MA contract that

supercedes the previous one and moots any termination decision based on documented

noncompliance in the prior year.  According to AHC, a non-complying MAO's repeated

violations would be wiped clean at the end of each year, and the MAO would be free to

continue until non-compliance is again found – and the whole process begins anew.  Such

exceedingly limited termination authority was not what Congress provided.  <u>See</u> 42

U.S.C. § 1395w-27(c)(2) ("[the] Secretary may *at any time* terminate any such contract . .

. .") (emphasis added).  It is inconceivable that Congress intended the procedural rights

found at § 1395w-27(h) afforded to plans that CMS proposes to terminate from the MA

program to nullify the termination authority provided in § 1395w-27(c)(2) if the appeal

process happens to straddle contracting periods.

### III.    THE BALANCE OF THE EQUITIES FAVORS DENIAL OF A PRELIMINARY INJUNCTION

#### A.    Plaintiff Has Failed to Make a Sufficient Showing of Irreparable Injury.

As explained above, AHC has failed to demonstrate a substantial likelihood of

success on the merits.  AHC has therefore failed to meet the first requirement of the

preliminary injunction analysis, which alone precludes the issuance of an injunction.

City of Las Vegas, 891 F.2d at 935 (affirming district court's denial of preliminary

injunction without addressing irreparable injury because appellant had insufficient

likelihood of success on the merits);  Howard v. Evans, 193 F. Supp. 2d 221, 227 (D.D.C.

2002) ("[I]f a plaintiff cannot show the likelihood that he will succeed on the merits of

his claim, even a very strong showing on the other three factors will not justify the

extraordinary remedy of preliminary injunctive relief.").

AHC has also failed to demonstrate that it will suffer irreparable harm warranting

the extraordinary relief of a preliminary injunction.  While the termination of AHC's MA

contract may result in considerable harm to AHC's business interests, AHC has

maintained its MA organizational status until now only because CMS agreed to a stay of

administrative proceedings while AHC negotiated (ultimately without success) a

potential stock purchase by HealthSpring, an organization that operated several Medicare

managed-care plans and which had a proven track record of service to Medicare

39

beneficiaries.  A.R. 47 at ¶ 10.  Absent the settlement agreement, the appeal proceedings

– and AHC's termination –  would likely have concluded much earlier.  AHC

understood—and specifically agreed—that failure to conclude a successful deal with

HealthSpring would dissolve the settlement agreement.[20]  A.R. 47 at ¶ 10.  Because the

potential harm AHC may suffer is largely of its own making, it does not provide

justification for an eleventh-hour intervention by the Court.  Cf. Lee v. Christian Coal. of

Am., Inc. 160 F. Supp. 2d 14, 30 (D.D.C. 2001) ("The case law is well-settled that '[a]

preliminary injunction movant does not satisfy the irreparable harm criterion when the

alleged harm is self-inflicted.'" (alteration in original)).

Moreover, plaintiff's claimed irreparable injury is contemplated by the statute.

By its very nature, termination of an MA contract will always result in the loss of the

Medicare line of business to an entity, and that is precisely the authority vested in the

Secretary by Congress.  In order to protect the private interest of an MA entity such as

AHC, Congress requires that the Secretary "provide[] the organization with reasonable

notice and opportunity for hearing (including the right to appeal an initial decision)

before terminating the contract." 42 U.S.C.  §1395w-27.  AHC was allowed to and did

exercise its procedural rights.  In addition, AHC was given numerous opportunities to

develop and successfully implement CAPs.  However, AHC either failed to implement

approved CAPs, or failed to develop a plan adequate to ensure compliance.  A.R. 1710.

---

[20]  The settlement agreement also provided that AHC would enter into a management
agreement with HealthSpring since AHC's own management had shown its consistent inability
to operate the MAO in compliance with statutory and regulatory requirements.  A.R. 44-45.
AHC has terminated that management contract effective December 31, 2006.

The appeal process in the instant case was conducted precisely as dictated by Congress, culminating in the November 30, 2006 final agency decision by the Administrator.  As discussed above, that decision is supported by substantial evidence in the record and should be affirmed by this Court.  That plaintiff may suffer some injury from a properly rendered agency decision is not the sort of irreparable injury sufficient to warrant the entry of a preliminary injunction.[21]

### B.     Entry of a Preliminary Injunction Would Injure Other Interested Parties.

AHC also fails to satisfy the third requirement for a preliminary injunction, which requires the plaintiff to demonstrate that an injunction would not substantially injure other non-moving interested parties, that is, that the balance of hardships favors granting a preliminary injunction.  Dorfmann, 414 F.2d at 1173.  A preliminary injunction barring CMS from terminating AHC would seriously harm AHC's beneficiaries by leaving them in the care of a provider that, as detailed in the administrative record, has a long – indeed, consistent – history of failure to comply with CMS regulatory requirements.  A.R. 2158-64, 2169-85, 2189-2210, 2286-317.  An MAO's failure to comply with CMS rules and regulations endangers beneficiaries' access to essential, quality health care.  See Eisenberg Decl. at ¶ 4, 6.  An injunction would also delay notice to AHC's beneficiaries of AHC's termination, which would leave the beneficiaries with less time to select new

---

[21]  If, as plaintiff claims, it is currently able to comply with MA program requirements, there is no indication that plaintiff cannot apply to enter into a new MA contract in the future.  See supra Argument Part II.A (outlining process whereby an organization may apply to become a part of the MA program).

MA plans or to return to fee-for-service Medicare.

The potential harm AHC may suffer if its request for a preliminary injunction is denied is less weighty by comparison.  There is no evidence that the issuance or denial of an injunction is the key to AHC's very survival.  Even if, as AHC claims, it is now fully capable of complying with CMS regulatory requirements (a claim which CMS denies), a denial of a preliminary injunction would not necessarily lead to AHC's demise.  Instead, AHC could file a new application for an MA contract in 2007 seeking certification in 2008.  Conversely, AHC has not shown that issuance of a preliminary injunction will ensure AHC's survival as a business.  Several potential buyers for AHC have come and gone and AHC has repeatedly requested a stay of the impending termination while it continues to search for a new deal.  Moreover, AHC's claim that termination of its MA contract would cause "irreparable harm to AHC's beneficiaries," and may leave them "[without] any insured health care at all," is false. Pl. PI Mem. at 6, 24.  Instead, after termination of AHC's MA contract, AHC's current enrollees will be able to obtain health coverage either through another MA plan, or through Medicare Parts A, B, and D. Decaro Decl. ¶¶ 14-15.

## C.     <u>Entry of a Preliminary Injunction is Not in the Public Interest</u>.

AHC has also failed to satisfy the fourth requirement of the preliminary injunction analysis, because a preliminary injunction would harm the public interest. Further delay in CMS's termination of AHC would seriously harm the beneficiaries currently served by AHC.  Eisenberg Decl. at ¶¶ 4, 6.  It would also impede the agency's performance of its statutory duty to evaluate MAOs, and protect beneficiaries by

terminating deficient providers.  <u>See</u> 42 U.S.C.A. § 1395w-27(d) ("Protections against fraud and beneficiary protections"); 42 C.F.R § 422.502.  Accepting AHC's arguments would effectively saddle CMS with the burden of repeated, up to the minute audits for providers, like AHC, that continually claim to be in current compliance, and would squander the agency's limited enforcement resources.

The Secretary and the public have a strong interest in the expeditious termination of repeatedly deficient providers.  The Medicare program was enacted for necessary health care services provided to the poor and aged, not to subsidize or otherwise benefit MA contract holders.  Plaintiff has failed to show that its pecuniary interest outweighs the government's interest in protecting the health insurance needs of Medicare beneficiaries and responsible use of the Medicare Trust Funds.

The Tenth Circuit's analysis in <u>SEC v. Greenburg</u>, 283 F.2d 773, 775 (10th Cir. 1960), is instructive in this regard.  In affirming the district court's denial of a preliminary injunction, the Court balanced the petitioner's asserted injury against the public interest, and found that the public interest, as evidenced by Congressional intent, was paramount.

> Irreparable injury to the petitioners is urged on the ground that they are excluded from the securities business and thus from earning their livelihoods in their chosen vocations.  Serious as this personal injury may be, it is not of controlling importance as primary consideration must be given to the statutory intent to protect investors.  Exclusion from the securities business is a remedial device for the protection of the public.  In the balancing of injury to the individual by exclusion from the security business and of harm to the public by proscribed activities in security transactions the necessity of protection to the public far outweighs any personal detriment resulting from the impact of applicable laws.  In each of the cases before us the Commission has found that the public interest is served by the actions which it has taken.

The same is true here.  Because AHC has failed to show that the harm it may suffer if an injunction is denied outweighs the significant harm that a preliminary injunction would effect on beneficiaries and the integrity of the MA program, the Court should deny plaintiff's request for a preliminary injunction.  See Yakus v. United States, 321 U.S. 414, 440 (1944) ("[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.").

## **CONCLUSION**

For the reasons stated herein, the Court should deny plaintiff's motion for a

preliminary injunction.

Dated: December 11, 2006                    Respectfully submitted,

                                            PETER D. KEISTER
                                            ASSISTANT ATTORNEY GENERAL
                                            JEFFREY TAYLOR
                                            UNITED STATES ATTORNEY
                                            SHEILA LIEBER
                                            DEPUTY DIRECTOR
                                            _____/s/_____
                                            HEATHER R. PHILLIPS
                                            Trial Attorney
OF COUNSEL:                                 JAMES LUH
Carol J. Bennett, Deputy AGC                Trial Attorney
Daniel Wolfe, Attorney                      U.S. Department of Justice
Health and Human Services                   Civil Division/Federal Programs
Office of General Counsel                   20 Massachusetts Ave., N.W., Room 7222
                                            Washington, DC  20001
                                            Ph:    (202) 616-0679
                                            Fax:   (202) 616-8470
                                            Email: heather.phillips@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No.:  06-2064 (RWR) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES | ) ) ) |
| Defendant. | ) ) ) |

THIS MATTER having come before the Court on Plaintiff's Motion for a

Preliminary Injunction and Defendants' Opposition thereto, it is hereby

ORDERED that Plaintiff's Motion for a Preliminary Injunction is DENIED.

**SO ORDERED.**

Dated: _____        _____