IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 1:06cv2064 (RWR) |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

In this action, Plaintiff America's Health Choice Medical Plans, Inc. ("AHC" or "Plaintiff") seeks only the right to be treated fairly and impartially by Defendant Centers for Medicare & Medicaid Services ("CMS") consistent with the terms of AHC's current contract with CMS and the governing regulations. While AHC believes that the administrative proceedings preceding this action were arbitrary and capricious in many ways, in this reply, AHC addresses primarily the fact that the termination proceedings, by CMS's own admission, dealt only with a contract that expired in 2005 and was superseded by an entirely new contract, with new terms, and that CMS has never instituted proceedings to terminate its new contract with AHC.[1] Resolution of that basic issue in AHC's favor, which AHC strongly believes is

---

[1]   CMS repeatedly references the "renewals" of Medicare Advantage contracts. AHC's new contract, effective beginning November 18, 2005, and covering calendar year 2006, was indeed "renewed" in 2006 for the 2007 term. That renewal – whether "automatic" as CMS contends or otherwise – is really not the significant issue for the Court, and CMS's discussion of renewals is somewhat of a red herring. The key point here is that CMS entered into an entirely new contract with AHC on November 18, 2005.

unavoidable under the acknowledged facts and applicable law, would obviate the need to analyze the administrative record to ascertain whether there was, or was not, substantial evidence supporting the Administrator's decision.

Although CMS attempts to deflect the Court's attention from this key issue in its Opposition, CMS does not contest the simple facts supporting AHC's position. The threshold question for this Court is therefore one of straightforward contract law and interpretation; i.e., what is the legal effect of the entirely new contract with AHC, which CMS executed days after the November 14-15, 2005 administrative hearing regarding the termination of the previous contract, which by its terms superseded all previous agreements, which CMS has never sought to terminate, and which even CMS concedes was not an ordinary "renewal." (Opp. at 34-35, 34 n. 18.) AHC's position, in short, is that CMS can no more ignore this new, expressly superseding contract, than could a private party who had terminated a previous contract, and then entered into a new one. AHC does not contend that CMS is or has ever been precluded from attempting to initiate proceedings to terminate the new contract based on any current compliance issues that CMS perceives; it contends merely that CMS has never done so. CMS would have the Court hold that the new contract is a nullity. Its position, however, is contradicted by basic principles of contract law and CMS's own regulations.

CMS argues that to enforce AHC's contractual rights would handcuff it from administering the Medicare Advantage ("MA") program. CMS posits that it followed the only course available when a termination action spans a calendar year. These arguments not only misconstrue the contracts, but ignore certain of Defendant's own regulations, which detail precisely what CMS may do under these circumstances. These arguments also ignore numerous cases in which federal courts have repeatedly held that contracts between the United States and private parties are governed by basic principles of contract law. AHC asks only that CMS abide by the relevant regulations, which would require CMS to prove that AHC is not currently in substantial compliance with the applicable regulations before terminating the current contract.

400499867v1

The fact that CMS so ardently seeks to avoid having to prove AHC's current non-compliance alone speaks volumes.  One can only assume that, if AHC's performance were as abysmal as CMS would have the Court believe, it would have initiated a current termination action long ago and demonstrated current non-compliance.  Instead, for as yet inexplicable reasons, CMS relies exclusively on alleged non-compliance in May 2005, which, even then, CMS acknowledged did not in any way threaten the health or safety of beneficiaries.

### A. Defendant Must Comply With Contract Procedures Before Terminating AHC's Current Contract, But Has Not Complied.

CMS does not deny that on November 18, 2005, it executed and delivered to AHC an entirely new MA contract with AHC, which, by its express terms, superseded the previous contract between the parties.  Although CMS would have this Court hold otherwise, the contracts between AHC and CMS are governed by general contract law principles.  "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."  United States v. Mobil Oil Explor. & Produc. Southeast Inc., 530 U.S. 604, 607 (2000) (applying common law contractual interpretation criteria to determine that the U.S. government agencies had breached their contract with defendant-oil company).

CMS cites a statute, 42 U.S.C. § 1395w-27(c), as supposed support for the proposition that MA contracts are somehow exempt from the application of general contract law principles.  The statute effects no such exemption.  To the contrary, the above statutory section and the regulation promulgated pursuant to that specific statute, 42 C.F.R. 422.503(c), merely exempt MA contracts from the Federal Acquisition Regulation ("FAR").  See 42 C.F.R. 422.503(c) ("Under the authority of section 1857(c)(5) of the Act [42 U.S.C. § 1395w-27(c)(5)], CMS may enter into contracts under this part without regard to Federal and Departmental acquisition regulations set forth in title 48 of the CFR and provisions of law or other regulations relating to the making, performance, amendment, or modification of contracts of the United States if CMS

-3-

determines that those provisions are inconsistent with the efficient and effective administration of the Medicare program."); 65 Fed. Reg. 40170, 40289 (June 2, 2000) ("The M+C statute [predecessor to the MA statute] does not contemplate a contract disputes procedure akin to the contract disputes procedure contained in Subpart 33.2 of the FAR.") (cited in Opp. at p. 36).[2] As CMS must be well aware, some types of government contracts are subject to the FAR and some are not. The statute CMS highlights simply provides that the Secretary may promulgate regulations exempting CMS from the FAR, and the Secretary did precisely that in 42 C.F.R. 422.503(c), citing 42 U.S.C. § 1395w-27(c) as authority.

Even where the terms of a contract are promulgated through notice and comment rulemaking, as CMS argues is the case here, "where there is a conflict between an agency's interpretation and the contract terms, … 'it is the unambiguous terms of the contract, not the unilateral beliefs of one of the parties, that define the parties' respective obligations.'" Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) (quoting Park Village Apartments v. United States, 25 Cl. Ct. 729, 733 (1992)). In the Commonwealth Edison case, the United States argued, much as it does here, that its energy contract should not be considered under normal contract law principles governing private parties, because the contract at issue with Commonwealth Edison was a "Standard Contract" whose provisions were essentially mandated by law, and reflective of the underlying regulations that were the subject of notice and comment rulemaking. The Court squarely rejected that argument, and held that it would not defer to the Government's interpretation, but instead viewed the matter as a question of law, with the terms of the contract governing – and interpreted – as they would be among private parties. In short, there is no "deference" to an agency's interpretation of its contract, even if it is structured around agency regulations. Id.

---

[2]   Defendant acknowledges that disputes concerning a final agency decision may be brought directly in the United States District Court for the District of Columbia, in contrast with claims brought under FAR contract, which generally follow a different disputes process.

The terms of AHC's current contract – which define the obligations of Plaintiff and Defendant – by their terms supersede any prior agreements between them. Article I of the 2006 contract provides, that:

> This contract governs the respective rights and obligations of the parties as of the effective date set forth above [November 18, 2005], <u>and supersedes any prior agreements between the MA Organization and CMS as of such date</u>.

(Emphasis added.) This new contract by its express and unambiguous terms, stands on its own and is separate from the prior contracts. CMS never initiated termination of this contract. If that were CMS's intent, the contract and governing regulations require that CMS provide notice of termination, justify the termination based on AHC's non-compliance with the current contracts, and, under Section 422.510(c)(1), afford AHC "a reasonable opportunity to develop and receive CMS approval of a corrective action plan to correct the deficiencies that are the basis of the proposed termination." CMS has not satisfied those contractual conditions to termination. The efforts to terminate the previous, superseded contract have no effect on the new, current contract and are legally moot. Indeed, even the Administrator held that the decision was based exclusively on facts in the record at the time of the hearing. The current contract was not executed by CMS until after the hearing so it could not have been a basis of that decision – or affected by it.

### B. Following Contractually Mandated Procedures Would Not Prevent CMS From Administering The Medicare Program.

CMS argues that due to the "evergreen" nature of MA contracts and "automatic renewal," it could almost never terminate MA contracts if the contracts for separate years required separate termination proceedings. (Opp. at 38.) The argument misses the mark on numerous levels. Holding CMS to the bargain it struck does not impinge on its ability to administer the Medicare program. First, the Court does not even have to decide whether a mere

renewal of a contract would require a re-initiation of the contract termination proceedings (though it probably would).  In this case, there was not simply a mere renewal after the November 2005 termination hearing; there was an entirely new contract.  Therefore, the issue of the legal effect of a normal "renewal" on termination proceedings need not be decided in this case.  Moreover, CMS's own regulations speak directly to the course CMS was to follow if a termination spans a calendar year.  CMS did not follow those procedures here and does not even acknowledge them.  Indeed, CMS's declarations appended to its memorandum make clear that in fact, in other cases, CMS knows precisely what to do:  it does not renew contracts that are subject to termination.

In short, all CMS needed to do, if it wanted to properly terminate its relationship with AHC, was to decline to enter into a new contract for 2006.  If it felt that it needed a contract in place during the termination proceedings, it could have negotiated an extension of the then-current contract term, with all parties preserving their respective rights during the termination proceedings, as contemplated under 42 C.F.R. 422.664(b).  Section 422.664(b) provides that "CMS extends the current contract at the end of the contract period (in the case of a determination not to renew) only – (1) If CMS finds that an extension of the contract will be consistent with the purpose of this part; and (2) For such period as CMS and the MA organization agree."  This "extension" is expressly distinct from renewal and does not impose on Defendant the obligations of the new contract.[3]

The contract terms and regulations also allow CMS to not renew Plaintiff's contract for any of reasons that would allow it to terminate Plaintiff's contract.  (Compl. Ex. B, Art.

---

[3]   In its attempt to avoid the superseding effect and separate termination requirements of the 2006 and 2007 contract, Defendant argues that the contracts are not new contracts but merely automatic renewals.  This argument has no basis in fact.  A renewal is a new contract, as set forth in the Article I of the 2006 contract.  Furthermore, the renewals are in not automatic.  They require an new agreement between the parties on the bid and notice of renewal from CMS.  (Compl. Ex. B, Art. VII; 42 C.F.R. 422.505.)  A renewal is not automatic if renewal requires an further agreement of the parties and an affirmative notice from Defendant.

-7-

VII(B)(2); 42 C.F.R. 422.506(b).) CMS could have made that decision during the pendency of its actions to terminate the 2005 contract. To the extent that the termination proceedings continued to the new year, the governing regulations permit Defendant to extend the existing contract – the one subject to termination proceedings – for a period of time, until termination decision is final. 42 C.F.R. 422.664(b). CMS simply did not follow its own regulations, and AHC should not have to pay the price for that now. AHC is not asking for the opportunity to continue to operate a substantially non-compliant MA Plan. Rather, it asks simply that CMS be held to its own contract and its own regulations, and judge AHC based on its current compliance.[4]

### C. AHC Has Demonstrated Irreparable Harm.

CMS's arguments against AHC's irreparable harm assume that CMS properly terminated the new contracts, which it has not. The harm that will flow from this improper action is unavoidably irreparable. It is well settled that the "destruction of [a] business is itself an irreparable injury." Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision, et al., 732 F. Supp. 1183,1200-01 (D.D.C. 1990) (granting the plaintiff-thrift's motion for temporary restraining order and preliminary injunction enjoining the government agency from taking action that would destroy the company and concluding that the destruction of a business is itself an irreparable injury); See also John B. Hull, Inc. v. Waterbury Petroleum Products, Inc., 588 F.2d 24, 28 (2d Cir. 1978) (affirming the lower court's granting of Plaintiff's request for a preliminary injunction because monetary loss constitutes irreparable harm where

---

[4]   AHC believes that this hearing is not the appropriate proceeding to resolve CMS's numerous dismaying mischaracterizations of AHC's current compliance. AHC is prepared nonetheless to present witness testimony demonstrating its current compliance, if so directed by the Court.

the movant's very existence is threatened, such as where an act threatens an ongoing business with destruction).  If CMS is not enjoined, its actions to terminate the Plan will destroy AHC, not to mention depriving thousands of members of their choice of health plan and provider.  AHC accordingly has demonstrated irreparable harm.

*    *    *

For the foregoing reasons, and those set forth in its opening memorandum of points and authorities, Plaintiff respectfully requests that the Court grant the Motion for Preliminary Injunction and enter an order in the form submitted herewith.

DATED: December 13, 2006

Respectfully submitted,

/s/
Deborah B. Baum (D.C. Bar #  393019)
David Cynamon (D.C. Bar # 182477)
Matthew A. Anzaldi (D. C. Bar # 455515)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

Attorneys for Plaintiff
America's Health Choice Medical Plans, Inc.