## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendant. | Civil Action No. 1:06cv2064 (RWR) |

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' EXPEDITED MOTION TO CLARIFY AND/OR RECONSIDER THE COURT'S DECEMBER 21, 2006 ORDER FOR PRELIMINARY INJUNCTION</u>

Plaintiff America's Health Choice Medical Plans, Inc. ("AHC" or "Plaintiff"), by

counsel, respectfully files this brief in opposition to the Expedited Motion to Clarify and/or

Reconsider the Court's December 21, 2006 Order for Preliminary Injunction, filed by Defendant

the United States Department of Health and Human Services, Centers for Medicare & Medicaid

Services ("CMS") on December 22, 2006.  CMS asks the Court to modify its Order so that

CMS may re-impose the marketing and enrollment sanctions that CMS imposed as

"intermediate" sanctions at the same time, and on the same basis, that it notified AHC of its

decision to terminate AHC's 2005 contract.  As will be demonstrated herein, however, its

arguments do not match its actions and do not support the modification it seeks.

## INTRODUCTION

This entire matter stems from action that CMS took toward terminating AHC's 2005 Medicare Advantage Contract with CMS. That action commenced on July 6, 2005, when CMS sent a letter notifying AHC of CMS's intent to terminate AHC's then-existing Medicare Advantage Contract with CMS. That letter, of course, triggered the lengthy administrative proceedings that predated this injunction action. While the actual implementation of the termination was predicated on the exhaustion of the administrative process, the imposition of intermediate sanctions, which were also imposed in the same July 6 letter, as their "intermediate" label suggests, were effected essentially immediately (as of August 3, 2005), long prior to contract termination. CMS is absolutely correct in one aspect of its motion, *i.e.,* that the issue of intermediate sanctions was not separately highlighted at length in this injunction proceeding, for the simple reason that the sanctions were an "intermediate" aspect of the termination proceeding, and part and parcel of it.[1]

While trying to persuade the Court that the sanctions issue is legally independent from the contract termination action, CMS omits from its motion several significant and highly relevant matters, both factual and legal, that demonstrate why, in this case, the sanctions issue is

---

[1]    CMS is incorrect, however, in suggesting that AHC did not raise the issue of sanctions in this Court. AHC specifically discussed CMS's imposition of these sanctions as part of the termination proceedings on pages 7, 8, and 21 of its Memorandum of Points and Authorities in Support of Application for a Temporary Restraining Order and Motion for Preliminary Injunction. Furthermore, the imposition of sanctions was expressly discussed at paragraphs 9, 28 and 55 of the Verified Complaint. Moreover, while the Prayer for Relief did not expressly ask for the removal of sanctions, in Paragraph B, it did broadly ask that the Defendant's "decision" be overturned. The Defendant's decisions specifically outlined in the Memorandum and Complaint included the determination to impose and uphold sanctions. If the Court deems it necessary to have the Complaint more precisely articulate that specific aspect of relief, or the motion to more precisely

Footnote continued on next page

not independent at all. Factually, in the very same July 6, 2005 letter in which it noticed the termination of AHC's 2005 contract, CMS also advised AHC that it was imposing intermediate sanctions, not predicated as CMS's recent motion would suggest, on any different or independent information or legal basis, but on the very same allegations that formed the basis for the threatened contract termination. Moreover, in the new, superseding contract that CMS executed with AHC effective November 18, 2005, CMS expressly obligated AHC to "accept new enrollments, make enrollments effective, process voluntary disenrollments, and limit involuntary disenrollments, as provided in subpart B of part 422." (AHC/CMS Contract dated November 18, 2005, at Article III, B.1., page 3.) Yet accepting new enrollments is precisely what the enrollment sanctions preclude AHC from doing.

Perhaps the most significant information that CMS omits from its motion, however, is the legal basis for CMS's imposition of sanctions. As discussed in Section I of the Argument below, CMS imposed the sanctions not under the provision of the regulation that permits imposition of sanctions for specified violations independent of any termination action, 42 C.F.R. § 422.752(a), but rather, as an adjunct to a termination action, which is permitted under an alternate regulation, 42 C.F.R. § 422.752(b). It is pursuant to this latter regulation that CMS imposed the sanctions on AHC in this case. (A copy of the July 6, 2005 letter imposing sanctions under § 422.752(b), and a copy of the relevant regulation are attached hereto as Exhibit A for the Court's convenience.)

Indeed, despite CMS's current protests to the contrary, apparently the CMS Hearing Officer, Kathleen Scully-Hayes, who heard AHC's original appeal in November 2005,

---

Footnote continued from previous page

   articulate that aspect of the relief, AHC will submit an Amended Complaint that more
                                                                Footnote continued on next page

understood that the sanctions were merely an adjunct to the termination proceedings. In her November 22, 2005 opinion, she expressly noted, "With respect to AHC's request that I address the intermediate sanctions in this ruling, my finding that CMS properly terminated AHC from the MA program negates such a discussion." (Hearing Officer Decision at 22, n.94.)[2] In short, CMS's arguments about the statutory/regulatory authority potentially available to issue sanctions independent of a termination action are theoretically accurate, but not relevant in this case. Once again, CMS's arguments simply do not match its actions.

Nor would continuation of those sanctions have any basis under the current circumstances, or under the current contract with CMS, which affirmatively obligated AHC to accept enrollees, and was executed by CMS after its July 6, 2005 letter imposing sanctions. CMS acknowledges that it had agreed to lift the sanctions while AHC was being operated by another MA Organization, HealthSpring, and only re-imposed them when HealthSpring's contemplated acquisition of AHC fell through. (CMS Motion at 7.) Since the termination of AHC's contract with HealthSpring, and the Court's decision in this matter, although, as described previously in the Complaint and elsewhere, AHC had implemented significant new compliance systems, policies and procedures, in continuing deference to CMS's stated concerns,

_____

Footnote continued from previous page

directly references the sanctions specifically.

[2]    CMS now argues (Motion, p. 6) that "AHC was not entitled to further review" of the sanctions decision after the Reconsideration Officer upheld the imposition of sanctions and the termination decision on October 18, 2005 (CMS mistakenly refers to the decision as 2006). CMS's remarkable position that AHC was not entitled to any review of an agency decision imposing sanctions that would preclude an MA Organization from marketing or enrolling new members is far-fetched. Not surprisingly, the only cases it cites in connection with that discussion (Motion, fn. 4) do not at all support that proposition. It is true that there is not a clearly delineated administrative review process separate and apart from the termination procedures, which is precisely why AHC has always understood the sanctions to be a component of this termination-focused action.

-4-

AHC has entered into another management contract, effective January 1, 2007, with another well-regarded, national independent health care consulting organization, Health Management Associates ("HMA"). HMA, which has extensive managed care/Medicare expertise, from its principals' private and public sector experience, has stepped in at AHC and assumed the operational and oversight responsibilities previously undertaken by HealthSpring. For the reasons more fully set forth below, AHC respectfully requests that the Court deny CMS's motion for reconsideration.

## ARGUMENT

### I.  CMS ONLY IMPOSED SANCTIONS AS AN ADJUNCT TO TERMINATION

CMS's motion is largely predicated, substantively, on its argument that the regulatory basis for imposition of intermediate sanctions is separate and distinct from the regulatory basis for termination of a contract. In essence, CMS posits that the Court's preliminary ruling that AHC's new contract with CMS superseded the earlier contract and therefore the termination action is preliminarily enjoined, has no bearing on the agency's supposedly independent imposition of marketing and enrollment sanctions. As noted above, CMS does not address how such sanctions are consistent with the execution of a new contract, which expressly supersedes all other agreements and obligates AHC to enroll new members. Nor does it address the specific regulatory provision under which CMS imposed the sanctions in the first instance.

The regulation governing the imposition of intermediate sanctions is 42 CFR § 422.752. CMS acknowledges that this regulation governs such sanctions (CMS Motion at 5, 7). But it does not explain the alternate legal bases within that provision for imposition of sanctions. Specifically, the regulation has two parts, subsections (a) and (b). Under subsection (a), separate and apart from any termination action, CMS may impose intermediate sanctions on an MA

organization for any of the violations listed in that subsection, enumerated in subparagraphs (1)

through (8). These violations include such actions as: imposing excess premiums on members

(subparagraph (2)); expelling a beneficiary in violation of the regulations (subparagraph (3)); or

contracting with an individual or entity excluded from participation in Medicare (subparagraph

(8)). Alternatively, without any independent regulatory determination, in subsection (b) the

regulation provides that CMS may impose intermediate marketing and/or enrollment sanctions

based solely on a determination to terminate the MA organization's contract pursuant to

§422.510(a). Indeed, this is the regulatory determination that CMS made in this case to

commence its attempted termination of AHC's contract.

    The clear import of that regulation is that, when CMS has decided to terminate an MA

contract, it may also impose intermediate sanctions as an adjunct to that proceeding, separate and

apart from any need to demonstrate any of the violations set forth in subsection (a) of the

regulation, and it may impose the sanctions without waiting for the administrative process to run

its course with respect to the termination. That is in fact what CMS did in this instance. In its

July 6, 2005 letter (Exhibit A hereto), in the first paragraph, CMS outlined specifically the

regulatory basis for its action as follows: "…CMS has determined, as authorized by 42 C.F.R. §

422.510(a), .752(b), that AHC's non-compliance warrants CMS' termination of AHC's Medicare

Advantage contract and the imposition of intermediate sanctions." Nowhere did CMS articulate

any violations under § 422.752(a). Nowhere, until its recent motion for reconsideration, did it

suggest that the imposition of intermediate sanctions was anything other than an adjunct to its

termination proceeding. Accordingly, AHC has treated the sanctions issue as just that, a matter

purely ancillary to the termination proceeding. As noted above, the CMS Hearing Officer

apparently viewed it accordingly. (Hearing Officer Decision at 22, n.94.)

## II.    CMS HAS NOT MET THIS CIRCUIT'S STANDARDS FOR RECONSIDERATION

CMS does not discuss the standards for reconsideration or clarification in its motion.[3]

Motions for reconsideration are disfavored.  Indeed, such requests should only be granted when the moving party establishes extraordinary circumstances. Lightfoot v. District of Columbia, 365 F. Supp. 2d 414, 421 (D.D.C. 2005) (denying the government's motion for reconsideration, and narrowly granting its motion to clarify the Court's order in a minor fashion by specifically naming the parties to whom the Order did not apply).  CMS has failed to establish extraordinary circumstances.

Although motions for reconsideration are not expressly provided for in the Federal Rules of Civil Procedure, when it grants such motions, this Court does so pursuant to Fed. R. Civ. P. 59(e) and 60(b). The general rule is that a motion for reconsideration is treated as a motion filed under Rule 59(e) if the motion was filed within 10 days of entry of the challenged order. Lightfoot, 365 F. Supp. 2d at 421. Moreover, any motion that draws into question the correctness of the judgment is functionally a motion under Civil Rule 59(e), whatever its label. Piper v. Dep't of Justice, 312 F. Supp. 2d  17, 21 (D.D.C. 2004). Therefore, because CMS filed its motion on December 22, 2006, one day after the Court issued its Order, and the motion questions the correctness of that Order, the Court should treat CMS's motion to reconsider as cognizable under Rule 59(e).

---

[3]    Cf., Amfac Resorts. L.L.C. v. U.S. Dept of the Interior, 150 F. Supp. 2d 96, 99 n.3 (D.D.C. 2001)(chastising the party moving for reconsideration, specifically stating, "Incredibly, Amfac's 25-page memorandum in support of its motion for reconsideration fails to cite, *even once*, the governing standard for a motion for reconsideration.") (emphasis in original).

Rule 59(e) motions "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." Anyanwutaku v. Moore, 151 F.3d 1053, 1057 (D.C. Cir. 1998). Indeed, Rule 59(e) motions are not granted if the court suspects the losing party is using the motion as an instrumentality for arguing the same theory or asserting new arguments that could have been raised prior to final judgment. Taylor v. Dep't of Justice, 268 F. Supp. 2d 34, 35 (D.D.C. 2003) (denying motion for reconsideration). Likewise, it is well settled that this Court will deny Rule 59(e) motions to reconsider if they simply reargue facts and theories upon which the court had already ruled. New York v. United States, 880 F. Supp. 37, 38 (D.D.C. 1995) (denying the government's motion for reconsideration). Therefore, this Court should deny CMS's motion because it entirely fails to assert a change in the law or the existence of any new evidence. Similarly, it fails to sufficiently allege clear error or manifest injustice.

This Court does not routinely grant motions to alter or amend a judgment after its entry. W.C. & A.N. Miller Co. 's v. United States, C. A. 97-0350 (SS), 1997 U.S. Dist. LEXIS 6361 (D.D.C. May 6, 1997)(denying the government's motion for reconsideration of the Court's *sua sponte* granting of summary judgment for the plaintiff). Furthermore, this Court has considerable discretion in ruling on motions for reconsideration. Piper, 312 F. Supp. at 20 (denying the government's motion for reconsideration). These standards have not been met in this case.

## III.    THE STANDARDS FOR INJUNCTION WERE MET

The Court has already ruled that AHC has sufficiently met the standards for entry of an injunction with respect to CMS's termination action. AHC did not, as CMS points out, separately demonstrate the irreparable harm that would arise from imposition of the marketing

-8-

and enrollment sanctions (though, at least insofar as the continuation or reimposition of such

sanctions preclude potential beneficiaries from their choice of MA Plan, such effects are

arguably implicit). Nor did AHC separately demonstrate the irreparable harm, or other factor

warranting injunctive relief, with respect to any specific incident to contract termination – of

which there were many. If AHC's 2006/2007 contract were terminated, there would be a host of

concomitant implications, in addition to marketing and enrollment being precluded. If justice

requires injunctive relief, there is no requirement for AHC to separately demonstrate that each

of those implications independently. Moreover, it is well settled that the "essence of equity

jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the

necessities of the particular case. [Indeed] flexibility rather than rigidity has distinguished

[equity jurisdiction]." Ctr. for Biological Diversity v. Pirie, 201 F. Supp. 2d 113, 116 (D.D.C.

2002) vacated on the grounds of mootness due to change in law, 2003 U.S. App. LEXIS 1110

(D.C. Cir. Jan. 23, 2003)(denying the government's motion for stay of the injunction during the

appeal process); New Mexico v. Watkins, 969 F.2d 1122, 1137 (D.C. Cir. 1992)(affirming the

lower court's granting of a permanent injunction because the relief "[met] the requirement that it

match 'the necessities of the particular case'"). Therefore, particularly given the flexible

jurisdiction of a court fashioning equitable relief, the Court has already properly found, as a

whole, that the termination action should be enjoined. The imposition of sanctions was solely

predicated on that termination action, and must rise or fall with it. The Court's preliminary

decision that it should fall should not be disturbed.

   CMS's argument that enjoining the imposition of sanctions is something other than

preserving the status quo, and therefore is somehow improper, omits the operative language

from the case on which it relies, Veitch v. Danzig, 135 F.2d 32, 35 (D.D.C. 2001). In Veitch,

the Court did not hold, as CMS suggests, that courts could not enter injunctions mandating certain conduct (CMS Brief at 8, and n.7); instead, the Court said that if the plaintiff was clearly likely to succeed on the merits, then the Court had discretion to fashion such relief, whether simply to maintain the status quo, or to mandate certain action. Veitch at 35. In this case, AHC's entitlement to relief is readily apparent from the language of the 2006 contract, and is not even predicated on extrinsic testimony on any disputed fact. Indeed, as AHC has previously proffered, if the parties cannot finally resolve this matter within the appropriate period, AHC can certainly move for summary judgment. As to the sanctions issue, it can also, of course, formally amend its motion for injunction, or file another application, if the Court is in any way troubled by the formality that the sanctions issue was not separately and distinctly highlighted.

AHC accordingly requests that the Court deny Defendants' Expedited Motion to Clarify and/or Reconsider the Court's December 21, 2006 Order for Preliminary Injunction and sustain the Order as it was entered.

DATED: January 3, 2007

                              Respectfully submitted,


                              /s/
                              Deborah B. Baum (D.C. Bar # 393019)
                              David Cynamon (D.C. Bar # 182477)
                              Matthew A. Anzaldi (D. C. Bar # 455515)
                              PILLSBURY WINTHROP SHAW PITTMAN LLP
                              2300 N Street, N.W.
                              Washington, D.C. 20037
                              (202) 663-8000

                              Attorneys for Plaintiff
                              America's Health Choice Medical Plans, Inc.

# EXHIBIT A



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Blvd.
Baltimore, Maryland 21244
MEDICARE PLAN ACCOUNTABILITY GROUP

July 6, 2005

Walter H Janke, M.D.                    *Sent Via Federal Express*
Chief Executive Officer
America's Health Choice Medical Plan
1175 South U.S. Highway 1
Vero Beach, FL 32962

RE:     Notice of Intent to Impose Intermediate Sanctions and Terminate Medicare Advantage
        Contract

Dear Dr. Janke:

This notice letter serves to inform you of the Center for Medicare & Medicaid Services' (CMS)
decision to propose imposition of intermediate sanctions, and to terminate your Medicare
Advantage contract effective October 1, 2005. For the reasons discussed below, CMS has
determined that America's Health Choice Medical Plan, Inc. ("AHC") is not in compliance with
the terms of its Medicare Advantage ("MA") contract (H1034) and certain applicable
regulations. As a result, CMS has determined, as authorized by 42 C.F.R. §§ 422.510(a), .752(b),
that AHC's noncompliance warrants CMS' termination of AHC's Medicare Advantage contract
and the imposition of intermediate sanctions. This decision has been made pursuant to CMS'
most recent focused audit that occurred May 10-12, 2005. Please see the attached audit report
documenting AHC's continued non-compliance with MA program requirements. Although AHC
has formally responded to CMS on several occasions since the May 2005 audit, the company's
responses have not mollified our concerns.

**Nature and Basis of Proposed Sanctions**

In order to operate as a Medicare Advantage Organization ("MAO"), a qualified entity is
required to enter into an MA contract with CMS and maintain compliance with the contract
terms and the applicable regulations. 42 CFR §§ 422.503, .504. Based on information reviewed
by CMS, which is further examined in the attached CMS Managed Care Monitoring Report
("Report"), CMS has determined, under 42 C.F.R. § 422.510(a)(3), that AHC no longer meets
the requirements for being a contracting organization as it has failed to effectively implement or
remain in compliance with the following provisions of 42 C.F.R. Part 422[1]:

        422.100 (a), (b)(1) - *General Requirements;*

---

[1]  See 70 Fed. Reg. 4588 (January 28, 2005).

Page 2 – Mr. Janke

> 422.112 (a)(1, 3, 6(i), 7) - *Access to Services;*
> 422.152 (a), (b), (f) - *Quality Improvement Program;*
> 422.503 (b)(3)(i, ii, vi) - *General Provisions;*
> 422.504 (a)(3, 5, 6, 7, 14(c)), (c), (d), (g)(1), (h)(2) - *Contract Provisions;*
> 422.520 (a)(1-3) - *Prompt Payment by M+C Organization;.*
> 422.562 (a), (b)- *General Provisions;*
> 422.564 (a), (b), (e) - *Grievance Procedures;*
> 422.566 (a) - *Organizational Determinations;*
> 422.568 (a), (d), (e) - *Standard Timeframes And Notice Requirements For Organizational Determinations;*
> 422.590 (a)(1,2), (b)(1,2), (c), (e) – *Timeframes and Responsibility for Reconsiderations;*
> 422.618(b), (c) – *Effectuation of Standard Reconsideration Determinations*

These deficiencies support CMS' determination to impose intermediate sanctions pursuant to 42 C.F.R. § 422.752(b) and to terminate AHC's Medicare Advantage contract pursuant to 42 C.F.R. § 422.510(a). The above deficiencies fall within the several categories of sanctionable noncompliance and demonstrate that: (1) AHC has substantially failed to carry out the terms of its contract with CMS; (2) AHC is carrying out its contract with CMS in a manner that is inconsistent with the effective and efficient implementation of Part 422; (3) AHC's failure to properly develop and implement a compliance plan means that it no longer qualifies to be a MAO; (4) AHC substantially fails to comply with the requirements in subpart M of Part 422 relating to grievances and appeals; (5) AHC fails to implement an acceptable quality assessment and performance improvement program as required under subpart D of Part 422; (6) AHC substantially fails to comply with the prompt payment requirements in § 422.520; and (7) AHC substantially fails to comply with the service access requirements in § 422.112. See 42 C.F.R.§§ 422.510(a)(1)-(3), (6), (8)-(10). An overview of the factual support for these deficiencies is set forth below and a more detailed explanation is articulated in the attached Report.

### *Contract Administration (42 C.F.R. §§ 422. 504 (g), (h)(2), .510(a)(1), (2))*

CMS has determined that AHC has substantially failed to carry out the terms of its MA contract and that AHC's performance under the contract is inconsistent with the effective and efficient implementation of 42 CFR Part 422. As detailed in the attached Report, CMS' determination is based on both AHC's failure to implement certain contract terms and its substandard performance with other material contract terms. AHC's contract with CMS states that AHC is subject to the requirements and conditions of Part 422 and that its continued compliance with these provisions is material to its performance of the MA contract. 42 C.F.R. § 422.504(a). AHC's lack of adherence to these provisions has resulted in deficiencies under 42 C.F.R. § 422.504 (a)(3, 5, 6, 7, 14(c)), (c), (d), (g)(1),

(h)(2). These deficiencies constitute an overall failure by AHC to perform under its contract.



CMS EXHIBIT
PAGE 2

Page 3 – Mr. Janke

*Failure to Meet Requirements to Continue as a Medicare Advantage Organization  (42 C.F.R. §§ 422.503(b), .504(a), .510(a)(3))*

CMS has further determined that AHC's failure to develop and implement an effective compliance plan renders it unable to meet the requirements to continue as a Medicare Advantage Organization.  As you know, 42 C.F.R. § 422.503 (b), not only requires an MAO to have a formalized compliance plan that contain all the elements in that provision, but also that the MA effectively implements the elements of its compliance plan.  Based on the evidence reviewed by CMS, AHC's compliance plan does not sufficiently define the role of the compliance officer, articulate employee disciplinary and training guidelines, or set forth adequate monitoring and auditing standards.  Additionally, the weaknesses in AHC's compliance plan and organizational structure contribute to AHC's inability to maintain substantial compliance with 42 C.F.R. Part 422.

*Substantial Failure Of Appeals And Grievance Requirements (42 C.F.R. §§ 422.504(a)(7), (d); 510(1), (2), (6 ))*

Based on the evidence obtained by CMS, AHC substantially fails to carry out the grievances and appeals requirements of 42 C.F.R. Part 422, Subpart M.  In general, AHC does not adequately inform its members of their rights, notify its members of its determinations, categorize incoming disputes, process disputes in a timely manner, track disputes, maintain dispute related documents, inform members of the outcomes of the dispute, timely effectuate the disputes, effectuate disputes accurately, and maintain its files in manner suitable for CMS to fully evaluate its compliance with Subpart M.  As a result of these deficiencies, AHC's members are denied the due process rights afforded by the regulations in Subpart M.

*Substantial Failure To Implement Quality Assurance And Performance Improvement Requirements (42 C.F.R. §§ 422.504(a)(5); .510(a)(1),(2),(8))*

AHC has failed to implement quality improvement programs required under 42 C.F.R. Part 422, Subpart D.  Based on CMS' review of the 2004 Quality Assurance Program ("QAP") and interviews with AHC staff, CMS has determined that AHC has not implemented a quality assessment and improvement program, as previously recommended in the January 2004 Focused Review.  Although AHC's QAP appear to include the elements recommended on the 2004 Corrective Action Plan (CAP), AHC has failed to provide supporting documentation that the program was actually implemented. Moreover, AHC has failed to integrate, collect, analyze, or report data necessary to implement a Quality Assurance Performance Improvement Program.  Similarly, based on review of the Utilization Management plan for AHC and interviews with staff, AHC has also failed to implement the utilization management program.  The attached Report provides further details regarding AHC's deficiencies in this area.

Page 4 – Mr. Janke

*Substantial Failure To Comply With Payment Processing and Prompt Pay Requirements (42 C.F.R. §§ 422.504(c), (h)(2); 510(a)(1),(2),(9); .520).*

AHC fails to substantially comply with the prompt payment requirements under 42 C.F.R. § 422.520. AHC's failure to implement an electronic claims processing department that is HIPAA compliant is a contract violation and a serious impediment to AHC's compliance with claims processing requirements. Although AHC has an internal policy requiring that claims are logged within five days of receipt, the evidence reviewed by CMS revealed that this policy is not being followed and some claims are not entered into AHC's system for several weeks. As a result, an unacceptable number of clean and non-clean claims are paid beyond the 30 or 60-day timeframe. For example, in a sample of 100 claims, examined in May 2005, only 42 were paid timely. CMS identified this chronic problem in previous sample reviews. Furthermore, during the review of this sample, AHC failed to demonstrate that interest is paid on clean claims that are not paid within 30 days. 42 C.F.R. § 422.520(a)(2). AHC's documented failure to abide by the prompt payment requirements severely diminishes AHC's ability to attract medical providers and thus provide reasonable access to care for its members.

*Substantial Failure Of Network Access Requirements (42 C.F.R. §§ 422.112; .504(a)(3); 510(a)(10))*

AHC substantially fails to comply with the service access requirements at 42 C.F.R. § 422.112. As explained in the attached Report, AHC's provider network is not adequately serving the health needs of the organization's members. AHC has only one contracted hospital in Brevard, Indian River, Martin, Okeechobee, and St. Lucie counties of Florida purportedly serving approximately 10,000 members. AHC has been unsuccessful in securing hospital contracts in these counties and this lack of hospital contracts compromises member access to appropriate medical care. AHC members are accessing medical care by way of the emergency departments of non-contracted hospitals. Similarly, AHC's provider network does not have enough gatekeeper providers and specialists to adequately maintain the membership population within the entire service area. The encounter data reviewed indicated high after-hour emergency utilization by the AHC members. Nine of the twenty-five AHC clinics reported that no physicians or mid-level providers were available to render after hours care, which is AHC's policy. Furthermore, during the verification process, clinic staff stated that physicians were not even consistently available five days a week or during regular business hours. As further described in the report, AHC's failure to provide appropriate access to care represents a serious failure in the most essential purpose of a MA health plan.

**Termination and Intermediate Sanctions**

Based on the noncompliance described above and in the attached report, CMS has determined to impose intermediate sanctions against AHC, and to terminate AHC's MA contract effective October 1, 2005. The proposed intermediate sanctions suspend AHC from enrolling Medicare beneficiaries and conducting any marketing activities, including the submission of marketing materials for review. CMS' determination under 42 C.F.R. § 422.510(a) permits CMS to





Page 5 – Mr. Janke

terminate AHC's contract and impose intermediate sanctions under 42 CFR § 422.750(a)(2) and (a)(4). See 42 C.F.R.§§ 422.510(a), .752(b).

In rendering its sanctions determination, CMS noted that many of the May 2005 findings demonstrated AHC's continued noncompliance with access to services and claims processing requirements that were previously identified in the CMS Biennial Monitoring Review (July 2002), the CMS Focus Review (January 2004), and the OIG Report entitled, *Review of Compliance with Medicare+Choice Prompt Regulations – America's Health Choice Medical Plans, Inc.,* dated December 29, 2004.

### Appeal Rights

If AHC disagrees with the termination determination, an authorized official of AHC must file a written request for reconsideration within 15 days of the date of notice of the initial determination, otherwise the termination will go into effect on October 1, 2005. 42 C.F.R §§ 422.646; .648-.658. However, if CMS' termination determination is appealed in accordance with 42 C.F.R. Part 422, Subpart N, the termination will not go into effect unless a final determination sustaining the determination is rendered. An authorized AHC official may send the request for reconsideration to any CMS office. As a courtesy, a copy of your request should also be sent to Ms. Cynthia Moreno in the CMS Central Office in Baltimore.

Reconsideration is the first step for a MAO to appeal adverse contract determinations, e.g. contract termination in accordance with 42 C.F.R. § 422.510(a), described in 42 C.F.R. Part 422, Subpart N. 42 C.F.R. § 422.648. The reconsideration process must be completed before the MAO has a right to a hearing regarding contract determinations under Subpart N. If upon reconsideration, the termination determination is affirmed, further review is permitted under 42 C.F.R.§422.664(a).

Additionally, AHC may submit a written response to CMS' proposed intermediate sanction. 42 C.F.R. § 422.756(a). The written response must be received within 15 days from receipt of this notice and contain the required information. After timely submission of a written request containing the required information under Section 422.756(a), CMS conducts an informal reconsideration under 42 C.F.R. § 422.756(b). A CMS official not involved in the original intermediate sanction determination will review the evidence and issue a written decision. If the initial intermediate sanction determination is affirmed, the sanction will be effective 15 days after the date in the notice of CMS' reconsidered determination. The sanction will remain in effect until CMS notifies AHC that the agency is satisfied that the basis for imposing the sanction has been corrected and is not likely to recur. 42 C.F.R. § 422.756(d)(3). If the initial intermediate sanction determination is reversed by the reconsideration official, the process terminates. Note, at CMS' discretion, the same CMS official may conduct the reconsideration of the termination determination and intermediate sanctions determinations.

Alternatively, or in addition to the appeal procedures under Subpart N, AHC may submit a corrective action plan (CAP) to correct the deficiencies that are the basis of the proposed termination. 42 C.F.R. § 422.510(c). The purpose of the CAP is to explain to CMS how the

Page 6 – Mr. Janke

sanctionable actions will be corrected and avoided in the future. If CMS approves the CAP, the termination will be rescinded. The CAP must: (1) address all findings; (2) provide complete and explicit descriptions of the actions AHC will take to correct each deficiency; (3) include both a timetable for when each activity stated in the CAP will be fully implemented as well as the AHC staff member(s) responsible for implementation; (4) include a detailed plan, including methodologies and time frames, for auditing each operational area to assure that the activities described in the CAP will result in full compliance; and (5) describe measures AHC will employ to ensure continued compliance after corrective actions are in place. When the corrective actions in the CAP are completed according to the timetable specified in the CAP, the CEO must submit a signed certification to CMS that the corrective actions have been completed and have resulted in full compliance with all MA requirements. In order to allow CMS an adequate opportunity to review the CAP, please submit a copy of the CAP to Ms. Teresa Kries, Branch Chief in the CMS Regional Office in Atlanta within 30 days. CMS reserves the right to conduct focused audits at AHC to confirm any eventual implementation of a CAP.

As required by 42 C.F.R. § 422.756(a) and (f), CMS will notify the Office of Inspector General, Department of Health and Human Services of this sanction determination and the information upon which it is based.

If you have any questions regarding this determination, please contact Christine Perenich at 410-786-2987.

Sincerely,

Cynthia Moreno
Acting Director

ENC:   CMS Site Visit Report

CC:    DHHS Office of Inspector General
       Rose Crum-Johnson, Regional Administrator, Atlanta Regional Office
       Wilma Cooper, ARA, Division of Medicare Operations, Atlanta Regional Office
       Christopher Eisenberg, Director, Division of Health Plan Accountability
       Patricia Smith, Director, Medicare Advantage Group
       Gloria Parker, Acting Director, Division of Program Management
       Teresa Kries, Branch Chief, Division of Medicare Operations, Atlanta RO
       Kirk Dobbins, DHHS Office of General Counsel
       Jennifer Dunlap, DHHS Office of General Counsel
       Daniel Wolfe, DHHS Office of General Counsel



*CMS Medicare Managed Care Monitoring Report*     

## Monitoring Review Results (Initial Report)

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET                 **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3     **Visit Start Date:**05/10/2005
**Monitoring Element:**AA01                                             **Exit Conference Date:**05/12/2005
**Review Type:**Focused                                                 **Date Report Issued:**
**Review Status:**Confirmed                                             **Date Report Due:**06/26/2005
**Element Reviewer:**Sondra Rothwell                                    **MCO Response Due Date:**
**CAP Reviewer:**Sondra Rothwell                                        **CAP Released Date:**
**MCO Response Received Date:**                                         **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
    Adequate and Appropriate Provider Network - The MAO maintains and monitors a network of appropriate
    providers that is sufficient to provide adequate access to and availability of covered services.

**Deficiencies**
    Based on the Health Service Delivery tables and staff interviews, the MAO failed to maintain an adquate
network of providers for their membership. The MAO has only one contracted hospital on the Treasure
Coast of Florida in which approximately 10,000 members reside. The plan has been unsuccessful with
securing hospital contracts on the Treasure Coast. The lack of these hospital contracts compromises
member access to approriate medical care. AHC members are having to access medical care by way of the
Emergency Department's of non contracted hospitals.

    Tenent hospital system had issued a Notice of Termination of Hospital Services Agreement to AHC and
Florida's Office of Insurance Regulation due to AHC outstanding reimbursement breaches. This intent to
terminate was to become effective May 19, 2005. However, as of May 18, 2005, the Tenet hospital system
rescined their termination letter contigent upon AHC making reasonable efforts to move all of the Tenet
Florida facilities into elecronic claims processing within the next six months in order to reduce the
issues they have experienced in the past. Tenet has also requested that AHC include patient control
numbers on all Explanation of Benefits.

    HCA submitted to the Atlanta Regional Office, cases located in Indian River County that have potential
exacerbation of acute disease management problems that had presented to HCA emergency department.
The Florida Quality Medical Assurance, Inc. is currently reviewing these cases to substantiate the following
allegations:

    Encounter data that AHC provider network does not have enough gatekeeper providers and specialist to
adequately maintain the membership population within the county. The encounter data shows high
after-hour emergency utilization by the AHC members. In many cases, the claims for these dates of
service were not paid. As a result, issues with cases from nonparticipating hospitals found in
Maximus CHDR cases were dismissed because AHC had not processed provider appeals and/or denied the
emergent claims. (Cases with these issues are currently being review by FMQAI.)

    AHC has four PCPS out of a total of 130 potential providers in Indian River county. Currently there is no
contract with between AHC and Indian River Hospital. In addition, AHC either does not have the following
specialists or have very few:

    0 radiologists out of 35 listed for Indian River county
    0 urologists out of 8 listed for Indian River county
    0 rheumatology out of 2 listed for Indian River county
    1 general surgeon out of 13 listed for Indian River county          **CMS EXHIBIT**
    2 cardiologists out of 25 listed for Indian River county             **PAGE 7**

**Corrective Action Required**
    The MAO needs to continue the efforts to contract with Medicare certified hospitals on the Treasure Coast.
Contracting with the certified hospitals will assure access and availablity for MAO membership.

**HPMS**

***CMS Medicare Managed Care Monitoring Report***
**Monitoring Review Results (Initial Report)**          Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

The MAO must remedy outstanding reimbursement issues with Tenet Health System to prevent possible contract issues in the future.

AHC must produce the following:

A. Utilization data for the following:
  -after-hour emergency utilization reports
  -Nonparticipating hospital usage
  -Panel size of the centers in the counties with fewer
    specialist and hospitals

B. Policies for the following:
  -Coverage of care 24/7
  -Disease Management program
  -Policies at the center level that deal with

1. Disease Management Coordination of members in the center
2. Office Coordination of appointments for members needing follow-up  appointments for Disease Management
3. Identification of high risk members by center to check that appointments are made and the members are compliant
4. Chart review for lab work and recommendations from specialist are on the medical records of high risk members and disease management.
5. Any policies for staff meetings concerning utilization reports from centers
6. Policies for flow of communication between staff members regarding care issues

C. Training manual for new employees in the centers to include:

  - Coverage hours
  - Coordination of care for high risk members
**Notes/Recommendations**

**Findings:**NOT MET                    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034        **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**AA02                **Exit Conference Date:**05/12/2005
**Review Type:**Focused                    **Date Report Issued:**
**Review Status:**Confirmed                **Date Report Due:**06/26/2005
**Element Reviewer:**Sondra Rothwell        **MCO Response Due Date:**
**CAP Reviewer:**Sondra Rothwell            **CAP Released Date:**
**MCO Response Received Date:**            **CAP Accepted Date:**
**Element  Projected Completion Date:**

**Requirement**
Adequate and Appropriate Access to Care - The MAO has written standards for timeliness of access to care and member services that meet or exceed such standards as may be established by CMS, continuously monitors its provider networks' compliance with these standards, and takes corrective action as necessary. The MAO ensures that the hours of operation of its providers are convenient to and do not discriminate against members. When medically necessary, the MAO makes services available 24 hours a day, 7 days a week.
**Deficiencies**

**CMS EXHIBIT**
**PAGE 8**

# *CMS Medicare Managed Care Monitoring Report*
## Monitoring Review Results (Initial Report)

**HPMS**

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All.     Date Report Generated:6/16/2005

Based on the review of HSD table 2, Policy number ND60-0031, staff interviews and verification from primary care clinics, it was determined that AHC has failed to provide a network to deliver adequate access to care for their membership.

Nine of the twenty five clinics revealed no Physician or Mid-level provider available to render care as indicated according to AHC's policy. The policy states that each facility shall have one or more physician or nurse on duty at all times.

During the verification process, clinic staff stated physicians are not always available five days a week nor during regular business hours. America's Health Choice of Okeechobee County staff acknowledged the facility is currently not staffed with a doctor or nurse at the present time.

**Corrective Action Required**

The MAO needs to assure that the clinics are staffed with Physicians or Mid-level providers during regular business hours to allow members adequate access to primary and specialty care.

Please provide CMS full listings of all staff model clinics listing clincal staff, degree and area of speciality. This listing should include the times and days of the week clinical staff is available in the office to see patients.

Provide CMS with monthly HSD tables and reports on the status of the network from identified counties of Okeechobee, Martin, St. Lucie, and Indian River

**Notes/Recommendations**

**HPMS**

**CMS Medicare Managed Care Monitoring Report**
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

Findings:NOT MET                          Review ID:5517
Region:04 Atlanta
Contract Number:H1034           Organization Name:AMERICA'S HEALTH CHOICE MEDICAL PLAN

Monitoring Guide Version:MA Monitoring Review Guide, Version 3    Visit Start Date:05/10/2005
Monitoring Element:QY01                          Exit Conference Date:05/12/2005
Review Type:Focused                              Date Report Issued:
Review Status:Confirmed                          Date Report Due:06/26/2005
Element Reviewer:Sondra Rothwell                 MCO Response Due Date:
CAP Reviewer:Sondra Rothwell                     CAP Released Date:
MCO Response Received Date:                       CAP Accepted Date:
Element  Projected Completion Date:

**Requirement**
QAPI Program Evaluated Annually - The MAO must have an ongoing quality assessment and performance improvement program that is formally evaluated at least annually.

**Deficiencies**
Based on the review of the 2004 Quality Assurance Program(QAP) and interviews with staff, America's Health Choice did not implement an ongoing Quality assessment and improvement program as previously recommended from the January 2004 focused review.  While the organizations program included elements recommended on the 2004 Corrective Action Plan (CAP), the MAO failed to provide supporting documentation as evidence that the program was actually implemented or currently active within the MA organization quality assurance program for the time period reviewed.

Review of the 2004 program revealed the MAO failed to comply with their documented SCOPE of the QI program.  The program did not include interaction with key departments within America's Health Choice both admistratively, operationally and clinically.  The QI program did not incorporate quality assessment or performance improvement for each of the key departments. Their documented program states they will incorporate information from customer service, appeals and grievances, medical management, credentialing, provider relations, claims, sales and marketing. The QI department failed to identify and correct systems through internal surveillance, complaints or other mechanisms.

Even though there was a policy making body, AHC's Board of Director's Committee minutes did not document the overall Quality Improvement program workplan or evaluation had been reviewed by this body.

These findings are repeat violations from the CMS site visit conducted January 06-08, 2004.

**Corrective Action Required**
America's Health Choice Medical Plan (AHC) must develop and implement the following to meet this requirement (QY01):

1. Provide Organizational chart for the Quality Improvement Department

2. Provide a workplan and evaluation system of the process based on the scope of the QI program.

3. Develop quality assessment tool that will assess each of the key departments within the organization.

4. Conduct a thorough evaluation of each key department then develop a performance improvement plan of all areas evaluated.

The MAO must provide CMS with the requested materials within 45 days of reciept of the report.

*CMS Medicare Managed Care Monitoring Report*     

**Monitoring Review Results (Initial Report)**     Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

AHC must submit the following:

1. Written QA program signed by the policy making body as well as the Board
2. Copies of QA minutes to reflect implementation
3. Board of Director minutes which show when the program was reviewed and approved.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*    **HPMS**
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET    Review ID:5517
**Region:**04 Atlanta
**Contract Number:**H1034    **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**QY02    **Exit Conference Date:**05/12/2005
**Review Type:**Focused    **Date Report Issued:**
**Review Status:**Confirmed    **Date Report Due:**06/26/2005
**Element Reviewer:**Sondra Rothwell    **MCO Response Due Date:**
**CAP Reviewer:**    **CAP Released Date:**
**MCO Response Received Date:**    **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
        Adequate Health Information System - The MAO must maintain a health information system that collects,
        integrates, analyzes, and reports data necessary to implement its QAPI program.
**Deficiencies**
        Based on the review of committee minutes, requested reports, and interview of personnel, America's Health
        Choice Medical Plan did not integrate, collect, analyze, or report data necessary to implement a Quality
        Assurance Performance Improvement Program.

        Review of Board minutes, Quality and Utilization minutes revealed minutes without related reports. There
        was no data to support analysis of provider audits or utilization reports that identify practice patterns.

        The UM/Peer Review committee minutes did not include data or documentation to identify concerns or
        issues with accessibility and/or utilization of services for specific members or groups of members. There
        was no analysis to monitor the impact of problem resolution strategies.

        Review of the data did not show documentation that revealed analysis of the following:

        1. Identification of highest referred specialist and services to monitor gaps in accessibility for provider
        network and/or provider relations.
        2. Provide audit systems to monitor practice patterns.
        3. Provider feedback systems of practice patterns or audits for educational and informational purposes.
        4. Utilization reports that show practice patterns for potential under/over utilization of services for
        members or providers.

        Overall this area demonstrates repeat findings cited from the previous focus visit conducted January
        6-8, 2004 with minimum recommendations considered for improvement.
**Corrective Action Required**
        AHC must identify and integrate health information systems capable of collecting and analyzing the following:

        A. Provider services based on paid claims
        1. outpatient/inpatient facility cost to include hospital, skilled nursing facilities, home health, mental
        health, etc.
        2. top utilization providers across services
        3. patient admissions by major diagnostic category

        B. Administrative reports that monitor the entire function of the organization to include but not limited to:
        1. claims summary by coverage type
        2. claims payment summary
        3. enrollment summary
        4. medical claim summary by benefit category
        5. inpatient claim cost summary
        6. inpatient claim utilization summary    **CMS EXHIBIT**
        7. distribution of outpatient facility claims by category, professional cost by provider type.    **PAGE 12**



*CMS Medicare Managed Care Monitoring Report*
**Monitoring Review Results (Initial Report)**          Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

    8. denial claim summary by benefit category
    9. total claims dollars by claimant total
    10. large claims costs by major diagnostic category

C. AHC must develop and implement an analysis team to identify data trends from internal reports
present to the QA/UM committee and Board of Directors.

D. AHC must develop and submit an updated written workplan for calendar year 2005 which integrates a
strategy to implement changes to corrected problems identified from data analysis.

E. AHC must record in the minutes of the QA/UM and Board of Directors committee the all reports
reviewed, trends and analysis of the reports, and the approval of the strategic plan recommended to
address findings.

F. AHC must submit to CMS copies of the reports along with committee minutes that include data
analysis, strategic plan and any corrective actions taken.

**Notes/Recommendations**

**HPMS**

## *CMS Medicare Managed Care Monitoring Report*
## Monitoring Review Results (Initial Report)
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

Date Report Generated:6/16/2005

**Findings:**NOT MET                   **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034           **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3       **Visit Start Date:**05/10/2005
**Monitoring Element:**QY03                                            **Exit Conference Date:**05/12/2005
**Review Type:**Focused                                                **Date Report Issued:**
**Review Status:**Confirmed                                            **Date Report Due:**06/26/2005
**Element Reviewer:**Sondra Rothwell                                   **MCO Response Due Date:**
**CAP Reviewer:**                                                      **CAP Released Date:**
**MCO Response Received Date:**                                        **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
Appropriate Utilization Management Program - The MAO must employ a utilization management program that meets CMS requirements.

**Deficiencies**
Based on review of the Utilization Management plan for AHC and interviews with staff, the MAO failed to implement the utilzation management program.

The UM plan was reviewed and the following defiencies were noted:

1. The committee minutes did not indicate accessiblity or utilization data of individual members or groups of members had been identified and corrected. The MAO was not able to detect and report over and under utilization of services.

2. The UM committee did not show intergration and/or communication with the QA and Peer review committees.

3. The UM committe minutes did not provide documentation of case management activities or evaluation. It lacked data or processes to evaluate and improve the overall program. In addition, it did not provide a process or mechanism for capturing and measuring quality data.

4. The UM program did not provide an effective or efficient use of observation stays and inpatient beds via the concurrent and retrospective review process.

**Corrective Action Required**
1. AHC must implement an active UM program and evaluate the UM plan as written.

2. AHC must implement and evaluate an effective process for conducting concurrent and retrospective reviews.

3. AHC must develop the following processes:(refer to QY01)

a. Process for sharing relevant information and reports with all department, providers, and committees such as QA, UM, and Perr Review.
b. Systems capable of capturing, tracking, trending, and reporting UM data that may be assessed across the MAO with appropriate security requirments.
c. Committee minutes that reflect the implementation of the above system implementation and process to share information, data analysis, case managemnt evaluation, member s issues with utilization and accessibility, provider patterns and other relevant data analysis and trends.

4. Copies of the information and all reports developed as referenced above must be submitted to CMS within 45 days of reciept of the report.

**Notes/Recommendations**

**CMS EXHIBIT
PAGE 14**



## CMS Medicare Managed Care Monitoring Report
## Monitoring Review Results (Initial Report)

**HPMS**

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET                    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

| | |
|---|---|
| **Monitoring Guide Version:**MA Monitoring Review Guide, Version 3 | **Visit Start Date:**05/10/2005 |
| **Monitoring Element:**QY05 | **Exit Conference Date:**05/12/2005 |
| **Review Type:**Focused | **Date Report Issued:** |
| **Review Status:**Confirmed | **Date Report Due:**06/26/2005 |
| **Element Reviewer:**Sondra Rothwell | **MCO Response Due Date:** |
| **CAP Reviewer:** | **CAP Released Date:** |
| **MCO Response Received Date:** | **CAP Accepted Date:** |
| **Element Projected Completion Date:** | |

**Requirement**

Significant Problems Corrected - The MAO corrects significant systemic problems that come to its attention through internal surveillance, complaints, or other mechanisms.

**Deficiencies**

Based on review of various monitoring elements, policy and procedures, and staff interviews America's Health Choice does not have an internal process in place to conduct internal surveillance of it's own programs and processes. AHC does not have a system in place to identify areas of deficiencies, validate findings or an evaluation process in place to correct defiencies.

1. AHC is unable to correctly distinguish between organization determinations, reconsiderations, and grievances and unable to process them through the appropriate mechanisms.

2. AHC substantially failed to issue denial notices or appeal rights to members when an unfavaorable initial organization determination was made.

4. AHC substantially failed to issue denial notices or appeal rights to members when pre-service denials were made.

5. AHC substantially failed to document accurate date information as it relates to appeals sent to Maximus CHDR. The MAO consistently provided   inaccurate dates of service and/or dates of reciept of member and provider appeals.

6. AHC consistently denied claims for medically necessary services, provided claims documentation that showed failure to pay clean claims timely, claims payment without associated interest owed to provider included.

**Corrective Action Required**

The MAO must develop a process in order to conduct internal surveillances in the areas of appeals and grievances (to include Maximus CHDR overturns), organization determinations, and claim denials. The MAO must provide CMS with the audit tools that will be used evaluate these areas.  The MAO must conduct the audits monthly for 12 months.

The MAO must formalize procedures for referring cases to the appropriate departments (e.g., QI), following up with departments, and documenting actions/investigations undertaken by other departments. Refer to GV01

The MAO must implement systems capable of capturing, tracking, trending, and reporting UM data throughout the organization. Refer to OP01

The MAO must develop claims development procedures that will allow for quick resolution of incorrect or incomplete claims, rather than an upfront denial of claims with minor errors.  Refer to OC01

*CMS Medicare Managed Care Monitoring Report*
**Monitoring Review Results (Initial Report)**

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**HPMS**

Date Report Generated:6/16/2005

The MAO must adhere to their pre service policy and procedures and incorporate per sevice denials, data, in there UM reporting structures and develop internal processes to evaluate the UM process.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*   
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET        **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034       **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**CN09                    **Exit Conference Date:**05/12/2005
**Review Type:**Focused                        **Date Report Issued:**
**Review Status:**Confirmed                    **Date Report Due:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN            **MCO Response Due Date:**
**CAP Reviewer:**                              **CAP Released Date:**
**MCO Response Received Date:**                 **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
  Adequate Compliance PlanThe MAO must have a formalized compliance plan that contains the requirements specified by CMS
**Deficiencies**
  AHC's compliance plan lacks certain necessary elements.  In some cases, existing elements must be revised to ensure the establishment of a coherent compliance culture that will be sustained through time.  Because of the continued problems with compliance -- especially in the repeat deficiencies for Chapter 13 elements -- CMS is concerned that the compliance officer position at AHC lacks sufficient power to instill a proper level of ongoing compliance at the company.
**Corrective Action Required**
  AHC must revise its compliance plan to include the following:

  --Development of internal monitoring and auditing standards.
  --Clarification about the compliance officer's reporting requirements.  The plan currently states that the individual has accountability to both the CEO and the Board.  Details about how the compliance officer knows when to report an issue to just the CEO, rather than the entire Board, is necessary.
  --Greater details about the scope and purpose of employee training.
  --More details about disciplinary guidelines for employees, as well as assurances that said guidelines will be implemented consistently throughout the company.
  --The compliance plan must also show how senior AHC management will empower the compliance department to make all necessary changes to create a fully compliant organization.

  CMS also requests an update on the hiring status of a permanent compliance officer, an issue that was discussed with CMS staff during the site visit.
**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*

**HPMS**

**Monitoring Review Results (Initial Report)**

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,     Date Report Generated:6/16/2005

**Findings:**NOT MET          **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

| | |
|---|---|
| **Monitoring Guide Version:**MA Monitoring Review Guide, Version 3 | **Visit Start Date:**05/10/2005 |
| **Monitoring Element:**GV01 | **Exit Conference Date:**05/12/2005 |
| **Review Type:**Focused | **Date Report Issued:** |
| **Review Status:**Confirmed | **Date Report Due:**06/26/2005 |
| **Element Reviewer:**gwyneveyre pasquale | **MCO Response Due Date:** |
| **CAP Reviewer:**Sondra Rothwell | **CAP Released Date:** |
| **MCO Response Received Date:** | **CAP Accepted Date:** |
| **Element Projected Completion Date:** | |

**Requirement**
Organization Determinations and Reconsiderations Not Categorized as Grievances - The MAO must correctly distinguish between organization determinations, reconsiderations, and grievances and process them through the appropriate mechanisms.

**Deficiencies**
Based on the review of 15 grievance case files, America's Health Choice Medical Plan (AHC) substantially failed to correctly distinguish between organization determinations, reconsiderations, and grievances, and to process them through the appropriate mechanisms. This is a repeat deficiency.

Case #4 documented that a "member called about getting his flu shot." The grievance notes indicate that this was a request for service, as the response to the member was summarized as "Informed him that there is a shortage Nationwide. AHC is suppose to get an order on Friday, but we [screen illegible] see. Case closed." There is no indication that this was treated as a service request.

Case #5 documented that a member's "complaint includes copay for both referrals." There was no indication in the case file that the copay issue was addressed as an organization determination. The case file did not contain a resolution letter or denial notice.

Case #11 documented that a member was making a "request for expedited services." There was no indication in the case file that the member's issue was treated as a request for an expedited organization determination. The resolution letter was sent to the member 65 days after the file indicated the member's request was received.

In addition to the above problems, AHC substantially failed to process grievances that it correctly categorized through the appropriate mechanisms. This issue is explained more fully in the findings for element GV02, but the following specific case is described in detail as an example:

AHC received a member letter with the following text on 1/26/05 (names withheld for confidentiality purposes):

"On April 12, 2004, I had a muscle biopsy..., ordered by Dr. 'A'. At that time I paid $250 co pay for the outpatient procedure. When I went to Dr. `A' for the results of the biopsy, he told me that they had taken the wrong muscle and that therefore he had no diagnosis. I called the Vero Beach office and talked to someone there and they told me they would work on it. That was the last time I spoke to a human being, every time after that I got voice mail, left a message and never got a return call. I was gone for the summer and as soon as I returned, I again tried to contact someone in grievance and got the voice mail. Finally `C' [of the grievance department] called and told me to write a letter. I don't know why I wasn't informed when I first called that I had to write a letter. I now have an ugly gash on my leg and no diagnosis. I feel I should be reimbursed for my copay as the mistake is not my fault, but the surgeon's. Dr. `B' [member's PCP] agrees with me.."

In addition to the member's letter, the case file contains a stamp indicating the case was copied to the appeals department on 1/26/05, member medical records, a grievance acknowledgement notice dated

**CMS EXHIBIT
PAGE 18**

*CMS Medicare Managed Care Monitoring Report*

**HPMS**

**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

2/1/05, and a screen print from the grievance log with the following entries:

"2/1/2005 - Received a letter from member wanting to be reimbursed for her out patient co-pay as the doctor took a biopsy of the wrong muscle.

3/10/2005 - Per notes from Dr. V, biopsy was order for the right leg and was performed on the right leg. There are no notes supporting that the biopsy was done wrong. [Based on medical records, it appears Dr. V was previously the member's PCP who requested the biopsy.]

The file also contained a screen print from the "Member Editor" system with the following entry:

"11/17/2004 - Member sent a letter for an appeal regarding co-pay for a biopsy that was done on his muscle. [screen illegible] manual log, case closed."

Among other problems, this case illustrates the following compliance issues:
- no documentation that the member's quality-of-care complaint was reviewed by a clinician not involved in the allegation
- no documentation that the member's issue was resolved and no resolution notice
- entry in "Member Editor" system dated months prior to receipt of member's letter.

**Corrective Action Required**

    I. AHC must develop the following:

    1. Criteria and a schedule for monitoring the performance of staff who handle grievances  (Please send the criteria and schedule to CMS)

    2. Single electronic system for tracking, trending and categorizing grievances  (Please send the grievance categories to CMS, and send monthly reports of system development progress)

    3. Formalized procedures for referring cases to appropriate departments (e.g., QI), following up with departments, and documenting actions/investigations undertaken by other departments  (Please send the referral, follow-up, and documentation procedures, and any associated forms, to CMS)

    4. Method for maintaining, in a secure place (i.e., not a trailer already known to be susceptible to storm damage) all grievance documentation

    5. Date logic to program into the electronic grievance system to prevent date discrepancies  (Please send CMS the date logic to be used)

    II.  In addition, on a monthly basis AHC must complete Worksheet GV1 for a sample of 10 grievance files, and send CMS the completed worksheet along with supporting documentation, including but not limited to: documentation of grievance receipt, referral, and resolution dates, member and AHC correspondence (if applicable), documentation of actions/investigations by other departments, and clear documentation of how all the member's concerns have been thoroughly addressed.  Please do NOT include medical records unless they are essential for documenting grievance resolution.

    III.  Because of the poor retention of documentation exhibited by AHC's grievance files, CMS is requiring an update on the status of all 30 grievances in the sample.  AHP must not simply resubmit the existing files.  We are requiring documentation to show that the particular issues were resolved.  This is especially important because of cases involved beneficiary concerns about care access and payment of claims.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*    **HPMS**
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034    **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**GV02    **Exit Conference Date:**05/12/2005
**Review Type:**Focused    **Date Report Issued:**
**Review Status:**Confirmed    **Date Report Due:**06/26/2005
**Element Reviewer:**gwyneveyre pasquale    **MCO Response Due Date:**
**CAP Reviewer:**Sondra Rothwell    **CAP Released Date:**
**MCO Response Received Date:**    **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
  Grievance Adjudication - The MAO must adjudicate internal grievances in a manner fully consistent with
  the MAO's written grievance procedure, as stated in the EOC.
**Deficiencies**
  Based on the review of 15 grievance case files, America's Health Choice Medical Plan (AHC) substantially
  failed to establish or maintain a grievance procedure as described in 42 CFR 422.564, the EOC, AHC's
  policies and procedures, or CMS guidelines. As a result, AHC did not investigate all allegations made by
  members, or resolve members' issues and notify them of resolutions. This is a repeat deficiency.

  Case file documentation was severely lacking. The grievances manager had only been in that position
  for one week, although his immediate predecessor was still employed by AHC. When reviewers
  requested further documentation from the grievances manager (such as correspondence between members
  and AHC), he stated that hurricanes had blown some of this documentation away, and that for cases
  not affected by the hurricane, he had "asked around but nobody knew what happened" to the
  documents.

  According to AHC Policy and Procedure GA25-0001, members may submit grievances either verbally or in
  writing. AHC distinguishes between "complaints" and "grievances" (although CMS considers both to be
  "grievances" per regulations). Written complaints are automatically categorized as grievances, whereas
  verbal complaints are categorized as grievances only if Member Services is not able to resolve them to the
  member's satisfaction within 72 hours of receipt. Verbal complaints that become grievances are to be
  forwarded from Member Services to the Grievance department via a written form. The policy and procedure
  further states that grievances are to be date stamped, and an acknowledgement notice sent to members
  within 7 days, and that all quality of care grievances are to be reviewed by the Medical Director, and then
  through the Risk Management Program if warranted. Grievances are to be resolved, including written
  member notification (per the EOC), within 60 days.

  Of the 15 grievance case files reviewed, 12 fit AHC's definition of "grievance" because they were
  received in writing or were not resolved to the member's satisfaction within 72 hours. These cases were
  therefore subject to AHC's grievance policies and procedures, yet an overwhelming majority of them were
  not processed according to those policies and procedures. In particular:

  Only three out of the 12 case files contained any acknowledgement notice, and only one of the three
  notices was timely according to AHC's seven-day standard.

  Seven cases involved allegations of poor care quality, yet there was no evidence in the files that any of
  these cases were reviewed by the Medical Director. In only one of the seven files (#9) was there any
  indication that the quality of care issues were forwarded to any other AHC department.

  Only six out of the 12 case files contained a resolution notice, and only one of the six notices was
  timely according to AHC's 60-day standard.

  Only one (#3) out of the 12 files contained sufficient documentation that the grievances were resolved. Of

*CMS Medicare Managed Care Monitoring Report* 
**Monitoring Review Results (Initial Report)**          Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,
          the six cases with a resolution notice, only three contained any information regarding case resolution, and
          it was unclear that the resolution provided was satisfactory to the member.  The remaining three notices
          were totally generic.  While it is typical for MAOs to not release information regarding quality-of-care
          investigations, two out of the three cases with generic notices clearly involved non-quality issues.  For
          the six cases without resolution notices, the grievance log notes were insufficient for the reviewer to
          determine that the issues raised by members had even been addressed, let alone resolved.
**Corrective Action Required**
          Please refer to the CAP under GV01.
**Notes/Recommendations**

**CMS EXHIBIT**
**PAGE 22**

*CMS Medicare Managed Care Monitoring Report*  **HPMS**
**Monitoring Review Results (Initial Report)**   Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET          **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034      **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

| | |
|---|---|
| **Monitoring Guide Version:**MA Monitoring Review Guide, Version 3 | **Visit Start Date:**05/10/2005 |
| **Monitoring Element:**OC01 | **Exit Conference Date:**05/12/2005 |
| **Review Type:**Focused | **Date Report Issued:** |
| **Review Status:**Confirmed | **Date Report Due:**06/26/2005 |
| **Element Reviewer:**DARIN WIPPERMAN | **MCO Response Due Date:** |
| **CAP Reviewer:** | **CAP Released Date:** |
| **MCO Response Received Date:** | **CAP Accepted Date:** |
| **Element Projected Completion Date:** | |

**Requirement**
> Correct Claim Determinations - The MAO must make correct claim determinations, which include developing the claim for additional information when necessary, for: services obtained from a non-contracting provider when the services were authorized by a contracted provider or the MAO, ambulance services dispatched through 911, emergency services, urgently needed services, post-stabilization care services and renal dialysis services that Medicare members obtain while temporarily out of the service area.

**Deficiencies**
> The deficiencies in this area constitute a repeat finding.
>
> A central feature of this element is the implementation and consistent use of proper claims development procedures, which would allow rapid correction of claims with missing or incomplete information. Such procedures would improve the claims payment process, decrease member confusion, and improve AHC's relationship with contracted and non-contracted providers.
>
> Currently, AHC lacks policies to develop claims. This leads to claims denials for minor provider mistakes, such as an incorrect date-of-birth or incorrect Social Security number. Denying these claims outright is not correct implementation of CMS policy.

**Corrective Action Required**
> AHC must develop claims development procedures that will allow for quick resolution of incorrect or incomplete claims, rather than an upfront denial of claims with minor errors. Sufficient implementation of the CAR will require management's commitment to providing the claims department adequate resources to ensure that providers receive phone calls to resolve the incorrect information so that claims processing can proceed.

**Notes/Recommendations**



**CMS EXHIBIT**
**PAGE 23**



## *CMS Medicare Managed Care Monitoring Report*
### Monitoring Review Results (Initial Report)

**HPMS**

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET          **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3          **Visit Start Date:**05/10/2005
**Monitoring Element:**OC02          **Exit Conference Date:**05/12/2005
**Review Type:**Focused          **Date Report Issued:**
**Review Status:**Confirmed          **Date Report Due:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN          **MCO Response Due Date:**
**CAP Reviewer:**          **CAP Released Date:**
**MCO Response Received Date:**          **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**

Reasonable Reimbursement for Covered Services - The MAO must provide reasonable reimbursement for services obtained from a non-contracting provider when the services were authorized by a contracted provider or the MAO, ambulance services dispatched through 911, emergency services, urgently needed services, post-stabilization care services, renal dialysis services that Medicare members obtain while temporarily out of the service area, and services for which coverage has been denied by the MAO but found to be services the member was entitled to upon appeal.

**Deficiencies**

The deficiencies in this area constitute a repeat finding.

There are also situations where AHC is denying claims for medically necessary services because of an incomplete provider network. Beneficiaries are being admitted to non-contracted facilities through an emergency room because contracted PCPs do not have admitting privileges to contracted hospitals. When attending physicians perform tests without the PCP's knowledge, the claims are being denied because the PCP did not authorize the test. Denial of medically necessary care is an inappropriate response to AHC's provider network deficiencies. This is another example of how claims deficiencies can cause consternation in members and the provider community, which can negatively impact AHC's ability to retain members and providers.

**Corrective Action Required**

Sufficiently implementing a corrective action plan to abide by CMS network access requirements will help to improve compliance in this area. AHC must ensure that claims staff is adequately trained to not deny medically necessary care delivered by non-contracted hospitals when a PCP does not have admitting privileges to a contracted facility.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*

**HPMS**

## Monitoring Review Results (Initial Report)

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET          **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3          **Visit Start Date:**05/10/2005
**Monitoring Element:**OC03          **Exit Conference Date:**05/12/2005
**Review Type:**Focused          **Date Report Issued:**
**Review Status:**Confirmed          **Date Report Issued:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN          **MCO Response Due Date:**
**CAP Reviewer:**          **CAP Released Date:**
**MCO Response Received Date:**          **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**

    Timely Payment of Non-Contracting Provider Clean Claims - The MAO must pay 95 percent of "clean" claims from non-contracting providers within 30 calendar days of receipt.

**Deficiencies**

    The deficiencies in this area constitute a repeat finding. As stated in the January 2004 CMS site visit report, AHC uses the "check printed" date as the date paid. During the May 2005 visit, CMS was informed that the two dates are always the same. Although this may be true, AHC could not provide evidence that the check is mailed the same day it is printed. Thus, it is difficult to discern the exact date a claim is being paid. This problem was mentioned in the January 2004 CMS report, but AHC failed to implement the required corrective action.

    We gained enough information, however, to show that AHC fails to pay 95% of clean claims on a timely basis. In the sample of 100 claims examined in May 2005, only 42 were paid timely. This chronic problem, which has been demonstrated by previous CMS sample reviews and by the Office of Inspector General, is a serious repeat deficiency. Claims managers noted that the rapid turnover of staff and the time required to train staff were two major impediments to ongoing compliance in this area.

**Corrective Action Required**

    AHC's management has failed to ensure that the claims department has sufficient resources to electronically accept claims. A new claims system will ameliorate the existing timeliness problems, but a new system may not immediately improve compliance to a sufficient level. As part of this corrective action, AHC must submit the following on a monthly basis:

- The number of non-contracted provider paid claims paid for each calendar month.
- The number of non-contracted provider paid claims paid after 30 days from receipt.
- Revised policies and procedures to show that the check mailed date, not the check printed date, is the day in which the claims timeliness count ends.
- A monthly report on the status of the new claims system, as well as training provided to claims department staff to ensure the new system can fulfill contractual claims payment responsibilities.
- An update on staffing of the claims department and the amount of staff turnover for each calendar month.

**Notes/Recommendations**



**CMS EXHIBIT**
**PAGE 25**

*CMS Medicare Managed Care Monitoring Report*



## Monitoring Review Results (Initial Report)

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

Date Report Generated:6/16/2005

**Findings:**NOT MET        **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034     **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**OC04                        **Exit Conference Date:**05/12/2005
**Review Type:**Focused                           **Date Report Issued:**
**Review Status:**Confirmed                   **Date Report Due:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN       **MCO Response Due Date:**
**CAP Reviewer:**                               **CAP Released Date:**
**MCO Response Received Date:**              **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**

Interest on Clean Claims Paid Late - If the MAO pays clean claims from non-contracting providers in over 30 calendar days, it must pay interest in accordance with § 1816 (c)(2)(B) and (C).

**Deficiencies**

During the review of the sample, it did not appear that the interest amount is being added to checks mailed to providers. The audit screens for each claim provided as part of the sample fail to show interest when the additional payment is due. During conversations with claims staff, CMS was informed that interest is being calculated and paid, but the only evidence of such calculation is a large database with a column for interest due. AHC must demonstrate that interest is being paid in all situations.

CMS is concerned about how AHC's claims timeliness noncompliance is resulting in tremendous amounts of interest. In the 168 page document that tracks interest, the total amount of interest due is astonishing, especially because dozens of claims appear on each page. The five-page sample reviewed by CMS showed one claim with over $1,100 in interest. Many other claims had much lower, but still troubling, amounts of interest, such as $80 or $90 for one claim. This demonstrates that AHC has a severe problem with clean claims compliance. The gigantic interest obligations could be imperiling AHC's long-term financial stability. Coming into compliance on claims timeliness and interest payment must become a top priority of AHC's leadership.

**Corrective Action Required**

AHC must show that it properly paid interest for all applicable non-contracted claims during the review period. This could be done by submitting information to CMS on CD. Also, AHC must submit the following, as separate line items, on a monthly basis:

- The amount of interest due for all non-contracted provider paid claims.
- The amount of interest paid for all non-contracted provider paid claims.
- The amount of interest due for all contracted provider paid claims.
- The amount of interest paid for all contracted provider paid claims.
- The current amount of interest due year-to-date for all providers.
- The current amount of interest paid year-to-date for all providers.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*    **HPMS**
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034    **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**OC05    **Exit Conference Date:**05/12/2005
**Review Type:**Focused    **Date Report Issued:**
**Review Status:**Confirmed    **Date Report Due:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN    **MCO Response Due Date:**
**CAP Reviewer:**    **CAP Released Date:**
**MCO Response Received Date:**    **CAP Accepted Date:**
**Element  Projected Completion Date:**

**Requirement**
    Timely Adjudication of Non-Clean Claims - The MAO must pay or deny all non-contracted claims that do not meet the definition of  "clean claims" within 60 calendar days of receipt.
**Deficiencies**
    Some claims in the sample did not show a denial date.  Also, there were several claims in the denial sample that had a "check printed" date.  Because of these misclassified cases, the element is not met.  In the cases that were reviewed, CMS discovered some cases that failed to meet the 60 day compliance standard.

    The inability of AHC to accept electronic claims is a noticeable drag in its claims payment timeliness responsibilities.  Although AHC has an internal policy requiring that claims are logged within five days of receipt, that policy is not being followed.  Some claims are not entered into AHC's system for several weeks.  This is undoubtedly contributing to clean and non-clean claims being paid beyond the 30 or 60-day timeframe.  Many claims appear to be received by AHC several weeks before AHC even knows the claim has been submitted.

    Management's inability to ensure a modern claims processing department is a serious impediment to AHC's compliance with claims requirements.
**Corrective Action Required**
    AHC's management has failed to ensure that the claims department has sufficient resources to electronically accept claims.  A new claims system should ameliorate the existing timeliness problems, but a new system may not immediately improve compliance to a sufficient level.  On a monthly basis, AHC must submit the following information:

- The number of non-contracted "non-clean" claims paid during the calendar month.
- The number of non-contracted "non-clean" claims paid during the calendar month that were paid within 60 calendar days of receipt.

    AHC must also submit a new policy and procedure about how to identify denied claims pursuant to the instructions provided for worksheet OC2.
**Notes/Recommendations**



**CMS EXHIBIT**
**PAGE 27**



*CMS Medicare Managed Care Monitoring Report*   
**Monitoring Review Results (Initial Report)**      Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET           **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034     **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3      **Visit Start Date:**05/10/2005
**Monitoring Element:**OC06                                            **Exit Conference Date:**05/12/2005
**Review Type:**Focused                                                **Date Report Issued:**
**Review Status:**Confirmed                                            **Date Report Due:**06/26/2005
**Element Reviewer:**DARIN WIPPERMAN                                    **MCO Response Due Date:**
**CAP Reviewer:**                                                      **CAP Released Date:**
**MCO Response Received Date:**                                        **CAP Accepted Date:**
**Element  Projected Completion Date:**

**Requirement**
    Claim Denials (Notice Content) - If an MAO denies payment, the written denial notice (CMS-10003-Notice
    of Denial of Payment (NDP)), or an RO-approved modification of the NDP, must be sent to the member. The
    written denial must clearly state the service denied and the denial reason.
**Deficiencies**
    AHC's denial notices, when they are provided, often do not clearly state the denial reason. "Inadequate
    notes" is denial reason that appeared in several instances in the denied claims sample.  Beneficiaries would
    likely not know what this means.  Clearly explaining each denial would improve customer service, decrease
    beneficiary complaints, and improve AHC's relationship with contracted and non-contracted providers.

    Additionally, some claims appeared in the universe that should not be included.  Claims denied because
    the member was not an AHC enrollee on the date of service should not be part of the universe, pursuant
    to the instructions in the OC2 worksheet.
**Corrective Action Required**
    AHC must submit the following information to CMS:
        • Revised policies and procedures to improve claims denial notices to ensure that denial reasons are
    clear and that beneficiaries will know which services are being denied.
        • Training materials that demonstrate applicable claims staff were informed about the importance of
    specific denial notices and how to provide such information in denial notices.
**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*

**HPMS**

**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET        **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034        **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**OP01        **Exit Conference Date:**05/12/2005
**Review Type:**Focused        **Date Report Issued:**
**Review Status:**Confirmed        **Date Report Due:**06/26/2005
**Element Reviewer:**TRINA ROBERTS        **MCO Response Due Date:**
**CAP Reviewer:**        **CAP Released Date:**
**MCO Response Received Date:**        **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
　　　　Standard Pre-Service Denials (Timeliness) - If the MAO makes an adverse standard pre-service
　　　　organization determination, it must notify the member in writing using the CMS-10003-NDMC (Notice of
　　　　Denial of Medical Coverage), or an RO-approved modification of the NDMC, of its decision as expeditiously
　　　　as the member's health condition requires, but no later than 14 calendar days after receiving the request
　　　　(or an additional 14 days if an extension is justified).

**Deficiencies**
　　　　Based on review of policies and procedures, interviews with AHC staff, and review of Standard Pre-Service
　　　　Denial files, Americas Health Choice Medical Plan (AHC) did not issue pre-service denials according CMS
　　　　regulations or according to it's stated policies and procedures.

　　　　Review of documents provided reveals AHC failed to notify members timely when services were denied or
　　　　did not notify members at all when the MAO ruled to deny services. Failure to notify members of a
　　　　pre-service denial compromises a member's right to exercise his/her appeal rights.
　　　　This was evident by 17 of 30 cases reviewed failed to provide documentation of member notifications.

　　　　Documentation revealed pre-service denials were issued without the direction of trained medical
　　　　personnel and confirmed by AHC's staff.

　　　　Although the pre-service request is an automated system the member notification component of the
　　　　process however, is a manual operation. This manual process consists of AHC staff going into a
　　　　separate computer program to manually input the service denied and a denial reason. Review of the data
　　　　found conflicting dates from when the denial was inputted into the system and when the manual letter
　　　　was generated in the separate computer program.

　　　　Because 17 of 30 samples reviewed did not include complete documentation of member denial notices
　　　　this element was not met.

**Corrective Action Required**
　　　　AHC must re-valuate is current pre-service policy and procedure revise as necessary and adhere to policy as
　　　　written.

　　　　AHC must make certain appropriate staff are trained on the policy and procedure when approving and
　　　　denying pre-service request.

　　　　AHC must collaborate with the appropriately trained medical staff when evaluating a request for
　　　　pre-service.

　　　　AHC must automate pre-service request, approvals, denials and member notification as expenditiously as
　　　　possible.

　　　　AHC must implement systems capable of capturing, tracking, trending, and reporting UM data throughout
　　　　the organization.        **CMS EXHIBIT**

**PAGE 29**

*CMS Medicare Managed Care Monitoring Report* 
**Monitoring Review Results (Initial Report)**           Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

AHC must incorporate pre-service denials as apart of their UM reporting structure and develop internal process to evaluate UM process.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*

## HPMS

## Monitoring Review Results (Initial Report)

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

Date Report Generated:6/16/2005

**Findings:**NOT MET                    Review ID:5517
**Region:**04 Atlanta
**Contract Number:**H1034          Organization Name:AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3       **Visit Start Date:**05/10/2005
**Monitoring Element:**OP02          **Exit Conference Date:**05/12/2005
**Review Type:**Focused          **Date Report Issued:**
**Review Status:**Confirmed          **Date Report Due:**06/26/2005
**Element Reviewer:**TRINA ROBERTS          **MCO Response Due Date:**
**CAP Reviewer:**Sondra Rothwell          **CAP Released Date:**
**MCO Response Received Date:**          **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
Standard Pre-Service Denials (Notice Content) - If the MAO makes an adverse standard pre-service organization determination, the written CMS-10003-NDMC (Notice of Denial of Medical Coverage), or an RO-approved modification of the NDMC, must be sent to the member and must clearly state the service denied and denial reason.

**Deficiencies**
Based on review of policies and procedures, interviews with AHC staff, and review of Standard Pre-Service Denial files, Americas Health Choice Medical Plan (AHC) did not issue pre-service denial notifications according to CMS regualtions.

Review of documents provided reveals AHC failed to notify members  when services were denied or did not notify members at all when the MAO ruled to deny services. Failure to notify members of a pre-service denial compromises a member's right to exercise his/her appeal rights.
This was evident by 19 of 30 cases reviewed failed to provide documentation of member notifications.

Although the pre-service request is an automated system the member notification component of the process however, is a manual operation. This manual process consist of AHC staff going into a separate computer program to manually input the service denied and a denial reason. Review of the data found conflicting dates from when the denial was inputed into the system and when the manual letter was generated in the separate computer program.

Case#12 classified as pre-service denial. Request was entered into automated system and denied sample reviewed contained hand written note "accidently denied"

Case#19 request for follow up and chemotherapy patient with history of metastatic carcinoma. Request denied in automated system sample contained no denial notification to member. Computer history show where case had been voided in the system.

Case#20 request for follow up denied same day request recieved.  Additional documentation show request later approved no documentation of member notification denial or approval.

Because 19 of 30 samples reviewed did not include complete documentation of member denial notifications this element was not met.

**Corrective Action Required**
AHC must re-evaluate it's current pre-service policy and procedure revise as necessary and adhere to policy as written.

AHC must make certain appropriate staff are trained on pre-service policy and procedures when approving and/or denying request.

*CMS Medicare Managed Care Monitoring Report*

**HPMS**

**Monitoring Review Results (Initial Report)**          Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

AHC must collaborate with appropriately trained medical staff when evaluating a request for pre-service.

AHC must automate pre-service requests, approvals, denials and member notifications as expenditiously as possible.

AHC must implement systems capable of capturing, tracking, trending, and reporting UM data throughout the organization.

AHC must incorporate pre-service denials as apart of their UM reporting structure and develop internal process to evaluate UM process.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*      **HPMS**

**Monitoring Review Results (Initial Report)**      Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET      **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034      **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3      **Visit Start Date:**05/10/2005
**Monitoring Element:**RC01      **Exit Conference Date:**05/12/2005
**Review Type:**Focused      **Date Report Issued:**
**Review Status:**Confirmed      **Date Report Due:**06/26/2005
**Element Reviewer:**gwyneveyre pasquale      **MCO Response Due Date:**
**CAP Reviewer:**      **CAP Released Date:**
**MCO Response Received Date:**      **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**

Favorable Claims Reconsiderations (Timeliness) - If the MAO makes a reconsidered determination on a request for payment that is completely favorable to the member, it must issue written notice of its reconsidered determination to the member and pay the claim no later than 60 calendar days after receiving the reconsideration request.

**Deficiencies**

Based on the review of eight (8) WS-RC1 case files, America's Health Choice Medical Plan (AHC) substantially failed to issue notices of favorable claims reconsiderations to members, or to pay the claims no later than 60 calendar-days after receiving the reconsideration requests. This is a repeat deficiency. (Ten case files were requested, but two of the files were found to be misclassified - they were actually unfavorable claims reconsiderations.)

Based on information in the files, all of the cases reviewed were noncompliant. None of the files contained a written notice to the member of favorable claim reconsideration. During the appeals discussion, the AHC manager responsible for appeals stated that he was unaware of CMS's requirement to notify members in writing of favorable reconsideration determinations.

Documentation in the files was severely lacking. As a result, in six of the eight cases reviewers were unable to determine the time elapsed between receipt of the reconsideration request and payment of the claim in dispute. For the two remaining cases, payment was timely.

One file (#3) contained a puzzling discrepancy between crucial dates. Specifically, the claim payment was dated almost two months prior to receipt of the appeal request. This raises serious concerns about the integrity of documentation provided to reviewers.

**Corrective Action Required**

I. AHC must develop the following:

1. Criteria and a schedule for monitoring the performance of staff who handle appeals (Please send the criteria and schedule to CMS)

2. Single electronic system for tracking and trending appeals (Please send monthly reports of system development progress)

3. Method for maintaining, in a secure place (i.e., not a trailer already known to be susceptible to storm damage) all appeal documentation

4. Date logic to program into the electronic appeal system to prevent date discrepancies (Please send CMS the date logic to be used)

5. Correspondence templates (based on CMS models) for informing members that AHC has overturned its original denial, or has forwarded it to the independent review entity (Please send CMS these templates)

II. In addition, on a monthly basis please complete Worksheet RC1 for a sample of 5 favorable claims

*CMS Medicare Managed Care Monitoring Report*    **HPMS**
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

reconsiderations, and send CMS the completed worksheet along with supporting documentation, including but not limited to: the initial denial notice, documentation of appeal receipt, member and AHC correspondence, and documentation of the date AHC paid the claim.  Please do NOT include medical records.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report* 

**Monitoring Review Results (Initial Report)**

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

Date Report Generated:6/16/2005

**Findings:**NOT MET                    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3     **Visit Start Date:**05/10/2005
**Monitoring Element:**RC02                                          **Exit Conference Date:**05/12/2005
**Review Type:**Focused                                             **Date Report Issued:**
**Review Status:**Confirmed                                         **Date Report Due:**06/26/2005
**Element Reviewer:**gwyneveyre pasquale                            **MCO Response Due Date:**
**CAP Reviewer:**                                                   **CAP Released Date:**
**MCO Response Received Date:**                                     **CAP Accepted Date:**
**Element  Projected Completion Date:**

**Requirement**

Adverse Claims Reconsiderations (Timeliness) - If the MAO affirms, in whole or in part, its adverse organization determination, or fails to provide the member with a reconsideration determination within 60 days of receipt of the request (which constitutes an affirmation of its adverse organization determination),  it must forward the case to CMS's independent review entity no later than 60 calendar days after receiving the reconsideration request. The MAO concurrently notifies the member that it has forwarded the case to CMS's independent review entity.

**Deficiencies**

Based on the review of nine (9) WS-RC2 case files, America's Health Choice Medical Plan (AHC) substantially failed to forward adverse claims reconsiderations to CMS's independent review entity or to notify members of its decisions.  (Ten case files were requested, but AHC failed to provide one of them.)

Based on information in the files, all of the cases reviewed were noncompliant.  Of the nine files reviewed, only three contained evidence of forwarding to CMS's independent review entity.  None of these three were forwarded in a timely manner, and only two included concurrent notification to the member. (These were also the only two files that included any member notification at all.)

Documentation in the files was severely lacking.  In addition, documentation in two of the files contained puzzling discrepancies between crucial dates.  Specifically, in one case (#1), what appeared to be the initial denial notice was dated three months after the appeal request was received, and in another case the initial notice was dated one month after the appeal request (#2).  This raises serious concerns about the integrity of documentation provided to reviewers.

**Corrective Action Required**

I. Please see item I. of the Corrective Action Required for Element RC01.

II. In addition, on a monthly basis please complete Worksheet RC2 for a sample of 5 unfavorable claims reconsiderations, and send CMS the completed worksheet along with supporting documentation, including but not limited to: the initial denial notice, documentation of appeal receipt, member and AHC correspondence, and documentation of the date AHC sent the case to CHDR. Please do NOT include medical records.

**Notes/Recommendations**



**CMS EXHIBIT**
**PAGE 35**

*CMS Medicare Managed Care Monitoring Report* 
**Monitoring Review Results (Initial Report)**    Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034    **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3    **Visit Start Date:**05/10/2005
**Monitoring Element:**RC03    **Exit Conference Date:**05/12/2005
**Review Type:**Focused    **Date Report Issued:**
**Review Status:**Confirmed    **Date Report Due:**06/26/2005
**Element Reviewer:**Sondra Rothwell    **MCO Response Due Date:**
**CAP Reviewer:**Sondra Rothwell    **CAP Released Date:**
**MCO Response Received Date:**    **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**
　　　　Effectuation of Third Party Claims Reconsideration Reversals - If the MAO's determination is reversed in whole or in part by the independent review entity, the MAO must pay for the service no later than 30 calendar days from the date it receives the notice reversing the organization determination.  The MAO must also inform the independent review entity that the organization has effectuated the decision.If the determination of the MAO is reversed in whole or in part by an ALJ, or at a higher level of appeal, the MAO must authorize or provide the service under dispute as expeditiously as the member's health requires, but no later than 60 days from the date it received notice of the reversal.

**Deficiencies**
　　　　Based on the review of the effectuation of claims reversal, it was determined that the MAO's appeals process and tracking system was inadequate. Dates were inconsistent throughout the documents that were reviewed. Actual appeal letters from providers were not available or if available they were not consistent with the dates that were provided to MAXIMUS Center for Health Dispute Resolution (MAXIMUS CHDR). Due to the insufficient record keeping, CMS was unable to determine if the effectuation process was followed according to CMS guidelines.

　　　　Review of the Medicare Managed Care Reconsideration Background Data Form provided to CHDR when submitting reconsideration decisions, the dates were inconsistent with information provided in the files for reconsideration. Interviews with AHC staff for explanation / clarification of the inconsistent data provided reveals AHC management unable to articulate reasoning or rationale of timeline of date provided to CHDR for consideration.

**Corrective Action Required**
　　　　The MAO must provide and maintain accurate information regarding appeals cases that will be sent to Maximus CHDR.  The MAO must provide training to the staff who will be responsable for appeals.  This training must include safe and proper recording keeping, information that should be submitted to Maximus CHDR and accurate data submission.  Please submit training material and a list names who attended the training.  In addition, the MAO must conduct a monthly audit to assure that the information is being sent to Maximus CHDR is accurate and sufficient.

**Notes/Recommendations**

*CMS Medicare Managed Care Monitoring Report*
**Monitoring Review Results (Initial Report)**

**HPMS**

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET                    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034        **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3        **Visit Start Date:**05/10/2005
**Monitoring Element:**RP01        **Exit Conference Date:**05/12/2005
**Review Type:**Focused        **Date Report Issued:**
**Review Status:**Confirmed        **Date Report Due:**06/26/2005
**Element Reviewer:**gwyneveyre pasquale        **MCO Response Due Date:**
**CAP Reviewer:**        **CAP Released Date:**
**MCO Response Received Date:**        **CAP Accepted Date:**
**Element Projected Completion Date:**

**Requirement**

Favorable Standard Pre-Service Reconsiderations (Timeliness) - If the MAO makes a fully favorable decision on a standard pre-service reconsideration, it must issue a decision to the member, and authorize or provide the service, as expeditiously as the member's health requires, but no later than 30 calendar days after receiving the reconsideration request (or an additional 14 calendar days if an extension is justified).

**Deficiencies**

Based on the review of five (5) WS-RP1 case files, America's Health Choice Medical Plan (AHC) substantially failed to issue notices of favorable pre-service reconsiderations to members, or authorize or provide the services timely.

Based on information in the files, all of the cases reviewed were noncompliant. None of the files contained a written notice to the member of favorable pre-service reconsideration. During the appeals discussion, the AHC manager responsible for appeals stated that he was unaware of CMS's requirement to notify members in writing of favorable reconsideration determinations.

Documentation in the files was severely lacking. As a result, in two of the five cases reviewers were unable to determine the time elapsed between receipt of the reconsideration request and authorization or provision of the service. Of the remaining three cases, two were authorized or provided late, and the third contained a puzzling discrepancy between crucial dates. Specifically, the authorization was dated prior to receipt of the appeal request. Based on examination of system screen prints, it appears that when an authorization is denied and later approved, the initial denial date remains in the system as the approval date. This raises serious concerns about the integrity of documentation provided to reviewers.

AHC's egregious failure to abide by appeals regulations is well demonstrated by the chronology of events documented in the file for case #1. The file contains appeal letters from the member dated 2/7/2004, 5/29/2004, 6/2/2004, and 10/7/2004. There is no record that AHC ever responded to this member's concern in writing. The member's 10/7/2004 correspondence is partially reproduced below to illustrate AHC's lack of responsiveness to member appeals, and to member concerns in general:

"I am requesting that the following information regarding my appeal... be reviewed by an appeal coordinator and a determination communicated to me. I sent the original appeal letter in May of this year. After hearing nothing from the plan for over a month, I began making calls to inquire about what may have happened to my appeal. I have made numerous phone calls to the health plan 800 number in the past few months. Each time I get transferred to different voice mail boxes where I leave messages requesting a return call to discuss my appeal. I have never received a call back from anyone."

**Corrective Action Required**

I. Please see item I. of the Corrective Action Required for Element RC01.

*CMS Medicare Managed Care Monitoring Report*

**Monitoring Review Results (Initial Report)**

HPMS

Date Report Generated:6/16/2005

Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

    II. In addition, on a monthly basis please complete Worksheet RP1 for a sample of 5 appeal files, and send CMS the completed worksheet along with supporting documentation, including but not limited to: initial denial notice, documentation of appeal receipt, member and AHC correspondence, and documentation of the date AHC authorized or provided the service. Please do NOT include medical records.

**Notes/Recommendations**

**HPMS**

*CMS Medicare Managed Care Monitoring Report*
**Monitoring Review Results (Initial Report)**          Date Report Generated:6/16/2005
Category: All, Element: All, Finding:MET WITH NOTE, NOT MET, Reviewer:All,

**Findings:**NOT MET                    **Review ID:**5517
**Region:**04 Atlanta
**Contract Number:**H1034          **Organization Name:**AMERICA'S HEALTH CHOICE MEDICAL PLAN

**Monitoring Guide Version:**MA Monitoring Review Guide, Version 3     **Visit Start Date:**05/10/2005
**Monitoring Element:**RP02                                          **Exit Conference Date:**05/12/2005
**Review Type:**Focused                                              **Date Report Issued:**
**Review Status:**Confirmed                                          **Date Report Due:**06/26/2005
**Element Reviewer:**gwyneveyre pasquale                             **MCO Response Due Date:**
**CAP Reviewer:**                                                    **CAP Released Date:**
**MCO Response Received Date:**                                      **CAP Accepted Date:**
**Element  Projected Completion Date:**

**Requirement**
> Adverse Standard Pre-Service Reconsiderations (Timeliness) - If the MAO is unable to make a fully
> favorable decision on a standard pre-service reconsideration, it must forward the case to CMS's
> independent review entity as expeditiously as the member's health requires, but no later than 30 calendar
> days after receiving the reconsideration request (or an additional 14 calendar days if an extension is
> justified).   The MAO must concurrently notify the member of this action.

**Deficiencies**
> Based on the review of two (2) WS-RP2 case files, America's Health Choice Medical Plan (AHC)
> substantially failed to forward unfavorable standard pre-service reconsiderations to CMS's independent
> review entity in a timely manner, and to notify members of this action.  This is a repeat deficiency.

> Neither of the two files reviewed was compliant.  In one of the files, there was no documentation of any
> of the items reviewed on WS-RP2.  For example, the case file did not contain documentation of the
> member's reconsideration request, AHC's decision, or mailing to the independent review entity.

> In the other file, there was documentation that the case was sent to the independent review entity timely
> and that the member was notified of this action.  However, the member was notified that the case was being
> sent a full six days before the case was actually sent, even though the notification is to occur
> concurrently.

> In addition to the above, it should be noted that it is highly irregular for there to only be two
> unfavorable pre-service reconsiderations during a six month period for an organization with 16 thousand
> members.  The small size of the universe may be due to the fact that AHC members are unaware of either
> denials or appeal rights because AHC substantially failed to provide members with written denial notices
> and appeal rights, per the deficiency cited in OP01.

**Corrective Action Required**
> I. Please see item I. of the Corrective Action Required for Element RC01.

> II. In addition, on a monthly basis please complete Worksheet RP2 for a sample of 5 appeal files, and
> send CMS the completed worksheet along with supporting documentation, including but not limited to:
> initial denial notice, documentation of appeal receipt, member and AHC correspondence, and
> documentation of the date AHC sent the case to the independent review entity.  Please do NOT include
> medical records.

**Notes/Recommendations**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICA'S HEALTH CHOICE MEDICAL PLANS, INC.,    ) ) ) ) | |
| Plaintiff,    ) ) | |
| v.    ) ) | Civil Action No. 06-2064 (RWR) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES,    ) ) ) | |
| Defendant.    ) ) | |

### ORDER FOR PRELIMINARY INJUNCTION

Upon consideration of Defendants' Expedited Motion to Clarify and/or Reconsider the Court's December 21, 2006 Order for Preliminary Injunction motion, the pleadings and arguments of counsel on Plaintiff's Motion for Preliminary Injunction, and all of the pleadings and papers filed in this action, this Court finds and concludes as follows:

WHEREFORE, for good cause shown, IT IS on this ___ day of _____ 2006,

ORDERED that Defendants' Expedited Motion to Clarify and/or Reconsider the Court's December 21, 2006 Order for Preliminary Injunction be, and hereby is, DENIED.

_____
United States District Court Judge

Deborah B. Baum, DC Bar #393019
Matthew Anzaldi
Samantha Mazo
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C.  20037
(202) 663-8492

*Plaintiff*


Sheila Leiber, Esq.
Heather R. Phillips, Esq.
James Luh, Esq.
United States Department of Justice
Civil Division/Federal Programs
20 Massachusetts Ave., N.W., Room 7222
Washington, D.C.  20001

Daniel Wolfe, Esq.
Office of the General Counsel
Centers for Medicare & Medicaid Services
1301 Young Street, Suite 1138
Dallas, Texas 75202

*Defendant*